UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS


MASSACHUSETTS INSTITUTE OF          )
TECHNOLOGY,                         )
                                    )
     Plaintiff,                     )
                                    )
                                    )     Civil Action
vs.                                 )     No. 1:10-cv-12186-RWZ
                                    )
MEVION MEDICAL SYSTEMS, INC.,       )
                                    )
     Defendant.                     )



**NON-JURY TRIAL**
**DAY ONE - SECOND SESSION**



BEFORE SPECIAL MASTER GALE R. PETERSON


UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
February 8, 2012
1:30 p.m.



*   *   *   *



HELANA E. KLINE, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
helanakline@aol.com

APPEARANCES:

For the Plaintiff:

PROSKAUER ROSE, LLP
By:  Sharada Devarasetty, Esq.,
     and Steven M. Bauer, Esq.
     One International Place
     22nd Floor
     Boston, MA  02110


For the Defendant:

SHEPPARD MULLIN RICHTER & HAMPTON,
LLP
By:  Nathaniel Bruno, Esq.
     Four Embarcadero Center
     17th Floor
     San Francisco, CA  94111

-and-

SHEPPARD MULLIN RICHTER & HAMPTON LLP
By:  Russell B. Hill, Esq.
     650 Town Center Drive
     4th Floor
     Costa Mesa, CA  92626

I N D E X


Witnesses called on behalf of the Plaintiff:


Testimony of:


Timothy A. Antaya, Ph.D.


                        Direct Cross Redirect Recross

By Ms. Devarasetty                      5, 37
By Mr. Hill                                          32

JOSEPH V. MINERVINI, PH.D.

By Ms. Devarasetty        41              77
By Mr. Bruno                      43

WILLIAM HASSENZAHL, PH.D.

By Ms. Devarasetty        93              112, 121
By Mr. Hill                      95                  118

Witnesses called for the Defendant:

ROGER D. MCWILLIAMS, PH.D.

By Mr. Hill              126              166
By Ms. Devarasetty              127

E X H I B I T S

| Nos. | Page |
|------|------|
| 62, 77, 106, 419, 420, 421, 422, 423 | 93 |
| 98, 65 | 94 |
| 4, 9, 11, 43, 47 | 124 |
| 70, 79, 81, 89, 99 | 124 |
| 103, 107, 110 | 124 |
| 305, 306, 307, 308 | 124 |
| 312, 313, 314, 315 | 124 |
| 325, 341, 413, 414, 417 | 124 |
| 103E | 124 |
| 100 | 126 |
| 80, 82, 117 | 127 |
| 86, 87, 106, 108, 111 | 178 |
| 605, 606, 619, 620, 630, 631, 632, 633, 634 | 178 |
| 635, 636, 637, 638, 639, 640, 641, 642, 643 | 178 |
| 646, 650, 652 | 178 |
| 452 | 179 |
| 101 | 179 |

P R O C E E D I N G S

(Timothy A. Antaya, Ph.D., previously duly sworn.)

SPECIAL MASTER PETERSON:  Thank you.  Please be seated.

MR. HILL:  It's second nature to stand up in the courtroom.

SPECIAL MASTER PETERSON:  I know.  All right.  Do we have everyone back from lunch, everybody we need?

MR. HILL:  We have the necessary parties.

SPECIAL MASTER PETERSON:  All right, good.  Ready to start?  I believe we were on redirect examination.  You may proceed when you're ready.

MS. DEVARASETTY:  Thank you, your Honor.  Do you mind switching the computers from yours to ours?

SPECIAL MASTER PETERSON:  Not at all, oops.

REDIRECT EXAMINATION BY MS. DEVARASETTY:

Q.  Dr. Antaya, just so that I can -- oh, I'm sorry.  Do you understand that you're still under oath?

A.  Yes.

Q.  Counsel asked you a number of questions on direct examination, and I just want to follow up on a couple of those things.

First, a very short question on royalties.  If you're named as an inventor on the '311 patent, do you receive -- and only just that, that action happens, that you're named

1    as an inventor, do you receive any increased compensation

2    from that?

3    A.   I don't know the answer to that question.

4    Q.   I'm going to turn your attention to your deposition

5    testimony; that's Exhibit 96, in the binders.  I'm going to

6    turn your attention to Page 220.

7         SPECIAL MASTER PETERSON:  Did you say Page 220,

8    counsel?

9         MS. DEVARASETTY:  Yes, I did.

10        SPECIAL MASTER PETERSON:  You've got 201 on the

11   screen.

12        MS. DEVARASETTY:  I do.  I see that.

13   Q.   I'm sorry.  I did make, instead of -- I did say "220,"

14   but I meant 201, I'm sorry.

15   A.   Okay, I'm there.

16   Q.   Okay.  So there you said in response to a question:

17   "If you're named as an inventor on the patent and royalties

18   are received that you will receive compensation," is that

19   right?

20   A.   Yes.

21   Q.   And so it's true that you don't receive compensation

22   financially if you're only named as an inventor but only if

23   MIT receives royalties on that patent, is that right?

24   A.   Yes.

25   Q.   So if MIT -- if you're named and MIT doesn't receive

1    the patent, you don't get royalties; is that correct?

2    A.   Correct, right.

3    Q.   And, currently, you receive royalties on the MIT

4    patents on the high-field synchrocyclotron, correct?

5    A.   Yes.

6    Q.   And if MIT licenses this additional patent on the

7    high-field synchrocyclotron, would you expect that MIT

8    would license that for additional royalties?

9    A.   I think that you would have to ask the Technology

10   Licensing Office at MIT.  It's not something that I think

11   about or am concerned about.

12          SPECIAL MASTER PETERSON:  Excuse me.  Counsel, when

13   you refer to in your question this additional patent, you're

14   referring to the '311 patent?

15          MS. DEVARASETTY:  That's correct, your Honor.

16          SPECIAL MASTER PETERSON:  All right.

17   Q.   Dr. Antaya, counsel asked you a number of questions

18   about -- you can put your deposition testimony away now.

19   Thank you.

20   A.   All right.

21   Q.   Counsel for Mevion asked a number of questions about

22   statements you've said in e-mails --

23   A.   Yes.

24   Q.   -- and I would like to clarify some of those statements

25   that you made and ask you what you meant by them, so I'm

1    going to ask you to turn to Exhibit 1; and if we could

2    focus on the first paragraph of the first e-mail there?

3    A.   All right, I'm there.

4    Q.   Okay.  There you stated:  "Your spec requirements for

5    extracted beam are going to make this very straight forward,

6    which is good because that will be a step in other spaces."

7         First, what did you mean by "this is going to be very

8    straight forward"?

9    A.   Yes.  My recollection is that Ken's aim was 50%

10   extraction efficiency.  For most of the years that I led

11   the beam development program on the big, on the two

12   superconducting synchrocyclotrons at Michigan State, we

13   were always pushing for 90 or 95% extraction efficiency;

14   and, in general, all of the existing synchrocyclotrons only

15   had around 10%, and so he was sort of between what the

16   synchrocyclotrons had done and what I'd done at Michigan

17   State so that it didn't hit me as, as, "of course," so

18   that's what I meant, that the extracted beam spec was

19   straight forward.

20   Q.   Okay, and then what did you mean by "step in other

21   spaces"?

22   A.   You know, exactly what we've discussed before, that it

23   was, you know, a very high-field accelerator in which you

24   had to get this, you know, this high quality magnetic field

25   because cyclotrons depend on the magnetic field, and so we

1    knew it was going to be hard in other areas; that's what I

2    meant by "step in other spaces."

3    Q.   And those spec requirements from the extracted beam

4    didn't make that hard process of designing the magnet any

5    easier, did it?

6    A.   No, absolutely not.  It just meant that one area was,

7    is -- was, was, you know, you know, sort of in the

8    wheelhouse.

9    Q.   I'm going to turn your attention to Exhibit 30.

10   A.   All right, I'm there.

11   Q.   And I believe it's the third paragraph of the document.

12   A.   Yes.

13   Q.   And this is a phrase that you often use, isn't it:

14   "I don't expect to create any new science, but I do not

15   wish to repeat old errors," in relationship to this project?

16   A.   Yes.

17   Q.   And what did you mean by saying it here?

18   A.   Here it's difficult to recall what we were discussing.

19   Possibly, I had sketched on the white boards outside of my

20   office some different modes of operating the system with

21   different dees and different harmonic numbers for the

22   acceleration.

23       That's my best guess at it, and I had done that to

24   explain this to the, you know, engineers at MIT, and I

25   think Ken may have been involved in that discussion.  And

1    so when I say, you know, "not create any new science," what

2    I'm really talking about is, you know, saying:  We're not

3    going to invent a new way of doing feasibility essentially.

4    I just don't want -- you know, when you're doing something

5    new, you just want to -- you know, you just don't want to

6    make errors that others have made before so....

7    Q.   So, for example, you're not creating a new type of

8    superconductor for this magnet; you're using known

9    superconducting technologies but perhaps in new ways?

10   A.   Yes.  So when you say that you're gonna do a very

11   high-field superconducting synchrocyclotron, you have to

12   choose the technology balance carefully, so you want most

13   of it to be something that you already know and then you put

14   in a couple of areas, and so where you -- you know, the more

15   that you don't have to push, the more robust it is; and since

16   this was a clinical application, you know, that was one of

17   the aims.

18   Q.   Do you remember Dr. Gall talking in this tutorial about

19   how all the principles of superconducting magnets were well

20   known prior to 2001?

21   A.   Yes.

22   Q.   So in your opinion were all the principles of

23   superconductors, superconductivity that were applied to

24   this magnet well known in 2001?

25            MR. HILL:  Objection.  It goes beyond the scope of

1    cross-examination.

2         SPECIAL MASTER PETERSON:  I'll allow it.

3    A.   Absolutely not, because you see that to design an

4    advanced magnet you need benchmark tools, so you've got to

5    have codes that can do the thermal stability, and the quench

6    and the forces, and all those have to be benchmarked ... and

7    so you build up within a group a very specialized knowledge

8    to do the engineering that isn't readily available, and so

9    Joe Minervini's group, you know, had an extraordinary

10   capability for 20 years of leading the development of

11   advanced magnets for fusion, and that was not widely known

12   unless one encountered Joe's group.

13       And you can do that for every superconductivity group,

14   the group we had at Michigan State, for example, the group

15   that's at Berkley now, all of the advanced methods that

16   allow you to advance the state-of-the-art are not in

17   textbooks.  Textbooks are 10 years or 20 years behind, so,

18   so when you're -- when you're, you know, trying to repeat

19   what others have done, you know, maybe that's useful; but

20   when you're trying to do something new, you need all very

21   carefully benchmarked set of tools, and those are not --

22   those are not in the literature.

23   Q.   So just so I can understand it, and you can explain it

24   to the Court, niobium-3-tin was a known superconductor for

25   awhile, but why was the application to this particular

1   magnet something that was new and innovative?

2   A.   In fact, niobium-3-tin was practically the first

3   superconductor that was made on an engineering scale, and

4   it is the case that it has to be reacted, and after

5   reaction it's brittle; but there is an exceptional

6   advanced engineering problem in this magnet that has to be

7   surrounded; and it's that, because of the -- and I'd almost

8   need a whiteboard to draw this, but the return yoke on the

9   outside of the cyclotron makes the flux come back in the

10  other direction.  And so it means that the field-in

11  cyclotron is, let's say, up inside on the poles and down

12  outside in the return yoke.

13      Well, it has to -- the flux has to go through zero

14  somewhere; and because of the topology of the

15  superconducting cyclotrons, that happens inside the coil ...

16  so part of the coil, the inner part of the coil, sees a

17  force that wants to push it outward, and this force is

18  huge; it's beyond the strength of most materials.

19      The back part -- the middle of the coil sees no force

20  and the outside of the coil sees a small inward force, and

21  it's this outward force on the inside that's, that's very,

22  very difficult to deal with.

23      If you put structure there, you lower the current

24  density, and so what we had to do was distribute this high

25  inward force throughout the whole winding path so that the

1    magnet wouldn't break, basically, and that was, that was,

2    that was --

3    Q.   Let me ask you another question.

4    A.   Yes, sure.

5    Q.   Was that task of dealing with the forces more difficult

6    because you had a brittle conductor?

7    A.   No, it's just fundamentally the whole force that a

8    circular winding sees when there's a large amount of flux on

9    the inside of it.

10   Q.   And how many cyclotrons before the cyclotron that

11   you designed for Still River used niobium-3-tin as a

12   superconductor?

13   A.   None.

14   Q.   Dr. Antaya, I'd like to talk to you a little bit about

15   your scaling model.

16   A.   Okay.

17   Q.   Can you sum up sort of briefly for the Court what

18   exactly your scale model does to improve the design process

19   for a superconductor, for a magnet, for a cyclotron?

20   A.   Yes, I'd be happy to.  The challenge we had was to --

21   you know, the desire was to, to go fast, to get this system

22   into hospitals where it could do good, and we couldn't use

23   the normal long involved engineering process; and, anyway,

24   it didn't look like funds were available, so we were trying

25   to do -- what I was trying to do was short circuit that

1    process.

2         The way you do it is to find a rule that allows you to

3    scale this built in set of orbit properties.  What I call

4    the equilibriums orbits.  These are the nested set of high-

5    quality orbits that particles can follow in acceleration.

6         And the, the way you do that is that you recognize that

7    the way you start the process is you recognize that the

8    orbits change the most in the center.  The spiral orbits

9    are larger in the center, and they get really close

10   together.  So you start in the center, and you say:  how

11   can I make two orbits from two different cyclotrons be the

12   same with different harmonic numbers; that's the ratio of

13   the RF frequency to the orbital efficiency of the ion, a

14   different ion even, and a different field.

15        And in that particular problem, all three kinds of

16   cyclotrons:  the classical, the synchrocyclotron, and the

17   isochronous cyclotron in the center, the radio dependence

18   of the magnet field is different, but in the center region

19   where you're starting they're the same.

20   Q.   Dr. Antaya, let me just stop you for one minute.

21   A.   Sure.

22   Q.   I just put up your scaling model on the screen, the

23   small one?

24   A.   All right.

25   Q.   And you circled -- this is Exhibit No. 326?

1    A.   Yes.

2    Q.   And in the top right-hand corner, you have something

3    circled there.  It says:  "Aim:  Change" --

4    A.   Yes.

5    Q.   -- "B, V, Q, E and keep same orbit geometry," correct?

6    A.   Yes.

7    Q.   And so does that mean that what you were trying to do

8    was keep the magnetic field you're going -- well, why don't

9    you explain what that means?

10   A.   Well, what it means is what I was trying to do was

11   find a way to change the magnetic field, that's B; the

12   accelerating voltage, B, the charge of the ion ... so the

13   ion in the final energy, that I was trying to find a way to

14   change all four of those and say that the orbits were as

15   good in the new machine as in the old machine, all right;

16   and if you go, can you go further in that, go --

17   Q.   Tell me what page you'd like me to flip through?

18   A.   About Page 6.  Go one more.  Okay, so you get two

19   results, and what's cool about this is it works for any of

20   the cyclotrons; and the first one is that the orbits will

21   never be the same if you change the cyclotron harmonic

22   frequency; this ratio of the RF voltage to the particle

23   orbit.  So if you change that ratio, the orbits will never

24   be the same, but the second equation is this one that's

25   called K Star, and it's labeled Equation 6 on the bottom,

1    and it's the energy gained per revolution, so how much ion

2    is gained in one orbit, and then some constants, and then

3    the characteristic constant di notte, which is a reference

4    voltage for the RF system; and then, and then some gamma

5    squared, and then a term in brackets, okay.

6        So that what you have is that if this ratio is the same

7    for two different orbits, for two different sets of orbits,

8    not just a particular orbit but for two different sets of

9    orbits, then the two machines would be equivalent, and I

10   then know that; I don't have to go any further and spend,

11   you know, significant engineering resources to defend it.

12   The design will work, so I use that.

13       So I have two different machines and they have two

14   different K constants, I set them equal and I say, you know,

15   I've got a bunch of constants divided by some terms coming

16   from the magnetic field ... and so I have something like a

17   Constant C divided by something like the radius squared

18   times a reference, a reference field value, all right?

19       What I did is I said:  All right, let's take the pole

20   radius out of the machine, all right?  So let's normalize

21   the radius of the machine.  So we let the radius go from

22   zero to one instead of from zero to the pole radius, so I

23   divided out the value of the pole radius; and for the

24   synchrocyclotron, you get a constant divided by the radius

25   to the power minus 2N, where N is the field index, okay,

1     so -- and so it's a couple steps from this, from this,

2     from where I am here at the end of 2003.

3         So now I have a pair, a set of orbits, that will be

4     equal under some condition; and I said:  I'll let those two

5     sets of constants be equal.  Later I have to come back and

6     verify that letting those sets of constants be equal be

7     equal; and when you do that, in the scale radius value, it

8     says simply that the field index in the scaled radius, the

9     rate's going from zero to one, you'll have the same orbits

10    if the field index and the scaled variables are equal, all

11    right.

12        Okay.  So now what I told Radovinsky to do was --

13            SPECIAL MASTER PETERSON:  Let me stop you at that

14    point.

15            THE WITNESS:  Sorry.

16            SPECIAL MASTER PETERSON:  He may have gone beyond

17    your question.

18            MS. DEVARASETTY:  Yes.

19    A.   All right, sorry.

20    Q.   So let me ask you just a very short question --

21    A.   Sure.

22    Q.   -- how does your scaling model, orbit scaling, compare

23    to the -- this simple relationship of the increasing

24    magnetic field and decreasing the radius of a cyclotron?

25    A.   Yes.  So it says something, so the simple momentum

1    scaling tells you something about one orbit, but the ions

2    in the cyclotron have to go from the center to the edge.

3    And so you have to, you have to prove that you can get them

4    from the center to the edge, and what the scaling law allows

5    you to do is say:  This set of orbits is good for this new

6    machine at a new field, a new operating voltage and even a

7    new ion, all right?  And, and so what it, what it did

8    immediately was give me an engineering prescription, which

9    I could give to Radovinsky to apply it.  So when you look at

10   my notes from May of 2004 --

11   Q.   Let me slow you down a little bit.

12   A.   Okay, sure.

13   Q.   So you said that you gave the scaling model to

14   Dr. Radovinsky and asked him to apply it, is that right?

15   A.   Yes.

16   Q.   And about how long did it take Dr. Radovinsky to come

17   up with a magnet design that would satisfy the criteria of

18   the high beam dynamics you gave to him?

19   A.   Roughly a month.

20        SPECIAL MASTER PETERSON:  Yeah, let me just comment

21   on that.  Kind of like the questions we had before noon,

22   the seven months between the log and when you're doing this,

23   when you speak of a month, and let's make the record clear

24   on this, I guess, from this point on:  is that a month of

25   man hours?

1          THE WITNESS:  Yes.

2          SPECIAL MASTER PETERSON:  A month of man hours?

3          THE WITNESS:  Yes.

4          SPECIAL MASTER PETERSON:  Working full time on that

5     project?

6          THE WITNESS:  Yes, and he, and he started

7     approximately the beginning of June of 2004 when we had

8     funding to use his services.

9          SPECIAL MASTER PETERSON:  All right.

10    A.   Okay.

11    Q.   Let me --

12    A.   Yes.

13    Q.   -- refer you to exhibit -- actually, let me ask you a

14    different question before I go there.

15         How long would you expect that design to take, have

16    taken if there was no scaling model?

17    A.   We, Joe and I, and my colleagues at MIT had been --

18    were working last year on a new cyclotron design; and in

19    a year of work in the field involving me and one of my

20    students and a designer and an engineer we got to a

21    preliminary design magnetic field in a year, so about

22    two-and-a-half man years worth of effort to get to

23    preliminary design, and, here, we got to a field with a

24    much higher quality in about a month, one person.

25    Q.   Can I ask, and can you tell me what Dr. Radovinsky's

1   work background was; does he have a Ph.D.?

2   A.   He has a Ph.D., yes.

3   Q.   And in 2001 did he have experience in doing magnet

4   design?

5   A.   He was a mechanical engineer with experience in magnet

6   design, yes.

7   Q.   And about how much experience, if you know, that he had

8   in 2001 or, I'm sorry, 2004?

9   A.   Of order, 15 years or so.

10  Q.   I'm going to turn your attention to Exhibit 443.

11       SPECIAL MASTER PETERSON:  Are we leaving the law at

12  this stage?

13       MS. DEVARASETTY:  Yeah, we are leaving -- well, the

14  application of the law; it's not quite leaving the law but

15  the notes.

16       SPECIAL MASTER PETERSON:  All right.  Let me just

17  ask a question then so it fits in with the record at this

18  point:  following up on a question that was asked on

19  cross-examination, has this -- you referred to it as a law;

20  I guess it's a series of equations, right?

21       THE WITNESS:  It's essentially a pair of equations,

22  yes.

23       SPECIAL MASTER PETERSON:  Okay, a pair of equations?

24       THE WITNESS:  Yes.

25       SPECIAL MASTER PETERSON:  Has that -- I understand

1    from the cross-examination that has not been published in

2    any peer-reviewed publications?

3            THE WITNESS:  That's right.

4            SPECIAL MASTER PETERSON:  Has it been published in

5    any publication, peer reviewed or otherwise?

6            THE WITNESS:  No.

7            SPECIAL MASTER PETERSON:  Has it been peer reviewed

8    at all, some shorter publication?

9            THE WITNESS:  We have discussed it with, with, you

10   know, several folks in the cyclotron design business.

11           SPECIAL MASTER PETERSON:  Okay.

12           THE WITNESS:  Yes.

13           SPECIAL MASTER PETERSON:  Well, I guess my question

14   really is:  in the scientific community, how does the

15   scientific community know whether it's right or wrong or

16   just a guess?

17           THE WITNESS:  When we -- so I think the answer would

18   be that the scientific community doesn't know.  The reason

19   for that was that at the time that we developed that we

20   were trying to keep all of the details of what we were

21   doing, you know, quiet, for, for consideration of --

22   you know, it was sponsored research with Still River,

23   and, you know, that discipline is sort of held to, to

24   essentially all of my notes on, you know, all of my own

25   personal engineering notes.

1      I am working on a textbook; I have for about 18 months,

2   and it is in that --

3          SPECIAL MASTER PETERSON:  Okay.

4          THE WITNESS:  So it's coming.

5          SPECIAL MASTER PETERSON:  Okay.  Well, let me, I

6   guess, ask the bottom-line question:  for some of the

7   questions that this Court is asked to address, how does the

8   Court know that those two equations are even correct?

9          THE WITNESS:  I believe that -- well, I believe that

10   they have been invented by the MIT team, but I wasn't a part

11   of that so....

12          SPECIAL MASTER PETERSON:  All right.

13   Q.   Dr. Antaya, there was a magnet design that came out of

14   the scaling law; is that right?

15   A.   Yes.

16   Q.   And so I'm going to refer you to Exhibit 443; this is a

17   presentation by Dr. Radovinsky, is that right?  It's on the

18   screen if you like.

19   A.   Oh, thank you ... all right.

20   Q.   This is a presentation by Dr. Radovinsky, is that

21   correct?

22   A.   Yes.

23   Q.   Is this a presentation that was made -- I'm sorry, and

24   let me flip to Page 6 of this, and this has a chart of, of

25   what, I believe, is a number of different versions of the

1    magnet design; is that right?

2    A.   Yes.

3    Q.   And it shows a number of different code names for the

4    magnet design, one is k250z2-0?

5    A.   Right.

6    Q.   It says that's a direct scaling of a design made by TAA?

7    A.   Yes.

8    Q.   Does that "TAA" refer to you?

9    A.   Yes.

10   Q.   And what does direct scaling of Wu's design mean?

11   A.   That means my scaling law.

12   Q.   And just to clarify your answer, does that mean

13   Dr. Radovinsky applied your scaling law --

14   A.   Yes.

15   Q.   -- and got that particular design?

16   A.   Yes.

17   Q.   And the design specifications that Dr. Radovinsky got

18   included the volume, the weight, the coil dimensions; is

19   that right?

20   A.   Yes.

21   Q.   Were all of these designs vetted by external review?

22   A.   Yes.

23   Q.   Do you remember about what time that external review

24   happened?

25   A.   In 2004 there were a couple of reviews later in 2004;

```
1    the specific times, I don't recall.

2    Q.   Do you remember who reviewed the designs?

3    A.   One of the reviews included Don May, who is, you know,

4    the cyclotron expert at Texas A&M University, and there was

5    a guy from -- you know, a high-field magnet guy from the

6    National High Magnetic Field Lab in Tallahassee, whose name

7    I don't remember, and one of the -- and others that -- whose

8    names I don't remember at the moment.

9    Q.   Do you remember a Dr. Stekly?

10   A.   Yes.

11   Q.   And is he one of the ones that you mentioned or is he

12   a different --

13   A.   He's one, he's one of these, one of the reviewers of

14   one of the reviews, yes.

15   Q.   Okay.  I'm going to turn your attention to his review,

16   which is Exhibit 316.  I'll put it up on the screen.

17        Do you recognize this document, Dr. Antaya?  Can you

18   blow it up a little bit so he can see it?

19   A.   Yes, I do.

20   Q.   Is this what you recognize as Dr. Stekly's review of

21   the magnet design?

22   A.   Yes.

23   Q.   And I'm going to draw your attention to the third

24   paragraph at the bottom.

25   A.   Yes.
```

1    Q.   And didn't he in that review say:  "There's nothing at

2    this point that looks impossible"?

3    A.   Yes.

4    Q.   Do you remember what he was referring to?

5    A.   Yes.  We had already by that time had a self-consistent

6    solution for the magnet that matched the, the characteristics

7    needed for a high-field synchrocyclotron.  So for me there

8    were two feasibility issues:  one, the beam dynamic scale; I

9    thought that was a go/no-go issue, and the other was so if

10   you could create that field could you also create a magnet

11   that could make that field?

12       And so this was closing the loop, an external expert was

13   saying that we closed that loop.

14   Q.   So was the external expert evaluating both of those

15   feasibility issues, was this external expert evaluating both

16   of those feasibility issues?

17   A.   I think he was -- in this particular case he was mainly

18   addressing that you could make a magnet that could create

19   that field.

20   Q.   And did these reviews give you confidence that your

21   scaling law worked?

22   A.   Yes.

23   Q.   Dr. Antaya, on cross-examination you were asked about

24   whether you had ever designed a synchrocyclotron before and

25   you had responded no; had you worked on synchrocyclotrons

1    before?

2    A.   Yes, I had.

3    Q.   And did you work on synchrocyclotrons in the context of

4    working with Dr. Blosser and Dr. Wu?

5    A.   Yes, and Dr. Gordon.

6    Q.   I'm going to turn your attention again to another

7    document that you saw on cross, which is Exhibit 629.

8    A.   Okay.

9    Q.   You're going to have to give me a moment.  Counsel, if

10   you don't mind helping me with the Bates numbers that you

11   referred to on cross-examination?

12        MR. HILL:  They were all within 819 to 24.

13   Q.   Dr. Antaya, in conjunction with these notes I would

14   like you to pull out the hard copy of Exhibit 330.

15   A.   Yes, I'm there.

16   Q.   Okay.  So can you tell me what Exhibit 330 is?

17   A.   This, this was my presentation from the kickoff of the

18   sponsored research agreement with Still River.

19   Q.   So who were you presenting to at that meeting?

20   A.   I'm presenting to my colleagues at MIT and Joe

21   Minervini's magnet group.

22   Q.   And what was the purpose of that meeting?

23   A.   This was/is, you know, one of the world's best magnet

24   groups but they'd never worked on cyclotron before and so my

25   task was to, to get them up-to-speed, and get them confident

1    with the engineering that we were going to do with them in

2    conjunction with the beam physics that I was going to do.

3    Q.   And at this point you had your scaling law in hand, is

4    that right?

5    A.   Yes.

6    Q.   Is there a relationship between the notes starting at

7    8819 and the presentation?

8    A.   Yes, so those were my notes to prepare this

9    presentation.

10   Q.   So when you wrote in that -- on the next page, if we

11   can flip to, in Exhibit 629 to the next page.  Well, let me

12   ask you a different question:  when you wrote these notes,

13   were they intended to indicate that anyone could build this

14   magnet?

15   A.   No, they were not.

16   Q.   Were they intended to show that a group of very

17   sophisticated professionals that had lots of experience in

18   the magnet world could do this?

19   A.   Yes.

20   Q.   Was there anyone on the MIT team that had only a

21   Bachelor's in Physics or Applied Physics or a similar degree

22   and just five years of experience?

23   A.   No.

24   Q.   When you were making this presentation, you said you

25   thought this was going to be a project that they could

1    handle; did you think that that was going to be easy for

2    this group to do?

3    A.   No, I did not.

4    Q.   Why not?

5    A.   For the, you know, the reasons we cited.  We were

6    collapsing the magnet for a cyclotron and trying to preserve

7    the cyclotron characteristics while dealing with issues of

8    the magnet that were novel because of its high-field.

9    Q.   I'm going to direct your attention to Exhibit 39 -- I'm

10   sorry, Exhibit 10.  This is a sketch that counsel directed

11   you to during cross-examination.

12       Was this sketch intended to be an engineering design?

13   A.   No, it was not.  It was -- Still River had a fellow who

14   was going to work on the ion source but the ion source sets

15   the initial particle distribution, the accelerator and

16   everything, the losses during acceleration, the extraction

17   efficiency all depend on the properties of the ions when

18   they're born, all right?  So cyclotrons are amplifiers;

19   they change the velocity, the velocity of the part.  They

20   change the velocity to --

21   Q.   Dr. Antaya, I'm sorry, but I would like to direct you a

22   little bit here.

23   A.   Sure.

24   Q.   If it wasn't intended to be an engineering design, what

25   was the intended purpose of it?

```
1    A.   It was intended to be educational.

2    Q.   And who were you educating?

3    A.   Townsend Zwart.

4    Q.   And who was he?

5    A.   He was a new -- or he was a Still River employee.

6    Q.   So at that time you didn't intend counsel's work to

7    take this and then apply it to the design; you were just

8    trying to educate him about the simple ideas?

9    A.   Yes.   There is a complex set of issues in the center

10   of a cyclotron, and my Ph.D. thesis solved them for the K500

11   and was trying to bridge an educational gap to Townsend so

12   that he could understand them.

13   Q.   Okay.   Thank you.   I'm going to direct your attention

14   to Exhibit 3, and this is the e-mail which Dr. Gall sent

15   to you attaching his spreadsheet, and you said that you

16   typically don't review spreadsheets; can you explain why

17   you don't do that?

18   A.   Spreadsheets made by people are difficult in that

19   there are so many different ways that you can program the

20   formulas into cells, and you spend a lot of time trying to

21   vet spreadsheets, and I don't like it.   For me, it's sloppy.

22   I don't let students do them, and so it's just, it's just,

23   it's just sort of for me a casual way of doing science and

24   engineering, and I don't have any use for it basically.

25   Q.   I'm going to direct your attention to Exhibit 109.
```

```
1    This is the e-mail that attaches the GRD from July 2005; is

2    that right?  Can you verbalize your answer for the court

3    reporter?

4    A.   I know.  I'm not sure what you want me to --

5    Q.   I just want -- this is the e-mail that attached the

6    GRD, is that right?

7    A.   You'd like me to read that e-mail?

8    Q.   I would just like you to confirm that my statement is

9    correct, that that's the e-mail that attached the draft GRD?

10   A.   Yes.

11   Q.   So this document is a draft, right?

12   A.   Yes.

13   Q.   And it's intended to be an evolving document?

14   A.   Yes.

15   Q.   It wasn't intended to be final at this stage?

16   A.   Correct.

17   Q.   You talked a little bit about your group, the group at

18   MIT that worked with you on this, on this project; how many

19   people were in that group that you worked with on the Still

20   River Project?

21   A.   Of order, of order, ten, something like that, at

22   various times.

23   Q.   And were there a main core group of people that was

24   outside of that, that was included within that ten, or is

25   that a group of ten core individuals?
```

1    A.   Ten core individuals.

2    Q.   Okay.  Was anybody on that team of core individuals a

3    person that only had a Bachelor's degree in Physics and

4    five years experience?

5    A.   Absolutely not.

6    Q.   Well, what was -- did everyone on the team have a

7    Ph.D.?

8    A.   Everyone had a Ph.D.

9    Q.   Isn't it true that some people didn't necessarily have

10   a Ph.D. but had significant experience?

11   A.   One individual, our stability analyst, Joel Schultz,

12   did not have a Ph.D., but he had 30 years experience; he had

13   a Master's degree and 30 years experience.

14   Q.   And why did you pick a team that had people of such

15   experience?

16   A.   So I had come from a pretty good magnet team at

17   Michigan State and I had worked with a number of magnet

18   teams at Berkley, Lawrence Livermore, other, other national

19   laboratories, but I felt that what we were going to attempt

20   was one of the most difficult magnets, and I had worked on

21   a number of first-of-a-kind challenging magnets and so I

22   needed the best team that I could find.

23        Plus, we wanted to go fast, and it was a desire still,

24   a stated desire of Still River, and if you try to build a

25   magnet team while you're doing this engineering you sort of

1    add years so you want a team with its benchmark tools and

2    its known methods that have been qualified on a large number

3    of magnets to take on this challenge, and so Joel's group

4    was the only one that I considered, you know, equal to the

5    task.

6         MS. DEVARASETTY:  I have no further questions, your

7    Honor.

8         SPECIAL MASTER PETERSON:  All right.  Since we've

9    let some questions go outside the scope of the initial

10   cross, you're entitled to recross, if you'd like.

11        MR. HILL:  Thank you, your Honor.

12        RECROSS-EXAMINATION BY MR. HILL:

13   Q.   You mentioned in your testimony just now that it took

14   2.5 man years to design; was that a magnet design that was

15   recent?

16   A.   It's a magnet design for a particle accelerator, yes.

17   Q.   Why didn't you use your scaling law to reduce that to a

18   month?

19   A.   Because this was using a new magnetic material, and we

20   didn't have even the properties for that material so we had

21   to even invent a new way of making measurements of material

22   properties so that we could use it in the computations, so

23   we spent, you know, significant time developing new

24   benchmark tools.

25   Q.   So you're scaling law wouldn't apply to those materials,

1    is that right?

2    A.   We didn't have a comparable machine to use the scaling

3    law on yet.

4    Q.   Is this a cyclotron?

5    A.   It is a cyclotron.

6    Q.   You also mentioned that you -- in response to Special

7    Master Peterson's request about why this wasn't published,

8    this scaling law that you felt that it had to be kept

9    confidential under the terms and the habit of keeping things

10   confidential in connection with the Still River Project,

11   correct?

12   A.   Yes.

13   Q.   But you put your standing law on a patent application

14   and filed it in the public record, correct?

15   A.   That's correct.

16   Q.   And the development --

17   A.   And I considered that the appropriate place -- one of

18   the appropriate places to do that.

19   Q.   One of the -- I'm sorry.  The scaling law was not set

20   forth in the statement of work that you agreed to between

21   MIT and Still River, was it?

22   A.   I don't recall whether it was or not.

23   Q.   Other than the magnetic field strengths, the range of

24   magnetic field strengths that's claimed in the '311 patent,

25   there's no specific feature of a magnetic design that's

1    claimed expressly in the '311 patent; is that true?

2    A.   I'd have to look at it.  I don't recall offhand.

3    Q.   Well, isn't it true that, in fact, MIT claimed the

4    specific features of the magnet that was created in separate

5    patent applications?

6    A.   I'm not sure I understand the question.  What is it

7    you're asking me?  Could you rephrase it?

8    Q.   So the magnet that was designed in conjunction with the

9    Still River Project had specific features and characteristics

10   that you believe are not listed, correct?

11   A.   Yes.

12   Q.   Those features weren't claimed in the '311 patent; they

13   were claimed in MIT patents, isn't that true?

14   A.   That's correct.

15            MR. HILL:  No further questions.

16            SPECIAL MASTER PETERSON:  All right.  Before you

17   leave, Doctor, I just have a couple of questions which

18   actually depends on the answer to the first question:  are

19   you familiar with the '311 patent at all?

20            THE WITNESS:  Yes.  Yes.

21            SPECIAL MASTER PETERSON:  And have you read the

22   claims in that patent?

23            THE WITNESS:  Yes.  Yes, I have.

24            SPECIAL MASTER PETERSON:  Are you familiar with

25   those claims?

1          THE WITNESS:  Yes.

2          SPECIAL MASTER PETERSON:  Could you point me to --

3   if you have copy of the '311 patent in front of you; if not,

4   could counsel --

5          MS. DEVARASETTY:  Dr. Antaya, it's Exhibit 12.

6          SPECIAL MASTER PETERSON:  The claims are at the very

7   end?

8          THE WITNESS:  Yes.

9          SPECIAL MASTER PETERSON:  Could you point to anything

10  in those claims that you would say "that's what I invented,"

11  and if you can't do that, just tell me:  "No, I can't do

12  that"?

13         THE WITNESS:  I can tell you what I think that I

14  contributed significantly to.

15         SPECIAL MASTER PETERSON:  All right, that's fine.

16         THE WITNESS:  So, certainly, Patent No. or Claim

17  No. 1.

18         SPECIAL MASTER PETERSON:  And what do you believe

19  you contributed?

20         THE WITNESS:  The -- you know, it's an apparatus,

21  you know, with the features described, but it was my

22  synchrocyclotron scaling law that enabled that accelerator

23  that's in that claim.

24         SPECIAL MASTER PETERSON:  All right.  Anything else,

25  and, again, I'm not limiting this to Claim 1?

1              THE WITNESS:  Yes.  So the apparatus, the apparatus

2     claims, you know, I think 31, 32.

3              SPECIAL MASTER PETERSON:  All right.

4              THE WITNESS:  So 30, 31, and 32.

5              SPECIAL MASTER PETERSON:  Let me stop you.

6              THE WITNESS:  Yes.

7              SPECIAL MASTER PETERSON:  And the basis for your

8     belief is again based on your scaling law or is this

9     something else?

10             THE WITNESS:  Yes.  Yes, the language about 6 Tesla

11    and simultaneously achieving, weak focusing, face stability

12    in a magnet that could generate it is exactly what we did.

13             SPECIAL MASTER PETERSON:  Based on your scaling law,

14    is that correct?

15             THE WITNESS:  Yes.

16             SPECIAL MASTER PETERSON:  Okay.  All right.  Any

17    other claims?

18             THE WITNESS:  I would have to look at them more

19    closely.  I'm absolutely running out of gas.

20             SPECIAL MASTER PETERSON:  Okay.

21             THE WITNESS:  But I would say that when you are

22    involved in this you're trying to do absolutely everything

23    you can to make the, you know, the project a success; and,

24    and all of the elements and -- virtually all of the elements

25    of the system are something that I had worked on, and in

1    many early discussions, you know, verbal discussions and

2    otherwise, you know, we suggested a way of doing things and

3    I think that --

4            SPECIAL MASTER PETERSON:  All right.

5            THE WITNESS:  -- that assisted in the development of

6    this patent.

7            SPECIAL MASTER PETERSON:  All right.  Any re-redirect

8    after those questions?

9            MS. DEVARASETTY:  Just one question, your Honor.

10           FURTHER REDIRECT EXAMINATION BY MS. DEVARASETTY:

11   Q.   Dr. Antaya, what was your role in developing the

12   accelerator versus Dr. Gall's role in developing that

13   accelerator?

14   A.   My role was sole, was a sole role.  There was really,

15   you know, from my perspective, nothing that Dr. Gall

16   provided me to -- that enabled the feasibility, and I came

17   from the group that actually had developed the concept of a

18   synchrocyclotron that was compact for proton beam radiation

19   therapy, and so there was really nothing that, that was

20   added.

21       For me, there are two novel features in this patent, my

22   synchrocyclotron, and something that isn't discussed but

23   which I would like to acknowledge to Dr. Gall; and, that is,

24   that the key insight for me over all the stuff that was

25   known that we already knew about cyclotrons on gantries and

1    treatment rooms and all of that was his recognition that

2    the field on average did not have to be as big as people

3    were spec'ing; and so the room scaling for me, which is the

4    scaling of the radiation field from 40 centimeters x 40

5    centimeters to 20 x 20, and I think that that notion, which

6    isn't, which isn't discussed was the novel feature compared

7    with everyone else's working on the treatment rooms.

8        So as I say, the two novel features are my

9    synchrocyclotron and his recognition that you didn't need

10   this large field, and, therefore you could compact the

11   space that the machine sat in.  If you have a certain sort

12   of momentum distribution and you need a big field,

13   everything has to be further away ... and so you collapse

14   that distance also by making the field smaller, and I

15   thought that was innovative at the time, and I thought that

16   was the key, the key thing that he brought to the table.

17       And it was genuinely new; I had lots of interactions

18   with folks working on proton beam radiation therapy and had

19   a hand in the design of the one of the IBA cyclotrons that's

20   most widely use for proton beam radiation therapy at the

21   present time, but I thought that Gall's understanding of

22   what was really needed in terms of the field to radiate --

23   irradiate the patient was genuinely new and relative to his

24   peers working on the problem of proton beam radiation

25   therapy, so I think those are the keys.

1          SPECIAL MASTER PETERSON:  Thank you, Doctor.
2   Anything else?
3          MS. DEVARASETTY:  Just one thing, your Honor.  I
4   would like to introduce Exhibit 443 which was not admitted
5   on direct but admitted during redirect.
6          SPECIAL MASTER PETERSON:  Let's hold off on that.
7   Mr. Hill, do you have anything else on re-redirect?
8          MR. HILL:  No, your Honor, other than admitting the
9   exhibits into the record.
10          SPECIAL MASTER PETERSON:  All right.  Go ahead.  I'm
11   sorry, Dr. Antaya.  Thank you very much.  You can step down,
12   and you're excused, and we have no further questions for
13   this witness, right?
14          MR. HILL:  Correct.
15          SPECIAL MASTER PETERSON:  You're excused.  If you
16   want to leave, or, obviously, you can stay with us if you
17   like?
18          THE WITNESS:  Thank you.
19          SPECIAL MASTER PETERSON:  All right.  Yes, what's
20   your exhibits?
21          MS. DEVARASETTY:  Just one, your Honor, 443.
22          SPECIAL MASTER PETERSON:  All right.  Mr. Hill?
23          MR. HILL:  No objection.
24          MS. CHRISTO:  I have 196, 113, 114, 15, 629, 3, 10,
25   30, 31, 39, 1, and 109.

1          SPECIAL MASTER PETERSON:  All right.  First, I was

2     asking if there was any objections to their exhibit and I

3     assume none, right?

4          MR. HILL:  None.

5          SPECIAL MASTER PETERSON:  All right, admitted

6     without objection.  Now, I feel like an auctioneer.  Any

7     objections to their exhibits as listed?

8          MS. DEVARASETTY:  No, your Honor.

9          SPECIAL MASTER PETERSON:  Admitted without objection,

10    all right.

11       Rolling right along ... MIT, your next question?

12         MS. DEVARASETTY:  MIT calls Dr. Joseph Minervini,

13    please.

14         SPECIAL MASTER PETERSON:  Okay, Doctor.  If you

15    would raise your right hand, Doctor.

16         (Joseph V. Minervini, Ph.D., duly sworn.)

17         SPECIAL MASTER PETERSON:  Please be seated.  And

18    when you're comfortable, if you could give us your name,

19    spelling your name?

20         THE WITNESS:  My name is Joseph Vito Minervini.

21    My last name is spelled M-i-n-e-r-v-i-n-o.

22         SPECIAL MASTER PETERSON:  All right.  Doctor, what

23    is your professional affiliation?

24         THE WITNESS:  I'm a Senior Research Engineer at the

25    Massachusetts Institute of Technology.

1          SPECIAL MASTER PETERSON:  Okay, and you're appearing

2     as an expert witness today or as a fact witness?

3          MS. DEVARASETTY:  As a fact witness, your Honor.

4          SPECIAL MASTER PETERSON:  As a fact witness, all

5     right.  You may proceed, counsel.

6          MS. DEVARASETTY:  May I approach the witness?

7          SPECIAL MASTER PETERSON:  Yes.

8     DIRECT EXAMINATION BY MS. DEVARASETTY:

9     Q.   Dr. Minervini, I've handed you what's been marked as

10    Exhibit 115.  Do you recognize this document?

11    A.   Yes, I do.

12    Q.   Do you recognize this document as the testimony that

13    you've given in this case?

14    A.   I do.

15    Q.   And on the last page, can you turn to the last page

16    for me?

17    A.   Yes.

18    Q.   Is that your signature there?

19    A.   It is my signature.

20    Q.   And it's dated January 25th, 2012; is that right?

21    A.   That's correct.

22    Q.   And you understand that this is the testimony that

23    you're offering in this case today?

24    A.   I understand that.

25          MS. DEVARASETTY:  I now offer this witness'

1    testimony into evidence as Exhibit 115.

2         SPECIAL MASTER PETERSON:  All right.  Any objection?

3    Well, it's not an exhibit; it's just direct testimony, so

4    it's not your place to object anyway, right?

5         MS. DEVARASETTY:  Well, we've already dealt with the

6    objections.

7         SPECIAL MASTER PETERSON:  Yeah, all right.  So

8    cross-examination -- oh, I'm sorry?

9         MS. DEVARASETTY:  I do want to admit the exhibits he

10   cites in his declaration.

11        SPECIAL MASTER PETERSON:  Okay, go ahead.

12        MS. DEVARASETTY:  So I apologize; these are going to

13   be a bit redundant from the last set, but I just wanted to

14   have a clear set of all of the exhibits that are cited in

15   his declaration.  These are not going to be -- these are not

16   just going to be additional exhibits.

17        SPECIAL MASTER PETERSON:  If they're already in, we

18   don't need to admit them twice.

19        MS. DEVARASETTY:  Okay.  Then, may I do that at the

20   end and then admit the exhibits from the direct and we can

21   deal with just the ones that haven't been admitted?

22        SPECIAL MASTER PETERSON:  Sure.

23        MS. DEVARASETTY:  And then I will offer the witness;

24   I'll turn the witness over to opposing counsel.

25        SPECIAL MASTER PETERSON:  All right.  Cross?

1          CROSS-EXAMINATION BY MR. BRUNO:

2     Q.   Good afternoon, Dr. Minervini.

3     A.   Good afternoon.

4     Q.   I'm going to take just a moment and ask my colleague,

5     Miss Christo, to arrange to find your deposition transcript,

6     which is Exhibit 98 marked in this case.

7     A.   Okay, I have it.

8     Q.   Thank you.  Dr. Minervini, you recall having your

9     deposition taken in connection with this action, right?

10    A.   Yes, I do.

11    Q.   And you remember that I was the one asking you the

12    questions on that date?

13    A.   Absolutely.

14    Q.   So you have before you Exhibit 98, is that correct?

15    A.   I do have Exhibit 98.

16    Q.   Does that appear to you to be a true and accurate copy

17    of your deposition transcript in this case?

18    A.   It appears to be, yes.

19    Q.   And have you reviewed that deposition transcript prior

20    to today?

21    A.   I have, yes.

22    Q.   Did you submit corrections?

23    A.   Yes, I did submit a few corrections on an errata sheet.

24    Q.   You recall that your answers at that deposition as

25    recorded in the transcript were under oath?

1    A.   I do.

2    Q.   And you answered my questions truthfully on the day

3    that your deposition was taken, right?

4    A.   I did.

5    Q.   Dr. Minervini, I would also like you to locate, if you

6    can, Exhibit 14 that has been marked in this case.  It's a

7    copy of the research grant between Still River and MIT

8    dated as of July 1, 2004, and I'll say in advance it may be

9    helpful if you can keep both your deposition transcript and

10   Exhibit 14 somewhat within reach?

11   A.   Yes, okay.

12   Q.   Do you have Exhibit 14 in front of you, Dr. Minervini?

13   A.   I do.

14   Q.   And, I'm sorry, I had this issue earlier; I wasn't

15   speaking loud enough, so would you mind speaking louder and

16   verbalizing your answers for the record?

17   A.   I do have it in front of me.

18   Q.   Thank you.  I'd like to ask you:  does this appear to

19   be a true and correct copy of the research agreement between

20   Still River and MIT dated as of July 1st, 2004?

21   A.   It does.

22   Q.   And looking at the first page of Exhibit 14, which is

23   marked with Production No. SRIV001154, I'd like to ask you

24   to look at Paragraph 2 designated on that page.  It's

25   titled:  "principal investigator," and it says after that:

1    "The research will be supervised by Dr. Joseph V. Minervini,

2    the quote principal investigator."

3         Do you see what I've read?

4    A.   I do see that.

5    Q.   And you were indeed designated as the principal

6    investigator on the project between Still River and MIT, is

7    that correct?

8    A.   I was.

9    Q.   And you served in that capacity throughout the entirety

10   of the research agreement's length, is that correct?

11   A.   Yes, I did.

12   Q.   But you do not recall ever seeing from Dr. Antaya a

13   complete beam dynamics simulation for the high-field

14   superconducting synchrocyclotron project between Still River

15   and MIT, is that correct?

16   A.   By "complete," I'm not quite sure what you mean.

17   Q.   Do you recall seeing any beam dynamic simulations from

18   Dr. Antaya?

19   A.   I recall seeing particle trajectory simulations from

20   Dr. Antaya.

21   Q.   But you do not recall seeing a complete beam dynamics

22   simulation, is that correct?

23   A.   Well, it depends on what you mean by "complete."

24   These were particle orbits dabbling from the center of the

25   device to extraction.

1    Q.   All right.  Dr. Minervini, I'd like to ask you to take

2    a look at your deposition transcript, which is designated as

3    Exhibit 98, and I'll ask you to please turn to Page 28 of

4    your deposition transcript.

5         Do you have that in front of you, sir?

6    A.   I do have it.

7    Q.   I'm going to read out loud Page 28 of your deposition

8    transcript starting at Line 7:  "Question:  But you don't

9    recall ever having seen from Dr. Antaya any sort of

10   memorandum or report that purported to be a complete beam

11   dynamics simulation with a high-field superconducting

12   synchrocyclotron?  Answer:  I do not."

13        Was that your sworn testimony, Dr. Minervini?

14   A.   It was, but there's also other qualifying questions

15   and answers.

16   Q.   Was that your testimony, Dr. Minervini?

17   A.   Yes.

18   Q.   Thank you.  And you do not know if Dr. Antaya ever

19   calculated a complete cycle of orbits for the high-field

20   superconducting synchrocyclotron project between Still River

21   and MIT, is that correct?

22   A.   I don't have a copy of a report that has that, no.

23   Q.   If you could look back at the research agreement,

24   Exhibit 14?

25   A.   Yes.

1    Q.   And I'd like to ask you to now turn to a page that is

2    marked with Production No. SRIV001163.

3    A.   I have it.

4    Q.   And I'm going to read out loud from the paragraph

5    towards the bottom of that page that's marked with No. 3.

6    Before I do that, I'll ask you:  do you recognize this page

7    to be the first page of Attachment A noted as the MIT

8    Statement of Work to the Research Agreement?

9    A.   I do recognize that, yes.

10   Q.   And this Statement of Work contains specific aspects of

11   the project that MIT was supposed to carry out, is that

12   correct?

13   A.   That's correct.

14   Q.   And so looking then at No. 3 towards the bottom of the

15   page, it states:  "Model proton acceleration using

16   ZCyclone3D and the developed input data," is that correct?

17   A.   That's correct.

18   Q.   And you do not know whether that work was ever

19   completed by MIT, do you?

20   A.   I do know that ZCyclone3D was used by Dr. Jun Feng to

21   run the beam particle orbits and were reported in memos, his

22   output, internal memos at MIT.

23   Q.   Internal memos at MIT?

24   A.   Yes.

25   Q.   But you do not know whether that work was ever

1    completed by MIT, do you?

2    A.   In what sense do you mean not completed?

3    Q.   I mean --

4    A.   This was the conceptual design phase so this was input

5    that went -- for it to be completed means for to complete

6    the design of the machine.

7    Q.   And you don't --

8    A.   You don't complete -- I think it's as Dr. Antaya stated

9    that the design isn't complete at the end of the conceptual

10   design phase.

11   Q.   And you don't know whether that was ever completed, do

12   you?

13   A.   This work was completed.

14   Q.   I'd like to ask you to look at your deposition

15   transcript again, please.

16   A.   Excuse me.  By "this work," I mean this conceptual

17   design phase.

18   Q.   The deposition transcript is Exhibit 98.

19   A.   Yes.

20   Q.   If you could please turn to Page 178 of your transcript.

21   A.   I have it.

22   Q.   And I'll direct your attention to Line 14, Page 178?

23   A.   I see it.

24   Q.   And I'll begin reading out loud at that line:

25   "Question:  Let me ask you about No. 3, just below which

1    states:  Model Proton Acceleration Using ZCyclone3D and

2    the Developed Input Data.  Did MIT ever complete that

3    work?  Answer:  (Deponent viewing document.)  I believe it

4    was done, I believe Jun Feng may have used that program

5    associated with that model.

6        Question:  You believe but you don't know for sure?

7    Answer:  I know for sure that Dr. Feng did some of those

8    types of calculations, yes.  Question:  Can you think of a

9    specific document that included those calculations?  Answer:

10   I would have to look.  I know that Dr. Feng wrote memos on

11   his work output and circulated them internally, and I would

12   have received those, and there's probably an electronic

13   version online on my computer."

14       That was your sworn testimony, correct?

15   A.   That's correct.

16   Q.   And directing your attention then again to No. 3 on

17   the Statement of Work at Exhibit 14, which, again, I'll

18   read for the record is:  Model Proton Acceleration Using

19   3Zyclone3D and the Developed Input Data?

20   A.   That's correct.

21   Q.   Thank you.  You do not know whether any such work was

22   transmitted to Still River, do you?

23   A.   As I stated in my deposition, I believe that

24   information that I discussed there was transmitted at least

25   through presentations, but the direct physics transmission

1    was between Dr. Antaya and Dr. Gall.

2    Q.   Well, Dr. Minervini, let me direct your attention then

3    back to your deposition transcript, which is designated

4    Exhibit 98, and I'm specifically going to be directing your

5    attention to Line 9 of Page 179?

6    A.   I see it.

7    Q.   And I'll read it out loud:  "Question:  Do you know

8    whether those calculations were ever transmitted to Still

9    River?  Answer:  I don't know for sure.  I would have to

10   see who -- for those specific ones, I'd have to see the

11   distribution list on an e-mail; but if they went to

12   Dr. Antaya, which was, I'm sure who they went to, then it

13   would be up to Dr. Antaya to deliver those.

14        Question:  But you were the principal investigator on

15   the project, right?  Answer:  Yes.  Question:  And, yet,

16   you don't know one way or the other whether those

17   calculations were transmitted to Still River?  Answer:  I

18   had no reason to believe that they were not transmitted to

19   Still River.  Question:  But you don't know for sure that

20   they were?  Answer:  I, I know what I just said.  I don't

21   know if they were not.  I do not know."

22        That was your sworn testimony, correct?

23   A.   That's correct.

24   Q.   Now, Dr. Minervini, you've never seen a working

25   superconducting synchrocyclotron for which Dr. Antaya was

1     the lead designer, have you?

2     A.   No.

3     Q.   When did Dr. Antaya ever show you the scaling law?

4     A.   I can't recall exactly when.  I believe that he showed

5     me the law on his office board or his open notebook at some

6     point, but I have no recollection of exactly when that was.

7     Q.   Well, let's try to hone that recollection a little bit.

8     Was it sometime around or sometime during the pendency of

9     the research agreement between Still River and MIT?

10    A.   Most likely, yes.

11    Q.   Was it sometime around 2004?

12    A.   It's possible, yes.  It would have to be of course

13    after he had developed it, but it was, you know, as stated

14    before, it was probably, you know, towards the end of 2000

15    or later.

16    Q.   And do you recall exactly what he showed you on his

17    white board?

18    A.   Something similar to what he had in his notes, but I

19    couldn't recite it verbatim myself.

20    Q.   Did he show you his notes at that time?

21    A.   Like I said, I'm not sure if he showed me either his

22    notes or expressed on the board, because he often puts

23    a lot of equations on the white board in his office or

24    sometimes even on the white boards out in the hallways, so

25    it could have been, you know, either of those places.

1    Q.   So you don't actually recall one way or the other

2    whether he showed you the scaling law, is that correct?

3    A.   Well, I'm just saying that I believe he did.

4    Q.   But you don't have a specific recollection of it?

5    A.   I can't remember a specific time, no.

6    Q.   And my question was somewhat different:  you don't have

7    a specific recollection of him actually showing you the

8    scaling law, correct?

9    A.   I have a recollection of him showing me equations on

10   his board which I believe at some point were related to the

11   scaling law.

12   Q.   Why do you believe that?

13   A.   I'm not sure how I could answer why do I believe

14   something ... you either believe something you don't.

15   Q.   Isn't there normally a basis for a belief?

16   A.   Yes, that's what you observe in this case.

17   Q.   What did you observe about the equations that he may

18   have shown you that leads you to believe that they were in

19   the scaling law?

20   A.   I believed that I recall them as being defined as the

21   scaling law.

22   Q.   Did Dr. Antaya ever say:  Dr. Minervini, here's my

23   scaling law?

24   A.   Well, maybe not exactly those words, but in words

25   similar to that, yes.

1   Q.   Did you have the capacity to understand the importance

2   of the scaling law?

3   A.   Probably not at the level that I would appreciate,

4   because I'm not a cyclotron physicist, and I had no

5   understanding of cyclotron physics prior to Dr. Antaya

6   interacting with Dr. Gall and Still River Systems at that

7   time on projects.  So anything I saw was new to me so that's

8   why I may have an incomplete recollection because it's not

9   like recalling other things that I may have been exposed to

10  in my past work experience or even, you know, what I mean,

11  in undergraduate/graduate school; I didn't study physics.

12  Q.   All right.  So anything you saw about cyclotron physics

13  was new to you at the time of the research agreement?

14  A.   Yes.

15  Q.   And, yet, you were designated as the principal

16  investigator on the project, correct?

17  A.   That's correct.

18  Q.   Dr. Minervini, who determined the feasibility of the

19  high-field superconducting synchrocyclotron on which MIT

20  and Still River were working together?

21  A.   Dr. Antaya did.

22  Q.   All right.  In that case let's go to your declaration

23  that was just entered --

24  A.   Yes.

25  Q.   -- by counsel for MIT, and I believe it was entered

1    as Exhibit No. 115, and I'll direct your attention please

2    to Paragraph 26.  Do you have that in front of you,

3    Dr. Minervini?

4    A.   I do.

5    Q.   Thank you.  I'll go ahead and read it out loud, the

6    beginning of Paragraph 26.  Indeed you state:  "Dr. Antaya

7    also made significant contributions to the project by

8    conceiving of the engineering and technological aspects of

9    the superconducting magnet that could show feasibility of

10   producing the magnetic field configuration required by the

11   desired synchrocyclotron's beam dynamics."

12        Is that your testimony, Dr. Minervini?

13   A.   It is.

14   Q.   But your opinion that Dr. Antaya determined the

15   feasibility is based entirely on the fact that Dr. Antaya

16   expressed that assertion to you, correct?

17   A.   I said he reported it in, I believe, a memo or an

18   e-mail sometime -- I believe it was in 2004 --

19   Q.   But it's --

20   A.   -- addressed to Ken Gall.

21   Q.   But it's entirely based on his self-reporting, is that

22   correct?

23   A.   Yes.

24   Q.   I'd like to ask you to look back at your deposition

25   transcript, please.

1    A.   But -- excuse me, but --

2    Q.   There's no question --

3    A.   -- with regard to the --

4    Q.   There's no question before you, Dr. Minervini.

5    A.   Okay.

6    Q.   Your deposition transcript is marked as Exhibit 98.

7    I'd like to please direct you to Page 32.

8    A.   I have it.

9    Q.   Thank you.  I'll read out loud at Line 20 of Page 32.

10   "Question:  Is it fair to say that the purpose of

11   Dr. Antaya's work under the research agreement with

12   Mevion was for the purpose of demonstrating a way in which

13   the high-field superconducting synchrocyclotron could be

14   built?"

15        Did I read that question accurately?

16   A.   You did.

17   Q.   Thank you.  Well, I'm actually going to skip forward,

18   that was to provide some context, to Page 33, and Line 23,

19   and I'll read again the question:  "Who determined that it

20   had the feasibility of working?  Answer:  From the physics

21   standpoint, I would say Dr. Antaya.  At least to my

22   knowledge, that was what was expressed.  Question:  Why do

23   you say that?  Answer:  Because he expressed that to me.

24   And I believe that if he believed it, that he was -- from

25   his expertise that it would likely work.

1    Question:  Do you have any basis from your own personal

2    knowledge for confirming that Dr. Antaya's claim that he

3    had demonstrated feasibility of the machine was accurate?

4    Answer:  The only -- well, I -- I know that he has notebooks

5    where he did most of his calculations and computer codes

6    and computer output and documents and files on his, you

7    know, computer electronic output, but can I confirm?  I --

8    since I'm not expert, I can't read that, and I take his

9    word for it.  Question:  And you're relying entirely on

10   Dr. Antaya?  Answer:  I am, yeah."

11       Was that your sworn testimony, Dr. Minervini?

12   A.   It is.

13       SPECIAL MASTER PETERSON:  Mr. Bruno, maybe this has

14   just gone over my head, which is entirely possible, but I

15   thought that the witness had testified exactly that before

16   you went into the deposition.  Am I missing something?  Did

17   he say something different in the deposition?

18       MR. BRUNO:  I believe from what I recollect the

19   answer that I heard on the fly today that his answers were

20   consistent, but I felt that his answer today at the hearing

21   might have been somewhat different in marginal aspects that

22   he testified to.

23       SPECIAL MASTER PETERSON:  Okay.  Well, I mean,

24   obviously, you can impeach using a witness' deposition,

25   but, you know, you don't need to use the deposition to

1   show that he said the same thing twice at least in

2   cross-examination.

3           MR. BRUNO:  Thank you, your Honor.

4           SPECIAL MASTER PETERSON:  Okay.

5           MR. BRUNO:  I'll move on.

6   Q.   Who's Joel Schultz, Dr. Minervini?

7   A.   Dr. Schultz is a former member of the division which I

8   head at Putnam Science and Fusion Center at MIT.

9   Q.   And what was his role in connection with this Still

10  River Project?

11  A.   Joel Schultz did most of the early conceptual and

12  preliminary design of the superconducting magnet system for

13  this project.

14  Q.   And did you supervise Joel Schultz in that regard?

15  A.   I did.

16  Q.   Did Joel Schultz request to you that he be taken off

17  of the Still River Project based on the fact that he found

18  it difficult to work with Dr. Antaya?

19  A.   At some point he did, yes.

20  Q.   And you supervised Dr. Antaya at MIT, correct?

21  A.   I did.

22  Q.   Other supervisees of you reported to you that

23  Dr. Antaya failed to adequately consider their opinions,

24  correct?

25  A.   I think Joel Schultz did for one, yes.

1    Q.   And there were others, correct?

2    A.   I heard complaints from Dr. Radovinsky.

3    Q.   Any others?

4    A.   Those are the two that are most prevalent in my mind

5    right now.

6    Q.   There might have been more?

7    A.   Maybe.

8    Q.   Let's go ahead and look back at the '311 patent, which

9    is Exhibit 12.

10   A.   Sorry, I have that.

11   Q.   Thank you, Dr. Minervini.  Do you recognize it as the

12   '311 patent?

13   A.   I do.

14   Q.   If you wouldn't mind turning towards the back of the

15   patent to the page marked MIT0000555.  It's on the page that

16   has the claims of the patent?

17   A.   I have it.

18   Q.   And if you would please briefly review and familiarize

19   yourself with the claims again?

20   A.   Yes.  Okay, I'm done reading them all.

21   Q.   You're generally familiar?

22   A.   Yes.

23   Q.   Thank you.  Dr. Minervini, you don't have any personal

24   knowledge of Dr. Antaya contributing any elements to any of

25   these claims, do you?

A.   I do have evidence/knowledge; for example, the
apparatus, this is Claim 25, the apparatus of Claim 24 in
which it gives, for instance, the range of 6 to 20 Tesla;
the apparatus of Claim 27 -- I'm sorry, Claim 26; the
apparatus of Claim 24, in which the magnet structure
comprises superconducting windings; the apparatus of Claim
19, in which the accelerator occupies a volume of less than
4.5 cubic meters; the apparatus of Claim 21, that is Claim
22, in which the energy level is in the range of 150 to 300
MeV; 23, the apparatus of Claim 1 in which the accelerator
is comprising a synchrocyclotron.  Anyway, there are many
like that.  I believe he contributed to those.

Q.   And your testimony is that that's based on your
personal knowledge?

A.   Yes.  At the time that this was filed, yeah.

Q.   All right.  I'd like to ask you to please turn back to
your deposition transcript, which is Exhibit 98.

A.   I have it.

Q.   And let's flip to Page 115 of that transcript, please.

A.   I have it.

Q.   All right, and I'm going to ask you to look at Line 13
of Page 115 and I'll give you a little bit of a running
start.

     "Question:  Do you recognize this as a copy of the
'311 patent, Dr. Minervini?  Answer" --

1    A.   Oh, I'm sorry, I took the wrong deposition.

2    Q.   No problem.

3    A.   I apologize.  That was 115, correct, Page 115?

4         SPECIAL MASTER PETERSON:  Was that Page 115, counsel?

5         MS. CHRISTO:  Correct.

6    Q.   All right.  We can start again.  So this is your

7    deposition transcript, Exhibit 98, Page 115?

8    A.   Okay.

9    Q.   And Line 13?

10   A.   Yep.

11   Q.   Thank you.  I'll begin again:  "Question:  Do you

12   recognize this as a copy of the '311 patent, Dr. Minervini?

13   Answer:  I do.  Question:  And you previously testified

14   that you have reviewed the claims of this patent before, is

15   that correct?  Answer:  Yes, briefly.

16       Question:  If you would, I'd like to turn your attention

17   to the claims of the patent which are found on Production

18   No. Page MIT555.  That is at least where the claims begin.

19   Answer:  (Deponent reviewing document.)

20       Question:  Now, I'd like you to take the time that you

21   need, Dr. Minervini.  I'm going to hand you a blue pen, and

22   if you would, please, by underlining identify each element

23   in the claims of the '311 patent that, based on your

24   personal knowledge, that you believe Dr. Antaya contributed

25   to the claims?

1     Answer:  (Deponent viewing document.)  I don't know

2     that I could be specific because I was not there or in any

3     interactions in the drafting of this document, the writing

4     of it, or the discussions or any work that went on in the

5     period supposedly leading up to this document.  I mean,

6     other than my, my interactions with the project after the

7     start of the contract.

8         Question:  So is it your testimony that you cannot

9     identify the specific portions of any of these claims that

10    Dr. Antaya may or may not have contributed?  Answer:  I

11    could speculate on where I believe that, at a minimum, he

12    had input into these claims, that had done work that led to

13    these claims.

14        Question:  Let me ask you this:  What would your

15    speculation as you described it be based on?  Answer:  My

16    understanding of his knowledge of superconducting cyclotrons,

17    superconducting magnet technology, interactions he had with

18    Dr. Gall during the period in which the background went on

19    for the development of this document, but I was not there

20    for any of the, you know, specific details of the things

21    that went on in here."

22        Is that your sworn testimony, Dr. Minervini?

23    A.  It is.

24    Q.  Let's turn back to your declaration, which is Exhibit

25    115 please.

1          SPECIAL MASTER PETERSON:  I'm sorry, counsel.  I'm

2     not sure how we left that.  With the witness you've

3     identified or you've pointed to several claims in the '311

4     patent; is it your testimony that you have no personal

5     knowledge that Dr. Antaya contributed to those claims?

6          THE WITNESS:  No, it is not my testimony.  I think

7     there's a discrepancy in the way this was -- the deposition

8     was read.  The quote I was referring to there was when the

9     claims were drafted, when the document was drafted, I had

10    no input or knowledge of that, and I also believe that I

11    didn't know exactly when that patent was filed at the time

12    so --

13         SPECIAL MASTER PETERSON:  All right.

14         THE WITNESS:  -- but it's just that within that

15    period of time I know that Dr. Antaya had done a lot of the

16    preliminary work on the synchrocyclotron design and magnet

17    design and all of these other elements that took place prior

18    to that patent being filed.

19         SPECIAL MASTER PETERSON:  Let me ask you this:  you

20    have the '311 patent in front of you?

21         THE WITNESS:  I do, yes.

22         SPECIAL MASTER PETERSON:  All right.  Turn to the

23    claims again, if you would, and what was the first claim

24    that you mentioned a little bit ago in your answer?  It was

25    somewhere around 20 or 21?

1          THE WITNESS:  I think the first one I actually

2     mentioned was 24, the apparatus of Claim 1 in which the

3     accelerator comprises a magnet structure having a field

4     strength of at least 6 Tesla --

5          SPECIAL MASTER PETERSON:  All right.

6          THE WITNESS:  -- and then several around that, yes.

7          SPECIAL MASTER PETERSON:  Okay.  Well, let's focus

8     on Claim 24.  Is it your testimony that you have personal

9     knowledge that Dr. Antaya contributed the field strength of

10    at least 6 Tesla to this invention?

11         THE WITNESS:  He contributed to the synchrocyclotron

12    that has a field range -- a field of at least 6 Tesla.

13         SPECIAL MASTER PETERSON:  Yes, but did he contribute

14    to this claim which claims a synchrocyclotron having 6

15    Tesla or was that Dr. Gall's idea as far as you know?

16         THE WITNESS:  That's what I was referring to, that

17    I don't know what was done at that time, particularly when

18    they had those interactions.

19         SPECIAL MASTER PETERSON:  Okay.  So --

20         THE WITNESS:  So I can't distinguish between them,

21    you know, when that, when that occurred.

22         SPECIAL MASTER PETERSON:  Okay.  Would it be fair

23    to say then as far as Claim 24 that you don't know between

24    Dr. Gall or Dr. Antaya who contributed what to Claim 24?

25         THE WITNESS:  Yes.

1      SPECIAL MASTER PETERSON:  Now, turn to the rest of

2  your claims that you've identified.  Does that apply to the

3  other claims that you've identified as well?

4      THE WITNESS:  Well, I know that Dr. Antaya knew that

5  energy level of the -- of a proton accelerator would be in

6  the range of 150 to 300 MeV; that's Claim 22.

7      SPECIAL MASTER PETERSON:  Claim 22, all right.

8  Let's focus on that, do you know as between Dr. Gall and

9  Dr. Antaya -- I'm probably mispronouncing that.

10      THE WITNESS:  Antaya.

11      SPECIAL MASTER PETERSON:  -- who contributed this

12  range of 150 to 300 MeV?

13      THE WITNESS:  No, I don't know how those numbers

14  were derived.

15      SPECIAL MASTER PETERSON:  All right.  Now, which

16  other claims did you refer to?

17      THE WITNESS:  I referred to 26, the apparatus of

18  Claim 24 in which the magnet structure comprises

19  superconducting windings.

20      SPECIAL MASTER PETERSON:  All right.  Now, again,

21  between Dr. Gall and Dr. Antaya, do you know who

22  contributed the suggestion of using superconducting

23  windings?

24      THE WITNESS:  I don't know.  It would be common

25  knowledge to use superconducting windings if you wanted a

1    compact cyclotron.

2            SPECIAL MASTER PETERSON:   Superconductors were known

3    for a long time, right?

4            THE WITNESS:   Oh, yes.

5            SPECIAL MASTER PETERSON:   All right.  Any other

6    claims?

7            THE WITNESS:   Well, I'm not patent lawyer so I --

8    you know, I don't know how to parse these things.

9            SPECIAL MASTER PETERSON:   That's all right.

10           THE WITNESS:   I know that it's a superconducting

11   magnet, that the compactness of a high-field superconducting

12   magnet which allows the mass of the device to be reduced to

13   something small enough that is feasible to be put on a

14   gantry.

15           SPECIAL MASTER PETERSON:   All right.

16           THE WITNESS:   So that relates to the Claims 17 and

17   18 about the mass of the device.

18           SPECIAL MASTER PETERSON:   Yes.  And that idea of

19   using superconductors to make a smaller magnet, do you know

20   if that idea came from Dr. Gall or Dr. Antaya or was this

21   just common knowledge in the field?

22           THE WITNESS:   I think it's common knowledge.  There

23   was already two superconducting cyclotrons being developed.

24   I'm not quite sure exactly when they started, but they were

25   -- I'm sorry, two superconducting isochronous cyclotrons

1    designed by Accel, a German company, which has since gone

2    out of business.

3              SPECIAL MASTER PETERSON:  Let me stop you.

4              THE WITNESS:  Yeah.

5              SPECIAL MASTER PETERSON:  Are you saying this from

6    personal knowledge or something you have read or something

7    somebody's told you?

8              THE WITNESS:  No, I have seen --

9              SPECIAL MASTER PETERSON:  Do you have personal

10   knowledge of this?

11             THE WITNESS:  Well, I've spoken to the person who

12   is in charge of building those devices.  In the mid 2000

13   year's time frame they designed, built, and delivered two

14   superconducting cyclotrons 250 MeV for proton radiation

15   therapy.  One's in operation now at the Paul Scherrer

16   Institute in Switzerland, and one's at the Reichert

17   Institute in Munich, Germany, treating patients.

18             SPECIAL MASTER PETERSON:  All right.  Going back to

19   the claims, are there any other claims you'd like to talk

20   about?

21             THE WITNESS:  Well, the volume and the mass are

22   related.  So when I look at 19, they're not really

23   independent, but the issue that we discussed earlier about

24   the iron yoke to contain the flux that is -- well, at least

25   I'm knowledgeable of that.  I worked on iron-based machines

1    in the 1970s, superconducting machines with iron where you

2    design the iron yoke return frame.  You added it up to keep

3    it just below saturation so you didn't have to deal with it,

4    and that determined the mass of the machine and thus the

5    volume as well.

6             SPECIAL MASTER PETERSON:  Do you find that in the

7    claims anyplace?

8             THE WITNESS:  Well, I find the volume in there, in

9    the mass, that's how --

10            SPECIAL MASTER PETERSON:  I see.

11            THE WITNESS:  -- they are related.

12            SPECIAL MASTER PETERSON:  All right.

13            THE WITNESS:  That's how they're technically

14   related, and that's how Dr. Antaya cites the yoke for the

15   synchrocyclotron.

16            SPECIAL MASTER PETERSON:  All right.  Anything else?

17            THE WITNESS:  No.  The magnetic field strength is

18   correct.  Well, for example, when I -- like at Claim 36,

19   which kind of is a dependent claim that kind of summarizes

20   a lot of it, but the work of Dr. Antaya was necessary to

21   have an accelerator configured to produce a charged particle

22   and be able to be mounted on a gantry that allows it to move

23   through a range of motion.  Because there's a lot involved

24   with the superconducting magnet technology and the

25   cryogenic technology that allows you to do that.

1      I mean, anyone could just say:  I want a magnet that
2   swings around a patient, but anyone can say:  I want to go
3   to the moon, too, but you have to know how to get there.  A
4   lot of people want to -- you know, have aspirations of what
5   they want to do, but it's the actual physics and science and
6   engineering that goes into it that it actually enables that
7   claim to be made.
8           SPECIAL MASTER PETERSON:  All right.  Anything else?
9           THE WITNESS:  I think that's most of it.
10          SPECIAL MASTER PETERSON:  Mr. Bruno, sorry to
11  interrupt, but I thought that we had a bit of a disconnect
12  in the testimony between what his original testimony was and
13  what he said during the deposition, but please feel free to
14  proceed.
15          MR. BRUNO:  Thank you, your Honor.
16  Q.  Dr. Minervini, may I please direct your attention again
17  to your declaration, which is Exhibit 115.
18  A.  Yes.
19  Q.  And let's look at Paragraph 14, please?
20  A.  Yes.
21  Q.  Thank you.  I'll go ahead and read it out loud.  "As
22  I said, Dr. Gall's performance specifications required a
23  cyclotron design that was beyond state-of-the-art at the
24  time.  In 2003 MIT was probably the only place in the world
25  that had the combination of talent required to design and

1   build a highly compact synchrocyclotron to meet Dr. Gall's

2   limited performance specifications, e.g., one compact enough

3   and light enough to rotate on a gantry."

4        Is that your testimony, Dr. Minervini?

5   A.   It is.

6   Q.   But in 2003 did you know what a synchrocyclotron was?

7   A.   I did once I had discussed it with Dr. Antaya and

8   Dr. Gall, not before then.

9   Q.   And in 2003 did you know what an isochronous cyclotron

10  was?

11  A.   Not before then, no.

12  Q.   So without knowing what a synchrocyclotron or an

13  isochronous cyclotron was you were not qualified to assess

14  the state-of-the-art in cyclotron design in 2003, were you?

15  A.   I was qualified to assess the state-of-the-art in high

16  field compact superconducting magnets which could enable a

17  small device.

18       I could not be qualified to say anything about the

19  feasibility of using a synchrocyclotron or an isochronous

20  cyclotron, but that we had expertise now with Dr. Antaya

21  in the group and with the expertise that, you know, I'm

22  familiar with, from 28 years of working at MIT, of a

23  group that could tackle the magnet problem; but that's

24  from what I was told.  The combination of the two was

25  beyond the state-of-the-art.

1    Q.   From what you were told?

2    A.   Yes.

3    Q.   Who told you?

4    A.   Dr. Antaya.

5    Q.   And you relied entirely on his word?

6    A.   I did.

7    Q.   And you're not testifying as an expert in cyclotron

8    design in this case, are you?

9    A.   I am not.

10   Q.   Dr. Minervini, just a bit of follow-up:  without

11   knowing what a synchrocyclotron was in 2003 prior to your

12   discussions with Dr. Antaya and Dr. Gall, you were also not

13   qualified to assess at that time whether MIT or any other

14   institution had the combination of talent required to

15   design and build a highly compact synchrocyclotron to meet

16   Dr. Gall's performance specifications, were you?

17   A.   I am confident of the magnet part, and I'm also

18   confident that we were likely the only ones who would

19   accept a risk like that.  If -- remember:  this was, as I

20   said, beyond state-of-the-art, and that's actually a

21   feature of what our division has been doing for the last

22   30 years at MIT is developing technology that's beyond

23   state-of-the-art, particularly when it involves

24   superconducting magnet technology.  So we are willing

25   to accept risk on a research basis; and if you read the

1    research contract, they're best effort; we don't guarantee

2    the performance of the device.

3    Q.   And you personally didn't know what a synchrocyclotron

4    was?

5    A.   No, not until it was explained to me.

6    Q.   And you're not testifying as an expert in this case

7    about cyclotron design, are you?

8    A.   No, I am not.

9    Q.   And, Dr. Minervini, you personally prepared and

10   submitted a written memorandum requesting that Dr. Gall be

11   given an appointment as a visiting scientist at MIT; isn't

12   that right?

13   A.   That's correct.

14   Q.   And Dr. Gall did receive that appointment based on

15   your recommendation, didn't he?

16   A.   That's correct.

17   Q.   Is it also true that Still River and MIT worked

18   together under the research agreement roughly between

19   2004 and 2007?

20   A.   Yes, that's correct.

21   Q.   And during that period you interacted with Dr. Gall

22   in a professional capacity in connection with aspects of

23   the project; is that correct?

24   A.   Yes, I was the principal investigator.

25   Q.   And you also interacted with Dr. Gall socially on some

```
1     level, is that correct?
2     A.   That's correct, we live in the same town.
3     Q.   You've gone to dinner together?
4     A.   Yes, we have.
5     Q.   Your wives know each other?
6     A.   Wives, less so, but my wife has been to her house and
7     my daughter actually babysat his children at one point.
8     Q.   And in all of your interactions with Dr. Gall, you
9     cannot think of any instance in which Dr. Gall had been
10    dishonest with you, can you?
11    A.   No.
12    Q.   This may take some finding, but if we could turn to
13    Exhibit 65?
14    A.   Is it possible to get some water while I'm waiting?
15    Q.   I'm sorry, Dr. Minervini; do you have Exhibit 65?
16    A.   I do have it, yes.
17    Q.   Thank you.  If you would please turn to -- this is
18    really the second page of this document marked with
19    Production No. SRIV002617?
20    A.   I have it.
21    Q.   Thank you.  I'll direct your attention to the top of
22    this page, and I'll represent that it appears to be an
23    e-mail from Ken Gall to Timothy Antaya, Earl Cleveland, and
24    Marc Buntaine; and I recognize, Dr. Minervini, that you're
25    not listed among those persons, but have I accurately
```

1   stated what appears to be represented in this e-mail?

2   A.   Well, you just stated who it was from and to, yes.

3   Q.   Yes.  Thank you.

4   A.   Okay.

5   Q.   So it's from Ken Gall and I'll read at the beginning of

6   this e-mail:  "Timothy, Not to worry.  Tesla are just doing

7   their best to keep up with any changes so they can meet

8   schedule.  We can communicate what we need to and reset

9   their expectations if need be.  We have always understood

10  your approach to using Tesla as a prime vendor.  I give

11  them high marks for their efforts thus far and to you for

12  identifying them and properly setting expectations with

13  them.  I think this is a communications protocol problem and

14  nothing more."

15       Did I accurately read that, Dr. Minervini?

16  A.   Yes, you did.

17  Q.   Now, let's turn back to the first page which is marked

18  with Production No. SRIV002616?

19  A.   I have it.

20  Q.   And I'll direct your attention to the top of this

21  e-mail, it says:  "From:  Timothy Antaya, To:  Ken Gall," is

22  that correct?

23  A.   That's correct.

24  Q.   And the subject states:  "If people can't communicate

25  they should just shut up," is that correct?

1    A.   That's correct.

2    Q.   And the e-mail begins:  "Ken, forgive me but it's not

3    a communication problem.  It's an understanding gap.  (If

4    you say that this is a communication problem one more time,

5    then I am going to come out there and kick your ass down the

6    hill and into the pond.)"

7         Now, I'm skipping down to the fourth paragraph.  "Now

8    I know that at various times it is viewed that these rules

9    are hurtful, the order is wrong, we are falling behind, and

10   people are not being allowed to work hard and contribute

11   what they think they should do, and at all times,

12   particularly from you, that there is a fuckin'

13   communications problem."

14        Did I accurately read that, Dr. Minervini?

15   A.   Yes, you did.

16   Q.   And, Dr. Minervini, you believe it's important for

17   research scientists in your division at MIT to behave

18   collaboratively with research partners; is that right?

19   A.   I do.

20   Q.   And you don't believe that Dr. Antaya's comments that

21   I just read in this e-mail marked as Exhibit 65 represent

22   an effective effort to communicate, do you?

23   A.   I wouldn't like to seek communications with exactly

24   that tone, no.

25   Q.   And, in fact, you believe Dr. Antaya acted

1    unprofessionally in writing the things that I just read

2    out loud from this e-mail designated as Exhibit 65, don't

3    you?

4    A.   Well, I think I just agreed with that in the previous

5    statement, yes.

6    Q.   That, indeed, Dr. Antaya acted unprofessionally?

7    A.   Well, in using that -- those words and tone, yes.

8    Q.   I'm sorry we keep jumping back and forth here, but

9    let's go back one more time to your deposition transcript --

10   or, I'm sorry, your declaration which is Exhibit 115.

11   A.   Okay.

12   Q.   And let's go to Paragraph 40, please.  Do you have that

13   in front of you?

14   A.   I do.

15   Q.   "Based on my understanding of the collaboration

16   between MIT and Still River and the contributions that

17   Dr. Antaya made to this technology, Dr. Antaya made

18   significant contributions to the technology described in

19   the '311 patent claims and deserves credit for these

20   contributions."  My question is:  what sort of credit do

21   you mean, Dr. Minervini?

22   A.   Well, if -- I'm not an assigner of inventorship, but

23   the '311 patent should include recognition of the work that

24   Dr. Antaya and MIT contributed to that patent as recognition.

25   Q.   But you don't mean to testify that Dr. Antaya should be

1    named as an inventor on the '311 patent, do you?

2    A.   Well, that's for this hearing to decide, but I believe

3    he contributed to the claims that are in that patent.  If

4    that then makes you an inventor, then the answer is yes, but

5    as I say I'm not a patent lawyer so, you know, I'm just

6    stating that I believe he did contribute to the claims as

7    I mentioned earlier.

8    Q.   All right.  Let me just go back to the deposition

9    transcript one more time, and we'll briefly look over a

10   portion of your testimony just so that we have clarity for

11   the record.

12       And this is Exhibit 98, your deposition transcript, and

13   I'll direct your attention to Page 8 -- I'm sorry, Page 13.

14   I'll direct your attention to Line 4 of Page 13.  Do you

15   have that in front of you?

16   A.   I do.

17   Q.   Thank you.  I'll begin reading.  "Question:  Should

18   Dr. Antaya be named as an inventor on the '311 patent?

19   Answer, I don't think I'm qualified to answer that.  It's

20   like a -- it's a legal decision that I wouldn't know how to

21   make.  Question:  You don't have an opinion one way or the

22   other as to whether he should be named as an inventor?

23   Answer:  I can't express an opinion on that."

24       Was that your sworn testimony, Dr. Minervini?

25   A.   That was.

1          MR. BRUNO:  Thank you, Dr. Minervini.  I have no

2     further questions at this time.

3          SPECIAL MASTER PETERSON:  All right.  I assume you

4     have redirect?

5          MS. DEVARASETTY:  I do.  I do, your Honor.

6          SPECIAL MASTER PETERSON:  How much time do you

7     think?

8          MS. DEVARASETTY:  I think I can finish in 15, maybe

9     20; I might go a little bit over, but it should be enough

10    for us before the break.

11         SPECIAL MASTER PETERSON:  All right, before the

12    break.  Let's try to get it in before the break then.

13    All right.  You may proceed.

14         REDIRECT EXAMINATION BY MS. DEVARASETTY:

15    Q.   Dr. Minervini, you testified on direct or on

16    cross-examination that you're well acquainted with

17    Dr. Gall; is that right?

18    A.   (No audible response.)

19    Q.   That you're well acquainted with Dr. Gall?

20    A.   Yes, I am.

21    Q.   You said that you've gone over to his house --

22    A.   I have.

23    Q.   -- is that right, and you've had drinks with him?

24    A.   I have.

25    Q.   You've had several conversations with him?

1    A.   Yes.

2    Q.   And you're aware of his technical background and

3    expertise, is that right?

4    A.   I am.

5    Q.   And you're aware of when Dr. Gall first came to MIT in

6    January 2003, right?

7    A.   Yes, I am.

8    Q.   And at that time Dr. Gall didn't bring with him a

9    design for a magnet that would enable a high-field compact

10   superconducting synchrocyclotron, is that right?

11   A.   No he didn't.

12   Q.   And based on your understanding of Dr. Gall's expertise

13   and technical knowledge, did you think that the skill that

14   he had would be sufficient to be able to build that magnet

15   without extensive research or experimentation?

16   A.   No, not at all.

17   Q.   And why not?

18   A.   Because he had absolutely no background in

19   superconducting magnets, applied superconductivity magnet

20   technology, or engineering that I could see from his resume,

21   and in discussions with him, you know, his expertise and

22   his educational work history.

23   Q.   What kind of experience do you have in that field?

24   A.   I have approximately 30 -- more than 30 years in this

25   field:  superconducting magnet technology.

1    Q.   And what kind of superconducting magnets have you

2    worked on?

3    A.   I've worked on -- well, initially, I worked on

4    superconducting magnets for superconducting electric

5    generators.  I did my graduate research on that at MIT,

6    and then I did post-doctoral work at the National Bureau of

7    Standards, it's now called NBS, in a group called:

8    Superconductors and Magnetic Materials where I did research

9    on AC losses and superconductors.

10       And then in 1984 I went to MIT where I've been for the

11   last 28 years in the Technology and Engineering Division,

12   and now I head -- where the focus, the primary focus, over

13   all those years was very large scale, high-field advanced

14   magnets for fusion applications, but during that period of

15   time we've done applications for high energy physics

16   experiments, accelerators, detectors, magnetic levitation,

17   magnetic launch for NASA, magnetic energy storage,

18   nuclear physics experiments, and the like.

19   Q.   And you said at the time MIT could build this

20   high-field compact superconducting synchrocyclotron, right,

21   or was --

22   A.   We were willing to take the risk.  I mean, there are

23   some things that I would like to do for fusion.  You know,

24   some physicists want 50 Tesla in the fields to improve the

25   fusion reaction, but there are certain things that I, you

1    know, would only risk as feasible and the high-field range

2    was feasible in my opinion.

3    Q.   The high-field range of what?

4    A.   Of -- that was being asked for in this application.

5    It was achievable but I think several people have said that,

6    you know, 20 Tesla has been made, but those 20 Tesla magnets

7    have a bore of about 35 to 40 millimeters, and the devices

8    weigh hundreds of tons and they're as tall as this building.

9    They're used for nuclear magnetic resonance research.

10       This requires a bore in a high field of this size, and

11   that's a different animal to go to high field, and previous

12   to this our largest magnet that we built was a 13 Tesla

13   magnet with 1.8 meter diameter bore and a 3.6 meter outer

14   diameter and three meters high that produced 13 Tesla at

15   45,000 amps and stored 650 megajoules of energy, and we

16   could fast-wrap it in eight seconds to full capacity

17   steadily, so we knew we had the engineering capacity

18   and the knowledge of superconducting magnet technology.

19       As a matter of fact, the superconducting conductor

20   that Dr. Gall showed was based on work we had done for

21   niobium-3-tin development, these high-field applications

22   for the last 20 years; and the specific piece that he

23   showed was from the levitated dipole experiment, which we

24   had recently completed before that.

25       It's a plasma physics experiment at MIT which has a

1    niobium-3-tin superconducting magnet, and the first high

2    temperature superconducting magnet that was used in the

3    fusion program in the U.S.

4    Q.   One follow-up question on that:  there aren't very

5    many labs using niobium-3-tin as a superconductor, is that

6    right, based on your experience?

7    A.   No -- well, not at that time.  The field of high

8    energy physics for the last decade has now gone strongly

9    into that direction after we showed in the 1990s from the

10   fusion program that you could achieve high fields in large

11   scale applications with them, and they've been actually the

12   area that have been pushing that development.

13   Q.   So when you said at that time, you meant in 2003; is

14   that right?

15   A.   That's correct.  They'd only done a few test model

16   magnets so I believe I heard the 15 Tesla magnet described

17   from Lawrence Berkeley, and I'm very familiar with the

18   group that, that developed that, and that was a test

19   magnet about this long (gesturing), but it was just a

20   completely different design than this.  It had -- you know,

21   it was for a synchrotron dipole accelerator.

22   Q.   When you said that --

23   A.   I'm sorry.

24   Q.   When you said that this compact high-field magnet for

25   a superconducting synchrocyclotron would be a different

1    animal, does that -- strike that.

2        You said that the high-field superconducting magnet

3    for the synchrocyclotron to make it compact would be a

4    different animal; does that mean that even for the group

5    at MIT, setting Dr. Antaya aside, would need extensive

6    research or experimentation to be able to build that

7    magnet?

8    A.   Well, some, yes, particularly with regard to the

9    project cooling.  We thought, at least the MIT team thought,

10   the design should be a dry design where there were no

11   liquid cryogens within the magnet because it would be

12   difficult to rotate them on a gantry and ensure stability

13   with the free service, and so we went to a dry-cooled magnet

14   which is basically induction-cooled, and that was to us

15   new for such a magnet.  Although, as Dr. Gall showed,

16   there were laboratory magnets produced with that type of

17   configuration -- being produced at that time, but, you

18   know, they're sitting in the lab stationary; they're not

19   being flung through the air.

20   Q.   And so let me take you back to the time when Dr. Gall

21   first came to MIT in 2003, you understood at that time that

22   there was no magnet design that Dr. Gall was bringing to

23   MIT; is that right?

24   A.   That's correct.

25   Q.   And when was the magnet design for that high-field

1   superconducting synchrocyclotron?

2   A.   Well, I think -- I'm not sure if documents were

3   presented; I know they're in the record -- it was presented

4   in phases.

5        The first contract, which is shown here, was basically

6   the conceptual design phase which was to prove feasibility,

7   and I can't recall the entire time frame for that.  It was

8   maybe a six-month study, and then we went to the preliminary

9   design phase where we had a preliminary design review by

10   the end of 2005, which kind of vindicates the feasibility

11   and gave assurance to go ahead and, you know, to the final

12   engineering design and fabrication.

13   Q.   Did that fabrication actually start after that

14   preliminary design review?

15   A.   There were probably components going on parallel

16   because as several people have said, it was very fast

17   track; people wanted to be as productive as possible.  So

18   once we had components designed to a level that we thought

19   would be sufficient for the final product, there was

20   development work going on in parallel on the conductor

21   itself; and then eventually when there were conductor

22   trials, pieces, then there were also winding trials and

23   things like that, but I can't remember exactly -- that was

24   probably more 2006, late 2005/2006 before you started

25   getting into actually producing metal.

1    Q.   And so is it your understanding that there was no

2    operative magnet when Dr. Gall came to MIT in 2003?

3    A.   Well, that's a very blank question.  What do you mean

4    by an operative magnet?

5    Q.   A magnet that would work for a high-field compact

6    superconducting --

7    A.   No, I think it was said several times.  Also, an issue

8    by Dr. Hassenzahl; there's no cookbook method for any of

9    these devices.  Every one like this is very specific.

10        Now, there are cookbooks that companies have for magnets

11   such as MRI -- big MRI producers; they produce on the order

12   of 3,000 of those a year.  And after 20 years of building

13   them, they've refined their designs such that they're in

14   production mode and they never change; they don't like to

15   introduce changes because the production efficiency and the

16   costs are very well-controlled at this point, but for the

17   first-of-a-kind device you basically start from these

18   principles which you find in the books that were described,

19   but you would have to, you know, you have to appropriately

20   apply them.

21        And, you know, so they kind of describe the process and

22   parts of the process you have to do to understand how to

23   build such a device, but you have to do all the integration

24   together, and that requires a lot of vigoration to do that.

25   Q.   So is it within your personal knowledge that Dr. Antaya

1    contributed to the development of that preliminary magnet

2    design?

3    A.   Absolutely.

4    Q.   And what in your personal knowledge do you know that

5    Dr. Antaya contributed to that particular design?

6    A.   Well, as I stated in my testimony here, most aspects

7    of it.  He did the initial calculations that sized the

8    conductor, the magnetic field.  He suggested the type of

9    conductor based on the type of conductor that we had just

10   previously used on the LDX Project, you know, the initial

11   sizing of the iron, the pole shape, the beam chamber, the

12   dees, the RF system, the ion source.  Virtually, you know,

13   the complete conceptual design; of which, once we had the

14   first part of the funding, then the engineers started

15   working in concert with him to, you know, to detail

16   calculations analysis, start to do some drawings and

17   iterations that -- from which we could trade-off components

18   because there was hundreds and hundreds of tradeoffs you

19   have to make to fit everything in a small space.  And you

20   move something a millimeter and it has repercussions

21   somewhere else in the design, and so that's why you need a

22   team, and you need a competent team that you want to work

23   with, to finish it, but he did the initial work and he fed

24   all the initial conceptual stuff to the team at MIT that

25   was working on it.

1        And as the principal investigator and the line manager

2    of those people, I acted in concert to organize their work,

3    to keep everyone working at the -- on the right things at

4    the right time; and, of course, we have other projects.

5    By the way, usually, no one works solely on one project so

6    there were other overlapping projects, and then, of course,

7    there are contractual issues and things, problematic things

8    that you have to keep track of.

9    Q.   You mentioned that you were the principal investigator

10   for this project and that on cross-examination you mentioned

11   that Dr. Antaya was not; was there a reason for that?

12   A.   At MIT "principal investigator" is a special status,

13   so to have "principal investigator" status, you have to be

14   either a faculty member; or if you're on the research staff,

15   you have to have a more senior appointment, and there's

16   two levels.  There's a principal scientist or engineer

17   appointment, and there's a senior scientist or engineer

18   appointment, and you could imagine them as being analogous

19   to associate professor and full professor but with research

20   as a primary goal not teaching.

21       So at that time I was the only one in the division who

22   had such a status.  I was a senior research engineer at

23   that time.  When Dr. Antaya came, he did not have that.

24   Normally, people do not come in with a senior status, and

25   it takes some time to demonstrate that you have the

1    capabilities and the experience, the professional

2    experience, to do that.  And so it was some years later

3    that we managed to promote him to principal research

4    engineer -- or, I'm sorry, principal research scientist,

5    which then gave him the status where he could independently

6    sign, you know, off on projects.

7         But in terms of doing these types of work, I mean, it's

8    a rarity in our engineering division; we're a physics lab

9    where most of the senior positions go to physicists, so in

10   my division there's only one other principal research

11   engineer, and so it sometimes makes organizing the work

12   difficult but --

13   Q.   Thank you.  Can I direct your attention to the patent,

14   Exhibit 12, please.  I'm going to direct your attention to

15   Claim 1.

16   A.   Yes, I see it.

17   Q.   Is it your belief that Dr. Antaya contributed to that

18   claim?

19   A.   Well, as he said, within -- within the definition of

20   the apparatus, yes, with the synchrocyclotron being part of

21   the apparatus.

22   Q.   Just so that I understand your testimony, is it that

23   because he was able to design and enable a compact

24   synchrocyclotron; that that's the basis of your belief for

25   his contribution to that claim?

1    A.   Yes, because this is worthless without having

2    feasibility to do both the physics and the engineering in a

3    combined way.   Otherwise, it's not feasible to make it

4    compact enough to -- to circulate or to swing around the

5    room.

6    Q.   I'm also going to direct your attention to Claim 30

7    and then ask you the same question:   do you believe that

8    Dr. Antaya contributed to that claim?

9    A.   Yes.

10        MR. BRUNO:   Objection, asked and answered.

11    A.   Yes, I do.

12        SPECIAL MASTER PETERSON:   I'm sorry, I didn't even

13    hear your objection.

14        MR. BRUNO:   I'm sorry, asked and answered was the

15    objection.

16        SPECIAL MASTER PETERSON:   Overruled.   You can answer

17    it again.   Your answer was yes?

18        THE WITNESS:   Yes.

19        SPECIAL MASTER PETERSON:   Okay.

20    Q.   And then ultimately Claim 31, do you believe

21    Dr. Antaya contributed to that claim?

22    A.   Yes, I do.

23    Q.   And what's the basis for your belief that Dr. Antaya

24    contributed to Claims 30 and 31?

25    A.   Because I believe it's his work that contributed to

1    making the accelerator small enough and light weight enough

2    to be mounted on the gantry and the orientation, and to

3    create the proton beam.

4    Q.   And I'll ask you to flip to the first page of that

5    patent, you'll notice the filing date of the provisional

6    application is on the first page under Related U.S.

7    Application Data, do you see that?  It's in the first

8    column about halfway down?

9    A.   The No. 22?

10   Q.   At No. 60.

11   A.   Oh, yes, I see the date.

12   Q.   Do you see the date that the provisional application

13   was filed?

14   A.   I do.

15   Q.   What date was that?

16   A.   November 18, 2005.

17   Q.   And based on your personal knowledge of superconducting

18   magnets, do you know of any other superconducting magnet

19   design that would have been able to enable the claims of

20   the '311 patent besides the one that MIT group designed

21   with Dr. Antaya?

22   A.   No, I do not.

23   Q.   I'm going to direct your attention to Exhibit 65.

24   A.   I have it.

25   Q.   Do you see the date on that e-mail?

```
 1      A.   Yes.
 2      Q.   Was the date on that e-mail after the filing date of
 3      that patent, of the '311 patent?
 4      A.   Yes, it was almost a year later:  October 12th, 2006.
 5           MS. DEVARASETTY:  I have no further questions, your
 6      Honor.
 7           SPECIAL MASTER PETERSON:  All right.  Recross?
 8           MR. BRUNO:  I have no further questions, your Honor.
 9           SPECIAL MASTER PETERSON:  All right.  Well, let's
10      take our mid-afternoon break.  Let's take 15 minutes until
11      3:55.  We'll stand in recess.
12           MR. BAUER:  Mr. Peterson, before we break there's
13      just one housekeeping thing I would just like to raise for
14      you.  I've got scheduled -- I have a court hearing with
15      Delaware so I'm going to have to excuse myself.
16           SPECIAL MASTER PETERSON:  All right.
17           MR. BAUER:  And after we scheduled this I have a
18      Federal Circuit argument on Friday, so I won't be here
19      tomorrow either but Miss Devarasetty will be just fine.
20           SPECIAL MASTER PETERSON:  You are well-represented,
21      have safe travels.
22           MR. BAUER:  Oh, thank you.  There's no place I'd
23      rather be than here so I want you to understand I'm not
24      skipping out on you all but this is one of my favorite
25      clients.
```

1          SPECIAL MASTER PETERSON:  I understand.  I

2     understand.  Actually, you'll be in warmer climate, I think

3     maybe, maybe.

4          MR. BAUER:  Thank you, your Honor.

5          SPECIAL MASTER PETERSON:  All right.  Anything else?

6          MS. DEVARASETTY:  I'm sorry, there is one matter as

7     far as the exhibits for the Minervini direct, but we can do

8     that after the break if you want?

9          SPECIAL MASTER PETERSON:  Let's do that after the

10    break.

11         MS. DEVARASETTY:  Okay.

12         SPECIAL MASTER PETERSON:  And the witness, we don't

13    need him again, right?  All right.  Doctor, you are excused,

14    with our appreciation and you can go home, go to work, do

15    whatever you can, go have a pizza.

16       All right.  Thank you very much.  We'll stand in recess

17    until 4:55.

18         (Whereupon, a brief recess convened.)

19         SPECIAL MASTER PETERSON:  All right.  I'm sorry, are

20    we ready to go back on the record?

21         MS. DEVARASETTY:  Yes, your Honor.

22         SPECIAL MASTER PETERSON:  Have we got everybody

23    here?

24         MS. DEVARASETTY:  That's correct.

25         SPECIAL MASTER PETERSON:  All right.  You had some

1    exhibits?

2         MS. DEVARASETTY:  That's right, your Honor.

3    Exhibits 62, 77.

4         SPECIAL MASTER PETERSON:  Wait, 62?

5         MS. DEVARASETTY:  62.

6         SPECIAL MASTER PETERSON:  62, 77.

7         MS. DEVARASETTY:  106.

8         SPECIAL MASTER PETERSON:  Okay.

9         MS. DEVARASETTY:  419 to 423.

10        SPECIAL MASTER PETERSON:  Got it.  That's it?

11        MS. DEVARASETTY:  That's it.  Those are the

12   additional exhibits.

13        SPECIAL MASTER PETERSON:  All right.  Mr. Hill, any

14   objection?

15        MR. HILL:  No objection, your Honor.

16        SPECIAL MASTER PETERSON:  All right.  Admitted

17   without objection.

18        (Exhibit Nos. 62, 77, 106, 419, 420, 421, 422, 423

19         admitted in evidence.)

20        All right.  Are we ready to move on to our next

21   witness?

22        MR. HILL:  Actually, we need to move some exhibits

23   in that we used to cross.

24        SPECIAL MASTER PETERSON:  All right.

25        MS. CHRISTO:  We would like to move to admit

1    Exhibit 98 and Exhibit 65.

2          MS. DEVARASETTY:  No objection.

3          SPECIAL MASTER PETERSON:  Okay.  Admitted without

4    objection.

5          (Exhibit Nos. 98 and 65 admitted in evidence.)

6          SPECIAL MASTER PETERSON:  Are we ready for our next

7    witness?

8          MS. DEVARASETTY:  MIT calls Dr. William Hassenzahl

9    to the stand.

10         SPECIAL MASTER PETERSON:  Okay.  By the way, as the

11   witness is making his way to the stand, by my calculations

12   to this point in time MIT has used -- of the five hours has

13   used an hour and 44 minutes, and Mevion has used two hours

14   and 46 minutes.

15      All right, and I'd just remind you that you're still

16   under oath from this morning.

17         THE WITNESS:  Yes.

18         (William Hassenzahl, Ph.D., previously duly sworn.)

19         SPECIAL MASTER PETERSON:  Thank you.

20         MS. DEVARASETTY:  May I approach the witness, your

21   Honor?

22         SPECIAL MASTER PETERSON:  Yes.

23      DIRECT EXAMINATION BY MS. DEVARASETTY:

24   Q.  Dr. Hassenzahl, I've placed in front of you a couple of

25   documents; one that's marked Exhibit 116, one, Exhibit 79,

1   and one, Exhibit 81, and I'm going to focus on Exhibit 116

2   for a moment.

3       Do you recognize this document?

4   A.   Yes, I do.

5   Q.   Do you recognize this document as your declaration in

6   this matter?

7   A.   Yes.

8   Q.   And that document includes the testimony that you're

9   giving today in this case, is that right?

10  A.   That is correct.

11  Q.   And that document also incorporates two other

12  documents, correct:  it incorporates Exhibit 79 and

13  Exhibit 81, is that right?

14  A.   Correct.

15  Q.   And I'd like to direct your attention to the last page

16  of Exhibit 116, and that page contains your signature; is

17  that right?

18  A.   That's correct.

19  Q.   And that document is dated January 25, 2012, correct?

20  A.   That's correct.

21       MS. DEVARASETTY:  Your Honor, I'd like to now offer

22  this witness' testimony into evidence which includes

23  Exhibit 116, Exhibit 79, and Exhibit 81.

24       SPECIAL MASTER PETERSON:  All right.  Any

25  objections?

1          MR. HILL:  No objections.

2          SPECIAL MASTER PETERSON:  All right, received

3     without objection.

4          (Exhibit Nos. 79, 81, and 116

5           admitted into evidence.)

6     CROSS-EXAMINATION BY MR. HILL:

7     Q.   Good afternoon, Dr. Hassenzahl.

8     A.   Good afternoon.

9     Q.   Now, you opine in your expert report that's now been

10    incorporated as testimony that the main point of novelty of

11    the claimed invention of the '311 patent is the design of

12    the high-field synchrocyclotron; is that true?

13    A.   It is the high-field synchrocyclotron, yes.

14    Q.   Would you agree, though, that the design of the

15    high-field synchrocyclotron is not recited in the claims of

16    the '311 patent?

17    A.   The design is not recited in the claims, that is

18    correct.

19    Q.   And, in fact, if you look at Claim 1 of the '311

20    patent, which is Exhibit 12 if you need to turn to it;

21    only an accelerator is recited, correct?

22    A.   At the time of the patent the only accelerator that

23    would satisfy that requirement was the high-field compact

24    synchrocyclotron developed at MIT under the direction of

25    Mr. -- Dr. Antaya.

1  Q.   My question was:  only an accelerator is recited in

2  Claim 1, correct?

3  A.   The word used there is "accelerator."

4  Q.   Correct.  In fact, the '311 patent teaches in the

5  written description that several kinds of particle

6  accelerators can be used to produce a 250 MeV proton beam,

7  correct?

8  A.   In the descriptions before the claims, is that what you

9  mean?

10  Q.   Yes?

11  A.   Yes, I agree there are many kinds of accelerators that

12  for 50 years have been able to do that.

13  Q.   And do you have Exhibit 12 handy?  It's the '311

14  patent.

15  A.   Oh, yes, right here.  Thank you.

16  Q.   Could you turn to Column 1 of the written description,

17  past that, the lengthy prior art disclosure?

18  A.   I have it.

19  Q.   Okay.  Could you go to Column 1, Lines 24 to 27, where

20  it talks, it describes the -- it starts off:  "Several

21  kinds of particle accelerators," do you see that?

22  A.   Yes.

23  Q.   Could you please read that paragraph into the record?

24  A.   "Several kinds of particle accelerators can be used to

25  produce a 250 MeV proton beam at a sufficient beam current

1    (for example, about 10 nA) for radiotherapy, including

2    linear accelerators, synchrotrons, and cyclotrons."

3    Q.   Thank you.  Now, you opine that Dr. Antaya should be

4    named as an inventor on the '311 patent because Dr. Antaya

5    made significant contributions to the design effort of the

6    synchrocyclotron and because of those contributions, the

7    design of the synchrocyclotron claimed in the '311 patent

8    was brought to a point that it could be designed and built

9    by a person of ordinary skill in the art.

10        Is that your opinion?

11   A.   I believe those are my words, yes.

12   Q.   Isn't it true that you have not undertaken any kind of

13   a study to determine whether Dr. Antaya's design actually

14   would work?

15   A.   That's true, I have not gone through the effort to go

16   through all of the details of the design that was included

17   in the MIT patents and the documentation that we have up to

18   the point of the preliminary design.

19   Q.   You're aware, aren't you, that Mevion has built a

20   working synchrocyclotron?

21   A.   I know they have installed a synchrocyclotron;

22   although, I know nothing about its functionality at this

23   time.

24   Q.   So you -- okay, that's good.  And let me just reiterate,

25   if I could, to make sure that I understand your testimony,

1    you can't opine one way or the other whether Dr. Antaya's

2    design would work as its described in the '311 patent,

3    correct?

4    A.   I guess I'm not sure what you mean by "work."

5    Q.   That it could actually produce a stable proton beam?

6    A.   No, I don't think that there are enough details to make

7    that decision.

8    Q.   Okay.  If the design actually did not work, would that

9    change your opinion whether he should be named as an

10   inventor on the '311 patent?

11   A.   No.

12   Q.   Why not?

13   A.   Because when you develop the first design of a system,

14   when you conceive of something, especially in these

15   superconducting magnet systems, the first one almost never

16   does what you want, and so you have to iterate that process

17   as well.  And you make some simple modifications, some

18   perhaps more complex modifications, but the core of the

19   design is what he was thinking about with a niobium-3-tin

20   coil, for example, with a general shape of the outside of

21   the device, perhaps some of the other internal pieces being

22   the same.  Then, that was the concept that is important to

23   this particular device.

24   Q.   You mentioned in your expert report that the '311

25   patent incorporates Dr. Antaya's design as well as the

1    specifications of Dr. Antaya's patents, right?

2    A.   I believe that's true.

3    Q.   And were you here this morning when Mr. Bauer suggested

4    this case was almost plagiarism?

5    A.   Yes, I was.

6    Q.   You do realize, don't you, that the work MIT performed

7    was done pursuant to an agreement with Mevion, and that

8    Mevion paid for the work?

9    A.   I do.

10   Q.   Do you know what the best mode requirement is for a

11   patent application?

12   A.   I do not know.

13   Q.   Are you aware that Dr. Antaya's named as an inventor

14   on multiple patents directed to specific features of the

15   synchrocyclotron that his team designed for Mevion?

16   A.   Yes.

17   Q.   One of those patents discloses and claims Dr. Antaya's

18   scaling law, correct?

19   A.   It talks about it but it does not go into great detail

20   on it, yes.

21   Q.   Do you agree that he's been credited for that, for

22   this scaling law, in another patent besides the '311?

23   A.   I don't think that's the core issue in the other

24   patent, but to the extent that he's been given credit for

25   that there, yes.

1    Q.   What is your field of expertise?

2    A.   Well, I have many fields of expertise, but in this

3    particular area let me talk about accelerators.  Fifty

4    years ago I received my Bachelor's degree in Physics and

5    Engineering and then went on.

6        In that time I have worked on either the concept of

7    detailed design or parts of installation of and making

8    operable 11 separate accelerators.  In addition to that, I

9    have worked on doing physics experiments on three different

10   machines independent of the others I mentioned so I have

11   worked on accelerators.

12   Q.   Okay.  And in that field can you tell the Court what is

13   required for something to be considered a scientific law?

14   A.   Oh, that's difficult to -- oftentimes, a law is

15   something in a conversation where you've come up with a

16   straight forward or a solution to a problem that condenses

17   the information into a few lines or a few equations, and

18   that can be thought of and described as law, as is the case

19   here.

20   Q.   Now, isn't it typically required that such a finding

21   would have to undergo extensive peer review and widespread

22   acceptance before it could be considered to be a law in your

23   field?

24   A.   Well, to do that it has to be distributed, and it has

25   to have a request made that it be evaluated in a particular

1    circumstance.

2    Q.   In your opening report you call Dr. Antaya's scaling

3    law actually a relationship rather than a law, isn't that

4    true?

5    A.   Same words.

6    Q.   And then in your rebuttal report you refer to it as

7    the scaling law, right?

8    A.   That's the typical words that have been used in other

9    discussions, the scaling law, yes.

10   Q.   What have you done, if anything, to verify the accuracy

11   of the scaling law that's reflected in Dr. Antaya's notes?

12   A.   I went through the notes.  I went through the

13   calculations, which are very hard to sort out frankly, and

14   went through my own verification, and came to the same

15   conclusion for the relationships or what we call the

16   scaling law.  I'm not sure anyone else has ever done that

17   actually.

18   Q.   Did you find anything in his scaling law notes that

19   showed he was actually using equations that had been

20   proposed long ago in prior art?

21   A.   The scaling law relationships/equations, I had never

22   seen before --

23   Q.   Okay.

24   A.   -- but all of those are derived from work that had been

25   going on for a long time.  It was in my mind his bright

1    light that said:  I can save a couple years of work by

2    showing this relationship, which he then found to be true.

3    I'm not sure he believed it was true at first, and that was

4    truly a genius piece of activity.

5    Q.   Can we go to Exhibit 109, please?

6    A.   Should I close '311 or leave it open?

7    Q.   Probably leave it handy.  I'll try not to go back and

8    forth.

9    A.   That's okay.  Go ahead.

10   Q.   You reviewed Exhibit 109 in preparing your opinions in

11   this case, did you not?

12   A.   Yes.  May I look at it for one second, please?

13   Q.   Sure.

14   A.   Yes.

15   Q.   Could you turn to Page 6 of that document, Section 3.4

16   Acceleration?

17   A.   Yes.

18   Q.   This shows a starting frequency of 145 MHz, correct?

19   A.   It shows that, yes.

20   Q.   And it shows a calculation of a final frequency of

21   114.4 MHz, correct?

22   A.   Yes.

23   Q.   In your opinion would these frequencies provide a

24   stable beam output in a superconducting synchrocyclotron?

25   A.   Well, I'd have to do the calculation, and I did do that

1    calculation before but I don't remember the numbers, and I

2    think I could check.  It won't take very long to check that,

3    but I don't have my calculators in here with me, but it may

4    or may not; I don't know.

5    Q.   You did the calculation before, though?

6    A.   I did the calculation, and I did not compare it to this

7    document when I did it.

8    Q.   And isn't it true that Dr. Antaya's calculation here

9    does not consider the weak focusing requirement for a

10   superconducting synchrocyclotron?

11   A.   It is entirely possible that that is for a constant

12   field rather than a field in which it decreases with

13   position --

14   Q.   All right.

15   A.   -- but I can't -- I don't know.

16   Q.   And when you did your calculation, did you consider a

17   weak focusing requirement for that calculation?

18   A.   When I did the calculation, I considered a change in

19   field from 9.5 Tesla at the center to 8.5 Tesla on the

20   outside.  That might not be the number that's used, but that

21   was my calculation.

22   Q.   Did you arrive at a final frequency of 106.3 MHz?

23   A.   I don't remember the number, but I actually wrote a

24   spreadsheet, and I think that's entered also as a document

25   here where I expanded what was done by Dr. Gall to include

1    a tabular list, depending on what you wanted it for a field

2    and how you wanted the gradient.  Again, I can't remember

3    all those details, but what final energy you wanted so I

4    think it's a straight-forward calculation.

5    Q.   And you had a chance to review Dr. Gall's notebook, the

6    one that has "proton" written on the front of it that was

7    shown this morning, right?

8    A.   I never saw the word "proton," but, yes.

9    Q.   You did see his?

10   A.   I did.

11   Q.   -- notebook, a copy of it?

12   A.   Uh-huh.  I mean, I've seen it.

13   Q.   And did you find any frequency calculations in there

14   that showed that Dr. Gall understood and applied the weak

15   focusing requirement before he met with Dr. Antaya?

16   A.   I don't remember.

17   Q.   Could you go to Exhibit 43, please; and, in particular,

18   in Exhibit 43 there's a page that has a Production number at

19   the bottom:  SRIV4147?

20   A.   I have that.

21   Q.   And do you see a frequency calculation there that

22   starts at 153 MHz and ends at 112?

23   A.   I do.

24   Q.   Does that calculation in your opinion include the weak

25   focusing requirement of a superconducting synchrocyclotron?

1    A.   Well, I do not know how the 61.75 and the 84.27 are

2    developed, but to include weak focusing you have to include

3    two factors:  one of them is from the mass increase, and the

4    other one is from the final field.  So to the extent that

5    you include the two of those, you can come up with the right

6    final frequency, yes.

7    Q.   And have you done any calculations to verify whether

8    the resulting 112 includes the factors that you just

9    mentioned?

10   A.   No.

11   Q.   Would you agree that before Dr. Gall approached

12   Dr. Antaya that there was a long-felt need to make a low

13   cost proton therapy machine with a superconducting

14   synchrocyclotron?

15   A.   I believe I made that statement this morning in my

16   tutorial, yes.

17   Q.   All right.  Indeed, that need was felt before June

18   2001 when Dr. Gall claims to have fully conceived of his

19   invention; isn't that true?

20   A.   Long before that time.

21   Q.   All right.  And there's a book that you cited to in

22   your rebuttal report by Mr. Scharf, do you recall that?

23   A.   Yes.

24   Q.   And it was from the year 1994?

25   A.   Yes.

1    Q.   You state in your rebuttal report that Dr. Gall

2    addressed the problem in exactly the same way as Dr. Scharf,

3    correct?

4    A.   Excuse me, I think --

5    Q.   Yeah.  Why don't we reopen up your rebuttal report,

6    which was Exhibit 81 and go to Page 7 please.

7    A.   Yes.  Can you ask the question again?

8    Q.   I'm just waiting.

9    A.   Oh, okay.  My hands are faster than your computer?

10   Q.   I want you to look at Paragraph 16 of your report.

11   A.   Okay.

12   Q.   And it carries over to Page 17 -- I'm sorry, Page --

13   A.   Page 7?

14   Q.   I'm getting very confused on my numbers now.

15   A.   Okay.

16   Q.   There's a sentence there that starts:  "These are all

17   the same issues that Dr. Gall addressed with his goal of

18   decreasing the size of the synchrocyclotron further."

19   A.   Yes.

20   Q.   "His solution addresses the problem in exactly the

21   same way (i.e., by reducing the mass of the cyclotron by

22   employing superconducting technology.)"  That was your

23   testimony in your rebuttal report, correct?

24   A.   I believe that those are directly from Scharf's book,

25   in fact, yes.

1    Q.   But isn't it true that Scharf's comments that you're

2    quoting to here actually describe a system that included a

3    beam transport mechanism?

4    A.   People typically used beam transport mechanisms at

5    that time, and it's possible that it is in one of the pages

6    before or after that statement so I would not be surprised,

7    yes.

8    Q.   And, in fact, at the beginning of Paragraph 16 of your

9    rebuttal report you quote there that the quote from Scharf

10   is:  "Installing the synchrocyclotron proper ... together

11   with beam transport system and a gantry."  That was the

12   quote?

13   A.   I see it.  Yes, it is there.

14   Q.   Okay.

15   A.   We don't know what that beam transport system is,

16   though.

17   Q.   But we know, don't we, that Dr. Gall presented an idea

18   to Dr. Antaya where there would be no beam transport system?

19   A.   You know, I look at that statement and I think about

20   the protons that leave the synchrocyclotron and then

21   eventually make it to the patient.  In the process of going

22   from the synchrocyclotron to the patient you may or may not

23   have magnets within the protons, which is what is typically

24   done, but you still have a beam transport system of some

25   form and you have a way of adjusting the energy of the

1    protons for different locations in the patient, and there

2    are a variety of methods used so that you get the right

3    dose.  And in a sense that's a beam transport system or a

4    beam controlled system as well, so it's not clear from this

5    statement what he meant by a "beam transport system," and

6    in my mind almost any method of doing it is a beam transport

7    system.

8    Q.   Isn't it true that the '311 patent does not describe or

9    claim a beam transport system?

10   A.   It does not claim it as a separate item.

11   Q.   And, in fact, doesn't the patent, the '311 patent of

12   Dr. Gall actually teach that his invention eliminates the

13   need for beam transport elements?

14   A.   He does say that in the earlier part of the description,

15   yes.

16   Q.   All right.  At Column 3, Lines 28 through 31, the '311

17   patent states:  "The direct mounting of the accelerator on

18   the gantry eliminates beam transport elements that would

19   otherwise be required to transport the beam from the

20   accelerator to the target volume within the patient."

21        Isn't that true?

22   A.   It doesn't say that there are no transport elements

23   needed; it says that it eliminates some transport elements.

24   Q.   Did I read correctly what the patent stated?

25   A.   I think so.  I can't, it's -- let me get to the patent.

1    It's right over here.

2    Q.   Okay.  Let's go to Column 3, Lines 28 through 31.

3    A.   What is the number again for the --

4    Q.   Column 3 -- oh, on the patent I think it's Exhibit 12.

5    A.   Okay.  I couldn't keep it open while I was doing the

6    other things.  What was it again, Column?

7    Q.   Column 3 --

8    A.   Right.

9    Q.   -- Lines 28 through 31.  The sentence begins:  "The

10   direct mounting"?

11   A.   Column 3:  "All extracted beam focusing and steering

12   elements are incorporated into the accelerator or

13   immediately adjacent to it."

14   Q.   Right, and could you read the next sentence please?

15   A.   "The direct mounting of the accelerator on the gantry

16   eliminates beam transport elements that would otherwise be

17   required to transport the beam from the accelerator to the

18   target volume within the patient."

19   Q.   And at the time of Dr. -- I'm sorry, I don't know if

20   Scharf is a doctor or not, but at the time of Scharf's

21   book in 1994, isn't it true that there were no compact

22   superconducting synchrocyclotrons that could be directly

23   mounted on a gantry?

24   A.   I think we've heard that none of -- the first one that

25   was made was the one we were talking about here so, yes.

1    Q.   Okay.  Now, shifting topics a bit you approached --

2    A.   Can I go back a minute?  Because this claims that

3    there is a focusing or a bending element associated with the

4    cyclotron itself that is part of the beam transport system.

5    Q.   Okay, understood.

6    A.   Okay.

7    Q.   Now, you approached the preparation of your reports

8    and opinions in this case with the assumption that Dr. Gall

9    did not have the technical understanding necessary to

10   conceive of the invention in the '311 patent before he met

11   Dr. Antaya; isn't that true?

12   A.   I believe I made that statement, yes.

13   Q.   And, in fact, in your deposition you testified that

14   you saw nothing in the background of Dr. Gall that would

15   indicate he had an idea of how a cyclotron worked; isn't

16   that true?

17   A.   That's correct.

18   Q.   And when you were asked whether you had any knowledge

19   that Dr. Gall had actually built a cyclotron, you were

20   surprised by that, weren't you?

21   A.   I had not read the statement where he said he had

22   built one before.

23   Q.   Would you go to Exhibit 1, please?

24   A.   Okay.

25   Q.   Do you recognize Exhibit 1?

1    A.   I have Exhibit 1.

2    Q.   And that's something you reviewed in preparing your

3    reports, is that true?

4    A.   Correct.

5    Q.   And this includes a list of what Dr. Gall calls basic

6    design specifications the cyclotron should meet, right?

7    A.   That seems like what he wanted to describe as blackbox,

8    yes.

9    Q.   And Mr. Bruno asked you about this document at your

10   deposition, didn't he?

11   A.   He did.

12   Q.   In fact, he posed a question to you:  "Were those

13   specifications sufficient to demonstrate the conception of

14   the invention claimed in the '311 patent?"  The court

15   reporter noted a pause, and you answered:  "So the answer

16   to your question is yes.  These were the major

17   specifications in the patent?  Yes, uh-huh."

18       That was your answer to Mr. Bruno's question, wasn't

19   it?

20   A.   Until I corrected it, yes, it was.

21   Q.   And you didn't correct that testimony until after

22   you'd taken a break and consulted with counsel outside,

23   isn't that correct?

24   A.   When I realized what the question actually was, I had

25   to turn it around.

1  Q.  But at the time before you took a break that was your

2  testimony, isn't that true?

3  A.  Based on misinformation from Mr. Bruno and a

4  misunderstanding of what he was saying, correct.

5          MR. HILL:  No further questions at this time.

6          SPECIAL MASTER PETERSON:  All right.  Redirect?

7          MS. DEVARASETTY:  Yes, your Honor.

8      REDIRECT EXAMINATION BY MS. DEVARASETTY:

9  Q.  Dr. Hassenzahl, I would like to direct your attention

10  to the claims of the '311 patent, so Exhibit 12.

11  A.  Yes, okay.

12  Q.  So counsel directed you to a comment in the -- in the

13  Column 1 in the background about several particle

14  accelerators that could be used to produce a 250 MeV proton

15  beam?

16  A.  Correct.

17  Q.  Could those other 250 MeV cyclotrons be mounted on a

18  gantry?  Let me put the question another way:  let me direct

19  your attention to the Column 1 down at the bottom at Line 63?

20  A.  53 or 63?

21  Q.  63.

22  A.  Okay.

23  Q.  I'm going to read that paragraph into the record.

24  It  says:  "In typical proton beam therapy, the circular

25  particle accelerator that produces the beam is too large to

1    mount on a gantry.  Instead, the accelerator is mounted in

2    a fixed position and the particle is redirected through a

3    rotating gantry using magnetic beam steering elements."

4        Does that suggest to you that there were other 250 MeV

5    accelerators that could be used, could be mounted on a

6    gantry and rotated around a patient for proton therapy?

7            MR. HILL:  Objection, leading.

8            SPECIAL MASTER PETERSON:  It is, sustained.

9    Q.   Dr. Hassenzahl, given the background of the '311

10   patent and your background in accelerators, at the time

11   of 2003 was it economically feasible to mount 250 MeV

12   accelerators to a gantry for proton therapy?

13   A.   At that time, 2000 - 2003, there was no device that I

14   would think could have been practically mounted to -- that

15   existed, that had been built, that could have been mounted

16   to a gantry.

17       Now, that doesn't mean you couldn't go crazy and build

18   something as big as this room and do that, but it was not a

19   practicality.

20   Q.   Okay.  I'm going to direct your attention to Claim 1 of

21   the patent.

22   A.   Yes.

23   Q.   Does that claim say anywhere without the beam transport

24   elements?

25   A.   It doesn't.

1         MR. HILL:  Objection, leading.

2         SPECIAL MASTER PETERSON:  Overruled.

3    A.   It does not discuss that part of this problem.

4    Q.   So it doesn't say those words "without the beam

5    transport elements"?

6    A.   It does not.

7    Q.   Based on your understanding of conception, does a

8    device have to be known to work to have someone conceive of

9    that device?

10   A.   No.

11   Q.   And because Dr. Antaya has been named on other patents

12   related to a high-field superconducting synchrocyclotron, in

13   your opinion do you think that means that he shouldn't be

14   named on other patents if he was -- if he contributed in

15   conceiving them?

16        SPECIAL MASTER PETERSON:  Excuse me, counsel, I'm

17   not sure I even understand that question.

18        MS. DEVARASETTY:  I'm sorry, I'll rephrase.

19        SPECIAL MASTER PETERSON:  All right.

20   Q.   You understand that Dr. Antaya has been named as an

21   inventor on high-field superconducting synchrocyclotron

22   patents, is that right?

23   A.   Correct.

24   Q.   And does the fact that Dr. Antaya's been named on

25   other patents preclude him from being named on the '311

1    patent?

2            SPECIAL MASTER PETERSON:  Are you asking this

3    witness as a matter of law or his personal opinion?

4            MS. DEVARASETTY:  His personal opinion.

5            SPECIAL MASTER PETERSON:  Okay.

6    A.   I don't see how it would have any effect.

7    Q.   And even though Dr. Antaya's scaling law is something

8    that he called a scaling law, let's say -- strike that.

9    If Dr. Antaya's scaling law was called something else,

10   let's say a relationship or just an algorithm, do you think

11   that renaming it would change your opinion as to whether he

12   significantly contributed to the claims in the '311 patent?

13   A.   No.

14   Q.   On cross-examination you were asked about a long-felt

15   need in the industry; can you tell me what there was a

16   long-felt need for?

17   A.   Well, that's a two- or three-fold answer so if I could

18   try ... as early as the 1950s I believe it was realized

19   because of the protons and also the pions, it would be a

20   very effective tool for treating cancer.

21       And the ability to do that increased with time because

22   of the control of the beams and the way to use them, and I

23   was involved in pion therapy in Los Alamos in the '70s

24   in developing the system to do that.  So there was a

25   long-felt need to rather than having a half-a-mile long or

1    a 200-ton accelerator for a more compact controllable

2    manageable device at an institution doing radiotherapy.

3        That was a continuing trend and desire over that period

4    of time, from I would say the '70s on, so I think that the

5    goal of having one of these small devices mounted in such a

6    way that it could irradiate a patient was very desirable

7    described by lots of people here.

8    Q.   So it's not, so people knew about -- is it true that

9    people knew that -- or strike the question actually.

10       People in the hospital industry wanted a small system

11   for proton radiotherapy, is that right?

12   A.   Yes, that's correct.

13   Q.   What was the reason for why they didn't have one?

14   A.   I'm not sure of the answer to that question.

15   Q.   Was there a design available before 2001 that would

16   allow -- a design of a superconducting magnet that would

17   allow or enable a compact superconducting synchrocyclotron?

18   A.   I don't know that there was.  Except for the work by

19   Wu and Blosser's suggestion in the '80s, I had not heard of

20   anything.  It's entirely possible that other people had

21   done work similar to this, but I'm not aware of it.

22   Q.   And is it possible that the difficulty of making such

23   a magnet was one of the reasons why it wasn't widely used?

24   A.   A superconducting magnet, as I said earlier, is the big

25   challenge in this device.  It's not the gantry, achieving 9

1  or 10 Tesla in a superconducting magnet.  Other kinds of

2  magnets had been done many times before, but each of them

3  was different, and I don't know what the confluence was that

4  led to MIT doing this particular work.

5  Q.  Thank you.  I'm going to ask you one last series of

6  questions, and I'm going to direct your attention to

7  Dr. Gall's deposition testimony at Exhibit 89.

8  A.  Okay.

9  Q.  And I'm going to direct your attention to Page 146.

10  A.  Which page again?

11  Q.  146.

12  A.  Let me find that.  I'm at 164 -- 146, yes.

13  Q.  And I'm going to direct your attention to Line 15.

14  A.  Of 146?

15  Q.  Okay.  Are you there?

16  A.  Yes.

17  Q.  I'm going to read this bit of testimony from Dr. Gall.

18  "Question:  In 2003 had you ever built a cyclotron before?

19  Answer:  I had worked with other people to build a small

20  cyclotron in the early days of my undergraduate career as I

21  believe I testified to earlier today.  Question:  What was

22  the magnetic field strength of that cyclotron?  Answer:

23  Oh, something less than 2 Tesla, probably about 1 Tesla.

24  Question:  And what was the radius of that cyclotron?

25  Answer:  Oh, it was tiny ... a few inches."

1     Here Dr. Gall is indicating his background and

2     experience in building cyclotrons; does this change your

3     opinion as to whether Dr. Gall had the necessary and

4     requisite technical expertise to design and build this

5     superconducting synchrocyclotron as claimed in the '311

6     patent?

7          MR. HILL:  Objection, it mischaracterizes the

8     testimony of Dr. Gall.

9          SPECIAL MASTER PETERSON:  Overruled.

10    A.   I think that was a college program that was done to

11    give some experience to a student in an undergraduate

12    environment if I recall, and I don't think that's relevant

13    to what we're talking about.

14         MS. DEVARASETTY:  Thank you.  I have no further

15    questions, your Honor.

16         SPECIAL MASTER PETERSON:  All right.  Recross?

17         MR. HILL:  Yes, your Honor, just a couple of

18    questions.

19         RECROSS-EXAMINATION BY MR. HILL:

20    Q.   If I could go back to Exhibit 12, the patent, Claim 1?

21    A.   Yes.

22    Q.   Counsel just on redirect asked you whether Claim 1

23    indicates that that apparatus should be made without a beam

24    transport technology, and you agreed with that; isn't that

25    right?

1    A.   There is a claim that there should be no beam

2    transport, correct.

3    Q.   What about the clause that states "that proton or ion

4    beam passing essentially directly from accelerator housing

5    to the patient," doesn't that suggest to you that the beam

6    transport of the prior art is not being used?

7    A.   In some of the prior developments after the particle

8    accelerator, rather than having the bending magnets that we

9    saw in the Wu thesis that went up, down and around, all the

10   things were quadricle magnets to focus the beam and control

11   the beam; and it's not clear that you could do that or

12   maybe even the statement earlier in the description that

13   there are some focusing elements as it leaves the

14   accelerator, so it's a little bit ambiguous to me.

15   Q.   Okay, fair enough.  Do you know as between Dr. Gall

16   and Dr. Antaya who was the first to suggest between them to

17   use a superconducting synchrocyclotron?

18        MS. DEVARASETTY:   Objection, beyond the scope of

19   redirect.

20        SPECIAL MASTER PETERSON:   I'll hear it.

21   A.   I believe that it was Dr. Gall who made that

22   suggestion.

23   Q.   Okay, and wasn't it also Dr. Gall who made the

24   suggestion that it should have a field strength between 6

25   and 20 Tesla?

1    A.   I believe those numbers were in the specification at

2    some point that he was writing.

3    Q.   Okay, and he presented those to Dr. Antaya when they

4    first met; isn't that true?

5    A.   I believe they discussed it, yes.

6    Q.   And it came from Dr. Gall, not Dr. Antaya, right?

7    A.   Correct.

8    Q.   And wasn't it Dr. Gall who suggested that the volume

9    should be about -- I'm sorry, I have to look at the claim.

10   Claim 30, please, that the volume should be about 4.5 cubic

11   meters and have a weight of less than 30 tons?

12   A.   I believe that those -- once you chose a field, you

13   end up with those two parameters, yes.

14   Q.   And that's something Dr. Gall put into his initial

15   discussions with Dr. Antaya, correct?

16   A.   I think so.

17   Q.   Yes.  He also specified an energy level of about 250

18   megaelectron volts, isn't that true?

19   A.   It's the standard energy that people aim for.  Why

20   would you change it?

21   Q.   Right.  And that was something that Dr. Gall presented

22   to Dr. Antaya when they first met, isn't that right?

23   A.   Dr. Antaya knew it 30 years before, so I'm not sure

24   what it means by "presented to."

25   Q.   That is something that in connection with developing

1   this superconducting synchrocyclotron that Dr. Gall

2   presented as design criteria to Dr. Antaya, isn't that true?

3   A.   One of the references that you gave was the -- maybe it

4   was 1; let's take a look at it.

5   Q.   Yep.  You want to look at Exhibit 1?

6   A.   I'm looking at 1 ... so in this specification that he

7   had it's 250 MeV, yes.

8        MR. HILL:  Thank you.  No further questions.

9        SPECIAL MASTER PETERSON:  All right.

10       MS. DEVARASETTY:  Your Honor, may I ask a question

11   since that was beyond my redirect, just one?

12       SPECIAL MASTER PETERSON:  Yes, you may.

13       FURTHER REDIRECT EXAMINATION BY MR. DEVARASETTY:

14   Q.   Dr. Hassenzahl, looking at the specifications in

15   Exhibit 1, at the time that this e-mail was written do you

16   think that a person with ordinary skill in the art would

17   have been able to reduce to practice a high-field compact

18   superconducting synchrocyclotron from those specifications?

19   A.   Well, I think of Joseph Minervini as being an expert,

20   not just skilled in the art.  I don't think he would have

21   understood it by those specifications so, no, it's not

22   something that an ordinary person skilled in the art could

23   do.

24       MS. DEVARASETTY:  Thank you.  No further questions.

25       SPECIAL MASTER PETERSON:  Okay.  Anything further

1    from anybody?  All right.  You're excused, Doctor.

2    Thank you very much.

3              THE WITNESS:  Thank you, Mr. Peterson.

4              SPECIAL MASTER PETERSON:  All right.  Is that the

5    end of the witnesses for MIT?

6              MS. DEVARASETTY:  Yes, your Honor.  I would just

7    like to admit exhibits but after those are admitted MIT will

8    rest.

9              SPECIAL MASTER PETERSON:  All right.  Let's take

10   those exhibits now.  Is Mevion ready with its witnesses?

11             MR. HILL:  We are.

12             SPECIAL MASTER PETERSON:  All right.  Let's hear

13   the exhibits and we'll get those introduced, and then we'll

14   start up with Mevion's witnesses.  All right.

15             MS. DEVARASETTY:  All right.  Exhibit 4, 9, 11, 43,

16   47, 70, 79, 81, 89, 99, 103, 107, 110, 305 through 308,

17   312 through 315, 325, 341, 413, 414, 417, and 103E.

18             SPECIAL MASTER PETERSON:  103E as in Epson?

19             MS. DEVARASETTY:  That's right.

20             SPECIAL MASTER PETERSON:  All right.  Mr. Hill?

21             MR. HILL:  Mevion at this time would move for a

22   directed verdict; MIT --

23             SPECIAL MASTER PETERSON:  No, do you have any

24   objections?

25             MR. HILL:  Oh, no objections, your Honor.

1          SPECIAL MASTER PETERSON:  Okay.  Admitted without

2     objections.

3               (Exhibit Nos. 4, 9, 11, 43, 47, 70, 79, 81, 89, 99,

4                103, 107, 110, 305, 306, 307, 308, 312, 313, 314,

5                315, 325, 341, 413, 414, 417, 103E.

6                admitted in evidence.)

7          SPECIAL MASTER PETERSON:  For the witness, yes, you

8     may leave.  And you have a motion?

9          MR. HILL:  Yes, we would like to move for a directed

10    verdict.  MIT has not come forward with clear and convincing

11    evidence corroborating Dr. Antaya's claim to inventorship

12    of any claim in the '311 patent.

13        In fact, the evidence that has come in has shown that

14    it was Dr. Gall who suggested all of the elements that are

15    claimed in the '311 patent, which I believe we just heard

16    admissions on several of those from their own expert.

17    Therefore, they have not carried their burden of proof,

18    and we'd ask for a directed verdict that Dr. Antaya not be

19    added to the '311 patent as an inventor.

20         SPECIAL MASTER PETERSON:  All right.  I'm going to

21    deny the motion.  You can re-urge it, of course, after the

22    conclusion of all of the testimony.

23        All right.  Let's call your first witness.

24         MR. HILL:  Would you mind if we took a very short

25    recess before we switch gears here?

1          SPECIAL MASTER PETERSON:  No.  Let's keep it short,

2     though.  Let's keep it to five minutes, all right.  We'll

3     start up actually at 10 minutes until.

4          MR. HILL:  Thank you.

5          (Whereupon, a brief recess commenced.)

6          SPECIAL MASTER PETERSON:  Are we ready to start?

7          MR. HILL:  We're ready.

8          SPECIAL MASTER PETERSON:  All right.  You may call

9     your witness.

10          MR. HILL:  Did we have a housekeeping item on our

11     exhibits yet?

12          MS. CHRISTO:  Yeah, your Honor, Mevion would like to

13     move to enter into evidence Exhibit 100.

14          SPECIAL MASTER PETERSON:  Just the one?

15          MS. CHRISTO:  Yeah, I think that's the only one.

16          SPECIAL MASTER PETERSON:  Any objections from MIT?

17          MS. DEVARASETTY:  Your Honor, I don't believe that

18     testimony was actually referenced in the cross-examination.

19          SPECIAL MASTER PETERSON:  Are you talking about

20     Exhibit 100?  What is it?

21          MS. DEVARASETTY:  It's Dr. Hassenzahl's deposition.

22     I don't believe anybody quoted from or used that exhibit.

23          MR. HILL:  Actually, I did quote from it.

24          MS. DEVARASETTY:  I just didn't recall.  If that's

25     true, then I have no objection.

1      SPECIAL MASTER PETERSON:  It's a deposition,

2  admitted.  Even over objection, admitted.

3      (Exhibit No. 100 admitted in evidence.)

4      MR. HILL:  Mevion calls as its first witness

5  Dr. Roger McWilliams.

6      SPECIAL MASTER PETERSON:  All right, Mr. McWilliams.

7  Sir, if you'd raise your right hand.

8      (Roger D. McWilliams, Ph.D., duly sworn.)

9      SPECIAL MASTER PETERSON:  All right.  Please be

10  seated.  And when you get comfortable, if you would give us

11  your full name, spelling your last name please?

12      THE WITNESS:  My name is Roger D. McWilliams.  Last

13  name is capital M-c-W-i-l-l-i-a-m-s.

14      SPECIAL MASTER PETERSON:  And what is your

15  professional affiliation, Mr. McWilliams?

16      THE WITNESS:  I'm a Professor of Physics at the

17  University of California, Irvine campus.

18      SPECIAL MASTER PETERSON:  And is it Dr. McWilliams?

19      THE WITNESS:  Yes, sir.

20      SPECIAL MASTER PETERSON:  All right.  I'm sorry for

21  the, for the prior reference.  All right, Dr. McWilliams.

22  You're appearing here on behalf of Mevion, is that correct?

23      THE WITNESS:  I believe so.

24      SPECIAL MASTER PETERSON:  And are you appearing as

25  a fact witness or expert witness or don't you know?

1          THE WITNESS:  An expert, sir.

2          SPECIAL MASTER PETERSON:  All right.  Sir, you may

3     proceed.

4          DIRECT EXAMINATION BY MR. HILL:

5     Q.   Dr. McWilliams, I've handed to you three documents:

6     Exhibit Nos. 117, 80, and 82.  Can you tell us what those

7     documents are?

8     A.   Exhibit 117 is titled:  Direct Testimony and Declaration

9     of Roger McWilliams, Ph.D., Exhibit 80 is a rebuttal expert

10    report of Dr. McWilliams, and Exhibit 82 is the initial

11    expert report of Roger McWilliams.

12    Q.   Are those true and accurate copies of your declaration

13    and two expert reports in this case that you're submitting

14    today as direct testimony?

15    A.   At a quick glance, it looks like it, yes.

16    Q.   And you signed those reports under penalty of perjury,

17    is that correct?

18    A.   Yes, I did.

19         MR. HILL:  We'd ask those be admitted as

20    Dr. McWilliams' direct testimony in this matter?

21         SPECIAL MASTER PETERSON:  All right.  Any

22    objections?

23         MS. DEVARASETTY:  No objections, your Honor.

24         SPECIAL MASTER PETERSON:  All right, admitted

25    without objection.

1          (Exhibit Nos. 80, 82, and 117 admitted in evidence.)

2          MR. HILL:  I will tender the witness for

3     cross-examination.

4          SPECIAL MASTER PETERSON:  All right.  Again, the

5     witness is accepted as an expert.  You may proceed.

6          CROSS-EXAMINATION BY MS. DEVARASETTY:

7     Q.   Dr. McWilliams, before this case you served as an

8     expert in approximately ten patent cases, correct?

9     A.   It was somewhere around that number, yes.

10    Q.   And this is the first time that you've ever been asked

11    to evaluate the issue of inventorship, isn't that right?

12    A.   Yes, that's correct.

13         SPECIAL MASTER PETERSON:  If you could,

14    Dr. McWilliams, speak right into the microphone.  Your voice

15    is sort of fading off.

16         THE WITNESS:  I apologize.  I am fairly soft-spoken

17    so please pipe in as often until I learn.

18         SPECIAL MASTER PETERSON:  All right.

19    Q.   Let me turn your attention to Exhibit 80, which is

20    your rebuttal expert report, I think.  Are you there,

21    Dr. McWilliams?

22    A.   Yes, ma'am.

23    Q.   And those pages have a number of -- describe the legal

24    perspective that you're using to come to your conclusions

25    on inventorship, is that right?

1    A.   They describe the perspective I'm trying to hold as a

2    scientist.  I know that they discuss these things; I don't

3    know if they provide a legal interpretation for them.

4    Q.   Counsel provided you case law and a summary of the

5    case law when you were preparing this perspective?

6    A.   Yes, they did.

7    Q.   But you don't have a law degree, do you?

8    A.   No.  I do not have a law degree, no.

9    Q.   So you're not sure whether the perspective that you're

10   taking as a scientist is the perspective that a lawyer

11   would take in reviewing this issue, is that right?

12   A.   I think that's a fair statement.

13   Q.   Now, you've been an expert in about four patent cases

14   in which technology -- that was related to technology that's

15   used in a superconducting particle accelerator, right?

16   A.   Approximately.  I think that seems to me to indicate

17   both in deposition.

18   Q.   And there are a lot of different types of technologies

19   that are involved in a superconducting particle accelerator,

20   correct?

21   A.   Yes.

22   Q.   So when you say that you've been an expert in patent

23   cases that involved technology used in superconducting

24   particle accelerators, you've never actually testified in

25   cases involving cyclotron accelerators, right?

1    A.   I've testified in cases where the cyclotron orbits

2    played a role, not where cyclotron accelerators were used.

3    Q.   You never opined on superconducting magnets in any of

4    those cases, right?

5    A.   I believe that's correct.

6    Q.   And in your entire career you've never designed or

7    you've only designed and built one magnet that you would

8    call a superconducting magnet, is that right?

9    A.   I believe I only personally ever designed and built

10   one superconducting magnet.

11   Q.   And that magnet is a magnet that you built in 1974,

12   correct?

13   A.   Somewhere in the mid '70s, maybe '74 is right.

14   Q.   About 40 years ago?

15   A.   Yeah.

16   Q.   That magnet used tin as the superconductor, correct?

17   A.   Yes, that's right.

18   Q.   The conductor didn't contain any niobium, isn't that

19   right?

20   A.   No, I don't believe it did.

21   Q.   And conductors with niobium are relative for the case

22   today, isn't that right?

23   A.   Yes, that's correct.

24   Q.   And the magnet you built 40 years ago, that wasn't for

25   an accelerator magnet, right?

1    A.   Yes, that is correct.

2    Q.   And the magnet you built using that tin superconductor

3    was operating, I believe, at helium temperatures?

4    A.   Yes, it was.

5    Q.   And are you aware of whether tin operates as a

6    superconductor at liquid helium temperatures?

7    A.   Using the liquid helium refrigeration system, yes, it

8    could do that.

9    Q.   Isn't it true that tin doesn't operate as a

10   superconductor until 3.7 kilograms?

11   A.   That's correct.

12   Q.   And the temperature of liquid helium is 4.2 kilograms?

13   A.   It's about 4.2, right.

14   Q.   And so tin isn't a superconductor at liquid helium

15   temperatures, isn't that right?

16   A.   They cool it just below that liquid helium temperature

17   you just said, that's right.

18   Q.   You've never designed a magnet for a cyclotron, right?

19   A.   That's correct.

20   Q.   You've never designed a cryogenic system that brings

21   temperature down to liquid helium temperatures, though,

22   right?

23   A.   Well, I've used ones that do, but I haven't -- other

24   than the two experiments, I don't think I did any design

25   work to get it to work at liquid helium temperatures.

1    Q.   You've done magnetic field calculations in the past?

2    A.   Yes, I have.

3    Q.   And you've done some in the last five years, right?

4    A.   Yes, I have.

5    Q.   And the ones you've done in the last five years were in

6    the .1 to .2 Tesla range, right?

7    A.   That's a common range for me to work in.

8    Q.   You've worked in that range in about the last five

9    years?

10   A.   I've certainly worked in that range over the last five

11   years, yes.

12   Q.   Have you worked outside of that range in the last five

13   years?

14   A.   There were magnets that go a fair bit higher than that

15   in the last five years.

16   Q.   But the question was about doing magnetic field

17   calculations outside of that range; have you done magnetic

18   field calculations outside of the range of .1 to .2 Tesla in

19   the last five years?

20   A.   I'm not remembering any computer calculations that are

21   coming to mind, but I can remember some experiment work.

22   Q.   So the answer to my question is:  no, there weren't

23   any field calculations that you did that were outside of

24   that range?

25   A.   No, I don't believe there were any computer

1    calculations for field tests that -- well, I'm not thinking

2    of any in this moment.

3    Q.   Of the magnets that you have designed, the highest

4    magnetic field that you designed is in the range of .6 to

5    .8 Tesla; is that right?

6    A.   That's probably right.

7    Q.   And the magnetic field of the cyclotron at issue here

8    is in the range of .6 to .8 Tesla range, right?

9    A.   That's the range that's being used here, yes.

10   Q.   And as the magnetic field goes up, the skill required

11   to design that magnet goes up, right?

12   A.   I think that you encounter some difficulties as you go

13   to higher fields, sure.

14   Q.   You heard Dr. Antaya and Dr. Hassenzahl talk about

15   some of the difficulties that result from going to higher

16   fields; do you agree with at least some of the difficulties

17   that they described today?

18   A.   That you have to have some awareness of some skills

19   that would help for those field analyses.

20   Q.   I want to turn to your opinion on inventorship.  You

21   agree that Dr. Antaya and Dr. Gall were collaborating

22   between January of 2003 and November 18, 2005, right?

23   A.   Yes, they were collaborating.

24   Q.   And you believe that the conception of the invention

25   of the '311 patent occurred before November 18, 2005, right?

1    A.   Yes, I do.

2    Q.   And it's your opinion that what's in Dr. Gall's

3    notebook, Exhibit 43, is sufficient for conception of the

4    claims of the '311 patent, correct?

5    A.   Yes, I think so.

6    Q.   And in your report you didn't discuss any technical

7    contribution of Dr. Gall after January of 2003 related to

8    the conception of the invention, right?

9    A.   I'm not recalling any.

10   Q.   So that your testimony today is that you don't recall

11   any discussion in your expert reports of any technical

12   contribution Dr. Gall made to the superconducting

13   synchrocyclotron after January of 2003, is that right?

14   A.   No, I don't think that I would agree with that.

15   Q.   So you just don't remember whether you discussed any

16   technical contributions?

17   A.   No, I thought your earlier question was about

18   conception of the technical contributions.

19   Q.   Okay.  Let me repeat my previous question.  In your

20   reports you didn't discuss any technical contribution by

21   Dr. Gall after January of 2003 related to the conception of

22   the invention in the '311 patent?

23   A.   I think that is right.

24   Q.   And in your expert report you talk about an

25   accompanying spreadsheet, which is Exhibit 103; do you

1    remember that spreadsheet?

2    A.   I remember some kind of spreadsheet.  You say that's in

3    the initial book?

4    Q.   Yes.  You don't think that that spreadsheet alone is

5    sufficient for invention, correct?

6    A.   This spreadsheet alone, no, I don't believe so.

7    Q.   And you don't believe that there's anything inventive

8    about the spreadsheet, right?

9    A.   Well, I'm thinking in terms of the '311 patent, I'm

10   thinking that the conceptual elements were done before that;

11   it's corroborative kind of evidence, but it doesn't stand

12   alone.

13   Q.   The spreadsheet, and let's take a look at your

14   initial expert report, Exhibit 82.  I'm going to turn

15   your attention to Page 19, and we're going to look at

16   Pages 19 and 20.

17       Here you discussed the formulas that are used in that

18   spreadsheet, right?

19   A.   Yes, ma'am.

20   Q.   And those are just mathematical formulas, aren't they?

21   A.   No, they're physics formulas.

22   Q.   Okay.  And they were -- the physics for these physics

23   formulas was well known in the art by 2001?

24   A.   Yes.

25   Q.   And you say that when the full physics of an equation

1    is known it's not inventive, isn't that right?

2    A.   Yes.

3    Q.   So there's nothing really inventive about the

4    spreadsheet, is there?

5    A.   I agree that a spreadsheet by itself is not inventive.

6    Q.   Okay.  Let's take a look at the spreadsheet.  I'm

7    going to pull up Exhibit 103.  Sorry, I'm just having a few

8    technical difficulties.  I want to get the right Excel up

9    so we're looking at the right exhibit.

10        Dr. McWilliams, in this spreadsheet there are a number

11   of cells that are hidden; isn't that right?

12   A.   Compared to the few that I see on the screen

13   presently, yes.

14   Q.   And you've evaluated some of those hidden fields, is

15   that right?

16   A.   Well, I opened up and looked at a broader set than

17   what's on the screen, yes.

18   Q.   Why don't we open this up so we can look at all of the

19   fields that we're -- are these the cells that you evaluated

20   that were hidden?

21   A.   It looks like it.

22   Q.   Are there any that are not here that you evaluated?

23   A.   I'm not seeing any at present.

24   Q.   And let's look at what elements the spreadsheet lists.

25   It lists a peak magnetic field strength, right?

```
1    A.   Yes.

2    Q.   And it lists final energy?

3    A.   Correct.

4    Q.   And it lists the cyclotron radius, right?

5    A.   I see that.

6    Q.   And you can calculate the volume from that radius,

7    isn't that right?

8    A.   Well, you can calculate a volume if you know the shape

9    of things, yes, for sure.

10   Q.   And you can calculate the cyclotron mass or it lists

11   the cyclotron mass, right?

12   A.   I see the mass listed, yes.

13   Q.   Now, let's look at the patent, Exhibit 12.  I'm going

14   to draw your attention to Claim 30, Dr. McWilliams.

15        This claim lists a magnetic field strength, right?

16   A.   Yes, it does.

17   Q.   And it lists an energy level for the accelerator for

18   the particles coming out of the accelerator?

19   A.   It lists the energy.

20   Q.   And it lists a volume for that accelerator, right?

21   A.   Yes, it does.

22   Q.   And it lists a mass which the accelerator is not to

23   exceed?

24   A.   Correct.

25   Q.   But you said that the spreadsheet even though it lists
```

1    all the same elements as were in Claim 12 wasn't inventive,

2    right?

3    A.   By itself.

4    Q.   All right.  So just listing those elements isn't

5    inventive, isn't that right?

6    A.   Listing the specific numbers --

7    Q.   Right.

8    A.   -- by themselves in the spreadsheet?

9    Q.   Right.

10   A.   No, that's not inventive.

11   Q.   And do you remember at your deposition when I posed

12   the question to you:  "Well, what if I plugged into

13   Dr. Gall's spreadsheet 30 Tesla," do you remember that?

14   A.   Yes, I do.

15   Q.   And you said that I hadn't conceived of a 30 Tesla

16   2.3 metric-ton device because that's plugged in, 30 Tesla

17   into Dr. Gall's spreadsheet; isn't that right?

18   A.   Yes.

19   Q.   And the reason that you said that conception wasn't

20   complete was because you needed to have some confidence

21   that that design could be built, right?

22   A.   Correct.

23   Q.   Let's look at Exhibit 335.  Do you recognize this

24   document -- I'm sorry, are you there, Dr. McWilliams?

25   A.   Yes, I have Exhibit 335 open.

1    Q.   Do you recognize that document?

2    A.   I'm not feeling familiar with it at this moment.

3    Q.   Do you remember relying on that document in your

4    expert testimony or in your expert reports?

5    A.   I don't recall citing it, by the way, by text in the

6    report.

7    Q.   I'm going to refer you to the second page in the

8    first paragraph, and the last sentence there where

9    Dr. Antaya says:  "We conclude that we are in a position

10   to objectively demonstrate that Key Issue No. 2 has also

11   been satisfied.  A magnet with acceptable superconducting

12   properties can be built above the 9 Tesla level that also

13   meets beam dynamic requirements, and this magnet weighs

14   less than 20 tons."

15        Isn't that what Dr. Antaya is saying in November of

16   2004, that he has confidence that the device can be built?

17   A.   That he has some confidence for that combination, yes.

18   Q.   All right.  Let me go back to my example of the

19   30 Tesla machine, and you said one of the other reasons

20   that you didn't think that conception was complete was

21   because you would want to know whether an ion source would

22   fit into the smaller cyclotron, correct?

23   A.   Yes.

24   Q.   And also you said that for conception of a

25   synchrocyclotron at a particular field, it's not enough

1     to simply say it's possible to create a magnetic field

2     strength, right?

3     A.   Sure.

4     Q.   And in my 30 Tesla example, you also said you would

5     want to be confident about how the forces could be dealt

6     with, correct?

7     A.   Yes.

8     Q.   So let's turn back to the notebook on your opinion of

9     conception, and that's Exhibit 43.

10    A.   I'm at 43.

11    Q.   And just to get everybody on the same page, it's your

12    opinion that that document is sufficient for conception of

13    all of the claims in the '311 patent, right?

14    A.   Yes.

15    Q.   And it's your position that conception was completed on

16    June 6, 2001?

17    A.   Yes, ma'am.

18    Q.   But the notebook doesn't have the word synchrocyclotron

19    before the date June 6, 2001, right?

20    A.   No English word is written there as I recall.

21    Q.   And the notebook doesn't have the word superconducting

22    in it before June 6, 2001, right?

23    A.   Specifically, again, the physics show what's there, but

24    the English word isn't earlier as you said.

25    Q.   And the notebook also doesn't show a synchrocyclotron

1  on a gantry before June 6, 2001, correct?

2  A.   I think that's referring to the English words.

3  Q.   I'm sorry, I was talking about a synchrocyclotron on

4  a gantry; it doesn't show that in the notebook before

5  January 6, 2001, right -- or June 6, 2001?

6  A.   I need to look back again, so can you ask the question

7  again so I can try to be complete?

8  Q.   The notebook doesn't show a synchrocyclotron on a

9  gantry before June 6, 2001, does it?

10  A.   I think maybe it does.  Let's see ... let me look back

11  again.  So if I look at Page 17, for example, following that

12  there's --

13  Q.   For the record, Page 17 is SRIV 4118.  Please continue.

14  A.   SRIV004140, I think it's implied on the next page,

15  which is SRIV4141, and there's SRIV4142.

16  Q.   Dr. McWilliams, let's take the pages you articulated

17  so far.  So Page 17, this is the page that you were

18  referring to as showing a synchrocyclotron on a gantry.

19       Can I interrupt your attention there.  Are you there?

20  A.   Yes.

21  Q.   So there's no gantry depicted in this picture, is

22  there?

23  A.   It looks like left-hand quick sketch is probably

24  holding that; there's an iso center there which indicates

25  rotation exists in this spot.

1    Q.   Couldn't that be just be something falling out of that

2    hook thing?

3    A.   I wouldn't take it that way, no.

4    Q.   And it doesn't really indicate that the circle there

5    is a cyclotron, right?

6    A.   It's implied by the sketch.

7    Q.   Couldn't that be a synchrotron?

8    A.   No.  The earlier synchrotron drawings in this are

9    distinctly different.  I would not take that to be a

10   synchrotron especially after cyclotron calculations were

11   done in the immediately preceding papers.

12   Q.   The notebook doesn't show any rotation exceeding 180

13   degrees before June 6, 2001, right?

14   A.   I think I discussed that in the reports, and I think I

15   disagree with that, but we'd need to go through the pages

16   to find where.

17   Q.   I'm going to turn your attention to your deposition,

18   Exhibit 101, at Page 203.  It's up on the screen if you'd

19   rather not look for it.  I'm going to start at Line 9.

20        SPECIAL MASTER PETERSON:  Maybe it would be faster

21   if you'd just look at the screen, Dr. McWilliams.

22   A.   Yes, sir.  Starting on Line 9?

23   Q.   Right.  "And the picture of SRIV004150 doesn't show

24   rotation exceeding 180 degrees, does it?"  And your answer:

25   "That one looks like, that one looks like it's showing

1    right around 180 degrees."  And the question was:  "Doesn't

2    it just show rotation of 90 degrees?"  And you said:  "It

3    shows a 180 degree rotation."

4         And so my question was the notebook doesn't show

5    rotation exceeding 180 degrees, is that right?

6    A.   Well, that particular page.

7    Q.   And none of the notebook pages before June 6, 2001,

8    illustrated the ion source used; is that right?

9    A.   No, they indicated a proton source if I remember right.

10   Q.   But it doesn't illustrate the dimensions or the size

11   or the particular nature of that ion source except that it

12   produces protons, correct?

13   A.   I think there was something in one of the drawings that

14   gave a size constraint by virtue of the drawing and where it

15   would need to go.

16   Q.   I'm going to direct your attention to your deposition

17   testimony at Page 208, Lines 13 through 17.  And when we

18   were talking about the notebook, I asked you a question:

19   "So that just indicates the presence of an ion source for

20   the cyclotron, but not what the ion source looked like or

21   its size, isn't that right?"  And your answer was:  "That is

22   correct.  I believe that's right."

23   A.   Yes.  That's what I was thinking about, you're right.

24   Q.   So Dr. Gall doesn't show in his notebook how small the

25   ion source needs to be to fit into his design, does he?

1   A.   No, it doesn't say that there's a drawing showing the
2   dimensions to do that.
3   Q.   And none of the notebook pages before June 6, 2001,
4   illustrate a cooling system for a superconducting
5   synchrocyclotron, correct?
6   A.   I think there's a page where I would disagree with that
7   statement.  As I recall, there was something that did make
8   remark about temperature issues that implied that.
9   Q.   To help you out, Dr. McWilliams, perhaps you're
10  referring to Page 14 of the notebook?
11  A.   Yes, thank you, and it has the word "cryogenics" up
12  above.
13  Q.   This is the page you're referring to, Page 14 of the
14  notebook that's on the screen?
15  A.   Yes, ma'am.
16  Q.   This page doesn't illustrate a cooling system for a
17  superconducting magnet, does it?
18  A.   It does not illustrate a cooling system, no.
19  Q.   And none of the notebook pages before June 6, 2001,
20  illustrate a pole-faced design for a magnet, do they?
21  A.   Again, I think maybe there's one drawing that has
22  this sort of broad stroke on that, but there's not a lot
23  of detail on it.
24      On Page 21, which is SRIV4146, there's an indication of
25  the center of the machine used to have some hollow space,

1    but there would be a pole consideration for that.  There's

2    also directly implied pole-based consideration frequency

3    ratios that are used in the coils.

4    Q.   I'm sorry, Dr. McWilliams.  Is this the page you're

5    referring to, Page 21 with the pole-based considerations?

6    A.   Yes.

7    Q.   And that doesn't, that doesn't discuss the shape of the

8    pole face at all, right?

9    A.   No, that doesn't discuss the shape and detail, but

10   then, again, on Page 22 there's an indication that you need

11   to pay attention to that.

12   Q.   And none of the notebook pages before June 6, 2001,

13   demonstrate how the forces in the superconducting magnet

14   would be dealt with, right?

15   A.   I don't remember anything directly talking about what

16   the force is.

17   Q.   I want to turn your attention to the design of a

18   magnet for a system like this, a superconducting

19   synchrocyclotron.

20        You agree that stable beam orbits are a desired outcome

21   for an accelerator, right?

22   A.   In this kind of application, yes.

23   Q.   And you agree that stable beam orbits are controlled by

24   the shape of the magnetic field, right?

25   A.   It can be a big help.

1   Q.   And you agree the design of a synchrocyclotron is an

2   iterative process, correct?

3   A.   Frequently, it is.

4   Q.   That's a common and typical practice for the design of

5   a synchrocyclotron?

6   A.   For most accelerators, there's an iterative process.

7   Q.   And you agree that the design of a magnet that will

8   have -- that will incorporate saturated iron, in a magnet

9   like that one must sculpt the magnetic field through both

10   the design of the coils and the shape of the pole face,

11   right?

12   A.   Yes.

13   Q.   And you agree that the specific shape of the magnetic

14   field -- you agree that to define the specific shape of the

15   magnetic field to provide stable orbits, one must conduct

16   an iterative process, right?

17   A.   If you're starting from scratch, yes.  If you're

18   scaling another design, the answer would be less iteration

19   would be needed.

20   Q.   But some iteration would be needed, is that right?

21   A.   Well, you might luck out and get it right the first

22   time.

23   Q.   But a typical process if you're not that lucky would

24   mean that you would need to use an iterative process, right?

25   A.   Typical starting from scratch, yes.

1   Q.   Even starting from -- from some baseline, isn't that

2   right?

3   A.   It's pretty common.

4   Q.   And that iterative process is sort of a trial-and-error

5   process, isn't it?

6   A.   I guess people use that terminology occasionally when

7   they're talking about that.

8   Q.   I'm going to turn your attention to your opinion on

9   a person of ordinary skill in the art.  You think that that

10  iterative process we were just talking about could be done

11  by a physics graduate, someone with a Bachelor's degree in

12  physics with five years experience; is that right?

13  A.   Who puts together the tools needed to address the

14  issue.

15  Q.   So it's your opinion that that individual, a person

16  with a Bachelor's degree and five years experience, may not

17  be able to do it themselves; isn't that right?

18  A.   Well, by putting it together with a team with the

19  appropriate skills, you would be able to do it.

20  Q.   So you think that a person with a Bachelor's degree

21  and five years experience could pick smarter people than

22  him to be able to build and design a superconducting

23  synchrocyclotron, right?

24  A.   Well, I think I would not agree with that statement.

25  Since accelerators typically are built by teams of people

1    and when you approach it, you need to find what skills you

2    bring to the table and what additional skills are needed to

3    be brought to it.

4    Q.   When I asked you at your deposition you said a

5    physics undergraduate degree with -- somebody with a physics

6    undergrad degree and five years experience in magnet design

7    would be able to take on the design of designing a magnet

8    for a compact high-field superconducting synchrocyclotron;

9    do you remember that?

10   A.   I think I said that if they had project management

11   assessment experience that they would know how to fill in

12   the areas that they did not know by getting additional

13   people or vendors, commercial people, or additional team

14   members.

15   Q.   Let me direct your attention to your deposition

16   testimony in Exhibit 101.  I'm going to direct your

17   attention to Lines 22 through -- on Page 179, Line 22

18   through 180, Line 14.

19       Are you there, Dr. McWilliams?

20   A.   Yes.

21   Q.   Okay.  "Question:  So you think someone with a physics

22   undergrad degree with five years of experience of magnet

23   design can do that task?"  And we were talking about the

24   magnet design task then and you said:  "Yes."

25       And I asked:  "How long would it take?  Answer:

1   depends on what the accelerator was and what kind of field

2   requirements are afforded.  Question:  What about a 9.5

3   Tesla synchrocyclotron?  Answer:  It would depend on what

4   part of the work they were doing, if they are modeling it.

5   Question:  Designing the magnet and shaping the magnetic

6   field?  Answer:  And it involved the modeling and testing

7   or just doing the computer calculations so we're clarifying

8   what the task is."

9       And I said:  "Well, just doing the computer

10  calculations."  And you said:  "I could imagine

11  circumstances where it would take a few weeks or up to a

12  few months, maybe possibly longer, depending on what the

13  application is."

14      So this isn't something that just takes a short amount

15  of time, it could possibly take a few months or even a year;

16  is that right?

17  A.   It could.

18  Q.   And once that design was done, it would take a team of

19  -- you're a person of ordinary skill in the art -- three to

20  five years to design the synchrocyclotron as described in

21  Exhibit 1, isn't that right?

22  A.   I could imagine that kind of time scale for the design

23  element.

24  Q.   You said a person of ordinary skill in the art is a

25  person with a Bachelor's degree in physics, applied physics,

1    or related engineering and at least five years of either

2    university graduate level or industrial field work

3    experience in one or more of the relevant art areas along

4    with five years of project management experience, right?

5    A.   Yes, I did.

6    Q.   And let's look at the relevant art, and that's on

7    Page 5 of Exhibit 82, which is your initial expert report.

8    I pulled it up on the screen if that helps.

9    A.   Okay.

10   Q.   Those are the relevant areas you're talking about for a

11   person of ordinary skill?

12   A.   Yes, ma'am.

13   Q.   So let me show you Exhibit 48.  When I asked you at

14   your deposition you said you didn't rely on this document in

15   forming your opinion, isn't that right?

16   A.   I gave the opinion that I didn't rely on it for the

17   conception conclusion, but that I had looked at lots of

18   papers over many years past that point just to see if

19   there was something that came in that was conceptually

20   important at a later date.

21   Q.   Did you rely on that for your opinion of what a person

22   of ordinary skill in the art was?

23   A.   I don't recall relying on Exhibit 48 to come up with a

24   person of ordinary skill in the art.

25   Q.   I'm going to turn your attention to the last page of

1    that document.  This is an outline from Dr. Gall that he

2    sent to Dr. Antaya for a government grant for funds to fund

3    the superconducting synchrocyclotron project, and here

4    Dr. Gall says:  "High technical risk.  Design of this

5    magnet will require participation of leading experts.

6    Thermal and mechanical margins will be tight.  Design of

7    a synchrocyclotron at this high a field also requires

8    participation of leading experts.  Very few people can

9    design cyclotrons, never mind synchrocyclotrons, high-field

10   cyclotrons even higher -- even harder."

11        Do you agree with those statements, Dr. McWilliams?

12   A.   Oh, I think that, again, you don't really know what he

13   means by a few or the level.  I could see somebody saying

14   that, but I tried to show in my report what I thought was

15   needed to do those tests.

16   Q.   Do you think there are very few people with a

17   Bachelor's degree in physics, applied physics, or related

18   engineering and at least five years of either university

19   graduate level or industrial field work experience in one

20   or more of the relevant art areas along with at least five

21   years of project management experience?

22   A.   That was quite a mouthful, but if I interpreted it

23   right, you asked:  are there very few people who have the

24   background you just gave out, can you --

25   Q.   That's right.

1   A.   The answer to that I think is no, but it's a very long

2   question.

3   Q.   Essentially, the question is:  do you think there are

4   very few people that are -- that meet your standard of a

5   person of ordinary skill in the art?

6          SPECIAL MASTER PETERSON:  If you know,

7   Dr. McWilliams.  I mean, if you're speculating, tell us

8   you're speculating.  We don't really expect you to know

9   every engineering research scientist in the world, which I

10  understand there are probably several hundred thousand.

11         THE WITNESS:  Yeah, and there are an awful lot of

12  people that you put together to make a team to do this kind

13  of work.

14  Q.   And continuing, looking at Exhibit 48 it looks like

15  Dr. Gall thought designing a synchrocyclotron took experts,

16  right?

17         MR. HILL:  It calls for speculation.

18         SPECIAL MASTER PETERSON:  It does.  You can rephrase

19  your question.

20  Q.   When you read that paragraph, does that suggest to you

21  that designing a synchrocyclotron took experts?

22  A.   Well, I think you want somebody who can design a

23  synchrocyclotron so if you want to label such a person as

24  an expert, then sure.

25  Q.   You don't think that one needs to know how to design

1    and build a superconducting particle accelerator to conceive

2    of one, isn't that right?

3    A.   I think that to be able to conceive, in the sense

4    that I think for conception of invention, I'd want to be

5    confident that the technology was available to reduce to

6    practice.

7    Q.   But they don't know, they don't need -- in your opinion

8    they don't need to know how to design and build that

9    superconducting particle accelerator, right?

10   A.   Like a specific person?

11   Q.   The person that in your mind, the inventor that

12   conceives of a superconducting particle accelerator, need

13   not know how to design it; is that right?

14   A.   Yeah.  I think in the sense that you're asking, yes;

15   but as people invent things, they often bring in somebody

16   to provide technology that they don't have at their own

17   fingertips but they'd know they'd like to be using.

18   Q.   I don't think that quite answers my question so I'm

19   going to ask it again:  you don't think that the inventor

20   who conceives of a superconducting particle accelerator

21   needs to know how to design it in order to conceive it?

22   A.   I think there are elements of a design that other

23   people would bring in, that that person might say:  Yeah,

24   I can go get that because I can't do it myself.

25   Q.   So they don't need to be able to design all of the

1    pieces of a superconducting accelerator to be able to

2    conceive it, is that right, in your opinion?

3         SPECIAL MASTER PETERSON:  I think, counsel, we're

4    -- at least what I'm getting, you're saying design; I think

5    he has a different idea of design.  When you say the design,

6    you mean build it?

7         MS. DEVARASETTY:  No, I mean design it, your Honor.

8         SPECIAL MASTER PETERSON:  In what sense?

9         MS. DEVARASETTY:  In a sketch-out of a device that

10   would meet the specifications that they're looking for.

11        SPECIAL MASTER PETERSON:  Okay, a conceptual design?

12        MS. DEVARASETTY:  Sure.

13        SPECIAL MASTER PETERSON:  Okay.

14   Q.   Dr. McWilliams, do you think that an inventor of a

15   superconducting particle accelerator needs to know how to

16   design a conceptual design of a superconducting particle

17   accelerator in order to be able to conceive it?

18   A.   Well, I think you're right to clarify that the way I

19   was thinking on the conceptual design side within kind of

20   10% parameters of what you're looking for and with all of

21   the permanent elements of it, I think, yes, somebody should

22   be able to know that those specifications -- that those

23   quantities will work.

24   Q.   Okay.  Now, let's talk about some of the people that

25   were involved in this effort for the superconducting

1    synchrocyclotron magnet to see what their qualifications

2    were, so let's look at Dr. Gall for instance.

3        By 2001 Dr. Gall was a person that was more experienced

4    than a person of ordinary skill in the art, is that right?

5    A.   Yes, he is.

6    Q.   And in 2001 he was also more experienced than your

7    person of ordinary skill in the art, is that right?

8    A.   Yes.

9    Q.   And around 2002 do you understand Dr. Gall was looking

10   for a team of people to be able to design and build a

11   proton radiation therapy system?

12   A.   I understand he was looking for a team.  I don't know

13   what he was advertising his purpose was.

14   Q.   Do you understand that in his witness statement

15   Dr. Gall said that he spoke with Dr. Blosser.  Are you aware

16   of Dr. Blosser's credentials as of 2003?

17   A.   Yes.

18   Q.   Do you think that he's a person of more than ordinary

19   skill based on your definition?

20   A.   Yes.

21   Q.   And Dr. Blosser has a few patents on superconducting

22   cyclotrons, right?

23   A.   Yes, he does.

24   Q.   And Dr. Gall also spoke with a Mr. Reardon, and are

25   you aware of Mr. Reardon's field?

1      A.    Some of them, yes.

2      Q.    And based on your knowledge of his skills in 2002, he

3      was likely to be a person of more than ordinary skill

4      according to your definition; is that right?

5      A.    Well, of the parts of his skills that I know of, I

6      think it's likely.

7      Q.    Dr. Gall also spoke to a Dr. Zeller.  Are you aware of

8      Dr. Zeller at the National Superconducting Cyclotron Lab at

9      Michigan State?

10     A.    I don't think I know him.

11     Q.    Dr. Gall characterized Dr. Zeller's background as a

12     professor emeritus at Michigan State and also working at

13     the National Superconducting Cyclotron Lab.  Now, would a

14     professor emeritus at this superconducting cyclotron lab be

15     a person of more than ordinary skill according to your

16     definition?

17     A.    It's pretty likely.

18     Q.    And a person with 30 years of experience in cyclotron

19     design would be a person of more than ordinary skill

20     according to your definition, right?

21     A.    I would think so.

22     Q.    I'm going to pull up one of the MIT patents, the

23     '258 patent which is Exhibit 301.  I'm going to focus your

24     attention on the inventors listed on that patent.  Are you

25     familiar with the background of the individuals listed here?

1    A.   Somewhat.

2    Q.   Can you tell me the individuals whose backgrounds

3    you're familiar with?

4    A.   I have some familiarity with Timothy Antaya's

5    background, some with Joel Schultz's, a little bit about

6    Radovinsky, and I don't think any of the others.

7    Q.   In your opinion Dr. Antaya as of 2003 was a person of

8    more than ordinary skill in the art, right?

9    A.   Dr. Antaya did some work that was more than ordinary

10    skill in the art, and some that was of ordinary skill, and

11    some that was below.

12    Q.   I'm not talking about with respect to the skill that

13    he applied to this project, but rather just his skill level

14    in general?

15    A.   I'm saying it's a little mixed.

16    Q.   So you don't think that he has more skill than a

17    Bachelor's degree in physics, applied physics, or related

18    engineering, and at least five years of university graduate

19    level or industrial field work experience in one or more of

20    the relevant areas along with at least five years of project

21    management experience?

22    A.   He certainly does.  He does have the capacity of a

23    person of more than ordinary skill.

24    Q.   He more than meets the requirements of your person of

25    ordinary skill, isn't that right, Dr. McWilliams?

1   A.   That is correct.

2   Q.   And what you know of Dr. Radovinsky, is he one of more

3   than ordinary skill according to your definition?

4   A.   From what I know of him, I believe so.

5   Q.   And what about Mr. Schultz, is he one of more than

6   ordinary skill?

7   A.   I don't know what his educational background is, but I

8   understand he worked in the field quite awhile.

9   Q.   If I represented to you that Mr. Schultz worked in

10  the field for over 25 years and has broad experience in

11  magnet programs, would you consider him a person of more

12  than ordinary skill?

13  A.   Again, I don't know what his educational background is,

14  but he may have achieved a similar level during that time.

15  Q.   I'm going to turn your attention to Exhibit 452 which

16  is not in the books.  Your Honor, may I approach the witness?

17       SPECIAL MASTER PETERSON:  Of course.

18  Q.   Are you familiar with this document, Dr. McWilliams?

19  A.   I wouldn't say I'm familiar with it at this moment, but

20  I may have seen it in looking through all of the documents

21  that were given to me some months back.

22  Q.   I'm going to turn your attention to the page that's

23  Bates labeled 8935.  This describes Mr. Schultz's

24  experience, do you see that?

25  A.   Yes, I see that.

1    Q.   Take a little bit of time to review that, and I'm going

2    to pose a question as to whether Mr. Schultz at the time of

3    the writing of this document, which is around 2003, whether

4    he was a person of more than ordinary skill.

5        Do you think Mr. Schultz is a person of more than

6    ordinary skill in the art according to your definition?

7    A.   Well, he doesn't have a Bachelor's degree in physics or

8    the related engineering field.  He has a Master's degree and

9    a lot of experience, so I think I would say he's a person of

10   more than ordinary skill in magnet design.

11   Q.   And in your report, either your expert report or your

12   rebuttal report, you don't point to a single cyclotron

13   patent that has an inventor that simply meets your

14   qualification for a person of ordinary skill in the art,

15   do you?

16   A.   Well, I think a person that exceeds a person of

17   ordinary skill.

18   Q.   You don't point to a single cyclotron patent that has

19   an inventor who does not exceed your level of ordinary

20   skill?

21   A.   I think that's probably right, but I'm not sure who the

22   whole list of inventors is.  I didn't cite too many patents

23   so it seems likely.

24   Q.   I'm going to turn to a different topic now.  I want to

25   turn your attention to the Scharf book that you cited in

1    your initial expert report, Exhibit 306.

2        You considered this book in forming your opinions in

3    your initial expert report, isn't that right?

4    A.   Yes, I did consider the Scharf book.

5    Q.   And you said that this is a book that describes

6    accelerator designs relevant for 250 MeV protons in the

7    1990 time frame, correct?

8    A.   It does include those considerations, yes.

9    Q.   Doesn't Scharf on Page 415 propose a synchrocyclotron

10   to treat patients with protons?

11   A.   415 being displayed there, yes, that's a proposed

12   synchrocyclotron.

13   Q.   And the proposed synchrocyclotron is to treat patients

14   with protons, right?

15   A.   Yes.  Though, hang on just a second ... well, this one

16   probably had protons proposed for the source, but I don't

17   know if they were then converted to electrons or not at a

18   later point.  It looks like protons up to the patient

19   delivery.

20   Q.   Let's look at the caption.  Can we blow that up as

21   well?

22   A.   Yeah, it says "Protons" in the caption.

23   Q.   So here Dr. Scharf is proposing using a

24   synchrocyclotron to treat patients with protons, right?

25   A.   Yes.

1    Q.   And Scharf also suggests increasing the magnetic field

2    to decrease the size of the proton accelerator, right?

3    A.   Right.   To the extent of this design, yes.

4    Q.   And he suggests increasing the magnetic fields to

5    decrease the size of the synchrocyclotron, right?

6    A.   I'm not finding that wording right there.

7    Q.   I'm going to actually turn your attention to your

8    deposition because I asked you the same question there,

9    Exhibit 101.

10   A.   It's indirectly there, but by the mass production

11   that's on the page --

12   Q.   So he is suggesting it, though, right?  He's suggesting

13   increasing the magnetic field to decrease the size of the

14   proton synchrocyclotron?

15   A.   He's suggesting shrinking the size will allow mass

16   production.

17   Q.   And superconducting magnets are typically known to be

18   higher field, isn't that right?

19   A.   They can go to high fields, yes.

20   Q.   So it's true that Scharf then is suggesting

21   increasing the magnetic field to decrease the size of a

22   proton synchrocyclotron, right?

23   A.   Well, it's showing how you could reduce it down to

24   52 tons here.

25   Q.   Let me point you to your deposition testimony,

1   Exhibit 101, at Page 149 to 150, and I'm going to blow up

2   149 starting at Line 8 to 150, Line 9, but you'll notice,

3   Dr. McWilliams, in the beginning part of the question I

4   just quote Scharf's book so I'm going to focus to the meat

5   of the question, which is starting on Line 6 on Page 150

6   which says:  "So I'm going to ask a series of questions

7   based on that.  One is:  doesn't Dr. Scharf suggest

8   increasing the magnetic field to decrease the size of a

9   proton synchrocyclotron?"  And your answer was:  "Yes."

10      Isn't that right?

11  A.   Yeah, by decreasing the mass as it says on that page we

12  were just looking at.

13  Q.   And Dr. Scharf also suggests increasing the magnetic

14  field could be accomplished by using superconducting magnets

15  as we already discussed, right?

16  A.   Yes.

17  Q.   Doesn't he also suggest on that page that one should --

18  he meaning doesn't Dr. Scharf on Page 415 -- we should

19  probably get that back up -- exhibit 306, if we could blow

20  that section up?

21      Scharf also suggests on that page that one should

22  decrease the size of the synchrocyclotron in such a way to

23  allow you to mount the synchrocyclotron to a gantry?

24  A.   There's a suggestion to decrease the size of the mass

25  in the figure, yes.

1    Q.   And doesn't Scharf say that being able to rotate a

2    synchrocyclotron in a gantry as one unit would simplify the

3    construction of the gantry?

4    A.   I believe that is correct, that it did show that.

5    Q.   And this book from Scharf is in 1994, right; that's

6    when he's writing this?

7    A.   I think it's 1994.

8    Q.   So he's not teaching away from going with

9    synchrocyclotron proton radiation therapy, right?

10   A.   For that particular example, he's teaching to use one

11   but he didn't teach away from it in other places.

12   Q.   But at least at one point he's actually teaching that

13   you should use one and that it would be beneficial, right?

14   A.   He's showing one that is proposed to be built that

15   could be beneficial.

16   Q.   You also said in your reports that in 1999 Dr. Blosser

17   thought that synchrocyclotrons were outvoted, right?

18   A.   That was Dr. Blosser's words, yes.

19   Q.   Well, let's look at Exhibit 304.  This is one of

20   Dr. Blosser's patents.  This is a patent from 1987, right?

21   A.   It looks like it to me.

22   Q.   Can we blow up just the top portion of the patent

23   so we can see it better?  Can you see that better,

24   Dr. McWilliams?

25   A.   I see that better now, yes.  Thank you.

1    Q.   And the patent covers a superconducting

2    synchrocyclotron, right?

3    A.   It says that's the topic.  Let me pull it up here so I

4    can see it a little better, okay.

5    Q.   So the patent is directed to superconducting

6    synchrocyclotrons, right?

7    A.   Yes, that's correct.

8    Q.   I'm going to turn your attention to the first column

9    of that exhibit, and I'm going to focus your attention to

10   the last two paragraphs before objects.  Can we try to blow

11   up the line numbers too?

12       Dr. Blosser says starting at Line 43 that

13   synchrocyclotrons have had success in recent years in

14   treating diseases of the eye and pituitary glands, right?

15   A.   Yes, he does say that.

16   Q.   And he also says that cyclotrons, and this is at

17   Lines 37 to 38, Dr. Blosser says that the synchrocyclotron

18   tends to be a competitive choice over the isochronous

19   cyclotron, right?

20   A.   For the energy range of 1 GeV and below he says, yes.

21   Q.   And he says, the use of -- he says:  "Such use of a

22   synchrocyclotron would lead to the consideration of possible

23   wide use of these ion accelerators in hospitals," right,

24   and that's starting at Line 43?

25   A.   Yes, that's right.

1   Q.   And he says at the end of that couple of paragraphs, he

2   says:  The overall accelerator system would be much smaller,

3   easier to install, and the total costs would be reduced by a

4   large factor if superconducting synchrocyclotron technology

5   could be used, correct?

6   A.   Correct.

7   Q.   And you believe that hospitals are always looking for

8   a less expensive way to provide treatment, right?

9   A.   I would imagine they are usually looking for that.

10  Q.   So Scharf and Dr. Blosser are both suggesting using

11  high-field magnets to decrease the size of the

12  synchrocyclotron, right?

13  A.   That's the wording that is being used here.

14  Q.   And didn't Dr. Blosser and Scharf both have the --

15  both know the technological capabilities of superconducting

16  particle accelerators?

17  A.   I think they knew quite a bit about them.

18  Q.   Do you think they knew as much or more than Dr. Gall in

19  2003?

20  A.   I couldn't make the comparison.

21  Q.   I'm going to turn to a different topic and just ask a

22  couple more questions, Dr. McWilliams.

23       You think that by November 17, 2005, that the group

24  at MIT had confirmed a workable, produceable magnet for the

25  '311 patent; isn't that right?

1    A.   They had produced a magnet design which possibly needed

2    some iterations but would basically, you know, be able to

3    provide the fields needed.

4    Q.   I'm going to direct your attention to your deposition

5    testimony at Exhibit 101, Page 166, Lines 3 through 7.

6    It's on the screen if you'd like, and I'm going to ask -- I

7    was clarifying a question and said:  "A design sufficient to

8    enable the invention, that's what I mean by design."  And

9    answer:  "I think that by that date of 17 November 2005,

10   the magnet design work done by the MIT group I had confirmed

11   a workable, produceable magnet for the '311."

12        Is that what you said?

13   A.   Yes.

14   Q.   And based on all of the documentation that you reviewed

15   there was not another embodiment available at the time of

16   the patent application -- I mean, let me rephrase.

17        And in your opinion based on all the documentation that

18   you reviewed at the time the patent application was filed

19   for the '311 patent there was not another embodiment

20   available that met the claims of the '311 patent, isn't

21   that right?

22   A.   I don't know if another magnet design was really

23   produced at that point.

24        MS. DEVARASETTY:  No further questions, your Honor.

25        SPECIAL MASTER PETERSON:  All right.  Redirect?

1          REDIRECT EXAMINATION BY MR. HILL:

2     Q.   Good afternoon or evening, Dr. McWilliams.  Counsel's

3     asked you several questions about the Scharf book that's

4     Exhibit 306.

5          Do you have that in front of you by chance?

6     A.   Yes.

7          MS. DEVARASETTY:  Your Honor, do you mind switching

8     the computers?

9          SPECIAL MASTER PETERSON:  Oh.

10          MS. DEVARASETTY:  Thank you.

11    A.   306.

12    Q.   Do you have 306?

13    A.   Yes.

14    Q.   And counsel turned you or had you turn to a page that

15    had a diagram on it and asked you questions about whether it

16    disclosed a proton therapy system, if you could turn there

17    please?

18    A.   I believe that was Page 415.  That's in the section on

19    the sum of prospective designs.

20    Q.   And that's on Page 415, do you see that?

21    A.   Yes, sir.

22    Q.   In your review of this book by Scharf and in

23    particular this section, do you find any differences with

24    what Scharf is disclosing here and with what you believe

25    Ken Gall conceived in 2001?

1    A.   Well, there are a number of differences here.

2    Q.   Could you list those for the Court, please?

3    A.   One of them is the volume.  Then, there's the mass for

4    the accelerator.  There's also the beam transport lines so

5    that the beam is not going essentially directly to the

6    patient.

7    Q.   Did you find anywhere in the Scharf book where there

8    is a superconducting synchrocyclotron delivering a proton

9    beam directly from the accelerator to the patient?

10   A.   I don't believe so.

11   Q.   Is this figure shown here on Page 415 a figure that is

12   taken from the Wu thesis?

13   A.   I believe this is from the article produced by

14   Blosser.  I don't remember if it was included in the Wu

15   thesis or not.

16   Q.   Was Dr. Wu somehow connected to Dr. Blosser?

17   A.   He did his thesis work there.

18   Q.   All right.  Did you find anything in the Scharf book

19   that teaches away from the invention that you opined Ken

20   Gall conceived of in 2001?

21   A.   The answer to that is:  yes, and I put it in one of the

22   two reports.

23   Q.   Can you tell the Court what it was that taught away

24   from Ken Gall's conceived invention?

25   A.   There was a general assessment of synchrocyclotron

1    usage as a function of time, that they had been popular and

2    were reducing in popularity going down to almost none left

3    in the world.

4    Q.   Okay.  If I could get you to go to Exhibit 43, which is

5    the "Protons" notebook from Ken Gall?

6    A.   Yes, sir.

7    Q.   Would you turn to Page 25 of that notebook, please?

8    A.   I have Page 25 open.

9    Q.   On Page 25 do you have an understanding of what that

10   depicts to you?

11   A.   Yes, I do.

12   Q.   What does that depict in your opinion?

13   A.   That depicts a synchrocyclotron on a gantry that can

14   rotate about 180 degrees.  The iso center with the patient

15   in it as indicated in the center as consideration for the

16   radiation shielding around it.  The dimensions of the room

17   are shown, so there's some implication about the masses

18   involved as well.

19   Q.   And on Page 26 do you see additional notes or diagrams

20   depicted there?

21   A.   Yes.

22   Q.   Does that indicate anything to you?

23   A.   Yes, it does as well.

24   Q.   Could you please share that with the Court?

25   A.   Yeah.  It's -- again, it looks like it's a

1    synchrocyclotron mounted on a gantry.  Above the iso center

2    that looks like it would be where a patient would be held.

3    I see some additional calculations here possibly with the

4    coefficient equations involved.  I'm not sure what the rest

5    of it is, and there are some dimensions as well.

6    Q.   Did you find a date on either of these two pages?

7    A.   Page 25 has a date of 5 July 2001; Page 26 has another

8    date on it that I see.

9    Q.   Okay, and on what date in your opinion had Ken Gall

10   conceived of the invention that's claimed in the '311

11   patent?

12   A.   I thought by the 6th of June 2001 it showed all of the

13   elements.

14   Q.   And why didn't you use the date of July 5th, 2001,

15   given the drawings and calculations that are shown on

16   Pages 25 and 26?

17   A.   Well, earlier drawings showed patient rooms and

18   radiation considerations and rotations.  With Page 26,

19   again, it has the overall geometry shown there but then

20   gets down into details that are refinements on the beam

21   delivery shape so I don't think that was essential to the

22   claims of the '311.

23   Q.   Thank you.  Could you turn back to Pages 21 and 22 of

24   this notebook?

25   A.   Yes, I have those open.

1    Q.   What do you find depicted on Page 21?

2    A.   21 is discussing the synchrocyclotron and the magnetic

3    field structure and return flux, 'cause that matters for

4    medical applications to know where it's going; and it has

5    some calculations specifically with some numbers both for

6    size and for magnetic fields considered.

7    Q.   And is 10 Tesla one of the magnetic fields considered

8    here?

9    A.   Yes, it is considered.

10   Q.   Look on Page 22.  Do you see a frequency calculation

11   there?

12   A.   Yes, I do.

13   Q.   Does that mean anything to you?

14   A.   Sure.

15   Q.   Would you please share with the Court what that means

16   to you?

17   A.   So the line in the middle of the page that starts with

18   "freq.," which means frequency, and I see "153," which I

19   take to be 153 MHz in this context, and I see the word

20   "start," so I take that to be the starting frequency in the

21   synchrocyclotron.  And then a ratio to reduce down to 112

22   MHz, and that ratio considers both the relative effects and

23   the weak focusing or face stability issues.

24   Q.   And have you done anything to verify whether this

25   calculation is correct?

1    A.   Yes.

2    Q.   Can you share that with us?

3    A.   This calculation follows the field index calculations

4    of the Wu thesis, and it includes again a factor for the

5    mass.

6    Q.   The gamma factor for the mass of a proton, is that

7    correct?

8    A.   Oh, yes.

9    Q.   Did you find anywhere in the materials that you were

10   provided similar frequency calculations by Dr. Antaya?

11   A.   No.  I found some frequency calculations going along

12   with it but not quite as similar as it would be nice to see.

13   Q.   Could I get you to go to Exhibit 109, please?

14        MS. DEVARASETTY:  Objection, beyond the scope.

15        SPECIAL MASTER PETERSON:  Overruled.

16   A.   I have it.

17   Q.   Exhibit 109, if you could turn to Page 6, Section 3.4

18   Acceleration?

19   A.   Yes, sir.

20   Q.   What do you understand from this?

21   A.   When I read this it says it's looking at a proton at

22   250 MeV.  The mass correction factor is one gamma is equal

23   to 1.267, and the starting frequency is at 145 MHz, and a

24   final frequency of 114 MHz -- 114.4 MHz.

25   Q.   With that start and final frequency, do you believe

1    that that would produce a stable output using protons?

2    A.   No, it would not.

3    Q.   Why not?

4    A.   It doesn't include the needed field index, the weak

5    focusing is not introduced here.

6    Q.   And if we go back to Ken Gall's notebook at Page 22,

7    the frequencies that are given on Page 22, would that

8    provide a stable proton beam output?

9    A.   Yes, it would.

10   Q.   Have you reviewed Dr. Antaya's scaling law?

11   A.   Yes, I have.

12   Q.   Do you find any application of Dr. Antaya's scaling law

13   in the conception by Ken Gall in his notebook?

14   A.   If I understood what you asked ... no, I do not.

15   Q.   Would, in your opinion, Ken Gall need to have

16   Dr. Antaya's scaling law in order to have fully conceived

17   of the claims or the invention that's claimed in the '311

18   patent?

19   A.   Certainly not.

20   Q.   Why not?

21   A.   Because the weak focusing stability questions have

22   been well understood for a long time.  The scaling up of

23   the design of a synchrocyclotron at high magnetic fields is

24   a straight-forward calculation.

25   Q.   Are you saying that Dr. Antaya's scaling law is a

1    straight-forward calculation?

2    A.   Do I personally find it straight-forward, yes.

3    Q.   What do you understand it to represent?

4    A.   The scaling law we spoke about today represents a

5    calculation of the orbital path of particles that have a

6    similar relationship satisfied by the K Stars.

7         Those calculations were done for a constant magnetic

8    field across the whole device, not a changing field, to

9    start with.  And then he did a little more refinement on it

10   by introducing the magnetic field scaled with gamma; again,

11   not including the weak focusing kind of elements in it.

12   Rather, it was increasing the magnetic field, and so the

13   equation has a series of expansions associated with it, so

14   it's an approximation to it, and we already know by other

15   means why we have those things scaled.

16   Q.   Would a team of persons of ordinary skill in the art

17   need Dr. Antaya's scaling law to reduce to practice what

18   Ken Gall has laid out here in his notebook at Pages 21 and

19   22?

20   A.   By no means.

21   Q.   Why not?

22   A.   Since the physics and the synchrocyclotron has been

23   known a very long time, you could scale from a magnetic

24   field based on other designs that are known to be

25   successful as long as you follow the field index

1    requirements, it's well-known.

2         MR. HILL:  No further questions.

3         SPECIAL MASTER PETERSON:  All right.  Recross?

4         MS. DEVARASETTY:  No, your Honor.

5         SPECIAL MASTER PETERSON:  No recross, okay.

6    You're excused.  Thank you very much, Dr. McWilliams.

7         THE WITNESS:  Thank you, sir.

8         SPECIAL MASTER PETERSON:  All right.  Let me just

9    do a calculation here given the hour.  I think we've made

10   pretty good progress today.

11        The way I have it MIT has used three hours and five

12   minutes of the five hours and Mevion has used three hours

13   and 36 minutes of the five hours ... so that gives Mevion

14   roughly an hour-and-a-half tomorrow out of the five hours

15   and roughly two hours for MIT out of the five hours, and

16   then plus the 45 minutes apiece for the closings, which

17   suggests to me that we will easily finish tomorrow.

18        Does anybody disagree with that?

19        MS. DEVARASETTY:  No.

20        MR. HILL:  Not at all, hopefully early in the

21   afternoon.

22        SPECIAL MASTER PETERSON:  All right, and starting --

23   should we start again at 8:30 or should we start at 9?

24   8:30 is fine with me.

25        MS. DEVARASETTY:  Yeah, I think earlier would be

1    better.

2           MR. HILL:  9 would be I think more reasonable for

3    everyone.

4           SPECIAL MASTER PETERSON:  9:00?

5           MS. DEVARASETTY:  9 is fine.

6           SPECIAL MASTER PETERSON:  All right.  We'll start

7    at 9.  Tomorrow for the argument, you know, obviously, what

8    I'm going to be looking to hear from you all is whatever

9    you can help me and ultimately the Court to resolve this

10   case, and we all know what's at issue.

11      I'm going to be looking to hear tying the testimony to

12   the clients, you know, who did what in terms of the clients,

13   and I think we've heard, you know, quite a bit of testimony

14   today, which is fine.  I mean, this is no criticism at

15   all, but a great deal of testimony about generally the

16   technology, and I think that's fine as background, but,

17   ultimately, we're going to have to tie this to the claims in

18   the patent.

19      And when you get to your argument tomorrow and then

20   ultimately the briefing, that's the sort of testimony or

21   the type of argument, the type of testimony, that I'm going

22   to be looking to hear.

23      While we've got a minute, can we talk about post-hearing

24   briefings?  The parties have already agreed -- I think you

25   agreed to 30 days after the days you get the transcript, is

1     that right?

2          MR. BRUNO:  There has been a stipulation I believe

3     between the parties since then that we would select

4     March 28th as the date that we propose for post-hearing

5     briefs.

6          SPECIAL MASTER PETERSON:  For the briefs?

7          MR. BRUNO:  For the first post-hearing briefs, yes.

8          SPECIAL MASTER PETERSON:  I see, regardless of

9     whether you have the transcripts?

10          MR. BRUNO:  In speaking with the reporter today, we

11    believe we'll have the transcripts in about three weeks so

12    it will work out by March 28th.

13          SPECIAL MASTER PETERSON:  All right, and you're

14    going to have responses and replies after this?

15          MR. BRUNO:  Those are currently provided for in the

16    stipulation, yes.

17          SPECIAL MASTER PETERSON:  Okay.  So we're looking at

18    the briefing being complete roughly mid to late April, early

19    May roughly?

20          MR. BRUNO:  Yes, your Honor.

21          SPECIAL MASTER PETERSON:  Okay.  So somewhere in

22    there, okay.  And you obviously will want an opinion as

23    shortly after that as possible -- well, the end of April,

24    the first part of May ... I would do my best then to try to

25    get something turned around in 30 days or less, somewhere

1   around there.  Hopefully, I can do that in May.  I've got

2   another lengthy arbitration in April, but I don't think

3   that's going to interfere with this, so I think, you know, I

4   think we can probably do that.

5       I'm just trying to think if there's anything else?  Do we

6   need to move any exhibits in?

7           MR. HILL:  Yes, we do, your Honor.

8           SPECIAL MASTER PETERSON:  All right, let's do that.

9           MS. CHRISTO:  Mevion would like to move the

10  following exhibits into evidence:  86, 87, 106, 108, 111,

11  605, 606, 619, 620, 630, 631, 632, 633, 634, 635, 636, 637,

12  638 through 643, 646, 650, and 652.

13          SPECIAL MASTER PETERSON:  All right.  Any

14  objections?

15          MS. DEVARASETTY:  No, your Honor.

16          SPECIAL MASTER PETERSON:  All right.  Received with

17  no objections.

18              (Exhibit Nos. 86, 87, 106, 108, 111, 605, 606,

19               619, 620, 630, 631, 632, 633, 634, 635, 636, 637,

20               638, 639, 640, 641, 642, 643, 646, 650, 652

21               admitted in evidence.)

22          MS. DEVARASETTY:  I'd also move to add some

23  exhibits, and that would be Exhibit 452, which I handed to

24  the Court, which was not included in the direct exhibits

25  that we provided.

```
 1              SPECIAL MASTER PETERSON:  All right.  Any

 2    objections, Mr. Hill?

 3              MR. HILL:  No.

 4              SPECIAL MASTER PETERSON:  All right, 452 also comes

 5    in without objection.

 6              (Exhibit No. 452 admitted in evidence.)

 7              SPECIAL MASTER PETERSON:  The last thing since we're

 8    changing --

 9              MS. DEVARASETTY:  I'm sorry, your Honor.  Can I add

10    one more, which is Exhibit 101 which is Dr. McWilliams'

11    deposition testimony.

12              SPECIAL MASTER PETERSON:  I thought 101 was already

13    in.  Okay, 101.

14              MR. HILL:  No objection.

15              SPECIAL MASTER PETERSON:  All right.  101 received

16    without objection.

17              (Exhibit No. 101 admitted in evidence.)

18              SPECIAL MASTER PETERSON:  Just I don't know how to

19    get in touch with our court reporter from this morning.

20    Can you get word to her that we're starting at 9?

21              THE COURT REPORTER:  I can, yes.

22              SPECIAL MASTER PETERSON:  All right.  Anything else

23    before we break for the evening?

24              MR. HILL:  Not from our side.

25              MS. DEVARASETTY:  No, your Honor.
```

1          SPECIAL MASTER PETERSON:  Then, we stand in recess

2     until 9:00 tomorrow morning.  Have a good evening.

3          MS. DEVARASETTY:  Thank you.

4          MR. HILL:  Thank you.

5          (Whereupon, the proceedings concluded at 6:27 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3        I, Helana E. Kline, a Registered Merit Reporter,

4    Certified Realtime Reporter, and Federal Official Court

5    Reporter of the United States District Court, do hereby

6    certify that the foregoing transcript, from Page 1 to

7    Page 180, constitutes, to the best of my skill and ability,

8    a true and accurate transcription of my stenotype notes

9    taken in the matter of Massachusetts Institute of

10   Technology v. Mevion Medical Systems, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23        /s/ Helana E. Kline              March 7, 2012

24        Helana E. Kline, RMR, CRR

25        Federal Official Court Reporter