UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS


MASSACHUSETTS INSTITUTE OF          )
TECHNOLOGY,                         )
                                    )
    Plaintiff,                      )
                                    )
                                    )          Civil Action
vs.                                 )          No. 1:10-cv-12186-RWZ
                                    )
MEVION MEDICAL SYSTEMS, INC.,       )
                                    )
    Defendant.                      )



**NON-JURY TRIAL**
**DAY TWO - SECOND SESSION**



BEFORE SPECIAL MASTER GALE R. PETERSON


UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
February 9, 2012
2:30 p.m.



*   *   *   *


HELANA E. KLINE, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
helanakline@aol.com

APPEARANCES:

For the Plaintiff:

PROSKAUER ROSE, LLP
By:  Sharada Devarasetty, Esq.,
     and Steven M. Bauer, Esq.
     One International Place
     22nd Floor
     Boston, MA  02110


For the Defendant:

SHEPPARD MULLIN RICHTER & HAMPTON,
LLP
By:  Nathaniel Bruno, Esq.
     Four Embarcadero Center
     17th Floor
     San Francisco, CA  94111

-and-

SHEPPARD MULLIN RICHTER & HAMPTON LLP
By:  Russell B. Hill, Esq.
     650 Town Center Drive
     4th Floor
     Costa Mesa, CA  92626

I N D E X


Closing Statements                                    Page


By Mr. Hill                                             4


By Ms. Devarasetty                                      20




E X H I B I T S


No.   Description                               Page


454   MIT's closing PowerPoint.                   53

657   Mevion's closing PowerPoint.                53

PROCEEDINGS

1

2     SPECIAL MASTER PETERSON:  Good afternoon.

3  Thank you.  Please be seated.  All right.  I guess we

4  need MIT --

5     MR. HILL:  I think MIT has conceded and left the

6  building.

7     SPECIAL MASTER PETERSON:  You know, hope springs

8  eternal, right?  My watch is a little fast I know.  I think

9  we have everybody.

10    Is everybody ready to roll with closing arguments?

11    MR. HILL:  We are.

12    SPECIAL MASTER PETERSON:  All right.  Mevion, the

13  floor is yours.

14    MR. HILL:  Thank you, your Honor.  Do you mind if I

15  stand over here?

16    SPECIAL MASTER PETERSON:  No.

17    MR. HILL:  Mr. Bruno promised some things to the

18  Court at the beginning of this case yesterday.  He spoke to

19  you about the burden that MIT has to carry, and he told you

20  that MIT couldn't meet that burden.  Indeed, MIT has failed

21  to meet its burden of proof by clear and convincing evidence

22  that inventorship of the '311 patent should be disturbed.

23    What was MIT supposed to do?  They were supposed to

24  show by clear and convincing evidence that Dr. Antaya made

25  a significant contribution to the conception of at least

1    one claim of the patent in issue, which is the '311 patent.

2        Why do we have that burden?  Courts require clear and

3    convincing proof of co-inventorship because of the strong

4    temptation for a person who consulted with the inventor and

5    provided him with materials and advice to further his own

6    position by reconstructing the extent of his contribution

7    to the extent of the invention.  MIT failed to meet that

8    burden.

9        You heard from Dr. Antaya.  You have his direct, you

10   have his rebuttal declarations, and his direct as his direct

11   testimony, you heard him on cross-examination and redirect.

12   He never testified that a single element in the claims was

13   his suggestion to Dr. Gall, not a single element.

14       He said a lot about a scaling law.  He testified, in

15   fact, that the scaling law is what led to the '311 patent,

16   and that's why he should be named a co-inventor; that's at

17   the very rebuttal of his rebuttal declaration, that's

18   what he said on the stand, that's what he said all along.

19       As the Court knows, he has the burden of bringing

20   forth corroborating evidence to support his testimony that

21   he contributed significantly to at least one claim of the

22   patent that is in issue.  Not only did he not testify, none

23   of the witnesses that MIT put on testified to those facts.

24       Dr. Minervini, he was questioned by you, he was

25   questioned by counsel; he could not corroborate a single

1   element of the claims being suggested by Dr. Antaya to

2   Dr. Gall, not a single element.

3       MIT also put on an expert witness, Dr. Hassenzahl.

4   Dr. Hassenzahl had reviewed the entire record of documents

5   that was provided, a long list that goes with his expert

6   report.  Did he come forward and say there was an element

7   of the claim that Dr. Antaya suggested to Dr. Gall?  No,

8   not a single one.

9       Instead, Dr. Hassenzahl also focused on the scaling law

10   but didn't provide corroboration of any claim element being

11   suggested by Dr. Antaya.  Moreover, he couldn't even tell

12   the Court whether the embodiment that Dr. Antaya allegedly

13   provided to the '311 patent worked.  He never tested it,

14   never determined if it worked.

15       So this focus on the scaling law, my question is:  so

16   what?  All their witnesses agreed that it's not disclosed

17   in the '311 patent, and it's certainly not claimed in the

18   '311 patent.  Dr. Antaya even testified at the end of his

19   cross-examination yesterday that he didn't even use the

20   scaling law in designing his new isochronous cyclotron.  In

21   fact, he's saying it took 2.5 man years so far to develop

22   that machine.  The Holy Grail that he came up with, he's

23   not even using it.

24       In short, MIT has not met its burden.  We can stop

25   right here.  I could ask you for a directed verdict again.

1      They haven't met their burden.  I might do that at the end

2      of this, but I'm going to go on.

3         You asked us before we left for the lunch break to come

4      back and talk about when does engineering become invention,

5      and there's a really good case on point.  It's the

6      Shatterproof glass case.  In this case, this case involves

7      a glass outer coating invention, and the assembly and the

8      system for doing that.  The inventor there conceived of the

9      various modules that would go into this system and then he

10     went out and hired people that were skilled in the art of

11     their specific areas to build those modules.

12         SPECIAL MASTER PETERSON:  This was the three-layered

13     safety glass, wasn't it?

14         MR. HILL:  I believe that's correct.  The guy who

15     built the conveyor system, which the inventor himself didn't

16     know how to do, claimed to be a co-inventor.  That was shot

17     down.  The Federal Circuit affirmed that an inventor may

18     use the services, ideas in aid of others, in the process

19     of perfecting his invention without losing his right to a

20     patent.

21         That applies to Dr. Gall.  He could use the services

22     and ideas in aid of MIT without losing his right to be the

23     sole inventor on the patent.  In fact, we heard testimony,

24     it hasn't been rebutted, that MIT services, ideas, and aid

25     didn't even work in the end.  MIT's Holy Grail scaling law

1    wasn't even used to come up with the final design for the

2    Mevion machine that's putting out a stable proton beam

3    today.

4       Dr. Antaya never did the calculations and the proof

5    required to show that his design would get to that stable

6    beam, and you heard unrebutted testimony from Dr. Gall

7    this morning that when they performed the simulation on

8    Dr. Antaya's machine, the design, to see if they would get a

9    stable proton beam output it failed.

10          SPECIAL MASTER PETERSON:  Now, actually, the current

11   machine is a commercial embodiment of something, but what I

12   heard was that the commercial embodiment may or may not be

13   a commercial embodiment of the scope of the claims of the

14   '311 patent; but as far as the configuration disclosed in

15   the specification, it's not a commercial embodiment.  Things

16   have been changed because I've heard Dr. Gall testify that

17   the specification -- what was disclosed in the specification

18   had incorrect numbers.

19          MR. HILL:  Actually, I don't think that's correct.

20   Dr. Gall in his direct declaration, I believe, indicated

21   that they're currently practicing one or more claims of the

22   '311 patent with the machine they have today.

23          SPECIAL MASTER PETERSON:  Yes, the claims, but not

24   what's disclosed in the specification?

25          MR. HILL:  Correct, and that's Dr. Antaya's design

1    that didn't work.

2          SPECIAL MASTER PETERSON:  Okay.  Now, to the extent

3    that the commercial embodiment may not use what's disclosed

4    in the specification, that really doesn't have anything to

5    do with inventorship of the '311 patent, does it?

6          MR. HILL:  Absolutely not.

7          SPECIAL MASTER PETERSON:  Okay.

8          MR. HILL:  Because the best mode known to Dr. Gall

9    at the time he filed his patent application was what MIT was

10   telling him would work.

11         SPECIAL MASTER PETERSON:  So back up a slide then.

12   I'm not sure -- the last two points on your slide that MIT

13   services didn't work and the scaling law wasn't used -- I'm

14   not sure what those have to do with the inventorship issues

15   here.

16         MR. HILL:  If I understand MIT's position correctly,

17   they're saying that Dr. Antaya and that the team at MIT was

18   of such extraordinary skill in the art that they had to take

19   Dr. Gall's concept and do the engineering to come to a point

20   where it was actually an invention.

21      Well, they didn't deliver a working embodiment.  They

22   delivered an idea, but it didn't work for its intended

23   purpose.

24         SPECIAL MASTER PETERSON:  All right.  Irrespective

25   of the commercial embodiment that you have now?

1          MR. HILL:  Correct.

2          SPECIAL MASTER PETERSON:  All right.

3          MR. HILL:  As I said, we could stop here because

4    they haven't produced any clear and convincing evidence,

5    but I want to go on.  Because I think if the roles were

6    reversed, if we were at the other table, and we were trying

7    to add Dr. Gall to this patent, I think we can put on clear

8    and convincing evidence, and I think that we did put on

9    clear and convincing evidence that he is the sole inventor

10   of the invention that's claimed in the '311 patent.

11       What I've done here, and Mr. Bruno showed this to you at

12   the beginning, is summarize into a checklist the features

13   that are claimed in the '311 patent.

14       Now, the ranges that you'll find in here:  the weight

15   ranges, the volume ranges, the energy ranges, the magnetic

16   field strength ranges, those aren't something picked out of

17   the air.  As Dr. McWilliams pointed out in his report and as

18   you can verify, if you were to use Dr. Gall's spreadsheet,

19   if you input the values into those equations, you're going

20   to come up with those exact ranges.

21       This isn't something just pulled out and say:  Oh, I

22   think I can go to 20 Tesla.  He demonstrated that to himself

23   in his notebook ... so what evidence have we put on that

24   Dr. Gall conceived of these elements before he talked to

25   Dr. Antaya indeed in 2001?

1        Let's start with the system configuration.  I'm going

2    to go to this.  Here's a sketch of the entire system

3    configuration that Dr. Gall put into his notebook, and this

4    was in July of 2001 long before he talked to Dr. Antaya.

5        It shows a superconducting synchrocyclotron mounted on a

6    gantry.  It shows the path for the beam to come directly

7    from the superconducting synchrocyclotron to the patient.

8    It shows the gantry can be rotated.  You can see the pivot

9    point.  It has all of the basic system configuration that's

10   claimed in the claims of the '311 patent.

11       We can prove by clear and convincing evidence, and I

12   don't think MIT even disputes on this point, that the system

13   configuration was in Dr. Gall's notebook in 2001.  The next

14   elements, this weight, a range that's less than 40 tons and

15   goes from 5 to 30 tons, that's claimed as you know in

16   various ways in the claims of the patent.  We have a

17   calculation that he completed in June of 2001:  12 tons.

18   That falls within the range.  It's less than 40; it's

19   between 5 and 30.  He had it in his mind.  We can show by

20   clear and convincing evidence he had the weight calculation.

21       The volume, 4.5 cubic meters, is one of the -- less

22   than 4.5 cubic meters is one of the claims; another one says

23   a range of .7 to 4.5 cubic meters.  We have a calculation he

24   performed in June of 2001.  He calculated 1.4 cubic meters

25   as the volume of the superconducting synchrocyclotron.

1  That falls in that range.  We've shown that by clear and

2  convincing evidence.  None of this has been rebutted by MIT,

3  not even a question raised about it.

4      The next is the energy level.  Did he have an energy

5  level that's within the range claimed?  Well, sure, he did.

6  Back in his notebook again, he calculated an energy output

7  of the proton beam of 250 megaelectron volts.  Is that in

8  the range that was claimed?  Yes, at least 150, a range of

9  150 to 300.  Shown by clear and convincing evidence, he had

10 that.

11     The last element that's common to all of the claims in

12 the patent is a magnetic field strength that's at least 6

13 Tesla, and a range of 6 to 20.  Did he have that in 2001?

14 Yes, he did.  He calculated on Page 21 of his Exhibit 43,

15 his notebook, a 10 Tesla magnetic field strength, undeniable.

16     That's the end of the case really.  We've shown by clear

17 and convincing evidence that in 2001 he had conceived of

18 every element that's claimed in the patent.  We can go

19 beyond that.  We can show he actually delivered this

20 concept to Dr. Antaya.  Dr. Antaya did not deny in the

21 slightest that he received Exhibit 1 in January 2003.

22     Let's look at what that shows.  This is from the e-mail

23 to Dr. Gall from Dr. Antaya briefly -- shortly after they

24 met.  Remember, Dr. Antaya responded within a few hours

25 and said:  It's gonna make it straight forward, the

1   specifications you provided.

2       We have a synchrocyclotron highlighted, italicized at

3   the beginning.  You'll find in the direct testimony of

4   Dr. Gall that Dr. Antaya had actually wanted to do a study

5   on an isochronous cyclotron first, and Dr. Gall had to

6   redirect him back to what he wanted, which was a

7   synchrocyclotron.  He knew he had done the study on it.  He

8   gave Dr. Antaya a spreadsheet.  Dr. Antaya doesn't look at

9   the spreadsheet, but he gave him a spreadsheet with all the

10   calculations showing him this is what he wanted.

11       It includes the extracted beam energy, 250 megaelectron

12   volts.  There's a beam current specified, the spot size, the

13   energy spread, the extraction efficiency.  The magnetic

14   field strength, here he was proposing up to 15 Tesla, but

15   it's rotatable through 180 degrees, that it has a cryogenic

16   system.  Obviously, it's going to have superconducting

17   magnets if it has cryogenics.

18       So that's what he delivered to Dr. Antaya.  What we

19   have now, we have Dr. Gall's notebook -- I'm sorry, a

20   notebook that stands unrebutted.  On its face it discloses

21   the elements that are claimed in the '311 patent.

22       We have Exhibit 1, it's not rebutted.  It discloses

23   most of the elements; and if you put it together with

24   his notebook, everything there is being delivered to

25   Dr. Antaya.

1    Then we have Mr. Sliski's testimony from this morning

2    asked on a claim-by-claim basis who came up with the idea,

3    who said what to whom, and it was all Dr. Gall telling

4    Dr. Antaya.

5        MIT can't meet its burden.  It can't attack the evidence

6    that we have put into the record, so what does it do?  It

7    creates a smokescreen.  We've seen four of them that I want

8    to talk about.

9        First is this notion of obviousness that's been kind of

10   permeating.  No one's come out and said the patent's obvious,

11   but you did hear Mr. Bauer in his opening statement say:

12   if you don't put Dr. Antaya on the patent, it's obvious

13   it's invalid.  Why in the world are these guys doing it?

14   And then that's been a theme through their testimony:  this

15   element was known, the prior element was known.  I'll show

16   you why that's not really known.

17       They attacked Dr. Gall's skills in the direct

18   declaration/expert report of Dr. Hassenzahl.  He took the

19   position Dr. Gall didn't have the technical ability to even

20   understand how a cyclotron worked.  He testified about that

21   in his deposition.  You know that's false.  The testimony

22   that's come in has proven that.

23       Then they focused on Dr. Antaya's scaling law through

24   Dr. Antaya and Dr. Hassenzahl, and then there's been this

25   permeating theme of MIT's engineering expertise that is so

high, so above the ordinary skill ... I want to address each one of these.

Obviousness is not an issue in this case.  We haven't asked you to decide the validity of the '311 patent.  In fact, MIT has stipulated with us that that's not an issue in this case.

That should be the end of the obviousness issue, but we can even go beyond that.  The closest reference that they've pointed to is the book by Scharf where it's describing the various cyclotron systems available in 1994, and he uses the Wu thesis and article, a system to talk about a superconducting synchrocyclotron mounted on the side of a gantry; but as Dr. McWilliams' pointed out in his report and his testimony that reference actually teaches away from the invention of the '311 patent.

Indeed, I had Dr. Hassenzahl yesterday admit that the very quote he put into his report shows that it has a beam transport system in it.  There's no suggestion in anything that they've cited to that the system that was shown in Scharf could be reduced to a size that would allow a direct proton beam to the patient, nothing ... so the obviousness red herring, it's irrelevant, it shouldn't affect the decision.

Dr. Gall's skills shouldn't be at issue here.  Dr. Gall could be a cab driver with some understanding of various

1    pieces of this system and come up with an idea that's

2    sufficiently permanent in his mind, and he knows he can go

3    to people and get them to put it together, and he could be

4    an inventor, but he goes way beyond that.  He has years and

5    years of experience of the cyclotron facility at Harvard.

6    He's testified to you about his project engineering and

7    lead design efforts in various phases of correcting

8    Dr. Antaya's work, of getting a machine that is now

9    putting out a proton beam at 250 MeV ... highly qualified.

10       I want to illustrate this from some evidence that came

11   into the record when you put Dr. Gall up against Dr. Antaya.

12   You'll recall that Dr. Antaya testified that one of the

13   critical things in a superconducting synchrocyclotron is

14   to maintain this weak focusing of the magnetic field.

15       I have here side-by-side a portion of Exhibit 43, which

16   is Dr. Gall's notebook in 2001, and then Dr. Antaya's design

17   specification for the cyclotron that was to be built at MIT,

18   and that was in 2004.  Both of them include a frequency

19   calculation.

20       Now, this frequency calculation I think has -- I'm not

21   sure that it's been made clear enough to the Court or not.

22   It was to me.  I think I have the same background as you;

23   I'm a patent lawyer, an electronics engineer, so it took me

24   a minute to get it, but I got it now.

25       As Dr. McWilliams has pointed out, if you take a look

1    at the final frequencies, there has to be a particular type

2    of frequency adjustment made to account for the weak

3    focusing.  Both Dr. Gall and Dr. Antaya took into

4    consideration this, this gamma factor, which is the mass

5    factor for the proton and put it into the calculation, but

6    Dr. Gall's calculation came out correct because he also put

7    into it the ratio for the weak focusing requirement that he

8    derived from the Wu thesis.  That's the correct frequency

9    that produces the stable beam output.

10       Dr. Antaya in 2004 in a paper he's submitting to have

11   this project approved doesn't take that into consideration,

12   and this is months after he has his Holy Grail scaling law

13   on hand.

14            SPECIAL MASTER PETERSON:  Well, actually, the

15   scaling law doesn't have anything to do with this, does it?

16            MR. HILL:  According to, according to Dr. Antaya,

17   all you had to do was scale out the previous design and you

18   would have the weak focusing you needed, and you'd have face

19   stability; this was part of the face stability portion.

20            SPECIAL MASTER PETERSON:  All right.

21            MR. HILL:  And Dr. Gall's expertise is not on trial

22   here; he frankly is an expert in another invention, which I

23   think that's been demonstrated.

24       Let's talk about MIT's engineering expertise.  What we

25   have here is Dr. Antaya on the record stating he wanted to

1    prove the feasibility of the concept to himself, and he

2    wanted to do that before he went out and got the university

3    involved.  He wanted to do that before there was a contract

4    in place.  And he said, he's done his scaling law, and he

5    did the feasibility study, and then he was ready to move

6    forward with it.

7        Well, proof that an invention works to a scientific

8    certainty is reduction of practice, which is not an

9    inventive act; and even if he has skills that are far beyond

10   one of ordinary skill in the art, Dr. McWilliams has clearly

11   made into the record that Dr. Antaya only exercised ordinary

12   skill in the specific portion that he reduced to practice of

13   Dr. Gall's invention.

14       SPECIAL MASTER PETERSON:  Well, let's think about

15   that for a minute.  What struck me -- you all are arguing

16   that the ordinary skill in the art has a relatively low-level

17   Bachelor degree plus, what, five years of experience?

18       MR. HILL:  Which I agree, but it's not taken out of

19   the sky; that's Dr. Antaya, Dr. Wu, everyone right before

20   they got their Ph.D., that was when they were doing their

21   thesis on these machines.

22       SPECIAL MASTER PETERSON:  All right.  Well, even

23   believing that's the case, I mean, if the question is:

24   could one of ordinary skill in the art reduce this

25   conceived invention to practice without adding invention,

1    it strikes me frankly that arguing that one of ordinary

2    skill in the art has a very high level of expertise is

3    better for your side.

4         MR. HILL:  And we could adopt -- exactly, we could

5    adopt what they've said and we win.

6         SPECIAL MASTER PETERSON:  Well --

7         MR. HILL:  The reason we haven't adopted that is

8    frankly future litigation concerns.

9         SPECIAL MASTER PETERSON:  All right.

10        MR. HILL:  Put the card on the table; but if you

11   want to apply their definition of ordinary skill, Dr. Gall

12   has to be the sole inventor.

13        SPECIAL MASTER PETERSON:  All right.

14        MR. HILL:  In fact, he is the sole inventor; and I

15   want to talk about why we think this idea was permanent in

16   his mind, and I go back to that drawing in his notebook that

17   shows the superconducting synchrocyclotron on the gantry.

18   It shows the beam line to the patient.  I remind you what

19   he showed you what our system looks like today:  a

20   superconducting synchrocyclotron on the gantry beamed

21   directed to the patient.

22      I want to close with a quote here from Dr. Antaya's own

23   words, Exhibit 39.  This is when things had somewhat broken

24   down between the parties, and he was writing a note to Ken

25   Gall, the CEO of what was then Still River, and he says:

1  "I want to assure everyone that I have the same aims as

2  before.  A stranger came into my office, made a very

3  compelling case for a single-room cyclotron.  Our experience

4  with other similar startups jived very well with that.  And

5  once we could see a technology path, we said we thought that

6  he had finally gotten it all right, and that we could help

7  make that happen."

8      Dr. Gall's the only inventor of the claims in the '311

9  patent.  We've gone through the claims element by element.

10 We've demonstrated by clear and convincing evidence that

11 he's the only inventor.  That wasn't our burden; that was

12 MIT's burden, and they haven't met it, and I'd ask you

13 again to enter a directed verdict on behalf of Mevion that

14 Dr. Gall is the sole inventor.

15         SPECIAL MASTER PETERSON:  All right.  MIT?  By the

16 way, for the record, I have that motion, and I'm going to

17 deny the motion perhaps not surprisingly and issue an

18 opinion in the case.

19         MR. HILL:  Thank you, your Honor.

20         MS. DEVARASETTY:  Can you hear me okay?

21         SPECIAL MASTER PETERSON:  Yes.

22         MS. DEVARASETTY:  I think that it's going to be

23 important to start here today with just laying a foundation

24 for the facts as you've given us a sort of assignment for

25 the closings, and I'd like to address those.  I think

1    laying a foundation is going to be important.

2        So in 2003, in January 2003, Dr. Gall provided

3    Dr. Antaya some design inputs for the superconducting

4    synchrocyclotron.  They included extracted energy, an

5    extracted beam current, extraction efficiency, a range of

6    magnetic field strength, and a few other design criteria,

7    but there wasn't -- these were all new design inputs.

8    There was no design there.  There was no conceptual design.

9    Dr. Gall testified on the stand today that he didn't have a

10   conceptual design of the synchrocyclotron when he came to

11   Dr. Antaya in January of 2003.

12       In fact, he was asking Dr. Antaya to come up with a

13   conceptual design for the synchrocyclotron.

14           SPECIAL MASTER PETERSON:  Well, let me ask you about

15   that.  Let's back up.  Your slide; and for the record,

16   you're referring to Exhibit 1, an e-mail from Dr. Gall to

17   Dr. Antaya.  Dr. Gall's notebook, however, was in existence

18   prior to this time.  You don't dispute that, do you?

19           MS. DEVARASETTY:  I don't dispute that, your Honor,

20   and MIT doesn't dispute that, no.

21           SPECIAL MASTER PETERSON:  Now, when you say a

22   conceptual design was not in existence, are you saying that

23   the notebook by itself does not disclose a conceptual design?

24           MS. DEVARASETTY:  It's insufficient, no.

25           SPECIAL MASTER PETERSON:  Well, you heard Mr. Hill

1    refer to diagrams in there, and I tend to agree that there

2    hasn't been a dispute over what those figures show.  They

3    show a gantry, et cetera, et cetera, right?

4         MS. DEVARASETTY:  That's right.  One of the things

5    that I would mention is that that figure was after the date

6    that they proposed that conception happened which is June 6,

7    2001.  Those figures are on July 5th, 2001; but even if

8    they move their conception date, I guess that doesn't

9    matter much, but the problem is that they don't have a

10   design to enable this, this configuration because everything

11   hinges on the size of the synchrocyclotron, being able to

12   make it small enough; and that's something that they didn't

13   have a design for, and they needed that because that was the

14   key to their invention.

15      That's what Mr. Cleveland said, and what Dr. Gall said

16   to the PTO:  that what enables this device is a weight and

17   volume of the synchrocyclotron; and without that, it doesn't

18   work.

19        SPECIAL MASTER PETERSON:  All right.  Well, I don't

20   mean -- let me just let you know:  I will tell you where

21   I'm coming from, and perhaps you can address that, and maybe

22   this is the disconnect:  if as an inventor -- and there are

23   a number of examples.  You probably heard of Jerry Lemelson,

24   for example.  Jerry had hundreds of patents ranging from

25   pharmaceuticals to nuclear reactors to toy cars to -- you

1     know, across the board; and, of course, he didn't really

2     know how to make any of that stuff, but he was an inventor

3     and had a very successful career.

4         As an inventor, my impression of the law, and you can

5     prove me wrong, my impression is that an inventor doesn't

6     need to know how his invention works because he just comes

7     up with something.  He don't need to be an educated person,

8     and you can have conception without necessarily knowing how

9     you're going to implement that, right?

10        MS. DEVARASETTY:  I think the relevant standard here

11    is what the person of ordinary skill in the art can do, not

12    what the inventor can do, and the inventor doesn't have to

13    be a person of ordinary skill in the art; I agree with that,

14    but, here Dr. Gall spoke with a number of different people

15    in the art.

16        He spoke to Dr. Blosser, who was a world renowned

17    scientist on superconducting cyclotrons, and he didn't think

18    that you could really go above 6 Tesla easily.  He certainly

19    told Dr. Gall that at a conference, and to a friend and a

20    colleague, he told Dr. Antaya:  Well, you know, I think

21    you're crazy for going above 6 Tesla; I don't think it's

22    going to work, and there were a number of other people that

23    mentioned the same thing.

24        Dr. Gall went to Dr. Hendry.  He's got 30 years of

25    experience in cyclotrons, and Dr. Hendry said that this is

going to be a really hard problem, so we have a number of
people that are experts in the field, and that, you know,
and from MIT standards, are people of ordinary skill in the
art because this is a really hard field that don't think
that it's possible, that don't think that it's easy to do,
and they can't say:  Oh, yeah, I know how to do that.  I can
look at that design and I can make you a cyclotron pretty
easily.

So because there isn't a person of ordinary skill in the
art that can take Dr. Gall's design from his notebook and
make a synchrocyclotron on a gantry, that means that
conception's not complete.

SPECIAL MASTER PETERSON:  Well, is that the test?
I mean, because something presents a hard engineering
challenge that doesn't necessarily make an invention, does
it?

MS. DEVARASETTY:  That's true, but conception is
defined as:  "Conception is complete only when the idea is
so clearly defined in the inventor's mind that only ordinary
skill would be necessary to reduce the invention to practice
without extensive or additional experimentation."

When we talked to Dr. Blosser, somebody who's built
superconducting synchrocyclotrons -- superconducting
cyclotrons for his entire life and he says that that's going
to be a hard problem, it doesn't seem like that's going to

1    be something that requires no extensive research and no

2    experimentation.

3            SPECIAL MASTER PETERSON:  All right.  Why don't you

4    just make your presentation, and we'll come back to this at

5    the end.

6        I do actually have some questions on this slide for you,

7    but I don't want to get you too far off track.

8            MS. DEVARASETTY:  Certainly.

9            SPECIAL MASTER PETERSON:  Please.

10           MS. DEVARASETTY:  Well, so I think we can probably --

11   let me just cut to the chase in the claims because I think

12   everybody might have a better foundation of the facts so

13   that we can start talking about some of the questions that

14   you want to raise.

15       So you asked about the claims, what claims did

16   Dr. Antaya contribute to, by applying his scaling law in

17   this particular -- for this particular project of enabling

18   a high-field compact superconducting synchrocyclotron.  If

19   you look at Claim 31, it claims:  "An apparatus comprising

20   an accelerator configured to produce a proton or ion beam

21   having an energy level sufficient to reach any arbitrary

22   target in a patient.  The accelerator being small enough and

23   lightweight enough to be mounted on a rotatable gantry and

24   in orientation to permit the proton or ion beam to pass

25   essentially directly from the accelerator to the patient."

1       This claim claims the accelerator being light enough

2    and small enough to be mounted on a gantry.  Now, I

3    understand that Dr. Gall first suggested this, and he was

4    the one that brought the idea to Dr. Antaya in the context

5    of this project between MIT and Still River, but Dr. Gall

6    didn't know how to enable this; he didn't know how to do

7    this without extensive research or experimentation.

8       He asked Dr. Antaya and experts at MIT, experts that

9    Mr. Sliski said would, would be one of a few places in the

10   world that could efficiently take on this task, and he asked

11   them to complete that because he didn't, he didn't know

12   enough to do it himself; and these people aren't people of

13   ordinary skill, they're people of extraordinary skill even

14   by our standard.

15       SPECIAL MASTER PETERSON:  Well, let me ask you this

16   question then:  let's just suppose that the '311 patent had

17   been drafted based on the disclosure in Exhibit 1 and the

18   sketches out of the notebook, wouldn't we end up having the

19   same claims?

20       MS. DEVARASETTY:  I think that we would have the

21   same claims, but I don't think that they would be -- I don't

22   think that that patent would be sufficiently supported.

23       SPECIAL MASTER PETERSON:  In terms of Paragraph 1?

24       MS. DEVARASETTY:  Right.  I mean, Dr. Gall had --

25   he says in his declaration that he had a provisional

1    application in 2003 that he could have applied for, and

2    he didn't apply for that idea in 2003.  He waited until

3    2005.  He waited after MIT had a design, after the

4    preliminary design review was done, and after the external

5    reviewers such as:  Paul Reardon, Earl Cleveland, there's a

6    gentleman Stan -- and I'm gonna butcher his last name --

7    Radovinsky, all reviewed this project and thought this was a

8    magnet design that was produceable, that was workable, and

9    they could go forward with the manufacturing.

10        Only at that point did Dr. Gall file his provisional

11   application, and that was because he needed that

12   information to enable his idea, to put a design that would

13   be considered a best mode; and without all of that, because

14   he didn't file in 2003 suggests that he needed the

15   information from MIT to support his claims.

16             SPECIAL MASTER PETERSON:  All right.

17             MS. DEVARASETTY:  Similarly, with Claim 30, we

18   have a medical synchrocyclotron having a superconducting

19   electromagnetic structure that generates a field strength

20   of about -- of at least 6 Tesla, produces for delivery to a

21   patient a beam of charged particles having an energy level

22   of at least 150 MeV, has a volume no larger than 4.5 cubic

23   meters, and has a weight less than 30 tons.

24        Now, I understand that all of these effects were

25   written out in Dr. Gall's notebook, and he did some

1    calculations, but those are the same calculations that were

2    in Dr. Gall's spreadsheet and I questioned Dr. McWilliams

3    about the spreadsheet and he said:  the spreadsheet wasn't

4    enough for conception.

5        You can't just list a magnetic field strength and a

6    mass and a volume and an energy level and say:  Now, build

7    me a cyclotron.  You need more than that.  You need to have

8    some kind of confirmation that it's buildable; that you have

9    to be able to know that the forces are going to be taken

10   into consideration.

11       You need to know that all of the pieces like the ion

12   source and the dees can be engineered small enough to fit

13   into the space that's going to be so small when you have

14   such a small cyclotron, and you need to have some kind of

15   confirmation of that, and that's nowhere in the notebook.

16   They don't point to it.  Dr. Gall says:  I don't have an

17   illustration of an ion source.  I don't have an illustration

18   of the pole face.  I don't have the coils.  I had to go to

19   MIT for that.

20           SPECIAL MASTER PETERSON:  Now, he testified he knew

21   they were necessary?

22           MS. DEVARASETTY:  Right, right, but you need to --

23   that's not what Dr. McWilliams was telling you that was

24   necessary.  It's not just that you need an ion source, but

25   you need to know the dimensions of that, that it's going to

1    fit in the space; you need to know how the puzzle pieces

2    are going to fit together to confirm that your design is

3    going to work.

4              SPECIAL MASTER PETERSON:  All right.

5              MS. DEVARASETTY:  So 36 is similar.  It claims an

6    accelerator and that the accelerator is configured so that

7    it can be mounted on a gantry, and the configuration of

8    mounting it on a gantry means that it has to be small enough

9    and lightweight enough to do so.

10        There's another set of claims that claims this in a

11   different -- a slightly different way, where it claims a

12   gantry on which an accelerator can be mounted, so that's

13   Claim 33, 34, and 1, and 37 is similar.  Now, these are --

14   I'm focusing on the deep independent claims because it's

15   MIT's position that Dr. Antaya did contribute to all of

16   these independent claims, and, therefore, he contributed to

17   all of the claims of the patent.

18        Now, these independent claims that have the preface "a

19   gantry configured with an accelerator mounted" -- or, I'm

20   sorry, "a gantry configured to hold an accelerator and to

21   enable the accelerator to move through a range of positions,"

22   those claims aren't really focusing on the gantry.  What

23   really enables these claims is the size of the accelerator,

24   and that's what Dr. Gall told the PTO.

25        He said the weight and volume of the medical

1   synchrocyclotron enabled the medical synchrocyclotron to

2   be mounted on a gantry and thereby provide a proton or

3   ion beam having an energy level sufficient to reach any

4   arbitrary target in the patient, so it's all about the

5   synchrocyclotron.  It's not about the gantry.  It's not

6   about patient positioning; it's about getting it small

7   enough, and that's what Antaya did.

8        SPECIAL MASTER PETERSON:  Well, I guess what I'm

9   obviously struggling with is that we know that an inventor

10  can go to someone more experienced and say:  Here's my idea,

11  make one of these, and it may be that the inventor doesn't

12  need to know necessarily all of the parameters, right?  I

13  mean, you don't need to know how something eventually

14  works; you have a broader idea for this and you take it and

15  you say:  Here, build one of these.

16       And then at that stage we have two different possible

17  things that could happen:  the person that you ask to build

18  one of these, he or she can go ahead and build it, and

19  that's the remedy, and that's many times the typical thing

20  that we read about in cases:  a professor, for example,

21  conceived something, gives it to a technician:  The

22  technician then using ordinary skill reduces it to practice,

23  and that technician is not an inventor by the bar exam

24  questions that we've all answered.

25       Here I guess we have something slightly different, but

1    I'm still struggling with:  if it is that different, I

2    don't think there's any question, I don't think Mevion or

3    anyone is questioning that the engineering going into this

4    magnet required some effort to do.  We may have some range

5    of opinion on how straight-forward it was, but it was an

6    engineering effort to do that; and what I hear you arguing

7    is that by making it smaller, that's the essence of the

8    invention, and so, therefore, Dr. Antaya should be a joint

9    inventor.  And I guess my question is:  even looking at

10   this and even looking -- even if we take, by making the

11   accelerator smaller, that contributed to the overall

12   invention, what did Dr. Antaya specifically invent that

13   allowed that to happen?

14        MS. DEVARASETTY:  I think the characterization

15   there is perhaps not necessary for conception.  He has to

16   contribute to conception and not necessarily complete

17   invention for him to be a joint inventor.

18        SPECIAL MASTER PETERSON:  But, actually, in answer to

19   my question, did he invent anything?

20        MS. DEVARASETTY:  I think that he did.  He came up

21   with a new -- I mean, he has four patents right now on the

22   efforts that he did ... so he came up with a new kind of

23   synchrocyclotron, which he claimed in the '258 patent.  He

24   came up with a new type of pole face which is claimed in

25   the '847 patent, and that's also claimed in the '905, which

1    includes the scaling law.  He has a new niobium-3-tin

2    conductor that's claimed in the '040.

3        All of those are new inventions that are above and

4    beyond what the state of the art was at the time that

5    Dr. Antaya got as a result of his efforts.  Now, not all

6    of those are sole-invented patents; he's a co-inventor on a

7    number of those, but he did invent in this process.

8        SPECIAL MASTER PETERSON:  All right.  Now, as I

9    understand the testimony, and I have not heard, and you can

10   correct me, rebuttal that none of those inventions are

11   covered by the claims of the '311 patent?

12       MS. DEVARASETTY:  So that the patent, the '258

13   patent, that application is specifically incorporated into

14   the '311 patent because that describes how to make the

15   magnet and the synchrocyclotron, and that's the accelerator,

16   and that's the claim that Dr. Antaya contributed to, this

17   accelerator that's lightweight enough and small enough to

18   be mounted on a gantry, and that's what the '258 claims.

19   It's a 9.5 Tesla synchrocyclotron that -- it doesn't claim

20   the gantry mounting, but it can be mounted to a gantry

21   because it's that small.

22       SPECIAL MASTER PETERSON:  So your argument is:

23   when the claims in the '311 patent refer to an accelerator,

24   they're limited to the accelerator in Dr. Antaya's patent

25   application such that the patent that's incorporated by

1    reference into the '311 patent?

2         MS. DEVARASETTY:  That's a particular claim

3    construction argument, and I wouldn't necessarily -- I

4    wouldn't necessarily agree that the patent is restricted

5    to that, but Dr. Antaya in this inventive process in the

6    contributions between Dr. Gall and Dr. Antaya and what they

7    contributed to make that invention, to get to a point where

8    conception happened, Dr. Antaya was a part of that.

9      What the eventual scope of the claims was as a result

10   of that interaction between them, I mean, that's something

11   that we decided was not necessarily required at this point.

12   It doesn't have to be that that accelerator is limited to

13   the accelerator that Dr. Antaya eventually patented.

14        SPECIAL MASTER PETERSON:  No, it doesn't.  You're

15   right.

16        MS. DEVARASETTY:  And so I think some of the

17   questions that you were asking is really about the

18   spectrum, where, where between suggesting the idea of a

19   small, compact superconducting synchrocyclotron to the

20   reduction to practice of the small, compact superconducting

21   synchrocyclotron does conception happen, and where in that

22   spectrum was the nature of the collaboration and the status

23   of the collaboration between Dr. Gall and Dr. Antaya?

24        SPECIAL MASTER PETERSON:  Yes, but, actually --

25   well, all right, you found --

1          MS. DEVARASETTY:  I found Dick Tracy.

2          SPECIAL MASTER PETERSON:  Yes.  You found Dick

3     Tracy, all right.  Yes.  I mean, the Shatterproof glass

4     case, of course, which is one of the classic cases as Mr. --

5          MS. DEVARASETTY:  Hill.

6          SPECIAL MASTER PETERSON:  -- Hill, thank you,

7     brought out.  You know, as inventors you want to have the

8     ability to go to someone that has the expertise and tell

9     them:  Here, make one of these without losing your right as

10    an inventor, right?

11         MS. DEVARASETTY:  Well, let's talk about Morgan v.

12    Hirsch.  That's a good case that's parallel ... so a guy

13    named Morgan, he goes to -- this is a case about thermal

14    underwear actually, a fabric that this guy thought was

15    really great, but what you could do is you could only, you

16    could only make them on these machines that are on the

17    left, which are really big, expensive, complex machines;

18    they're complex knitting machines.  And so he wanted to

19    make similar fabric on a simpler knitting machine, so he

20    knew the type of knitting machine he wanted; that's on the

21    right, and he goes to a company that makes knitting

22    machines, these circular knitting machines, and says:

23    Here's a fabric I want you to make for me; I want you to

24    make a machine that makes the fabric, and they come up with

25    a design, and they present it to Morgan, and Morgan says:

1    That's not quite right.  The fabric's not quite right, go

2    back and do it again.

3        And they go through a number of iterations, and they

4    finally get it right, and Morgan v. Hirsch is an

5    interference case; it's not a joint inventorship case, and

6    both Morgan and Hirsch apply for the patent, but the Federal

7    Circuit said that Morgan wasn't the inventor because you

8    can't just say:  Make me something; I have an idea of what

9    it looks like without knowing exactly how to do it and

10   exactly what to do.

11       So they say:  asking someone to produce something

12   without saying just what it is to be or how to do it is

13   not what the patent law recognizes as inventing, so I think

14   here this situation is very parallel to Morgan and Hirsch.

15       You have a guy that -- Dr. Gall comes up with a good

16   idea, a good idea to mount a compact, high-field

17   superconducting synchrocyclotron to a gantry to make

18   proton radiotherapy easier, more accessible, something that

19   hospitals can purchase and provide cancer treatment more

20   easily, but he doesn't, he doesn't know how to make the

21   synchrocyclotron, and that's okay, but neither does anybody

22   else.

23       You have to go to experts to do that.  That's what he

24   said.  He went to Dr. Blosser.  He went to Dr. Zeller.  He

25   went to Dr. Hendry.  He spoke to Reardon and said:  who do

1    you know that's going to help me do this?

2        And he ends up with Dr. Antaya, somebody that's worked

3    on five superconducting cyclotrons, somebody that's very

4    much an expert in the field, and he goes to MIT, a group --

5    one of the only groups in the country that's used

6    niobium-3-tin.

7        This is a boutique conductor; it's not like everybody

8    was using it, and he uses them as the people to say:  Help

9    me build my cyclotron.

10        SPECIAL MASTER PETERSON:  What do you say in

11    response to Mr. Hill's argument, and we did hear testimony

12    that actually the design result of MIT didn't work?

13        MS. DEVARASETTY:  Well, conception -- to complete

14    conception you don't need to know that it works.

15        SPECIAL MASTER PETERSON:  Okay, but you don't

16    disagree that it didn't work?

17        MS. DEVARASETTY:  I don't know whether it does or

18    not because we've heard testimony from Still River that

19    their design -- you know, that MIT's design didn't work, but

20    we haven't had any way to know because MIT hasn't been able

21    to build their device because there's no funding to do it;

22    Still River pulled the funding so that we haven't been able

23    to proceed.

24        SPECIAL MASTER PETERSON:  All right.

25        MS. DEVARASETTY:  I do want to go back to the

1    recent Federal Circuit case that came down because while it

2    is a chemical case I think it's very parallel to this case

3    and so I'd like to discuss it with you.

4              SPECIAL MASTER PETERSON:  Okay, sure.

5              MS. DEVARASETTY:  So here the problem is that

6    somebody -- there's a company that's looking for some

7    compounds that can withstand high temperatures with

8    liquid crystal displays, LCDs, and they go to Kent State

9    and they ask a Dr. Seed to work on this project with them,

10   and Dr. Seed says:  I don't have that much time.  You know,

11   I've got other commitments.

12             SPECIAL MASTER PETERSON:  Yes.  Actually, I'm very

13   familiar with the facts of the case --

14             MS. DEVARASETTY:  Okay.

15             SPECIAL MASTER PETERSON:  -- but, I mean, I don't

16   want to stop you; we can still talk about the case, but he

17   gets a researcher, and this researcher starts working some

18   on his own, some by Dr. Steve.  They have another guy.  I

19   forget what his name is; he's a technician.  He takes these

20   compounds and tests them, whether or not they'd increase

21   the temperature range for the LCDs.

22        They test Compound 7.  That was Dr. Falana's compound

23   that he had synthesized, found an increase in range but not

24   for the entire range that they were after.  Dr. Falana

25   then leaves Kent State design, goes someplace else.  They

1    subsequently use Dr. Falana's synthesized method to make

2    Compound 9, which actually did cover the entire temperature

3    range for the LCDs.

4        MS. DEVARASETTY:  That's right.  Those are all the

5    facts that I would tell you about except I would add a

6    couple.

7        SPECIAL MASTER PETERSON:  Okay.

8        MS. DEVARASETTY:  One is the synthesis protocol

9    that Dr. Falana came up with that was developed while he

10   was working with Dr. Seed, and it was for that project, and

11   the second is that that synthesis protocol was disclosed

12   within the patent.

13       Actually, there's one more that -- to make a parallel

14   to, to our case:  Compound synthesis is sort of a

15   trial-and-error process, you know, trying to find the

16   right compound with the right specifications so -- and you

17   don't shake up a beaker and you figure out what comes out

18   and then you go test the products and see if that's going

19   to satisfy the specifications, and here we sort of have a

20   similar process --

21       SPECIAL MASTER PETERSON:  Well, let me stop you at

22   that point, though.  You're absolutely right, the

23   synthesizing method that Dr. Falana came up with was used

24   to synthesize both his Compound 7 and Compound 9 that was

25   part of the patent.

1      Now, do you remember the case that they distinguished

2   in Falana V Kent State:  American Bioscience?

3           MS. DEVARASETTY:  I can remind myself --

4           SPECIAL MASTER PETERSON:  Okay.

5           MS. DEVARASETTY:  -- if you want.

6           SPECIAL MASTER PETERSON:  No.  Actually, as you're

7   looking there, my recollection is American Bioscience was

8   brought up and they said:  Wait a minute, wait a minute,

9   and in American Bioscience the Federal Circuit said:  you

10  don't need to know, that knowing how to make the compound is

11  absolutely irrelevant.

12     My recollection of Falana is that the Federal Circuit

13  distinguished American Bioscience and they said there that

14  there was no evidence that the claim compound was made by

15  this secret method, and so we're drawing a distinction.

16  And in Falana there was no question that Falana's

17  synthesizing compound was used to make the claimed

18  invention.

19     My understanding here is that, you know, as far as the

20  law, the scaling law, is concerned, Mevion says they didn't

21  use it.

22          MS. DEVARASETTY:  Well, Mevion didn't use it but

23  they didn't use it after the patent was filed, so, you know,

24  they -- for the design that was disclosed in the patent,

25  the scaling law was used and so you were right to

1    articulate when you were talking to Mr. Hill that when

2    Dr. Gall testified on the stand that in 2006 was when they

3    started doing the redesign.  2006 is after the patent was

4    filed for, and they said:  Gosh, this design doesn't work;

5    we gotta retool; we gotta figure out something else to do.

6    That doesn't matter.

7         What's in the patent and what's supporting the patent

8    was supported by the scaling law, and so, therefore, the

9    American Bioscience distinction goes away, and here you have

10   a method that Dr. Antaya used and he showed you a -- sorry,

11   I just didn't want to go back.

12        He showed you a memo by -- a presentation actually by

13   Dr. Radovinsky where he says or where Dr. Radovinsky shows

14   that there's a particular solution that's a direct scaling

15   of Dr. Antaya's -- by Dr. Antaya of the Wu design, so the

16   scaling law was applied and then derivations of it

17   afterwards, and so these are all magnet designs.

18        And you heard Dr. Gall testify that there were all of

19   these different magnet designs that came out of MIT, and

20   they were all the result of the first direct scaling that

21   Dr. Antaya did with his scaling law, and that was the basis

22   of all of these designs and they put what they thought was

23   the best mode, and everybody thought it was going to work,

24   right?

25        We have an external review by Reardon, by Earl

1    Cleveland; he came in and he gave a review, and he thought

2    it was going to be a workable design.  Dr. Minervini sent a

3    memo out and said it was an overwhelming success; they

4    thought it was going to work, and so they put this design

5    into the patent and they patented it without giving credit

6    to MIT for all of the work that they did to enable that

7    patent.

8         SPECIAL MASTER PETERSON:  All right, I understand

9    the argument.  I understand, and I didn't mean to dissuade

10   you from talking about Dick Tracy.

11        MS. DEVARASETTY:  Oh, it was just -- it was a way

12   to talk about the spectrum.

13      One thing I do want to point out here is that the

14   necessary design parameters for manufacture ... you heard

15   Earl Cleveland get up and talk to you and tell you that he's

16   the guy that builds cyclotrons for a living.  He did this

17   for IBA.  He's dedicated his life to do proton radiotherapy

18   and make this -- and make that particular therapy more

19   readily available to patients, and so he's built and

20   manufactured these things for a really long time.

21      He knows what he needs -- what kind of design parameters

22   you need to be able to build these things and be able to

23   make them, and I think he said you need dimensions of the

24   contour of the pole face, you need the superconducting

25   material, and you need the dimensions and the shapes of

1    the coil; and all of this stuff MIT provided in Exhibit 55,

2    and none of this stuff was in Dr. Gall's notebook.

3         SPECIAL MASTER PETERSON:  See, and I don't see that

4    anybody's going to disagree with that frankly, that MIT

5    clearly was contracted with and provided a set of design

6    specifications showing or telling Mevion how to build one

7    of these or they're gonna build one of these and here are

8    the specs to build them which Mevion says that ultimately

9    didn't work, but regardless here's what it is.

10        I guess I'm still struggling with:  assuming that's the

11   case, where did this invention come in?  I mean, giving

12   people specifications to build something, that isn't an

13   invention, is it?

14        MS. DEVARASETTY:  Giving -- coming up with those

15   design specifications may be.

16        SPECIAL MASTER PETERSON:  Well, maybe.  Sometimes

17   yes, sometimes no.

18        MS. DEVARASETTY:  Right.  I mean, I don't think that

19   anybody's disputing that Dr. Gall came up with an invention

20   when he or maybe not completed the invention, right, that's

21   what MIT is arguing -- - didn't complete the invention when

22   he came up with the specifications of the 6 Tesla machine

23   that had a 250 MeV beam coming out of it that was of a

24   certain mass and a certain volume to be mounted on a

25   gantry, but that's not sufficient for complete conception.

1    You need to be able to give that to a person of

2 ordinary skill in the art and have them reduce it to

3 practice without extensive experimentation.

4         SPECIAL MASTER PETERSON:  Well, and that's kind of

5 coming back to, I guess, where I asked Mr. Hill about MIT

6 says the level of ordinary skill in the art is very high:  a

7 Ph.D., 15 years of experience -- I forget all the parameters,

8 but it seems to me once that you make that argument that one

9 of ordinary skill in the art has lots and lots of skill,

10 that detracts from your argument that more than that is

11 needed to reduce one of these inventions to practice.

12    I mean, after all, if you say Dr. Antaya was one of

13 ordinary skill in the art, I mean, clearly, if we go that

14 far, he gave the design specs to reduce this to practice;

15 and if that was within his ordinary skill, that's the end of

16 the day.

17         MS. DEVARASETTY:  I understand what you're saying,

18 Special Master Peterson.  I mean, we contemplated also

19 accepting their person of ordinary skill in the art because

20 I think that that means that we win automatically, but we

21 couldn't because it's wrong.

22    I mean, the level of ordinary skill is just not that

23 low; and so as a matter of principle, you can't -- we

24 couldn't offer that, so Dr. Antaya isn't a person of

25 ordinary skill.  Even by that standard, he's a person of

1    above ordinary skill, and I've already mentioned to you at

2    least two people of more than ordinary skill that didn't

3    think that this was possible or at least feasible and

4    thought that it was going to be very difficult, which was

5    Dr. Hendry and Dr. Blosser.

6         SPECIAL MASTER PETERSON:  Again, I don't mean to

7    quibble with you; I guess I am, but saying something is

8    difficult or having some potential disbelief is not

9    necessarily invention.  Again, I come back to things may be

10   difficult to engineer, and there may be extraordinary

11   engineering challenges; that doesn't necessarily mean

12   there's an invention there.

13      Now, you point out that patents have issued, okay.

14   Patents sometimes issue despite, you know, whether there's

15   an invention, but that's something obviously to consider, and

16   I guess my quibbling is saying something is hard or people

17   said it would be difficult does not necessarily equal

18   invention.

19        MS. DEVARASETTY:  I think this comes back to the

20   point that MIT is making about obviousness.  If you bring the

21   invention all the way back to say that it was just inventive

22   to suggest a lightweight, high-field machine, then there's

23   no invention because people had been thinking about that

24   before, right?

25      Dr. Blosser had been thinking about that for a long time;

1    he even has a patent on his superconducting synchrocyclotron

2    where he says:  We want to go high field, we want to make it

3    smaller, we want to put it on a gantry because that's going

4    to be good for medical purposes; you have Dr. Wu saying the

5    same thing, you have Dr. Scharf saying the same thing, and so

6    and these -- they're saying this not in, not in 2000, not

7    right before Dr. Gall comes up with the idea for it, but

8    they're saying it in 1987.  It's been a long time that people

9    have been thinking about this and think:  that would be a

10   good idea.  We want to get there, but we don't know how to do

11   it.

12        And so it is invention to be able to figure out how to do

13   this.  I mean, I understand that just because a problem is

14   difficult doesn't necessarily mean that there's an invention,

15   but this was, this was a unique problem, and it was sort of a

16   barrier that you had to get across.

17        You had to figure out how to cross that barrier because

18   now you have saturated iron and more field provided by the

19   coils.  This is a machine that nobody's worked on before,

20   and you've got to figure out how to break that barrier, go

21   and establish a new design field and design the magnets so

22   that it can, so that it can match the field.  That was

23   invention.

24             SPECIAL MASTER PETERSON:  All right.

25             MS. DEVARASETTY:  One of the things that I do want

1    to mention about some of the arguments that we've been making

2    is that we don't want Mevion to hide behind the presumption

3    of validity of the patent.

4         They say:  Oh, our patent's valid, our patent's valid,

5    but then they bring this invention to the very small quantum

6    about what's being done in the art before and say:  Oh, but

7    our patent's valid so you can't test obviousness; you can't

8    test validity, but the problem is that if they hide behind

9    that presumption -- I mean, the patent issued because the

10   patent office thought there was invention there.  There was

11   enough quantum of invention, and so they said:  Okay, the

12   patent's valid, we're going to issue the patent, but if you

13   decrease the quantum of invention so that Dr. Antaya's

14   contribution isn't, isn't inventive, then this little

15   contribution is maybe not anticipated but certainly

16   obvious over the prior art, and we talked about that with

17   Dr. Blosser so then the other thing that they argue --

18        SPECIAL MASTER PETERSON:  Well, I mean, let me say,

19   my understanding is that you're not contesting validity in

20   this case?

21        MS. DEVARASETTY:  It's true that we're not contesting

22   validity, but we want to put into perspective what Mevion is

23   arguing right now, that they can't -- they can't just argue

24   anything under the sun as invention because they have other

25   requirements of the patent that they need to satisfy.

1          SPECIAL MASTER PETERSON:  And by other requirements

2     you're referring to what?

3          MS. DEVARASETTY:  Novelty, nonobviousness, and

4     enablement.

5          SPECIAL MASTER PETERSON:  But none of -- I guess,

6     overall I understand your point, but doesn't it really boil

7     down to a patent has issued; it carries a presumption of

8     validity under Section 282.  That means you have a clear

9     and convincing standard of proof to show inventorship or

10    co-inventorship.  I mean, isn't that the bottom line?

11         MS. DEVARASETTY:  Well, I don't dispute that, but

12    what I'm saying is that they can't hide behind the

13    presumption of validity and argue things that, obviously,

14    that very clearly make some of the invention in their patent

15    obvious over the prior art just because there's a presumption

16    of validity.  I mean, I understand the standard is clear and

17    convincing.

18         SPECIAL MASTER PETERSON:  Okay.  We can move on.

19    When you say hide behind this, the standard, the presumption

20    of validity, I frankly don't know what you mean by that.

21    I don't know that anybody's hiding; it's a statutory

22    presumption of validity that every patent is entitled to,

23    right?

24         MS. DEVARASETTY:  Yes, your Honor, but if you have --

25    if you're given a presumption of validity based on the idea

1   that there is invention in your patent and that your patent

2   contains nonobvious material and then you argue here in

3   front of you that what's actually in the patent is not this

4   much that's required for invention but only this much, which

5   if presented to the patent office in that light, they would

6   have considered obvious ... yeah.  Now, they have a

7   presumption of validity so they can argue whatever they want,

8   but what I want to pose to you is that if they're going to

9   argue that much is all the invention required ... well, at

10  that point it was, it was obvious to go high-field and small

11  because people had been wanting to do that for awhile, and

12  the invention was being able to figure out how to do it,

13  and so the quantum required for invention was larger, and

14  Dr.  Antaya contributed to that.

15       SPECIAL MASTER PETERSON:  Well, you can cover it in

16  your brief, if you'd like.  You don't need to obviously,

17  but I think the Federal Circuit has addressed this in the

18  Telefex v. KSR case and others.  Once the patent issues, my

19  sense is that the Federal Circuit has said several times:

20  presumption of validity controls.  Whatever happened in the

21  patent office, et cetera, is irrelevant.  The presumption of

22  validity controls ... so you don't need to spend any time on

23  that here.  If you want to cover it in your brief, you can.

24       MS. DEVARASETTY:  Sure.  And since you're very

25  familiar with the case law, I'm going to just go down to

1    this last slide to show you just some of the case law and

2    where the points lie on what's inventive and what's not

3    inventive.

4        And so we talked about Falana and applying the method to

5    what's an apparatus claim and that being inventive and

6    somebody -- and coming up and building a machine that

7    somebody specifies without knowing exactly how to do it,

8    that's inventive, but in Sewall v. Walters there was a

9    circuit design that was included in the specification under

10   the instruction of the inventor, and that was included in the

11   specification but it wasn't inventive because that only took

12   ordinary skill; and there were a number of different designs,

13   no one at the time that could satisfy that design.

14       Now, in this case Dr. McWilliams testified that there

15   weren't any other magnet designs that were known at the time

16   to be able to satisfy the claims of the '311 patent.  There

17   were a number of -- there were a number of iterations that

18   MIT had that they were considering, but they hadn't posed

19   that to an external review to say:  Does this work, does this

20   not work?  This was the only one that they knew that worked,

21   and they put that in the patent.

22       And then if you look at Burroughs Wellcome, this is just,

23   you know, verifying drug efficacy so this is the AZT case.

24            SPECIAL MASTER PETERSON:  Right.

25            MS. DEVARASETTY:  So somebody has an idea for AZT.

1    They have the pharmaceutical compound.  They know how to

2    make the compound.  They know how to -- the composition for

3    the drug.  They know how to administer it, and the only

4    thing they want to verify is whether it's going to work on

5    humans because they've already tested it in mice.

6        And so once they do the verification, the people that

7    did the verification, they weren't inventors.  Now, in this

8    case Dr. Gall has it in his head, he says:  I know it's

9    going to work, but you've got people, respected people, in

10   the industry that are not sure.  And so it's not the same

11   as that, where it's just for verification of all these

12   principles; and Dr. Gall didn't have all of the same

13   things that the inventors had in Burroughs Wellcome.

14       He didn't have what could be equivalent to the method

15   of making it and the pharmaceutical specifications.  I mean,

16   he had, he had this general concept; he had a circle on a

17   gantry and said:  That's my cyclotron; can you make it for

18   me; and that's not enough for invention.

19       So the last thing I'm going to leave you with is just

20   that Dr. Gall says that this takes experts, right?  He said

21   Mr. Cleveland agreed with this, Mr. Sliski agreed with this,

22   and he said that at the time that he thought it was a fair

23   statement that it took experts, and this was very difficult,

24   and it wasn't something -- just it wasn't just engineering,

25   he needed somebody to help him with the design.

1    He was part of the process but he didn't end the

2    process.  He needed more, and, therefore, Dr. Antaya's

3    significantly contributed to the claims in the '311 patent.

4         SPECIAL MASTER PETERSON:  All right.  Well, thank you

5    very much, ladies and gentlemen.  You've obviously given me

6    a lot to think about.

7    It's not an easy problem by any stretch of the

8    imagination.  You all have lived with it for some time, and

9    now I'm going to live with it for awhile.

10   All right.  So as we talked yesterday, your briefing is

11   going to be done -- I forget, is it March 28th?  Is that

12   when you have your first round of briefs, and then responses

13   and replies after that going into mid to late April

14   approximately, something like that.

15   All right.  And as I said yesterday, given that time

16   frame I will try to turn something around as quickly as

17   possible, hopefully in 30 days; if not, it may take longer,

18   but I hope not.  I will get to this as quickly as possible.

19   I have several boxes of exhibits up here.  Could I

20   prevail on the parties to send those to my office in

21   San Antonio, and I guess what we don't have in the record

22   yet are your PowerPoint slides from your close.

23   Are you planning on putting exhibit stickers on those

24   and introducing those?

25        MR. HILL:  Yeah, we're going to exchange those and I

1    think that would be appropriate.

2            MS. DEVARASETTY:  Yeah, we certainly can do that.

3            SPECIAL MASTER PETERSON:  All right.  Just indicate

4    to the reporter, I guess, what exhibits those are going to

5    be so that they show up in the exhibits introduced as part

6    of the record, and I will consider those admitted as part of

7    the record.

8        Anything else that we need to discuss or cover before we

9    adjourn?

10           MR. HILL:  Not from Mevion's side.

11           MS. DEVARASETTY:  Not from MIT except for the

12    confidentiality.  The parties have discussed how to deal

13    with that, and we've agreed that the entire transcript will

14    be designated public except for Dr. Gall's testimony today,

15    and that Mevion will take the opportunity, time permitted,

16    under the protective order to designate highly confidential

17    information in that portion, and then we'll work out with

18    the Court how to re-designate the portions that we designated

19    highly confidential.

20           SPECIAL MASTER PETERSON:  All right.  So at least

21    in the interval, the reporter should prepare a separate

22    transcript for Dr. Gall's testimony today?

23           MR. HILL:  Agreed.

24           SPECIAL MASTER PETERSON:  Okay.  Well, let me --

25    I'm trying to get this, but let me, again, say how much I

1    appreciate the parties' diligence, your selection of

2    witnesses, and, certainly, the way you have presented

3    this case, the declarations, et cetera, all been very

4    helpful, all been thought-provoking, document engineering

5    challenges; this will be a challenge, certainly, to me to

6    sort all this out and hopefully I'll come up with something

7    that in the end is correct both factually and legally, but

8    that's my job.

9        I look forward to the parties' briefs to help me out

10   with that; and with that, the hearing is adjourned.  I hope

11   everyone has a safe trip back home, and I look forward to

12   receiving your briefs.

13       Thank you very much.

14           MR. HILL:  Thank you, your Honor.

15           MS. DEVARASETTY:  Thank you.

16           (Exhibit Nos. 454 and 657 admitted in evidence.)

17           (Whereupon, the proceedings concluded at 3:45 p.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I, Helana E. Kline, a Registered Merit Reporter,

4    Certified Realtime Reporter, and Federal Official Court

5    Reporter of the United States District Court, do hereby

6    certify that the foregoing transcript, from Page 1 to

7    Page 54, constitutes, to the best of my skill and ability,

8    a true and accurate transcription of my stenotype notes

9    taken in the matter of the Massachusetts Institute of

10   Technology v. Mevion Medical Systems, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23        /s/ Helana E. Kline                March 7, 2012

24        Helana E. Kline, RMR, CRR

25        Federal Official Court Reporter