UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS


MASSACHUSETTS INSTITUTE OF          )
TECHNOLOGY,                         )
                                    )
    Plaintiff,                      )
                                    )      Civil Action
                                    )      No. 10-12186-RWZ
vs.                                 )
                                    )
MEVION MEDICAL SYSTEMS, INC.,       )
                                    )
    Defendant.                      )



**BENCH TRIAL**
**DAY ONE - FIRST SESSION**



BEFORE SPECIAL MASTER GALE R. PETERSON


UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
February 8, 2012
8:30 a.m.



*   *   *   *



CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
(617) 261-0555

```
       APPEARANCES:

 2

 3     For the Plaintiff:

 4
       PROSKAUER ROSE LLP
 5     By:  Sharada Devarasetty, Esq., and
            Steven M. Bauer, Esq.
 6          One International Place
            22nd Floor
 7          Boston, MA 02110

 8

 9

10
       For the Defendant:
11

12     SHEPPARD MULLIN RICHTER & HAMPTON LLP
       By:  Nathaniel Bruno, Esq., and
13          Robyn B. Christo, Esq.
            Four Embarcadero Center
14          17th Floor
            San Francisco, CA 94111
15
       -and-
16
       SHEPPARD MULLIN RICHTER & HAMPTON LLP
17     By:  Russell B. Hill, Esq.
            650 Town Center Drive
18          4th Floor
            Costa Mesa, CA 92626
19

20

21

22

23

24

25
```

```
1
2                              I N D E X
3
4     Plaintiff's Tutorial
5       By Dr. Hassenzahl . . . . . . . . . . Page 13

6
7     Defendant's Tutorial
        By Dr. Gall . . . . . . . . . . . . . Page 34
8
9     Plaintiff's Opening Statement
10      By Mr. Bauer . . . . . . . . . . . . . Page 59

11
12    Defendant's Opening Statement
        By Mr. Bruno. . . . . . . . . . . . . Page 80
13
14
15
16
17    WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS
18
19    TIMOTHY A. ANTAYA, Ph.D.

20      By Ms. Devarasetty:        106
        By Mr. Hill:                      116
21
22
23
24
25
```

1              P R O C E E D I N G S

2              (The following proceedings were held in open court

3    before the Honorable Gale R. Peterson, United States District

4    Court, District of Massachusetts, at the John J. Moakley United

5    States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on

6    February 8, 2012.)

7              SPECIAL MASTER PETERSON:  Good morning everyone.

8    Thank you.  Please be seated.

9              All right.  Once again, good morning everyone.  Let's

10   see if we can get the screen going here.  All right.

11             This is Massachusetts Institute of Technology vs.

12   Mevion Medical Systems, Inc., Civil Action No. 1-10-CV-12186

13   and we are ready to begin, assuming everyone is here.

14             Would counsel make their appearances and let me know

15   if we have everybody present that needs to be present.

16             MR. BAUER:  Good morning, Mr. Peterson.  I'm Steven

17   Bauer from Proskauer.  With me is Sharada Devarasetty and our

18   paralegal, Heidi Schneider, and we have our team all here.  I

19   can introduce them to you right now if I can.

20             SPECIAL MASTER PETERSON:  Okay.

21             MR. BAUER:  Dr. Antaya will be our first witness.

22   Dr. Hassenzahl, who is our expert.  Mr. Minervini -- Dr.

23   Minervini, David, and then two people from the MIT Technology

24   Licensing Office, Jack Turner and Tom O'Keefe (phonetic).

25             SPECIAL MASTER PETERSON:  Okay.  Welcome everyone.

1          All right.  For Mevion.

2          MR. HILL:  Good morning.  Russ Hill from Sheppard

3    Mullin.  With me is Nate Bruno and Robyn Christo.  In the

4    courtroom with us we have Alan Sliski, one of our fact

5    witnesses.  We have Don Pelto, a partner at Sheppard Mullin.

6    Ken Gall, who is our inventor on the '311 patent.  We have

7    Earl Cleveland, another fact witness, and then Dr. Roger

8    McWilliams, who is our expert witness.

9          SPECIAL MASTER PETERSON:  All right.  Very good.

10   Welcome to you all as well.

11         As I understand it -- and we've had some discussions

12   off the record and exchange of email, but, for the record, as

13   I understand it, we will start out with some objections that

14   the parties have lodged to various declarations that have been

15   filed in the case.  After that we will have tutorials.  The

16   parties have assigned the tutorials -- or time for those

17   tutorials at 45 minutes a side; is that correct?

18         MR. HILL:  Yes.

19         SPECIAL MASTER PETERSON:  All right.  Then openings

20   by the parties.  Those the parties have set at 30 minutes per

21   side, direct and rebuttal five hours per side over the next

22   two days, and closing 45 minutes per side at the end if we

23   need that, and then post briefing after that.

24         My plan is to -- just so everyone knows, my plan is

25   to go this morning until 10:00, 10:15, somewhere in that

1    range, for mid-morning break, 15-minute break, and then go to

2    shortly before 12:30 or so.  Take our noon recess at 12:30 for

3    an hour until 1:30.  Start this afternoon and have a mid-

4    afternoon break at 3:00, 3:15, 3:30, depending on where we

5    are, and then go to 6:30, with possibly a stretch break in

6    between.

7             Does anyone have any objections to that schedule?

8             (No response.)

9             SPECIAL MASTER PETERSON:  All right.  Hearing none,

10   let's start with the objections then and, as I said as we were

11   meeting shortly before the hearing, it seems to me that these

12   objections fall into a couple of categories.  Perhaps we can

13   take those up fairly summarily.

14            I have -- this is Mevion's objection to hearing

15   Exhibit 92, which is a settlement agreement between MIT and

16   Still River Systems, now Mevion.

17            Let me ask, I guess Mr. Hill -- or Mr. Bruno -- well,

18   actually, let me start with Mr. Bauer.  What's your purpose in

19   offering this exhibit?

20            MR. BAUER:  Your Honor, Ms. Devarasetty will be

21   addressing that.

22            SPECIAL MASTER PETERSON:  All right.

23            MS. DEVARASETTY:  Your Honor, presently it's just on

24   the exhibit list.  It hasn't been offered by any witness

25   currently.  And so, the parties have agreed that if any

1    exhibit hasn't been offered by a witness, we would only object

2    when and if it was offered.  So, at this time I would ask that

3    Mevion reserve that objection for a time that it might be

4    offered into testimony.

5         SPECIAL MASTER PETERSON:  Okay.  Actually, does that

6    apply to all of the exhibits?

7         MS. DEVARASETTY:  Only the exhibits that are not --

8    haven't been used by a witness.

9         SPECIAL MASTER PETERSON:  Well, as to all of the

10   objections, do I understand -- the parties tell me that you're

11   reserving all of those objections until a declaration is

12   offered or --

13        MS. DEVARASETTY:  No.  The exhibits that have been

14   used by a witness, the parties have agreed that they would

15   lodge those objections at the time that they had exchanged

16   these objections.

17        SPECIAL MASTER PETERSON:  All right.

18        MS. DEVARASETTY:  And that if they didn't raise them,

19   then all objections to admissibility would be waived, but to

20   unused exhibits, we would raise those objections when those

21   exhibits were used.

22        SPECIAL MASTER PETERSON:  All right.  Then how about

23   the objections to the declaration by Dr. Hassenzahl?  Do we

24   need to discuss those objections?

25        MS. DEVARASETTY:  We do need to discuss those

1    objections.

2              SPECIAL MASTER PETERSON:  All right.  Now, it seems

3    to me that all of those objections are, essentially, going to

4    lack of foundation, improper opinion testimony.  Is that a

5    fair characterization of those objections?

6              MS. DEVARASETTY:  I think they fall into two

7    categories, your Honor.  I would say that there's some that

8    are hearsay objections and others that are lack of foundation

9    and improper testimony.

10             SPECIAL MASTER PETERSON:  All right.  As to those,

11   I'm going to overrule those objections.  I think given that

12   this is a -- not a jury trial -- if we had a jury, the outcome

13   may be a little bit different, but given what we're doing here

14   today, I think we can tell the difference between hearsay and

15   testimony that has a proper foundation or not.

16             Now, as to the objections to Dr. Minervini -- I'm not

17   sure how to pronounce that.

18             MS. DEVARASETTY:  *Minervini*.

19             SPECIAL MASTER PETERSON:  *Minervini*?

20             MS. DEVARASETTY:  *Minervini*.

21             SPECIAL MASTER PETERSON:  *Minervini*.  All right.

22             It seems to me those fall into the same category; is

23   that right?

24             MS. DEVARASETTY:  I agree.

25             SPECIAL MASTER PETERSON:  Okay.  Objection overruled

1   on those as well for the same reasons.

2          Turning to MIT's objections, the first objection is

3   to testimony and exhibits, testimony, documents, et cetera,

4   coming up after the date of filing of the application to turn

5   into the patent-in-suit.  Are you going to handle those

6   objections as well?

7          MS. DEVARASETTY:  We should handle those only because

8   of our exhibits that we've offered into evidence and testimony

9   as well.

10          SPECIAL MASTER PETERSON:  So, these are -- we need to

11   handle these now.

12          MS. DEVARASETTY:  That's right.

13          SPECIAL MASTER PETERSON:  All right.  Do you have

14   anything further to say about those?

15          MS. DEVARASETTY:  I think the argument that we made

16   was pretty clearly made out in our objections, your Honor.

17          SPECIAL MASTER PETERSON:  Okay.  I'm going to

18   overrule those objections.  To me we have -- I will just say

19   at the outset, the way I have taught conception, reduction to

20   practice, et cetera, is it's always a case of when you look

21   backward in time.  At the time an event happens, you don't

22   necessarily know that you have conception or reduction to

23   practice.  Because why?  You don't have a claim yet.  You

24   don't have a count in interference or you don't have a claim.

25   And so, you're always working backwards from a claim or a

1    count or something else to find where in time where you have

2    that conception or reduction to practice of that claim subject

3    matter.

4          So, yes, while it's true that events following a

5    conception or reduction to practice may have no bearing on the

6    matter, they may very well.  Sometimes they do.  Sometimes

7    they don't.

8          Let's see.  The next one is hearsay testimony and

9    also inadmissible opinion of a -- I skipped one.  Documents

10   and testimony regarding Dr. Antaya.  I'm having trouble --

11         MS. DEVARASETTY:  *Antaya*.

12         SPECIAL MASTER PETERSON:  Okay.

13         Character.  Again, I'm going to overrule those.  I

14   think that -- you know, again, if we had a jury, that may be

15   something that would be -- something we could talk further

16   about, but given that this is a hearing before the Court, I

17   think we can figure out what is permissible and what is not

18   permissible.

19         The third objection under Rule 802, inadmissible

20   hearsay testimony; fourth objection under Rule 701, 704,

21   admissible opinion by lay witness; and the fifth objection

22   under Rule 701, lacks foundation, based on speculation, again,

23   I think considering that this is not before a jury, it's

24   before the Court, we'll be able to figure out what the actual

25   facts are.  Those objections are overruled.

1          Anything else from the parties on the objections?

2          MR. BRUNO:  Nothing from Mevion, your Honor.  Thank

3    you.

4          SPECIAL MASTER PETERSON:  Any from MIT?

5          MS. DEVARASETTY:  No, your Honor.

6          SPECIAL MASTER PETERSON:  Are we ready to begin,

7    then, with the tutorials?

8          MS. DEVARASETTY:  Yes, we are.

9          SPECIAL MASTER PETERSON:  All right.  Is MIT going to

10   start?

11         MS. DEVARASETTY:  I believe so.

12         SPECIAL MASTER PETERSON:  All right.

13         MS. DEVARASETTY:  Dr. Hassenzahl will be giving the

14   tutorial for MIT.

15         SPECIAL MASTER PETERSON:  Let's see.  You're number

16   two, right?

17         MS. DEVARASETTY:  I believe so.

18         SPECIAL MASTER PETERSON:  All right.  And, as I

19   mentioned to counsel before we began this morning, before this

20   hearing the parties have provided me with witness declarations

21   and a great deal of other materials, including the tutorials

22   or the tutorials in the form of PowerPoint slides that we're

23   going to be discussing this morning.

24         I have read all those declarations.  I have read the

25   patent and the claims.  I think I'm generally familiar with

1    the technology.  I have gone through the PowerPoint slides.

2         So, with that, you can start -- or the parties can

3    start wherever they choose to, but I think at least I am one

4    step up on the technology.  So, with that, you can start at

5    any point that you would like.

6         DR. HASSENZAHL:  All right.  I'll try.  And I'm glad

7    to hear you've reviewed it and I won't be talking to a

8    freshman.

9         SPECIAL MASTER PETERSON:  All right.  Let me ask

10   counsel, is the witness going to do a narrative or are you

11   asking questions?

12        MS. DEVARASETTY:  The witness will be doing a

13   narrative and you can ask questions if you like, but counsel

14   won't be asking questions.

15        SPECIAL MASTER PETERSON:  Let's start with the

16   witness.  Would you stand and raise your right hand.

17        **WILLIAM HASSENZAHL, Ph.D., SWORN.**

18        SPECIAL MASTER PETERSON:  Please be seated.

19        State your full name and professional affiliation for

20   the record please.

21        DR. HASSENZAHL:  My name is William Hassenzahl,

22   H-a-s-s-e-n-z-a-h-l.

23        SPECIAL MASTER PETERSON:  What is your professional

24   affiliation?

25        DR. HASSENZAHL:  I am the president of a company

1  called Advanced Energy Analysis in Las Vegas, Nevada.

2          SPECIAL MASTER PETERSON:  You're appearing here as an

3  expert witness on behalf of MIT; is that right?

4          DR. HASSENZAHL:  That is correct.

5          SPECIAL MASTER PETERSON:  All right.  And your first

6  -- well, he's going to give us a tutorial of the background

7  technology.  So, Doctor, when you're ready, please proceed.

8          **PLAINTIFF'S TUTORIAL:**

9          DR. HASSENZAHL:  Okay.  What I will do -- good

10  morning, Mr. Peterson.

11          SPECIAL MASTER PETERSON:  Good morning.

12          DR. HASSENZAHL:  What I will try to do is shorten it

13  a bit and move to what I think are some critical pieces that

14  are relevant to the process of development of the technology

15  in this particular patent.

16          SPECIAL MASTER PETERSON:  All right.

17          DR. HASSENZAHL:  And some of the details go back to

18  the beginnings of work on material -- devices like this.  So,

19  I'm out of my script right now, but I'm going to try to cover

20  things as well as I can.

21          So, the next slide, please.

22          I just wanted to show this so that it would be

23  apparent that it's a complex device.  It's a compound system

24  that comprises many technologies and each of those

25  technologies must function on its own and function in cohort

1  with the rest of the technologies for the device to work

2  effectively.

3          To work effectively in this case it means it produces

4  a beam of protons and that it directs those protons as the

5  user would like to have them.  He may then use them beyond

6  that point.  Next slide.

7          I was going to go through some of the history, but I

8  think we can probably skip to the chase here and talk about

9  the accelerators, like cyclotrons, and about superconducting

10 devices.  So, let's move right on ahead.

11         And, again, there are lots of particles that are

12 accelerated, and people in this room have worked on

13 accelerators for most of the different particles mentioned at

14 the top.  And the energy regime is a little different from

15 what we normally work with.  The electron volt, it's a unit of

16 energy instead of a --

17         COURT REPORTER:  Instead of a?

18         DR. HASSENZAHL:  Joule, j-o-u-l-e.

19         If you have any questions about those details, you

20 can ask me and I'd be happy to explain them.

21         SPECIAL MASTER PETERSON:  No.  My background is

22 electrical engineering.

23         DR. HASSENZAHL:  I understand that.  I didn't know

24 exactly what it was.  So, this is great.  So, let's proceed.

25 Next slide, please.

1          I'm going to just jump down to linear accelerators

2     and mention that we typically in the old days used to have

3     accelerators in our house, in our televisions with the cathode

4     ray tubes that accelerate electrons, but we don't have them

5     anymore.  And the accelerators of interest today are

6     cyclotrons.  This is supposed to make a circle.  There we go.

7     And synchrocyclotrons.  We'll skip the other ones as we go

8     along until maybe the very end.  Next slide.

9          The development of these devices occurred in the late

10    '20s and then progressing from that time.  Ernest O. Lawrence

11    at Berkeley has a patent on the cyclotron, and I'll spend a

12    couple of minutes describing how that device works in detail

13    because it's important to understand the critical nature of

14    understanding the magnetic field and the changes in the

15    magnetic field to keep beams of particles going.  Next slide.

16         So, this is a slide from Lawrence's patent and the

17    device consists of several pieces and it has both an electric

18    and magnetic field to control the paths of the particles.

19         So, first of all, if you look to the left, you'll see

20    here that there are on the top what are called dee's.  They

21    look like a dee from the top view, and inside of those two

22    dee's particles carry out an orbit.  If we look to the area

23    over here (indicating), we see those dee's from another view

24    and they have an electric field from one of them to the other

25    in this case.  That electric field is supplied by a high-

1      frequency oscillator, as shown in this area.  So that it

2      oscillates positive and negative as a function of time.

3             In addition to the electric field, there is a

4      magnetic field.  The magnetic field goes between two poles in

5      one direction or the other, and it's constant rather than

6      being an oscillating field.

7             If you look at the curves in a little more detail,

8      you will see near the top that they are arced because the

9      field decreases as it leaves the poles.  That has an important

10     effect on keeping the particles together, keeping the bunches

11     of particles together.

12            So, now let's look at what happens when a particle is

13     introduced at a point here (indicating) in the accelerator.

14     When the voltages are correct, that particle will be

15     accelerated across the gap.  As it goes across the gap, going

16     from -- it's a proton.  So, it goes from a positive charge to

17     a negative charge.  It goes across the gap and then it coasts

18     within the dee around to the other side.  When it reaches this

19     side, if everything is in sync, the particle continues to be

20     accelerated again by the electrical field, which has reversed

21     during that time.

22            The net result is that there are bunches of

23     particles -- next slide -- that exist within the accelerator.

24     It's not a continuous beam of particles, just bunches.  And

25     I've shown those bunches in what I think is an appropriate

1    fashion here.  They're pretty much lined up radially at a

2    given time in this snapshot.  The shape of those bunches is

3    critical and it's important to keep the bunches together

4    because they want to come apart.

5          And pulling them together are two effects:  One of

6    them is the shape of the electric field and the other one is

7    the shape of the magnetic field.  They tend to oscillate back

8    and forth and particles within the bunch move around, but the

9    overall size of that bunch remains approximately constant

10   throughout the acceleration process.  That's not an accident.

11   That's the result of planning and design of the machine.  We

12   call the study of that process beam dynamics and understanding

13   the beam dynamics of every machine that is built is critical

14   before you begin detailed construction.  Next slide.

15         Just to go over some of the pieces.  Since we've seen

16   them and you understand them, I won't jump back and forth, but

17   there's a magnet, which I think is perhaps the most critical

18   piece of this system.  All of them are important.  There's an

19   ion source that produces the ions you want, the two dee's with

20   an RF system.  What was not shown is that there is a vacuum

21   system that is surrounding the dee's and in the region where

22   the particles are accelerated, there's a vacuum so that they

23   do not collide with air or other gas.

24         There is also an extraction system, which one has to

25   be careful so the particles leave the accelerator and go where

1    you want them to go.  So, on the left -- sorry, that was on

2    the left.  On the right are some components.  I'm not going to

3    go through them.  I think we understand them.  So, let's move

4    on ahead.

5           And we can see -- this was what I was going to jump

6    back and forth.  And I will say one thing, that there are --

7    there's an alpha at the bottom and alpha at the top and that

8    line in the middle defines the acceleration plane of the

9    system.  That's pretty much true on all cyclotrons and

10   synchrocyclotrons, that there is that acceleration plane.

11   Next picture, please.

12          One thing happens with particles as they go faster

13   and faster and that is there's a relativistic mass effect.

14   The mass effect causes the particles to be heavier.  So, the

15   particles get heavier.  They don't increase in velocity when

16   they get a kick from that new voltage as much as they could.

17   So, we go back one side -- slide.

18          What would happen is that if they continue to

19   accelerate farther and farther, the particles on the outside

20   here (indicating) would begin to lag behind.  If they lag

21   behind enough, they get out of synchronism with the radio-

22   frequency field and they stop being accelerated.  And so,

23   there are limits to some machines based on that relativistic

24   effect.

25          That can be accommodated in two ways.  One is by

1   reshaping the poles so that the magnetic field is not

2   constantly going around in a circle.  And the other one is to

3   take the RF which is applied with this oscillator and to

4   change it as a function of time.  As the particle gets farther

5   out, the RF decreases in frequency.  Next slide.

6          On again.  So, there are two basic kinds of these

7   devices:  One is one where everything is synchronism all the

8   time.  That's called an isochronous cyclotron.  The beam and

9   the particles come out, as we said, in a group of bunches.

10  Those bunches are almost continuous.  And then there's a

11  synchrocyclotron where the RF frequency is ramped.

12         The difficulty with having that synchrocyclotron is

13  that it's a lower intensity, because only for every ramp do

14  you get one bunch or a couple of bunches.  You don't get a

15  bunch for every RF cycle.  So, the output intensity is less.

16  On the other hand, the device is smaller, so smaller

17  footprint, and you can do other things with it.  You can go to

18  higher energy of each particle.  Next slide.

19         This is a picture you find on the Internet, many

20  other places.  It's the first large synchrocyclotron built at

21  Berkeley.  It has the yoke, very big yoke.  Weighed 4,000

22  tons, a couple of poles, and coils that produce the magnetic

23  field.  Next slide, please.

24         That device was left in place when a new accelerator

25  was built simply because it was so heavy, but there's another

1    electron accelerator in the same building where that was and

2    it was shut down in the '80s.  Next slide.

3         So, I mention that beam dynamics was critical and the

4    beam dynamics is something that has evolved over 60, 70 years.

5    And in the early days, simply, one would work on a piece of

6    paper and calculate what would happen to the particles, how

7    you would control them, how you would make the magnetic field

8    correct.  You would build a device and then you would trim the

9    field either by putting small coils on the surface of the pole

10   or by putting small pieces of magnets of iron to change the

11   field in a way that would help control the particles, and

12   often this was basically an experimental event that occurred

13   after the accelerator was built to bring it into better and

14   better performance.

15        On the other hand, as time has gone on, it gets a

16   little complicated to do that.  So, that first accelerator had

17   a couple of dozen or bits of particles.  Today if you have a

18   machine that's at 250 Million electron Volts -- and that is

19   capital M, lower case e, capital V -- it takes about 10,000

20   orbits.  You can't really calculate the details of what will

21   happen like that with that with a piece of paper.  You need to

22   have a computer program and you need to iterate the process

23   and follow the tracks of the particles and to follow the

24   bunches.  So, that's what the beam dynamics system and process

25   is today.  Some of the details are discussed below.  Next

1   slide.

2         So, today when you make -- build one of these

3   devices, you have an iterative process.  One is to design a

4   magnet to have a field that you can use and the other is to do

5   the beam dynamics to see if that field is appropriate.

6   Oftentimes when you finish the beam dynamics on a given field,

7   you determine the field wasn't right.  So, now you have to

8   redesign the magnet and come up with a different field.

9   That's all done before you build it.  So, this is an iterative

10  process that occurs.  It may take months or years.  In some

11  cases for the big machines that have been built, it takes five

12  or six years and it's a continuing process up to the last

13  minute when it's beginning operation.

14        SPECIAL MASTER PETERSON:  With the prevalence of

15  computer modeling, why hasn't that been used?

16        DR. HASSENZAHL:  It is.  The computer -- I'm sorry.

17  This is a computer process now and it -- I should have said

18  that.  I think I have it somewhere else, but it is an

19  iterative process with a computer code and it's a numerical

20  and computer tracking process.  There are some more

21  sophisticated methods that people use, but at the point they

22  -- today they do not give as accurate a result as one in which

23  you have a computer code that actually tracks the path of the

24  particle.

25        SPECIAL MASTER PETERSON:  All right.

1          DR. HASSENZAHL:  Those others are called stochastic.

2          COURT REPORTER:  I'm sorry?

3          DR. HASSENZAHL:  S-t-o-c-h-a-s-t-i-c.

4          SPECIAL MASTER PETERSON:  You mentioned that

5    sometimes this may take years.  And I guess I'm having

6    difficulty.  If you have computer modeling that can change all

7    the parameters, why would this take years?

8          DR. HASSENZAHL:  The iterative process between the

9    magnetic field calculations and the beam dynamics does not

10   integrate to give a coherent so that there's one set of

11   computer modeling and another set of computer modeling and

12   there's a human interface in between, because there are many

13   other factors involved besides just what the beams are and

14   what the fields are -- will be.

15         SPECIAL MASTER PETERSON:  All right.

16         DR. HASSENZAHL:  So, there's a -- as an example,

17   there's a -- the biggest accelerator in the world today is the

18   Large Hadron Collider, LHC, and the beam dynamics process for

19   that began somewhere around 1986, if I recall, and they did

20   not come up with detailed machine design and the final beam

21   parameters until around 1998.  In an urgent situation, you

22   might do it more quickly, but that was, in fact, the process

23   on that machine.

24         SPECIAL MASTER PETERSON:  All right.

25         DR. HASSENZAHL:  Next slide.

1              So, this is a history of some of the circular

2    accelerators, and we'll jump down to 1984 and the fact that in

3    the late '70s the cost of the electricity for those coils in

4    the machines was getting so great on these machines, that it

5    was a burden, not just economic, but also for the power

6    companies, because the machines would be ramped and field on

7    these machines rather than constant and they used a tremendous

8    amount of energy.  Two, 300 megawatts were used for some of

9    the accelerators.  So, the first superconducting accelerator

10   was built at the Fermi Lab in Illinois.  Began operation about

11   1994.  It's about three miles in circumference for that

12   machine.  Next slide.

13             So, we talk about superconductivity.  And what is it?

14   I'm sure you know that, basically, the resistance of these

15   materials essentially goes to zero as they get cold.

16             There was a period of about five years in the late

17   '50s, early '60s where three important events occurred.  First

18   of all, the understanding of the theory and why it works came

19   out of the University of Illinois, Bardeen Cooper, and it was

20   discovered that two materials, niobium 3 tin, which is

21   discussed in some of the patent, and niobium titanium could

22   carry significant currents in a high magnet field if they were

23   cold.  More recently other materials have been discovered.

24             The next slide just gives a little bit of a scale and

25   on the scale I've shown helium liquid at 4.5.  It ranges from

1    4.2 to 4.5, depending on what the operating conditions are

2    when you use it, but the materials here can be used in a

3    helium bath or at helium temperatures very effectively.  There

4    are many other superconductors.  Most of them do not become

5    superconducting until even lower temperatures.  Even if you

6    put them in a bath of liquid helium, they are not super-

7    conducting.  You have to go to extremely low temperatures.

8    Next slide.

9            So, why would you use superconductors?  Well, first

10   of all, we mentioned economics and I think the economics

11   overall is the principal reason.  You still have to keep them

12   cold.  That takes some energy.  But they carry a much higher

13   current than the -- and they also have a higher magnet field,

14   which reduces the size of the devices.  Next slide.

15           So, in the '80s people began thinking about using

16   superconducting accelerators for proton radiotherapy and

17   there's a machine I'll get to in a moment where people talked

18   about even doing it there.

19           At any rate, in the mid '80s, Dr. Blosser,

20   B-l-o-s-s-e-r -- well, I guess you can see it also.  He's from

21   Michigan State University -- suggested, as the patent, on a

22   5.5 T device in a one-room setting.  One of the students there

23   later on in 1990 did a thesis where he calculated and carried

24   out those detailed calculations I was talking to you about in

25   principle, at least, not building a device, to have a stable

1    5.5 --

2              COURT REPORTER:  I'm sorry, 5.5 test?

3              DR. HASSENZAHL:  5.5 T, t-e-s-l-a.  It's lower case

4    t-e-s-l-a, but the abbreviation is capital T.

5              Next slide.  This is a picture of what is perhaps the

6    premiere proton therapy facility in the country.  The father

7    of that device was a Dr. Philip Livdahl, who was at Fermi Lab

8    and was involved in superconducting devices as well, but they

9    were not ready at the time that this machine was built.  And

10   so, it shows three groups where individuals can be treated

11   with protons.

12             And next slide.  On the left is the accelerator.

13   This is a synchrotron, not a synchrocyclotron.  It has many

14   magnets in it and those magnets change in field with time, and

15   each of these magnets is about the size of a small vehicle.

16   Next slide.

17             This is a picture of -- from Wu's -- Dr. Wu's thesis.

18   Shows, essentially, a single-room process with a gantry

19   supporting both synchrocyclotron here and delivering protons

20   to a patient.  Next slide.

21             Gantries are used in many places in the medical

22   profession.  This is an example of one for a different

23   application and it's basically an engineering feat to make a

24   gantry.  It's not a scientific or technical issue.  Next

25   slide.

1           So, a little comparison between conventional

2     cyclotrons and superconducting machines.  This is what we saw

3     before.  Next slide shows, I think, little twists that you

4     have to have.

5           Well, first of all, you can make the yoke circular

6     rather than making it rectangular, make it a lot smaller.

7     Still has the same poles, but above two tesla.  And I don't

8     know if you're familiar with the saturation effects in iron.

9           SPECIAL MASTER PETERSON:  Yes, I am.

10          DR. HASSENZAHL:  Okay.  Then I won't go into that,

11    but it adds a whole new level of complication to solving the

12    magnetic field problem and you do need codes to do that

13    calculation.  ANSYS is one of the frequently used codes to

14    come up with geometry.  On the other hand, you --

15          COURT REPORTER:  I'm sorry.  Could you spell that

16    code for me?

17          DR. HASSENZAHL:  AN -- capital ANSYS.

18          The superconducting coils are perhaps the most

19    critical piece to this and that's because they have a very

20    high current density.  They carry a lot more current.  They

21    have a lot more forces on them than coils in a conventional

22    magnet.  You need structure to hold them together and you need

23    structure to keep them from being pulled towards some of the

24    metal, some of the iron components.  Again, there's a vacuum

25    chamber, but it's an additional vacuum chamber to keep the

1    coils from getting too hot from radiation and contact from the

2    outside.  So, there's special supports, as I said, between

3    them.  Next slide.

4           So, if we look -- and we like to compare a

5    superconducting synchrocyclotron with the original one that

6    was built at Berkeley, we can compare this slide and the next

7    one.  So, this -- go back one, please.

8           This shows this compact pole system which is,

9    perhaps, a couple of meters in diameter, and all of the same

10   components, a vacuum system, a region for coils.  The coils

11   are not shown here, but that's okay, and the place where the

12   radiofrequency signal comes into the dee's, the vacuum system

13   for particle acceleration and a hole, a groove to bring in

14   ions to have an ion source in the middle.  Next slide.

15          This is the other one.  And the high field compact

16   superconducting synchrocyclotron is basically the same size as

17   what goes in the pole here, maybe half as big.  Next slide.

18          Again, this shows the picture now showing the coils.

19   Doesn't show all the parts, but it shows a method for cooling

20   the coils with the cryocooler.  These are devices that you can

21   buy from a variety of manufacturers off the shelf.  Next

22   slide.

23          The question of building a cyclotron or synchro-

24   cyclotron is one of iteration.  Building superconducting

25   devices is the same.  And if you look around the world, you

1   find that two or three brand-new superconducting coil systems,

2   magnet systems are designed and built every year.  It's not

3   something that you change a car design or you change something

4   here or change something there.  Each one of them is very

5   different and there are only a few groups in the world that

6   can do that process.  And so, realizing -- and I think this

7   is, in my mind, the critical piece, is realizing these new

8   devices is a creative process.  It's not something that you

9   can just get off the shelf.  You can't go to a trade school or

10  a university or get a Ph.D. and learn to do that.  Each one is

11  a new step.  Each one is an adventure.  Next slide.

12          So, we talked about saturated iron and since you're

13  aware of it, it adds an additional iterative step.  So that

14  for a superconducting synchrocyclotron there's normal beam

15  dynamics and magnetic field step, but there's an iterative

16  step in addition to take the magnetic field and to look at the

17  conductors, the coils, and the iron, and it's those two

18  iterative steps that increase the complexity of coming up with

19  a detailed design of a cyclotron.  Next slide.

20          I think we've gone through this before.  Next slide.

21          I think there are lots of challenges in the

22  superconducting magnets, as I mentioned, and I'm not going to

23  go through a lot of details.  In fact, we thought, since we

24  didn't know that you would be aware of things, what we would

25  do, but I did include some slides on magnet protection, and

1   the critical issue on the next slide is that you have an

2   extremely high current density, which means that it's almost a

3   fuse, that if you don't decrease the current quickly, the

4   coils, the conductors will burn out and that happens very

5   quickly.

6          And down at the bottom I talk about the fact that

7   normally -- I don't know how to do that right anymore -- that

8   it takes about half a second to burn out some of these coils.

9   So, you just decrease the current in that period of time.  And

10  these have a great deal of energy in them.  So that there is a

11  high voltage within the system when it's being -- energy is

12  being extracted or being absorbed internally.  It's a

13  complication.  Next slide.

14         This just shows the relative slides and current

15  density.  I think you are familiar with that.  Next slide.

16         Only an example of a failure and on the right you can

17  see in a very big magnet that's at Brookhaven National

18  Laboratory in Long Island how the energy is extracted in less

19  than a half a second.  Next slide.

20         So, to conclude, I think the important thing here is

21  that this is a difficult task in designing and building and

22  conceiving of an advanced magnet system, a superconducting ion

23  field cyclotron, supercyclotron.  So, it's a great deal of

24  effort.

25         So, I'll conclude.  If you have any questions, I'll

1    be happy to try to answer them.

2         SPECIAL MASTER PETERSON:  Actually, I just really

3    have one or maybe a follow-up question.

4         What you told us this morning on the design of these

5    systems -- would everything that you have told us this morning

6    have been known by one of ordinary skill in the art as of the

7    filing date of the patent-in-suit?

8         DR. HASSENZAHL:  I think that's an issue, defining

9    what one of ordinary skill in the art is.

10        SPECIAL MASTER PETERSON:  All right.

11        DR. HASSENZAHL:  And I think back to 2000, 2003

12   timeframe, there are only a dozen -- few dozen people who I

13   would think would have skills to go about building -- and

14   maybe teams of people and I know teams are a real issue here.

15   I don't know how -- I think of them all the time because there

16   are 20 people working on many of these machines.  Person of

17   ordinary skill in the art I define as someone with about 15

18   years of experience and who has worked on other machines.

19        As you look around, what you find -- and I hadn't

20   thought about it at the time of the expert report -- is that

21   you know there weren't many cyclotrons being built in that

22   timeframe because the physics had gone on to bigger and larger

23   machines.  And so, a person of ordinary skill in the art

24   certainly would have had experience in a variety of pieces,

25   but there would not have been very many teams that could have

1    gone about building the kind of device that I talked about.

2              SPECIAL MASTER PETERSON:  Let me clarify the

3    question.

4              I really wasn't asking in terms of building a

5    machine, but, for example, some of the considerations going

6    into building one of these machines, some of the theories or

7    the education or knowledge.  Your Slide 33, for example,

8    superconducting coil protection, are these types of scientific

9    principles or -- let me say more correctly.  Would the

10   scientific principles have been known by one of ordinary skill

11   in the art as of the filing date of the patent-in-suit?

12             DR. HASSENZAHL:  You're asking me a legal question

13   and I'm a scientist.  Ordinary skill in the art piece comes up

14   again --

15             SPECIAL MASTER PETERSON:  That's fine.  I withdraw

16   the question.

17             DR. HASSENZAHL:  I'm sorry.

18             MR. BAUER:  So, Mr. Peterson, there's two very

19   different levels of ordinary skill.  So, I think he can answer

20   the question if you say, you know, as you understand one of

21   ordinary skill.  I think he's concerned -- we haven't prepared

22   this, but the two levels here -- they're taking the position

23   one of ordinary skill, bachelor's degree with a few years of

24   experience.

25             SPECIAL MASTER PETERSON:  No.  I understand that.

1          MR. BAUER:  And I know that Dr. Hassenzahl doesn't

2     think that.

3          SPECIAL MASTER PETERSON:  No.  I --

4          MR. BAUER:  So that -- in fact, I think if -- I know

5     you phrased it would a Ph.D. know this or would a bachelor's-

6     degree person know this.  I think he can answer that question.

7          SPECIAL MASTER PETERSON:  All right.  Let me try to

8     clarify.

9          I do understand from the materials that we have two

10    different definitions -- or definitions that are urged by the

11    parties for one of ordinary skill in the art and, actually, I

12    was trying to -- what I was trying to elicit with my question

13    was not necessarily someone building this, but just the

14    knowledge.  Whether it's Ph.D. or bachelor, I really don't

15    care, just whether -- in your opinion, whether the knowledge

16    was out there in the published literature of what you have

17    told us this morning during the tutorial.

18         DR. HASSENZAHL:  So, to answer that question -- now

19    it's a little more straightforward in my mind.  There are

20    several books that are included in the documentation that we

21    have that give you for instances of magnets and accelerators

22    that have been built.  There is no guidebook that takes you

23    through that process so that a person who, even if he had ten

24    years of experience, let's say, and one might think of as

25    being of ordinary skill in the art, could have taken that and

1    proceeded to build a device.  That is where the -- that's

2    where the complication is, in my mind, and that's the issue of

3    the cookbook.  So, I think that a person of ordinary skill in

4    the art can take a cookbook and he can come up with the

5    answer, but there isn't a cookbook because it is a conception

6    process on each magnet system.

7              SPECIAL MASTER PETERSON:  All right.

8              DR. HASSENZAHL:  I tried to write that cookbook, but

9    it didn't work.

10             SPECIAL MASTER PETERSON:  All right.  Thank you very

11   much, Doctor.

12             (Dr. Hassenzahl steps down.)

13             SPECIAL MASTER PETERSON:  All right.  Now we'll hear

14   from -- I believe Dr. Gall is your witness.

15             MR. HILL:  Yes, your Honor.  Dr. Kenneth Gall will

16   present our tutorial.

17             SPECIAL MASTER PETERSON:  Dr. Gall, if you would

18   raise your right hand.

19             **KENNETH GALL, Ph.D., SWORN.**

20             SPECIAL MASTER PETERSON:  Thank you.  Please be

21   seated.

22             MS. DEVARASETTY:  Your Honor, could you switch the

23   computer for us?

24             SPECIAL MASTER PETERSON:  All right.

25             MS. DEVARASETTY:  Thank you.

1          SPECIAL MASTER PETERSON:  Sorry.  There you go.

2     You're probably going to have to remind me a lot of that.

3          MS. DEVARASETTY:  Fine.

4          SPECIAL MASTER PETERSON:  Dr. Gall, would you please

5     give us your full name and your professional affiliation.

6          DR. GALL:  Yes.  My name is Dr. Kenneth Gall, and I

7     am the chief technology officer at Mevion Medical Systems.

8          SPECIAL MASTER PETERSON:  All right.  The defendant

9     in this case, right?

10          DR. GALL:  I am representing Mevion Medical Systems

11     and the named inventor on the '311 patent.

12          SPECIAL MASTER PETERSON:  All right.  Again, we're

13     going to have just a narrative as opposed to Q&As?

14          MR. HILL:  That's correct, your Honor.

15          SPECIAL MASTER PETERSON:  All right.  You may proceed

16     when you're ready, Dr. Gall.

17          **DEFENDANT'S TUTORIAL:**

18          DR. GALL:  All right.  Thank you.  And good morning.

19          I understand that you already understand much of the

20     material and Dr. Hassenzahl has done a very good job of

21     covering most of the material.  So, I will limit my comments

22     to areas that have not been covered already or areas where we

23     might disagree a little bit on what the applicable technology

24     is.

25          SPECIAL MASTER PETERSON:  All right.

1          DR. GALL:  All right.  Just a quick outline to give

2     you an overview, and I understand you've already seen it.  The

3     '311 patent really concerns cancer treatment and radiation

4     therapy, in particular.  And so, I just wanted to motivate the

5     reasons for the invention of the '311 -- the invention

6     described in '311.

7          I will go into a little bit about what proton therapy

8     is in comparison to conventional radiation therapy and talk

9     about some of the prior existing technology for proton

10    therapy, quickly show you what the Mevion solution is as

11    described in the '311 patent and then go through some of the

12    issues of the cyclotron, the synchrocyclotron, the isochronous

13    cyclotron, and, as I said, I will just talk about the

14    differences from what Dr. Hassenzahl has already presented.

15         I will also touch on superconducting magnets and then

16    superconducting cyclotrons, as they have been described

17    already, and, again, just talk about slight differences and

18    then, finally, I'll wrap up just by showing what kind of a

19    market impact this invention has had on the field of proton

20    therapy and what it means to cancer patients in the country

21    and, actually, throughout the world.

22         So -- excuse me a second.

23         The second leading cause of death in this country is

24    cancer and what you can appreciate in the figure on the right

25    is that this curve is heart disease, which is actually

1    decreasing in frequency.  And so, the cause of death from

2    cancer will soon be the leading cause of death in this country

3    and throughout the world, of course, and is a huge problem.

4         So that, as you see at the bottom, by the year 2030,

5    it's estimated that 17 million people will die of cancer each

6    year.  And, as I'm sure you're probably well aware, when you

7    have cancer, you're treated either with surgery or you cut the

8    tumor out or with chemo theory where drugs are administered to

9    kill off the cancer before harm is done to the patient or with

10    radiation therapy, and radiation theory is used in about

11    two-thirds of all cancer patients in this country today.

12    There's actually a huge need worldwide where the rates of

13    radiation therapy treatment are not nearly that high.

14         And, just briefly, radiation works to kill cells to

15    cause them to not be able to replicate, really, and that's

16    done by breaking the DNA strands within the cells and it's

17    either done directly by an ionization breaking one of the DNA

18    strands or an ionization of a nearby molecule causing it to be

19    a free radical, which then can break one of the DNA molecule

20    strands.

21         And so, this is a very well understood process by now

22    biologically, and on the right you can see is a cell survival

23    curve where if you look at the number of cells surviving given

24    radiation doses, as the dose goes up, more and more cells are

25    killed, and it's quite an elaborate set of experiments to

1    derive this, but these things have been known for nearly 100

2    years now and it's a very mature technology in that regard.

3            This figure shows a conventional radiotherapy

4    treatment room.  Within this device is a small electron

5    accelerator that would be of a few Million electron Volts.

6    That would make a high-energy x-ray beam that would be

7    directed to the patient and this is a gantry that has an

8    accelerator on it and can direct the beam to the patient that

9    you see laying here on the couch from a direction anywhere

10   around the 360 degrees around the patient.  That couch would

11   also be movable so you can aim the beam into the patient from

12   any direction, and that choice of geometry is very important

13   to be able to avoid critical normal structures while still

14   delivering the radiation to the tumor.

15           So, the way in which the dose is deposited with high-

16   energy x-rays -- it's important to understand in contrast to

17   protons.  So, I'll go through it briefly.  If you look at the

18   dose deposited as you go in depth into the patient, it peaks

19   within just a centimeter or two of the surface, but then

20   continues on all the way through and out the other side of the

21   patient.  On the right are some dose distributions that you

22   can see which are formed by combining a series of beams, high

23   energy x-ray beams.  This case shows a treatment of a brain

24   tumor which would just be in this high-dose area here

25   (indicating), but as you can see, there is dose going into the

1    rest of the brain where there is no disease and that would

2    only cause complications.

3          Well, there is a better way of treating patients and

4    that's with proton beams, and this was recognized sometime ago

5    in 1946.  Robert Wilson, while working at the Harvard

6    cyclotron, one of the early synchrocyclotrons, wrote this

7    paper where he proposed the use of protons for radiotherapy,

8    and he had recognized that this phenomena, first observed by

9    Bragg in the early 1900s, where the dose deposited slowly

10   increases until it comes up to an abrupt peak and then falls

11   completely to zero at some particular range, and that range is

12   tunable by changing the energy of the beam or by placing

13   material in front of the beam.

14         So, to contrast that to x-ray therapy, that is the

15   curve I showed you for dose deposition for x-rays.  That is

16   the curve, the Bragg peak, of a proton beam.

17         So, what was recognized also very relatively early on

18   in the 1960s at Harvard and other places is that if you add a

19   series of Bragg peaks together, you can form an area of

20   uniform dose with less dose prior to the tumor and zero dose

21   after the tumor.

22         So, if you compare that to the x-ray dose -- to bring

23   this x-ray dose up to the same level as the proton dose, this

24   peak dose would have to be several times higher.  And so, this

25   entire area in front of the tumor would receive much more dose

1    and there would be much more dose after the tumor.  So, just

2    from the basic physics, it's evident that proton therapy is a

3    much better way to treat patients.

4            SPECIAL MASTER PETERSON:  Unless it was a surface

5    tumor of some kind where depth wasn't an issue.

6            DR. GALL:  That's true.

7            So, for the vast majority of cases, proton therapy

8    will always be better.  There are some cases where x-ray

9    therapy is -- it's hard to find cases where x-ray is

10   preferable, but it would be adequate.

11           And, finally, just to give you a clinical example

12   that I think particularly well motivates the case for proton

13   therapy, this is a planning study of a pediatric patient, who

14   is a three-year-old boy, and in young children they can

15   sometimes develop what's called a myeloblastoma.  That is a

16   kind of brain tumor that will seed tumor cells into the

17   cerebral spinal fluid.  When it does that there are tumor

18   cells floating wherever.  To treat them with radiation, you

19   have to apply radiation to the skull and all along the spine

20   so you completely irradiate all of the cerebral spinal fluid.

21           So, this shows the patient prone.  (Indicating) Here

22   is the patient's chest.  The patient's skull is here.  And if

23   an x-ray beam is aimed from the posterior of the patient, it

24   can be made to give full dose all along the spine where the

25   disease is.

1           Unfortunately, if you look at a cross-section

2    straight through the patient here, which is shown on the

3    right, at the level of the heart, that x-ray beam is coming

4    straight through the heart and the lungs.  So, these patients

5    are very well treated with x-rays, most -- there are 90 plus

6    percent survival rates from this device when treated with

7    x-rays.  However, they live a very long life, full of

8    complications due to that excess dose.  They will have repeat

9    surgeries to correct problems from that excess dose.

10           If we contrast that to proton therapy, that same beam

11    coming in from back now stops along the front edge of the

12    vertebral body and there is no excess dose to other organs.

13    So, this has been a very compelling use of proton therapy.

14           There's a facility here at the Massachusetts General

15    Hospital in Boston where the demand for this kind of treatment

16    is so high, they've published papers on the ethics of triage

17    and cases of this kind.

18           So, the question is why it wouldn't be used on every

19    patient or on the vast majority of patients where it's clearly

20    advantageous.  And the reason is this:

21           As Dr. Hassenzahl also pointed out, existing

22    technology for proton radiation therapy facilities resulted in

23    your having to build a very large facility, roughly the size

24    of a football field, and containing equipment that would cost

25    hundreds of millions of dollars.  This was a facility that was

1    built in Munich, Germany and was reported to cost on the order

2    of $300 million.  So, quite an expensive treatment as it was

3    in, say, the late 1990s, and the principal reason for that is

4    because the accelerators to make a proton beam of 250 MeV are

5    very large and have been very large.

6            Dr. Hassenzahl showed you the synchrotron.  This is

7    the IBA cyclotron.  It's an isochronous cyclotron, and he's

8    already described that and I'll describe it a little bit more

9    in a minute.  And you can see the rather large gentleman

10   walking around the yoke and you can see a few more in there.

11           In contrast, this is the Mevion proton therapy system

12   solution.  And you can appreciate the scale of it immediately

13   by seeing the couch there.  That's just about the size of a

14   person, and in this system the cyclotron occupies just this

15   area at the middle of the tube that straddles between two arms

16   mounted on bearings to the side walls.

17           There are other advantages besides just the small

18   cyclotron here that are described in the claims of the '311,

19   such as the fact that its limited rotation around the patient

20   allows you to make some of the radioprotective walls thinner

21   and this reduces facility cost.

22           SPECIAL MASTER PETERSON:  You're speaking of less

23   than 360 degrees?

24           DR. GALL:  That's correct.

25           SPECIAL MASTER PETERSON:  Okay.

1          DR. GALL:  This is another view, sort of an

2   architectural rendering of the size of the room, and I'll show

3   you a comparison in a second, as you're aware.  This room

4   measures 25 feet across by 30 feet deep and it's about 28 feet

5   high on the inside.  And so, it's a considerably smaller room

6   than that large facility that I showed you before, even in

7   comparison to a single one of those treatment rooms.

8          So, the importance of the Mevion solution is not just

9   that the single room is much smaller than any other

10  conventional proton therapy room, but that it can be deployed

11  as a single room alone and you don't have to amortize the cost

12  of that large accelerator over many rooms, which is really the

13  reason that these facilities are built with multiple rooms.

14         All right.  So, I think that that motivates the

15  reasons for proton therapy and the reason that the solution as

16  described in the '311 is a worthwhile invention.

17         The principles of the cyclotron have already been

18  described.  I just want to point out that the equation for

19  describing that resonance condition is rather straightforward.

20  It's just that the frequency is equal to the charge of the

21  particles, times the magnetic field, divided by some constants

22  and the mass of the particle.  This was first recognized by

23  Lawrence in the 1930's and in the end is a rather simple

24  equation.

25         Dr. Hassenzahl already showed you the first page of

1    that patent and so, I will not elaborate much further other

2    than to say that that simple relationship of particles

3    crossing exactly at the right time is not actually what

4    happens.  In fact, the particles can cross at any phase of the

5    radiofrequency as long as it's in the positive voltage part of

6    that phase.

7            Early cyclotrons could get up to about ten Million

8    electronic Volts, but they had to slip and phase constantly.

9    They would start out at a very low voltage, ride through a

10   very high peak voltage, and then they would slip and phase

11   until they got to a very low voltage again, and that was, in

12   part, due to this relativistic mass rise, and the only way to

13   get particles to higher and higher energies was to increase

14   the voltage of the RF.  I'll show you next.  This is just an

15   image of the very first cyclotron.  It's not worth going into

16   very much other than to point out this was truly inventive

17   early on.  In the 1930's this was a very novel idea.  Today,

18   high school students build cyclotrons quite regularly and

19   there are Web pages out there, cyclotron kits where, actually,

20   you know, high school students have built cyclotrons of this

21   size.

22           So, once this device was developed, Lawrence

23   recognized that you could start to study physics of particles

24   by making machines of ever increasing size and energy, is

25   really what they were after.  Dr. Hassenzahl has already shown

1    you the 184-inch cyclotron at Berkeley.  That became the first
2    synchrocyclotron.  Actually, as it was first designed, it was
3    meant to be a classic cyclotron where the radiofrequency would
4    remain fixed in frequency, but they recognized that the
5    voltage would have to go to such high levels, that it was
6    becoming impractical, and it was during the design development
7    of that machine that the proposal for the synchrocyclotron was
8    developed and they changed this design so it would be a
9    synchrocyclotron where the frequency is swept in order to
10   maintain this mere resonance condition.
11           And so, these few equations are really all that is
12   necessary to understand the operation of a synchrocyclotron.
13   The relativistic mass rise, as already been described, can be
14   just written out as this factored gamma, times the rest mass
15   of the particle, and so long as the frequency then stays in
16   step with this relativistic mass rise, you will have a
17   condition where the particle always crosses at some positive
18   voltage.  Although, again, in the actual synchrocyclotron,
19   it's more complicated than I described to you even for the
20   classic cyclotron because particles don't just go around and
21   cross at a positive voltage.  They, in fact, speed up so much
22   that they will go to see negative voltage and they'll slow
23   down, and then they'll slow down so much that they see
24   positive voltage again and speed up.  So, these are what are
25   called phase oscillations in the synchrocyclotron, and it's

1    very important to understand those because it places

2    constraints on the voltage of the radiofrequency system tied

3    to sweep rate of the frequency.

4           The other important equation to understand is what's

5    called the field index and it is conventionally written this

6    way:  As N is equal to negative of the ratio of the radius

7    over the magnetic field, times the rate of change of the

8    magnetic field with radius.

9           And what you can recognize is since the radius and

10   the magnetic field are always positive and the requirement for

11   weak focusing, which I'll describe a bit more in a second,

12   always has to be positive, that this DBER, the rate at which

13   the magnetic field falls off the radius, must be negative.

14   So, that's the requirement for focusing in, actually, the

15   classic cyclotron and the synchrocyclotron, is that that

16   magnetic field must fall with radius.

17          And the reason for that is that is the way in which

18   the particles remain in vertical focus inside the cyclotron.

19   So, I'm sure you're aware of the equation that the force of a

20   charged particle in the magnetic field is perpendicular to

21   both its direction of travel and the magnetic field.

22          And so, if you look at the components of the magnetic

23   field here (indicating), above the plane of acceleration, you

24   notice that there's a vector pointing outward.  So, if there's

25   a particle that goes into the page, the cross product of the

1    velocity with that magnetic field vector has a force that will

2    push the particle back down towards the acceleration, the

3    central plane.

4            Likewise, if you look below the acceleration plane,

5    that component of magnetic field pointing inward when crossed

6    with the velocity vector will give you a force that points the

7    particle backwards, the acceleration plane.  So, that is the

8    reason for having to have a following magnetic field, is it

9    gives you this shape of the magnetic field, which allows for a

10   vertical-focusing beam to be contained.  So, these principles

11   were well understood.

12           I got these figures from this book by Stan Humphries.

13   The latest edition was copyrighted 1999.  Actually, the first

14   edition of this was in the mid 1980s.  And he took these

15   figures from an even earlier publication of Livingston, who is

16   the chief engineer working for Lawrence and later came to MIT.

17           Now, I want to take the time to compare that to the

18   isochronous cyclotron because it's important to understand

19   what the limitations of isochronous cyclotron are and also

20   important to understand why people started making isochronous

21   cyclotrons.

22           As Dr. Hassenzahl pointed out, the intensity in the

23   synchrocyclotron was limited because you only had one series

24   of beam pulses at each frequency sweep.  Well, with the

25   isochronous cyclotron you can keep the frequency constant

1    because instead you change the magnetic field inversely with

2    this factored gamma.  And so, this meant that you could get

3    particles coming out all the time.  They were constantly

4    accelerating from the center all the way out to the edge.

5           However, the difficulty is that if you increase the

6    magnetic field as you go out in radius, you can no longer get

7    this bowed shape of the magnetic field as a consequence of

8    Maxwell's equations.  The magnetic field lines are essentially

9    straight and you no longer have vertical focusing, but it was

10   recognized in the 1940s that you could make a magnetic field

11   that changed as --

12           COURT REPORTER:  I'm sorry, changed as?

13           DR. GALL:  Azimuthally, a-z-i-m-u-t-h-a-l-l-y.

14           SPECIAL MASTER PETERSON:  Namely, on the azimuth.

15           DR. GALL:  I'm sorry?

16           SPECIAL MASTER PETERSON:  Namely, on the azimuth.

17           DR. GALL:  Yes.  Exactly.  Thank you.

18           And you could do that by closing the gap between the

19   magnet pole faces at areas which were called "the hills" for

20   high-magnet fields, and decreased -- and increasing the pole

21   gap in the area called "the valleys," and when you did that,

22   you could create another curvature of the magnetic field that

23   would allow those particles to remain focused.

24           Now, that principle can be used in isochronous

25   cyclotrons up to some certain field strength, and I'm

1    belaboring this point a little bit because it demonstrates why

2    people could only go to certain sizes in isochronous

3    cyclotrons for applications in proton therapy.

4           This raising and lowering of the magnetic field with

5    pole face shaping is really limited to the saturation

6    magnetization of iron, which is about two tesla, but that

7    property, which is called flutter in the accelerator physics

8    world, is -- has to be a certain percentage of the magnetic

9    field in order to maintain that focusing, and that field is

10   around six or seven tesla.  You can no longer maintain enough

11   flutter with just iron yoke pole face shaping to maintain

12   focusing beam.  So, an isochronous cyclotron is limited in the

13   magnetic field that you can go to simply as a result of not

14   being able to get enough flutter with iron pole face shaping.

15   You would have to achieve that flutter by some other means and

16   that would be much more complicated.

17          So, I put this here with very little else on it just

18   to make a few points.  Essentially, since 1960 all cyclotrons

19   have been isochronous cyclotrons, and by that I mean any large

20   cyclotron, industrial cyclotron.  Clearly, classic cyclotrons,

21   as I said earlier, are built by high school and college

22   students today and there were some rebuilds of

23   synchrocyclotrons even into the 1970s, but new cyclotrons

24   since the '60s have been isochronous cyclotrons.

25          So, that covers the area of the accelerator.

1          We will talk a little bit about superconductivity.
2     As already mentioned, it's about 100 years old.  Last year is
3     the 100th-year anniversary of the discovery of super-
4     conductivity, and that is, as already stated, where the
5     resistivity of the material goes to zero below certain
6     temperatures.
7          And what I just wanted to point out was that this is
8     also a technology where, clearly, there have been developments
9     over time, such that the first successful superconducting
10    magnet was built in 1954, but already in 1995 there were
11    publications where you have magnetic fields of 20 tesla.
12         So, Dr. Hassenzahl has already pointed out some of
13    the issues of making high-field magnets with different
14    materials.  I just wanted to cover a little bit of the issue
15    that, yes, indeed, when you go much above two tesla, the iron
16    saturation magnetization, you need to use superconducting
17    materials to make a practical magnet.
18         The two different kinds of materials, it's important
19    to understand, there are engineering differences.  Niobium
20    titanium is a ductile metal.  So, you can put it on wire lines
21    and stretch it out and wrap it into coils and it's pretty
22    impervious to handling.
23         Niobium 3 tin, on the other hand, is really a
24    ceramic.  And so, it can't be strained very much before it
25    will crack and lose its superconducting properties.  So, most

1    people making superconducting magnets choose to use niobium

2    titanium and there were literally thousands -- probably even

3    tens of thousands of superconducting magnets made with niobium

4    titanium.  Every hospital has a large superconducting magnet

5    as part of the magnetic resonance imaging system, and those

6    are all -- essentially all made from niobium titanium, but

7    niobium 3 tin is a better superconductor.  It's

8    superconducting at higher temperatures or at same

9    temperatures, higher fields, and this is well-known and has

10   been pointed out by many authors.

11         Dr. Hassenzahl said there is no cookbook for

12   superconducting magnets.  However, there is a wealth of all of

13   the engineering details needed to build superconducting

14   magnets.  This is a book published by Martin Wilson, who is a

15   professor in England.  This was published in the mid 1980's

16   and in it contains all data concerning properties of

17   superconducting materials, how to do magnet protection,

18   practical examples of all kinds of superconducting magnets,

19   and just to show the difference between niobium titanium and

20   niobium 3 tin, if you were to look at a constant current, you

21   could carry much, much more current in niobium 3 tin than you

22   can in a -- I'm sorry -- much more current in niobium 3 tin

23   than you can in niobium titanium in a given magnetic field or

24   at a given current, you can go to much higher magnetic field

25   with that material.

1           So, this is a picture showing the various components

2    that go into the conductor that is in the Mevion magnet.  So,

3    this is called niobium 3 tin cable and channel design.  So,

4    this is a quarter, which is a little blurry.  So that just

5    gives you the scale.  This is the cable itself, which is a

6    series of twisted wires.  Most of that wire is actually

7    copper.  So, the part of it that's superconducting is actually

8    only half of that.  So, it's a very small cross-section of

9    superconducting material.  This is a copper channel --

10           SPECIAL MASTER PETERSON:  Wait.  Let me ask you.  You

11   say that this is -- this looks flexible, but you're saying the

12   niobium 3 tin is a ceramic, which makes it semi-rigid?

13           DR. GALL:  That's true.  So, if I had this little

14   piece of cable here and I were to hand it to you and if you

15   were to bend it, you would hear it cracking.

16           SPECIAL MASTER PETERSON:  I see.

17           DR. GALL:  So, that means that when you process this,

18   you have to be very careful in the way that you process it.

19   And so, the minimum-bend radius is specified.  And what you do

20   is to take this wire when it's prepared by the wire

21   manufacturer.  It is just tin and niobium together clad in

22   copper.  You put that into a furnace and it reacts and turns

23   into niobium 3 tin.  At that point it's the superconductor in

24   the ceramic that you have to handle very carefully.  So, it's

25   put on spools of a minimum-bend radius.  It's put through a

1    process of soldering it into this channel on a line where the

2    minimum-bend radius is all specified and when it's wound into

3    the coil, it cannot be bent more than that minimum-bend

4    radius.  So, it's much more difficult to handle.  However, it

5    is capable of much higher magnetic fields.  And so, this --

6              SPECIAL MASTER PETERSON:  Let me stop you.

7              So that I understand, you make the coil and then you

8    heat it to create the superconducting material?

9              DR. GALL:  So, there are two ways in which to make

10   the coil out of this material.  One is called wind and react.

11   The other is react and wind, and they're -- it's onomatopoeic.

12   It's pretty clear what it is.  You can wind coil, put it in an

13   oven and have superconducting material.

14             There are issues with that because you have to keep

15   the layers insulated from each other.  And so, the insulation

16   has to last through the very high temperatures of reaction and

17   then you have to pot that coil afterwards.  The temperature

18   has to be uniform throughout the coil.  So, for very large

19   coils, it's not very practical.

20             For larger coils, a way -- another way to do it is to

21   react it first and then wind it.  Then you have the

22   complications of handling.  You can't bend it.  It's easy to

23   have an error in the production of this that you wouldn't find

24   out until a lot of money has been invested down the line.

25             Nevertheless, wind and react is the process that we

1    used and the reason for that is because that was the process

2    that was specified by the folks at MIT when they engineered

3    this magnet, and they did that for a very good reason, because

4    they had an existence proof of the magnet which was very

5    similar to the magnet that we use.  This is a picture showing

6    folks from the Plasma Science and Fusion Center with the

7    cryostat lid of the magnet that is called the floating coil of

8    the Levitated Dipole Experiment, and the folks at MIT would

9    routinely bring investors and others interested over to see

10   this magnet.  It is a niobium 3 tin cable and channel react-

11   and-wind magnet, and this is the coil of our magnet, which is

12   niobium 3 tin cable and channel react and wind of roughly the

13   same size.  It does carry more current and it's designed to

14   work at lower temperature and higher magnetic field.  However,

15   trading one for the other, you can see that the previous coil

16   is capable of the same kinds of magnetic fields.

17          So, superconducting magnets by the late 1990's, early

18   2000's were things that you could just buy off the shelf.  If

19   you could find one off the shelf that was already designed for

20   your purpose, you could go to a catalog and -- for instance, I

21   got this drawing from a Website where there are dozens of

22   magnets of all kinds of shapes, sizes, magnetic field

23   strengths.  And at this time there is also a twelve-tesla MIT

24   magnet being delivered to Ohio State University that was much

25   larger than the magnet that we use in our system.

1          So, superconducting magnets at some point certainly

2     were inventive, but, like any invention, sooner or later

3     becomes more of a commodity, and this is the way that we think

4     of magnets, as one of many known elements that have been

5     combined in the '311 in a new and unique way.  So, that's the

6     superconducting magnets.

7          Now, a bit about superconducting cyclotron.  As

8     already pointed by Dr. Hassenzahl, the first superconducting

9     cyclotron was the K500 proposed by Henry Blosser, you see here

10    at Michigan State University.  That was an isochronous machine

11    and it was an isochronous machine because they were doing

12    physics research and needed high-beam currents and wanted

13    high-beam energies.  This was 500 MeV, twice the energy of

14    what's required for proton therapy at 250.

15         And as also already pointed out by Dr. Hassenzahl,

16    Dr. Blosser proposed, but never built, a synchrocyclotron that

17    had roughly the same magnetic field strength limitations as

18    there had been applied to isochronous machines.  So, this was

19    a 50-ish, 52-ton, as you see here, machine that would need to

20    be mounted to the side of the patient on a bearing and that

21    added the compilation that there were still these bend magnets

22    that would be required to bring the beam to the patient.

23         So, in contrast, here is an image of the completed

24    Mevion cyclotron.  It is considerably smaller at approximately

25    ten tons, with a peak magnetic field in the acceleration

1  region of nine tesla.

2         And so, I pointed out to you earlier that the

3  magnetic field in an isochronous cyclotron was limited if you

4  just use iron pole face shaping.  Well, in the synchro-

5  cyclotron, as long as you can maintain that field shape as

6  specified by the field index, you can maintain vertical

7  focusing.  And so, you can go to much higher magnetic fields,

8  and the limits of the magnetic fields is really limited by

9  what you can achieve with iron pole face shaping.  Again, you

10  can do it other ways, but that's the most straightforward.

11  And iron saturates at two tesla and you need approximately a

12  ten percent field change in a synchrocyclotron to maintain

13  focusing.  And so, ten percent of 20 tesla is two tesla.  So,

14  20 tesla is a practical upper limit for what can be achieved

15  in a superconducting synchrocyclotron because that's where

16  pole face shaping can run out and you would have to use some

17  other method.

18         So, I believe that covers everything I wanted to say.

19  I just wanted to wrap up by pointing out that this innovation

20  has had and I believe will continue to have a very large

21  impact on cancer care in the nation and the world.  Prior to

22  our announcing this system was available for people to install

23  at their hospitals, there were only about four proton therapy

24  systems facilities in the country.  There are a few more that

25  have been built since, but over 20 years only nine in the

1   country have been built.

2        Right now we have contracts to deliver 17 of these

3   systems.  So, we'll almost double the number that already

4   exists and, in fact, we haven't even treated the first patient

5   with it yet.  The facility is just coming online in St. Louis

6   where our first system is going in.  So, once the FDA has

7   given us clearance for broad marketing and we're treating

8   patients, we fully expect to have many, many orders for these

9   and this will, obviously, positively impact the cancer care

10  for patients in the nation and the world.

11       So, that's all I have to say and I'm happy to answer

12  any questions.

13       SPECIAL MASTER PETERSON:  All right.  No, no

14  questions, at least at the moment.  Thank you very much.

15       DR. GALL:  All right.  Thank you.

16       (Dr. Gall steps down.)

17       SPECIAL MASTER PETERSON:  All right.  Let's take a

18  ten-minute recess and then we'll start with opening

19  statements, which, again, I understand are going to be about

20  30 minutes apiece.  That will give us an hour, just for your

21  planning.  Then I anticipate that we will start with witness

22  testimony immediately after the opening statements before we

23  break for lunch.

24       All right.  Ten minutes.  We'll start up a little bit

25  after 10:00.

```
1              (Recess taken.)

2              SPECIAL MASTER PETERSON:  Thank you.  Please be

3    seated.

4              Do we have everybody that we need?

5              MR. BRUNO:  Yes.  And with the pleasure of the Court,

6    your Honor, one administrative matter, if we may.

7              SPECIAL MASTER PETERSON:  Yes.

8              MR. BRUNO:  Mevion moves the entrance and admission

9    of the technology tutorial slide presentation just presented

10   by Dr. Gall.

11             SPECIAL MASTER PETERSON:  Is that marked as an

12   exhibit?

13             MR. BRUNO:  It is.  It's marked as Exhibit 656.

14             SPECIAL MASTER PETERSON:  656?

15             MR. BRUNO:  Yes.

16             SPECIAL MASTER PETERSON:  All right.  MIT, any

17   objection?

18             MS. DEVARASETTY:  No objection, your Honor.

19             SPECIAL MASTER PETERSON:  All right.  Received in

20   evidence without objection.

21             (Exhibit No. 656 received in Evidence.)

22             MS. DEVARASETTY:  I'm sorry?

23             SPECIAL MASTER PETERSON:  Received without objection.

24             MS. DEVARASETTY:  Okay.  And MIT would move to admit

25   our tutorial as well into evidence.
```

1          SPECIAL MASTER PETERSON:  All right.  And that

2     exhibit number is?

3          MS. DEVARASETTY:  464.

4          SPECIAL MASTER PETERSON:  464.  Any objection from

5     Mevion?

6          MR. HILL:  No, your Honor.

7          SPECIAL MASTER PETERSON:  All right.  Also received

8     without objection.

9          (Exhibit No. 464 received in Evidence.)

10          SPECIAL MASTER PETERSON:  All right.  Openings.

11     Openings are 30 minutes.  MIT, you may proceed when you're

12     ready.

13          MR. BAUER:  Mr. Peterson, in Texas style, I should

14     just be sitting at the counsel table?

15          SPECIAL MASTER PETERSON:  Either way, Mr. Bauer.  You

16     can sit or --

17          MR. BAUER:  I'll give that a try.  We'll see how it

18     goes.  If I can, I would like to hand you a copy.

19          (Attorney Bauer hands a document to the Court.)

20          MS. DEVARASETTY:  Your Honor, do you mind switching

21     the computers?

22          SPECIAL MASTER PETERSON:  Sure.

23          And you can use that microphone.  You can bend that

24     down.  That's one of the reasons for using counsel table.

25          MR. BAUER:  That's on?  Okay.  Good.

1          Thank you, Mr. Peterson.  Let me just get in front

2    here.  All right.  So, there we go.

3          **PLAINTIFF'S OPENING STATEMENT:**

4          MR. BAUER:  Just to ground us, just a couple of

5    slides just to remind us what we're here to deal with.  Just a

6    couple of quotes from some Federal Circuit cases.  I don't

7    think there's going to be any issue about these two

8    statements, that this is an issue on joint inventor.  It's

9    fact specific.  There's really no caselaw that's going to

10   guide us that this -- if you find this specific fact or that

11   specific fact.  You need to look at all the facts together

12   because there's no bright line standard here.

13         SPECIAL MASTER PETERSON:  Actually, Mr. Bauer, unless

14   I'm incorrect and -- actually, I guess I'm asking you to tell

15   me.  I gathered from the parties' submissions, that on the law

16   there is no disagreement between the parties at all that I can

17   see.

18         MR. BAUER:  I think that's probably right.  We

19   probably cite different cases.  They probably cite cases in

20   which there is no joint inventorship and we cite them where

21   there are.  So, we didn't cite cases in the statement of the

22   law.  So that if you wanted to look at them, but I think the

23   statement of the law is right.  This is a fact-specific issue.

24         SPECIAL MASTER PETERSON:  And we all read the same

25   Federal Circuit cases anyway, right?

1          MR. BAUER:  That's right.

2          So, the next slide is just -- again, it's just to

3     ground us.  Conception is complete, right?  What we're talking

4     about here is conception.  We don't want to get confused with

5     reduction to practice, but conception is only complete when

6     you're in a situation that it could be able to reduce to

7     practice without extensive research or experimentation.

8          So, just simply saying, Gee, I would like a small

9     high field magnet for proton therapy, that's the beginning of

10    conception.  That's something that Dr. Gall -- we don't take

11    issue.  Dr. Gall came to MIT and said I want -- I think

12    there's a market for -- that's what -- a market for a small

13    high field, low-cost proton beam device.  He came to MIT with

14    that.  We don't take issue.

15         And, in fact, I think what you'll see as we go

16    through the facts, there's really not a lot of dispute on the

17    facts either when you look at this.  This isn't a question of

18    who did what.  Dr. Gall called up MIT, said I'd like one of

19    these things, and the facts will show MIT took the project

20    over and worked on it for a long time, delivered a bunch of

21    stuff, and then patents were filed.

22         The question really is going to come down to one of

23    ordinary skill at the end of the day and that becomes the

24    dispute here.

25         MIT's contention that you need -- that there's only a

1    few people in the world who could have done this, and Dr.

2    Gall's contention, apparently, or Mevion's, a bachelor's

3    degree with four years experience could have done this,

4    although I actually think he started to say a high school

5    student could do it, but -- at least a small one, but -- and

6    then that gets -- that is the focus of the case.

7           And it's -- I'm stumbling here.  I'm trying to

8    understand why Dr. Gall would come in here and take the

9    position that anybody could do this, because -- what I'm going

10   to show you is the exhibits.  If anybody could have done this,

11   he didn't have an invention, because if the invention is

12   simply I want a small system, people were saying that for

13   years, and we're going to show you those documents.

14          But here's the real -- when we focus on the testimony

15   -- the testimony -- well, it is testimony in the sense he was

16   sworn.  The statement that the magnets were available off the

17   shelf and people could do all that -- well, the first document

18   I'd like you to look at, this is a document Dr. Gall wrote.

19   It's Exhibit 48, March 31st, 2004.  This is after the MIT

20   people had been involved just -- the MIT people were

21   approached in January 2003, was the first beginning.

22          March 2004, a year later, Mevion is thinking about

23   getting government funding.  So, they're talking about

24   drafting a grant proposal for the federal advanced technology

25   program.  So, this is an internal document.  I just have some

1    pages, but the whole exhibit is in the record.  And Dr. Gall

2    writes to Dr. Antaya and lays out the outline of this grant

3    proposal to the government.

4            And on the next page, this is what Dr. Antaya -- Dr.

5    Gall is saying after the MIT people are involved for a year.

6    He's saying, We're going to tell the government challenging

7    research, high-field magnets are still difficult due to high

8    stresses, high-field cyclotrons are still difficult due to

9    extraction efficiency requirements.

10           And then the next page, "High technical risk - Design

11   of this magnet will require participation of leading experts,"

12   not high school kids or college kids.  "Thermal and mechanical

13   margins will be tight.  Design of a synchrocyclotron at this

14   high a field also requires participation of leading experts.

15   Very few people can design cyclotrons, never mind

16   synchrocyclotrons.  High-field synchrocyclotrons even harder."

17   That's what Dr. Gall was writing in 2004.

18           And, remember, Dr. Antaya, if he's not the leading

19   expert in the field, he's one of a handful.  That's why they

20   went to MIT.  We're not talking about just some MIT Ph.D.

21   sitting around or grad student looking for a job.  Dr. Antaya

22   is the expert on this, and they're telling the government, We

23   need the experts.  Today they come in and say, Oh, anybody

24   could have done this.

25           So, let me just talk about what did Dr. Antaya think

1    as an expert, the expert, when they first consulted him.  So,

2    they came to him -- this is Page 4.  They came to him in

3    January 2003.  And one of the first things Dr. Antaya wrote

4    back to Dr. Gall is this superconducting synchrocyclotron,

5    versus the Harvard one, it's like comparing the cost and

6    performance differences.  Big, big impact if it can be done.

7    Nobody else in the world would know, and Dr. Antaya is saying

8    big, big impact if.  This is "if."  Not "no problem."

9              In May 2003, Dr. Antaya -- now, here's --

10             SPECIAL MASTER PETERSON:  This is Exhibit 18 you're

11   looking at?

12             MR. BAUER:  This is Exhibit 18.

13             SPECIAL MASTER PETERSON:  All right.

14             MR. BAUER:  Now, Dr. Gall made a comment about, Gee,

15   at the time there were 20 tesla superconductors out there.

16   It's not the question of the field strength.  It's the

17   question of the quality of the field.

18             So, just like Dr. Gall today said, Hey, people were

19   doing 20.  There were seven.  You could buy it from a catalog.

20   Well, this is what Dr. Antaya told them:  "Making 9 point" --

21   this is his list of difficulty, all right?  So, if you look at

22   the document, in order of difficulty at 9.5 tesla, and Antaya

23   has, number one, "Field quality, à la Wu."  Wu is the prior

24   art.  "Field quality, but at 9.5," number one in order of

25   difficulty.

1          At the bottom of the list, "Making 9.5 tesla is not

2     on the list."  Yeah, people could do high field -- high

3     strength.  "Making 9.5 is not on the list.  The field frontier

4     is 20 tesla," but field quality, number one.

5          Look at the last item that Dr. Antaya tells Dr. Gall.

6     "Item number one above is a go/no go issue."  This is the

7     world's experts are calling it that.

8          Next page.  This is in May 2004, a year later.

9          SPECIAL MASTER PETERSON:  Perhaps you can tell me,

10    Mr. Bauer.  I was missing it somewhere in the testimony.  Why

11    was this such an engineering feat?  I mean, we all know how

12    magnets are made.  We all know how superconducting magnets are

13    made.  The technology is out there.  Books are written about

14    it.  Why was this such a difficult hurdle?

15         MR. BAUER:  The field quality, the field -- as you

16    heard Dr. Hassenzahl, it could take 18 years to put this thing

17    together.

18         SPECIAL MASTER PETERSON:  I understand.

19         MR. BAUER:  What Dr. Antaya was looking for was a way

20    to get it done.  Dr. Antaya, I think, might say, Yeah, in 18

21    years I could have done it or you could have given it to a

22    bachelor's degree or given it to a teen.  He's being asked to

23    do it in a year.  And, so --

24         SPECIAL MASTER PETERSON:  Yes.  I guess my question

25    goes beyond that, Mr. Bauer.  I know that, and that's in the

1    declarations.

2              MR. BAUER:  But why is it so hard?

3              SPECIAL MASTER PETERSON:  But why is it?

4              MR. BAUER:  But why is it so hard?

5              SPECIAL MASTER PETERSON:  Yes.

6              MR. BAUER:  I think -- we'll let Dr. Antaya answer

7    that one.

8              SPECIAL MASTER PETERSON:  All right.

9              MR. BAUER:  I keep hearing how hard it is and -- but

10   with your permission, when we put him on, we'll ask him that,

11   because that's one extra question for his declaration, but

12   we'll ask him that as one question as a rollover before the

13   cross-examination.

14             SPECIAL MASTER PETERSON:  That's fine.

15             MR. BAUER:  Okay.  Great.

16             So, Exhibit 44, this is a year after, May 2004.  Dr.

17   Antaya, we still have unique problems to address for which

18   there is at present no existence proof.  Two recent magnets,

19   and he talks about them, are representative.  The challenge --

20   so, this may go a little bit -- the challenge, uniqueness,

21   engineering complexity, engineering solution, outcome.

22             So -- the next page.  May 2004.  Now, this is

23   interesting.  This one is written from Mevion.  This is a

24   document Mevion is -- it's a full document, when you look at

25   it.  It's written by Mr. Sliski, who is one of their witnesses

1    today.

2           SPECIAL MASTER PETERSON:  Just so the record is

3    clear, this is Exhibit 76.

4           MR. BAUER:  Exhibit 76.  And he's talking -- he's

5    writing this email to Dr. Gall.  So, this is one of their

6    witnesses.  To Dr. Gall, talking about what they need to do to

7    get funding, and he's talking about a tour at the MIT lab,

8    shows device and scale, et cetera, and he's talking about they

9    need to convince the investors of the technical -- that the

10   technical risk is low, all right?  They need to convince the

11   investors.  This group at MIT is one of very few in the world

12   that can efficiently take on a project such as this.

13          So, again, we just talked about how hard is this.

14   Everybody -- and, again, there's really no fact question.

15   Everybody is saying this is really hard for a year and a half.

16   And that goes back to just saying, "I want one" doesn't get

17   you there.

18          Exhibit 46.  It's only now in July that Dr. Antaya

19   says, I've got it.  He actually says it a few days before, but

20   this is an exhibit in which it's found in writing, and he's

21   saying here the engineering feasibility is now established,

22   only in July.

23          And the reason it's established, on Page 9 -- this is

24   a page from Exhibit 46 -- he came up with a scaling law, and

25   when you heard these -- both of the people were talking about

1    the iterative process and how you keep doing it, and the whole

2    thing, and you never know -- it's iterative.  You do it.  It

3    doesn't work.  You do it again.  It's an art form that takes

4    years.

5              What Dr. Antaya came up with is a scaling law that

6    allows him to go back to somebody else's system and move this

7    process along quickly.  And so, what -- he was able to do in

8    18 months what other people were taking years to do to get

9    this thing to work.

10             The ideal solution is an exact geometric scaling of

11   the 5.5 tesla solution, and this is the eureka document, in a

12   sense, if we were trying to prove -- you know, if it was a

13   real patent infringement case and we were talking about that,

14   this would be that document.

15             Next page, Exhibit 45.  I don't have the whole

16   exhibit in front of me.  I just pulled out the quote, but Dr.

17   Antaya -- what we show you there is Dr. Antaya writes to Dr.

18   Gall.  This solution -- this, by the way, is two weeks before

19   the other one.  That's why I was saying this was all taking

20   place in July.  Dr. Antaya writes, "Our solution contains two

21   features that appear to be unique."

22             And Dr. Gall's response, which is on the slide

23   underneath the thing that says "from Dr. Gall," but Dr. Gall's

24   response is, the first sentence, "Timothy:  The progress you

25   are making is remarkable.  This is great news."

1          So, we have July 2004.  And what comes out of that

2     progress?  Four patents that are applied for by MIT.  That's

3     on Slides 11, 12, 13 and 14.  It's Exhibits 301, 302, 303, and

4     11.

5          So, Dr. Antaya does this work, applies for patents

6     and gets them on his work on the high-field synchrocyclotron.

7          Now, let's compare when we say, Why is Dr. Gall

8     fighting this?  Slide 15 is the pages from his lab notebook

9     that he claims are his eureka moment.

10          SPECIAL MASTER PETERSON:  Exhibit 515?

11          MR. BAUER:  Page 15, Exhibit 43.

12          SPECIAL MASTER PETERSON:  Okay.

13          MR. BAUER:  Exhibit 43 is Dr. Gall's lab notebook.

14     And within the lab notebook they point to four pages and they

15     say, Here's our conception.  So, the first two pages they

16     point to are on Page 15 of his lab notebook, which is the

17     slide in front of you, and what those are is his -- again, not

18     -- his idea that, Gee, I would like a high field -- that's

19     what he's writing down, is the field.  He's writing down two

20     tesla is 1.2 meters.  Ten tesla is .24.  He's writing field

21     numbers down.  I want a high field number.

22          On the next page of that slide, which is Page 4146

23     and 4147 from his exhibit, which is six months later -- I'm

24     sorry -- a year later, in June of 2001.  So, this is their

25     conception, two pages dated May 30th, in which he says ten

1    tesla, and two pages dated June 6, 2001, in which he writes

2    down the number 12 tons.

3           SPECIAL MASTER PETERSON:  I'm sorry, Mr. Bauer, but

4    just so the record is clear, because it's not on this slide,

5    your Slide No. 16 is referring to which exhibit?

6           MR. BAUER:  43.

7           SPECIAL MASTER PETERSON:  Exhibit 43?

8           MR. BAUER:  Right.  Both exhibits -- the Slides 15

9    and 16 both are pages from Exhibit 43.

10          SPECIAL MASTER PETERSON:  All right.  Great.  Thank

11   you.

12          MR. BAUER:  That's their definition of conception,

13   that Dr. Gall said, I want ten tesla.  It falls within the

14   scope of the claim.  Twelve tons.  It falls within the scope

15   of the claim.  So, they say, Hey, by June he knew he wanted a

16   12-ton, ten tesla or something within the scope of the claim

17   and that's...

18          Now, here's the problem with that.  If that's the

19   invention, twelve tons, ten tesla, small, there's no invention

20   here.  If that was the end of it, that -- so, Page 17 of the

21   slides is Exhibit 304.  Blosser had a patent, superconducting

22   synchrocyclotron.

23          By the way, both Blosser and Wu -- you'll hear the

24   names.  Those scientists -- we didn't just go out and do some

25   research.  I mean, these are the two that everybody in the

1    field talks about, Blosser and Wu.

2         SPECIAL MASTER PETERSON:  I understand that.  And,

3    actually, Dr. Gall worked for Dr. Blosser, right?

4         MR. BAUER:  That's right.  And Dr. Wu --

5         DR. ANTAYA:  No, Dr. Gall did not work with Dr.

6    Blosser.  I did.

7         SPECIAL MASTER PETERSON:  I'm sorry.  Yes.

8         MR. BAUER:  Okay.  That's right.

9         So, these were the -- actually, I just want to make

10   sure -- we didn't go out and look for some prior art to try to

11   invalidate it.  We want this patent to be valid.

12        And, by the way, this is an interesting -- rights

13   don't turn on your decision here.  They have the exclusive

14   rights from MIT to the patents with various -- I mean, there's

15   a license agreement.  This is an inventorship.  It's over

16   respect at this point.  It's not that we're trying to take

17   patents back or anything like that.

18        So, we would be happy with this patent to be valid,

19   but we don't understand how it survives if the invention was

20   completely conceived on the day that Dr. Gall said, I want a

21   small high field.  Because look at what Blosser said.  And

22   Blosser -- this is Exhibit 304.

23        And what did Blosser say in his patent in 1987?  He

24   says, "In recent years the successful medical use of proton

25   beams from synchrocyclotron has led to consideration of

1    possible wide use in hospitals in this and other applications.

2    If a superconducting synchrocyclotron could be substituted for

3    the conventional non-superconducting synchrocyclotron, the

4    overall accelerator system would be much smaller, easier to

5    install and total cost."

6          Blosser was saying, You want one smaller.  Well, that

7    was 1987.

8          Dr. Wu goes one step further.  This is Exhibit 38.

9    This is Dr. Wu's thesis.  He shows on Page 4268 in this

10   thesis, "You see that synchrocyclotron stand-alone proton,

11   cancer therapy facility using 250 Million electron Volts with

12   a rotating gantry."  You see all of these things that Dr. Gall

13   says, right?  But on the next page, 21, which comes from 4286,

14   Dr. Wu says, "All the synchrocyclotrons used in present proton

15   therapy programs are older, massive, room-temperature

16   machines."

17         Two sentences down, "If the synchrocyclotron is

18   redesigned as a superconducting high magnetic field device,

19   the mass and costs are greatly reduced and an overall system

20   with many appealing features results.  The advantages of

21   adapting a superconducting cyclotron for medical use has been

22   demonstrated by the construction and completion of the first

23   superconducting cyclotron for neutron therapy."

24         So, everybody was out there, everybody.  People knew

25   we want a small superconducting.  That's what Dr. Gall -- Dr.

1   Gall had an idea.  The idea was the time is right.  The market

2   is right.  That's not invention.  That's not invention in the

3   patent law.

4          So, finally, on Page 22, Dr. Antaya and MIT deliver

5   -- you know, we saw that it was in 2004 that they said, We can

6   do it.  We have the idea.  November 2005 they deliver.  This

7   is Exhibit 55.  This is a document that comes from MIT.  It's

8   the deliverable, essentially, the design description document.

9   That's November 7th.

10         I don't have a copy, but Exhibit 415, which is two

11  weeks later, November 17th, summarizes there was an internal

12  design review.  So, MIT made the deliverable.  Two weeks later

13  they had the internal design review and that document

14  confirmed -- it was an external design review.  The document

15  confirmed, "Design review held on November 17th.  In this

16  preliminary design review, the nine tesla magnet design was

17  presented.  In consideration of all of the above, the

18  overwhelming conclusion is that this review was a success.  A

19  risk-adverse magnet design has been completed."

20         So, November 2005 they now say it's done.  This is

21  the step.  We're now ready to start building.  Until 2005, two

22  years with Dr. Antaya and his grouping working on it and they

23  finally say, We're now ready to go to the next page.

24         Now, it's interesting.  The next page.  The next day

25  Dr. Gall files his patent.  So, it's only after MIT tells him

1   and then the design review board says, We have something, he

2   applies for the patent.

3          And what does he put into his patent?  And, again,

4   this is a matter of respect.  MIT is an academic institution.

5   It's almost a plagiarism case more than an inventorship case.

6   Because what did he put into his patent?  The next page.  He's

7   using the drawings MIT gave him.  This is his support, his

8   enablement for the patent.

9          So, on the left is the drawing from Dr. Antaya's

10  patent.  On the right, it's the one from Dr. Gall.

11         The next page.  This is more.  These are the magnet

12  structures.  This is what MIT worked on.

13         Now, I want to be clear.  They didn't copy it from

14  the picture from the MIT patent.  These are pictures -- well,

15  this is what MIT delivered in the deliverable, but that's what

16  they use.

17         Page 27, they incorporate by reference the MIT

18  patent, "Additional information can be found in the MIT

19  patent."

20         And Page 28 is just to confirm that -- in the patent

21  it refers to the serial number.  Page 28 is just to show you

22  that that serial number is referring to the MIT patent.  So,

23  they incorporate that.

24         Now, then we look at the claims, 529, and there's two

25  types of claims to be looking at.  First, Claims 30 and 31,

1    because, as you said at the beginning, we have to look at the

2    claims to see what's invented here and, in fact, right, not

3    just what was built.

4           Claims 30 and 31 are directed directly at what MIT

5    delivered.  These don't even deal with what Dr. Gall came up

6    with.  These are the apparatus.  These are the synchro-

7    cyclotron.  So, put aside whether there was a market need and

8    whether it was proton-beam therapy and all that discussion

9    about we're saving the world, we're saving babies.  That's

10   nice, but these claims go to what the MIT people did.  These

11   claims are what's in the MIT patent, essentially.

12          So, no question, these -- I think there would be an

13   argument that Dr. Gall is the sole inventor, but we're not

14   pressing that argument.  We just want to be named on the

15   patent, but these claims -- did I say "Dr. Gall"?

16          SPECIAL MASTER PETERSON:  Yes.  I was wondering about

17   that.

18          MR. BAUER:  I'm sorry.  Thank you.

19          Dr. Antaya.  My client was about to kill me, I'm

20   sure.

21          These claims the argument is that Dr. Antaya would be

22   the sole inventor or the MIT team, because these are the

23   claims that the MIT patents.

24          But the next claims -- for example, Claim 1, it's all

25   about -- well, not all about.  This is the bigger apparatus,

1    all right?  This is the patient support system.  So, this has

2    the gantry and using the proton beams from the accelerator to

3    the patient.  So, this is a little bit broader, but smack in

4    the middle, the accelerator, beam configured to produce the

5    proton beam.

6            Now, what we've highlighted here is everything in

7    that claim -- and this is why I'm stumped by their position.

8    Everything in that claim that's highlighted in yellow is what

9    you see in the Wu thesis.  We saw it.  There's a gantry, an

10   accelerator.  The accelerator is configured to produce a beam.

11   Now, Wu was a neutron beam, I think.

12           SPECIAL MASTER PETERSON:  Mr. Bauer, let me ask you,

13   if what you say is true, it's in the Wu thesis.  Whether they

14   argue it's in the prior art or not, it really doesn't matter.

15   You're saying it is in the prior art, right?

16           MR. BAUER:  Well, what I'm saying is if they're right

17   that Dr. Gall is the sole inventor, the result is they're

18   going to end up with an invalid patent, and I don't know why

19   they would be taking that position.

20           SPECIAL MASTER PETERSON:  Okay.  Well, let me ask you

21   that.  On this slide -- I guess I don't understand.  You're

22   saying the material in yellow is part of the Wu disclosure,

23   part of the Wu document.  That's a fact that doesn't have

24   anything to do with this lawsuit, the outcome or the arguments

25   or anything else, right?

1         MR. BAUER:  It's just to put into context the

2    arguments that they're making.  If -- it's the contrast.  We

3    think there is invention.  There's no question, we think

4    there's invention.  MIT has four other patents on it.  We

5    think there's invention and it was at least partly done with

6    Dr. Antaya's group figuring out how to make this thing work,

7    all right?  That's our view.

8         What we're saying is the contrast, the opposite view.

9    If you don't think Dr. Antaya contributed anything, as we

10   understand their position -- when Dr. Gall said, "I want a

11   small system," anybody could have done it.  Well, if anybody

12   could have done it, this patent is invalid.  That's not for

13   you to find, but it's for you to put into context, the

14   rationality of the competing positions, the sensicality of the

15   competing positions, because if he's right -- you can make

16   that finding, that he's the sole inventor, but what's left --

17   because if what he's saying is, When I came up with the same

18   idea that Dr. Wu said, anybody could do it, we've got a

19   problem.  And that brings us, really, to the end.

20        I have one other case, just -- we all do read the

21   same cases.  I'm just not sure if you've seen this.  This just

22   came down from the Federal Circuit in the last few weeks.

23   It's a chemistry case, but other than that, it's almost

24   indistinguishable.  I mean, I read it -- when I read it, I

25   thought, Oh my gosh, this is it.

1          The group had the compound.  The guy says, I can tell

2    you how to make the compound.  It wasn't a patent on the

3    method, but he says, I'm part of your compound group --

4          SPECIAL MASTER PETERSON:  Yes, but wasn't this -- the

5    way I read the case, this is unique to chemical compounds.

6    They said in the case of chemical compounds, the law has

7    always been even if you're claiming only the composition

8    itself, you don't have an invention until you know how to make

9    the composition.  That's different with mechanical devices.

10         MR. BAUER:  So, this case -- that's why I said this

11   is a chemistry case.  This is a chemistry case and they use

12   that kind of language.  In the chemistry field this is

13   special.  We need that.

14         In this case, with this kind of technology, where you

15   hear that there is no cookbook, that every one of these things

16   has to be made special, I think this just -- if you took out

17   the word "chemistry" and you put in "supercyclotron colliding

18   approach," right, where it's all Ph.D.'s doing this thing, I

19   just think they -- it's a good teaching case because here you

20   can say, I want the system.  You can say it, but it's trial

21   and error.  That's the difference here.  This isn't just an

22   engineering project that I'm just going to go hire some

23   engineers and say, Can you build one of these things?  You're

24   not buying it off the catalog.

25         You know, Dr. Gall says, I buy it out of a catalog.

1    You don't, all right?  So, it's the trial and error that makes

2    -- this may be a non-chemical case that -- I mean, one thing

3    I'm fairly certain is this is -- at the end of this case, you

4    can say you're a rocket scientist, all right?

5           So, just to wrap up now.  Slides 35 and 36 just put

6    in comparison what we say the level of skill is.  And, you

7    know, what you're going to -- right.  Everybody -- you know,

8    everybody involved in this, Ph.D.'s with years and years

9    experience.  You're not going to hear from a single witness

10   that's -- you know, that they -- a bachelor's degree in

11   physics with four years experience.

12          I mean, as you listen or as you read the documents --

13   because we're trying -- ordinary skill -- what is the standard

14   level, not is there one -- this isn't a question, is there one

15   person out there who is really smart, you know, Westinghouse

16   science award.  Could he do it?  That's not -- the question is

17   let's look at the big picture of all the people doing it and

18   try to come up with a sense of what is the standard, what's

19   the ordinary proof, and you -- nobody is disagreeing.  There

20   weren't a lot of people out there to do it.  They didn't hire

21   MIT if they could have gone and hired ten engineers that are

22   unemployed around Route 128 and said, Build this thing.  They

23   didn't go to General Electric and say, Build one of these

24   things.

25          So, here's the last thing, and this just sums it all

1   up, this last slide, 37.  This is Dr. Gall's deposition

2   testimony.  So -- it's in the record and we hope he'll say the

3   same thing when he's cross-examined.

4           "Was there any requirement that you were trying to

5   satisfy by disclosing the information that MIT provided to

6   you?"  We're talking about in the patent.  "And you can answer

7   that question yes or no.

8           And he answered, "I believe I was required to provide

9   sufficient detail that someone else could reproduce the

10  invention.

11          Question:  "Could you have done that without

12  disclosing the work from MIT?

13          Answer:  "Probably not at that time.

14          Question:  "Could you have done it without disclosing

15  information that you gained from Dr. Antaya?

16          Answer:  "Probably not at that time."

17          I think, Mr. Peterson, the same level of enablement

18  goes to the issue of conception, and if the person reading the

19  patent needed this -- I think it collapses together, and

20  that's what Dr. Gall says, I incorporated all this because I

21  wanted people to understand it.

22          And so, we just wrap up.  This is a matter of

23  respect.  Dr. Antaya doesn't make more money coming out of

24  this.  He contributed.  And what you'll hear when you hear --

25  and MIT doesn't allow licensees to take the technology from

1     MIT and put it in their own patents, even if they have a

2     license.  So, this isn't -- it's just -- you take the work

3     from MIT.  You give MIT respect.  It's an academic

4     institution.  That's what they expect.  Thank you.

5              SPECIAL MASTER PETERSON:  All right.  Thank you.

6              All right.  Mr. Hill?  Mr. Bruno?

7              MR. BRUNO:  With the pleasure of the Court, may I

8     stand in the well, your Honor?

9              SPECIAL MASTER PETERSON:  Of course.

10             MR. HILL:  Could you switch the computer, please?

11             MS. DEVARASETTY:  Counsel, do you have a copy of

12    that?  Counsel, do you have a copy of that in a smaller form

13    that we might have at counsel table?

14             MR. BRUNO:  It will be displayed when it's relevant

15    on the screen during the presentation.

16             MS. DEVARASETTY:  Thank you.

17             SPECIAL MASTER PETERSON:  Mr. Bruno, you may proceed

18    when you're ready.

19             **DEFENDANT'S OPENING STATEMENT:**

20             MR. BRUNO:  Good morning, your Honor, and may it

21    please the Court.

22             SPECIAL MASTER PETERSON:  Of course.

23             MR. BRUNO:  The evidence in this case supports three

24    complementary conclusions, each of which is sufficient in and

25    of itself to deny MIT's request to disturb Dr. Gall's sole

1    inventorship of the invention claimed in the '311 patent.

2            SPECIAL MASTER PETERSON:  Mr. Bruno, please keep your

3    voice up.  I realize we don't have a -- in fact, let's see if

4    that microphone on the witness stand has a long enough cord

5    that you might be able to use that.  Let's try that.  There

6    you go.

7            (Discussion off the record.)

8            MR. BRUNO:  So, back to the three complementary

9    conclusions, your Honor.

10           First, the evidence will show that MIT cannot fulfill

11   its heavy burden of clear and convincing evidence to

12   demonstrate that Dr. Antaya made a significant contribution to

13   at least one claim of the '311 patent.

14           Now, as counsel for MIT said, the parties do agree

15   about many of the legal standards in this case, but he failed

16   to mention one, a very important legal standard, and that is

17   the burden of clear and convincing evidence to disturb the

18   inventorship as stated on the issued '311 patent, and that's

19   an important thread to keep in mind throughout this case, that

20   at all times MIT bears that heavy burden to overcome the

21   inventorship stated on the issued patent.

22           Number two, the evidence will show that Dr. Gall

23   completely conceived of the invention claimed in the '311

24   patent as of no later than June 6th, 2001, before ever meeting

25   Dr. Antaya, and thereby foreclosing any suggestion that Dr.

1    Antaya had an opportunity to contribute to the conception of
2    the claims, which it is his burden to prove.

3            And, three, the evidence will show that any work that
4    Dr. Antaya allegedly contributed to the engineering design of
5    one embodiment of the invention that is claimed in the claims
6    of the '311 patent amounted to nothing more than non-
7    inventive assistance with reduction to practice, utilizing no
8    more than ordinary skill in the art.

9            In fact, Dr. Antaya's involvement actually hindered
10   and deterred the reduction to practice of Dr. Gall's
11   invention, both through his proposal of unworkable designs
12   and, unfortunately, behavior that was detrimental to the
13   collaborative working environment, that actually required
14   Still River to hire its own team of in-house engineers after
15   MIT had purportedly completed its work, in order to redo the
16   work that MIT had failed to do.  When its design was tested,
17   it failed.

18           And so, drilling down further on the first and
19   perhaps most important point in this case, the undisputed
20   evidence demonstrates that as of today, Dr. Gall is the sole
21   and only inventor named on the '311 patent, and that might
22   seem like an obvious point to make, but it's a crucial and
23   critical point in this case because of the strong presumption
24   that the Federal Circuit applies to the correctness of issued
25   patent inventorship.

1          As a matter of fact, caselaw of the Federal Circuit

2     states that, "The inventorship on an issued patent is presumed

3     correct, such that those inventors are considered to be the

4     true and only inventors of the patent as issued."

5          And MIT, as I said, has the heavy burden of clear and

6     convincing evidence that Dr. Antaya made a significant

7     contribution to the claims of the '311 patent, not just to the

8     specification of the '311 patent, not to the disclosure of one

9     embodiment of what is claimed in the claims of the '311

10    patent, but, indeed, the heavy burden of clear and convincing

11    evidence to demonstrate conception of the claims themselves.

12         SPECIAL MASTER PETERSON:  Now, you would agree, would

13    you not, Mr. Bruno, that if they show contribution to a

14    conception of at least one claim in the patent, that's

15    sufficient?

16         MR. BRUNO:  Indeed, your Honor, that is sufficient,

17    at least one claim.

18         SPECIAL MASTER PETERSON:  Okay.

19         MR. BRUNO:  But, again, to reiterate, claim.

20         SPECIAL MASTER PETERSON:  Yes.

21         MR. BRUNO:  Thank you, your Honor.

22         The policy behind this from the Federal Circuit is

23    clear.  The Federal Circuit states that there is a strong

24    temptation for a person who consulted with the inventor to

25    further his own position by reconstructing the extent of his

1    contribution to conception looking back retrospectively, and

2    the evidence will show that truer words could not have been

3    spoken about this case.  That, indeed, certainly Dr. Antaya

4    and MIT would love to have their name associated with such a

5    life-changing technology as the invention claimed in the '311

6    patent, but the evidence shows that the invention is solely

7    Dr. Gall's.

8         The burden is important because we should keep in

9    mind that Mevion really doesn't need to prove anything in this

10   case.  It doesn't have to establish a single fact.  If we

11   stood up and said nothing, the burden would still be on MIT.

12   So, it's not a level playing field in which we're just trying

13   to decide whether it's more probable than not that Dr. Antaya

14   invented or conceived of the claims or Dr. Gall invented or

15   conceived of the claims.  Again, the standard is MIT must

16   prove by clear and convincing evidence of Dr. Antaya's

17   conception.  MIT must meet that heavy burden and it cannot.

18        As a matter of fact, looking to just one piece of

19   evidence at this point in the case, Dr. Antaya himself at a

20   point in time in 2006 agreed that Dr. Gall was the sole

21   conceiver and inventor of the '311 patent, in a manner of

22   speaking.  Exhibit 39 in this case is an email from Dr. Antaya

23   that he sent when he was recounting certain events that had

24   taken place over the course of the relationship between MIT

25   and Still River, and he said, quote, describing Dr. Gall, "A

1    stranger came into my office.  Made a very compelling case for

2    a single-room synchrocyclotron."

3            And this is in all the rest of the slide.  He

4    continued on in that email to say, "Our experience with other

5    start-ups jives very well with that and once we could see a

6    technology path, we said that we thought he has finally gotten

7    it all right and that we could help make that happen."  The

8    words of Dr. Antaya himself demonstrating Dr. Gall's sole

9    conception of the invention claimed in the '311 patent, Dr.

10   Gall's compelling case for a single-room synchrocyclotron.

11           One other final word about the burden that MIT bears.

12   This burden of demonstrating clear and convincing evidence is

13   not one that can be fulfilled simply using the testimony of

14   Dr. Antaya himself, the alleged co-inventor.  Federal Circuit

15   law is also clear that MIT must provide corroboration of Dr.

16   Antaya's testimony and that's a very important fact as well.

17   MIT has only called one corroborating witness in this case,

18   Dr. Minervini, and, as the evidence will show, Dr. Minervini

19   cannot corroborate any alleged contributions of any elements

20   to any claims by Dr. Antaya.

21           Moving to the second major theme.  Even though Mevion

22   need not prove a thing in this case and should prevail based

23   entirely on the application of the legal burdens, Mevion will,

24   nevertheless, affirmatively prove that Dr. Gall solely and

25   completely conceived of the invention claimed in the '311

1    patent as an additional mechanism for establishing its defense

2    and demonstrating the inventorship of the '311 patent should

3    not be disturbed.

4            I think the parties certainly would agree that this

5    case in many ways hinges on conception.  Conception in the law

6    is the touchstone of inventorship and the definition of

7    conception is, "The formation in the mind of a definite and

8    permanent idea of the complete and operative invention as it

9    is later to be applied in practice."  "Later to be applied in

10   practice."

11           And Dr. Gall as of June 6, 2001, as the evidence will

12   show, had that "definite and permanent idea" in his mind "of

13   the complete and operative invention as it was later to be

14   applied in practice," and he then set out to find a team of

15   individuals to help him reduce it to practice, to help him

16   build what he had conceived based on his unique blend of vast

17   experience -- and this is important -- particularly with

18   synchrocyclotrons.

19           And perhaps the best way to demonstrate Dr. Gall's

20   complete conception prior to ever meeting Dr. Antaya is by

21   walking through a brief timeline of the key events --

22           SPECIAL MASTER PETERSON:  Mr. Bruno, let me ask you,

23   are you familiar with the cartoonist Chester Gould?

24           MR. BRUNO:  No, your Honor.

25           SPECIAL MASTER PETERSON:  He draws Dick Tracy -- or

1    drew Dick Tracy.

2          Let me ask you.  When Chester Gould introduced the

3    two-way wrist TV in the Dick Tracy cartoon series in around

4    1955, I believe, when he didn't have any idea in the world how

5    to build it, did he have a complete conception of a two-way

6    wrist TV?

7          MR. BRUNO:  According to the law of the Federal

8    Circuit, your Honor, if he had "a definite and permanent idea

9    in his mind of the complete and operative invention," then,

10   yes, if the invention could have been "reduced to practice

11   using ordinary skill in the developing field of art."

12         SPECIAL MASTER PETERSON:  Even if he didn't have any

13   idea how to do it?

14         MR. BRUNO:  Certainly.

15         SPECIAL MASTER PETERSON:  Okay.

16         MR. BRUNO:  So, your Honor, just very briefly, if I

17   may, I would like to walk through a timeline of events and,

18   again, this will be displayed on the screen, if that helps you

19   to see a little bit better, but I think it's important just to

20   pace through exactly what the evidence will show, hitting the

21   high points and the key elements from the declarations that

22   Mevion has submitted in this action and I think it's --

23         SPECIAL MASTER PETERSON:  Let me ask you.  I think

24   counsel asked if there was a smaller version of this that

25   could be marked as an exhibit.

1          MR. BRUNO:  We can certainly mark this as an exhibit,

2    your Honor.  I don't have any exhibit stickers with me, but if

3    we know what's next in order, we can give it an exhibit

4    sticker.

5          MS. DEVARASETTY:  Counsel, we have some exhibit

6    stickers and we can do that.

7          MR. BRUNO:  Thank you.  Do we know what is next in

8    order?

9          SPECIAL MASTER PETERSON:  You can handle that at the

10   break.  I just -- for the record to be clear, we need to

11   mark -- even if they're demonstratives, we need to mark a

12   smaller version for the record.

13         MR. BRUNO:  We'll certainly provide that, your Honor.

14         SPECIAL MASTER PETERSON:  Okay.  Thank you.

15         MR. BRUNO:  So, pacing again, then, through the key

16   elements of the timeline, it's helpful to see the progression

17   of exactly how it is that Dr. Gall did have these initial

18   seeds of an idea and developed them into a complete and

19   operative invention as of June 6, 2001.

20         So, let's examine a little bit of Dr. Gall's unique

21   expertise and experience.  It starts in 1977.  Dr. Gall at

22   Colby College in Maine obtained his physics degree, the degree

23   of choice for this particular field of art.

24         He went on to Boston University and obtained his M.S.

25   and his Ph.D. in high energy and nuclear physics, giving

1    himself the foundation of knowledge that he would need to

2    later conceive of this invention, and he began his career in a

3    very interesting location at the Massachusetts General

4    Hospital, Harvard Cyclotron Laboratory, and this is a very

5    important fact because the Harvard Cyclotron Laboratory at

6    that point in time was one of the only operating

7    synchrocyclotrons in the United States.

8         You saw in both presentations the fact that there's a

9    big difference between isochronous and synchrocyclotrons.

10        And for eight years, Dr. Gall, working at the Harvard

11   Cyclotron Laboratory, helping to deliver proton radiotherapy,

12   was daily tutored by the inventors of that synchrocyclotron

13   who had been there for 40 years and he learned it inside-out,

14   all of its systems, all of its components, all of its design,

15   all of its architecture, all of its technology, day in and day

16   out working with the inventors of that machine, helping to

17   deliver proton radiation therapy.

18        That gave him a very unique insight into the workings

19   of synchrocyclotrons and, of course, also his full-time work

20   delivering proton radiation therapy to patients, and he began

21   at this time to think to himself, How could I make this

22   smaller?  How can I deliver this on a wider basis?  And those

23   are the seeds that began to germinate inside of his mind.

24        Also at this time he had the opportunity to work at

25   the Fermi National Laboratory and there he helped commission

the very first hospital-based proton radiation therapy
facility.  At that time it was 36,000 square foot facility,
three levels high, cost more than $100 million to build.
Again, Dr. Gall was thinking to himself, How can we make this
amazing technology more widely available to people with
cancer?

SPECIAL MASTER PETERSON:  Mr. Bruno, I guess I just
have to ask the bottom-line question.  Why is that invention?
I mean, we have radios that took up the size of a living room
and we want to make them smaller.  And so, transistors and
other developments allowed radios to be smaller, tape
recorders, Walkman.  The ENIAC computer took up, you know, a
good size space and now we have computers down to the size of
a -- making something smaller is not necessarily invention, is
it?

MR. BRUNO:  Not necessarily, but, again, using the
law of the Federal Circuit -- your Honor is certainly familiar
with this standard -- that using new and useful combinations,
even of known elements in the prior art, and combine them in a
new and useful way that nobody had ever done before, that is,
indeed, a new invention.

SPECIAL MASTER PETERSON:  It is, but I guess I'm
reacting to -- you said he had the seeds of this idea when he
saw this huge machine.  Well, isn't that sort of the normal
reaction?  If you have a huge machine that costs millions of

1   dollars, doesn't everybody want to make it smaller?  How is

2   Mr. Gall's conception or thought process at that moment

3   different than the rest of the world?

4          MR. BRUNO:  Well, I think the answer to your

5   question, your Honor, is that, indeed, in retrospect --

6   certainly, everybody would love to make it smaller, but at the

7   time nobody had suggested it in quite the way that Dr. Gall

8   did.

9          SPECIAL MASTER PETERSON:  Okay.  Well, let me follow

10  up on that, then.  You said, "in not the way he did."  Okay,

11  maybe we can go there.  He suggested making it smaller.  And

12  what did you mean by "in that way"?

13         MR. BRUNO:  I think it would help, perhaps, if we

14  continue to pace through some of the facts so that I can get

15  to maybe the crux of one of the questions that's been asked.

16         I will say this.  In the presentation that we saw

17  from MIT's counsel, they made the point -- or the argument

18  that Dr. Gall was just proposing what Dr. Wu had done, and

19  that's not true and I can demonstrate that by pointing the

20  Court directly to Exhibit 12, Claim 1 of the patent, and we

21  can always make comparisons later, if necessary, but there was

22  one very key point of novelty that's different between what

23  Dr. Gall proposed and what Dr. Wu proposed.

24         If you look at Claim 1, the last element of that

25  claim is that, "The proton or ion beam passing essentially

1     directly from an accelerator housing to the patient."  That

2     was absolutely new.  The idea that you could hang this very

3     high-field superconducting synchrocyclotron on a gantry and

4     pass a proton or ion radiation beam directly from that housing

5     on the gantry to a patient on the patient treatment table in

6     the same room, that was the "aha" moment and that was

7     absolutely new and that's what Dr. Gall invented.

8              SPECIAL MASTER PETERSON:  Well, again, let me play

9     devil's advocate for a moment.  But wasn't that because of the

10    size?  I mean, you couldn't put a 50-ton device on a gantry.

11    So, you had to put it in a room and use fields to ran it to a

12    patient, like the Loma Linda facility.  So, by reducing the

13    size, you were able to put it on a gantry and have a direct

14    interaction with the patient.  Wasn't this -- that the

15    relationship with size?

16             MR. BRUNO:  I think certainly there is some size

17    relationship, but there are a number of calculations behind

18    that and a number of system configuration elements that are

19    claimed in Claim 1 of the patent that don't necessarily have

20    to do with the size of the synchrocyclotron itself, but that

21    have to do with the system configuration in the room.

22             SPECIAL MASTER PETERSON:  Okay.

23             MR. BRUNO:  In terms of the gantry, in terms of the

24    accelerator mounted on the gantry, in terms of rotating around

25    the patient, in terms of delivering beam directly to the

1    patient.  None of those things are necessarily directly

2    related to size.

3         SPECIAL MASTER PETERSON:  You could do all of those

4    things with the prior art system that weigh -- how many tons

5    was the one at Loma Linda?

6         MR. BRUNO:  It was, I believe, more than 100 tons.

7         SPECIAL MASTER PETERSON:  Could you do that with a

8    100-ton machine?

9         MR. BRUNO:  I don't think that would be feasible from

10   an engineering standpoint.

11        SPECIAL MASTER PETERSON:  Okay.  I guess these things

12   have to rotate at least in a 180-degree arc, if not maybe a

13   little more, around the patient and that's very significant.

14   Putting 100 tons on the end of an arm and rotating it is a

15   fairly substantial engineering task, right?

16        MR. BRUNO:  Certainly.  And Dr. Gall, I'm sure, could

17   speak better to this than I could, but, as he demonstrated

18   with the delivery of proton radiation therapy, one of the key

19   elements of that therapeutic technology is the ability to get

20   the right angle in order to point the beam at the tumor, the

21   particular location, and deliver the dose in the correct way.

22   And so, indeed, rotating it around the patient is very

23   important to the delivery of the oncology service.

24        SPECIAL MASTER PETERSON:  All right.  You may

25   proceed.

1          MR. BRUNO:  Thank you, your Honor.

2          I'll try to sum up very quickly, then.

3          That where we're going with this is to say that the

4     evidence will show that Dr. Gall had a very unique blend of

5     education, experience with the Harvard cyclotron.  He then

6     went to the University of Texas and continued this proton

7     radiation therapy.  He also worked at the Proton Therapy

8     Corporation of America designing systems for major

9     corporations throughout the country, and all of this time,

10    again, the seeds are growing.  They're germinating.  He's

11    trying to come up with a way of doing this invention and he

12    goes to the cyclotron conference in May of 2001, has some

13    important conversations with people there about magnetic field

14    strength capabilities with magnet technology at that time and,

15    indeed, at that conference Dr. Gall spoke with a gentleman

16    named Dr. Wu about a thesis that he had prepared.

17         And just for purposes of creating a visual aid, at

18    that conference Dr. Wu, in fact, gave Dr. Gall his last

19    hard-bound copy of his thesis and included a note (indicating)

20    that you still see it to this day, his contact information,

21    and Dr. Gall went back to his room and read that thesis and

22    there were, indeed, ideas in there that sparked that "aha"

23    moment for Dr. Gall and that "aha" moment that he had in his

24    hotel room at that conference was that you could combine a

25    very high-field magnet with a synchrocyclotron for proton

1   radiation therapy in a way that would allow you to make it

2   small enough to hang it on a gantry and deliver the proton

3   beam directly to the patient.  That was something that nobody

4   else knew and nobody else had suggested before and that was

5   something that was very unique to Dr. Gall and only that he

6   could have thought of because of his vast and unique

7   experience at the Harvard Cyclotron Laboratory working with

8   the synchrocyclotron.

9        So, try as anybody might, nobody has ever

10  demonstrated that somebody else had thought of that before.

11  And, in fact, an important point to note, of course, the Wu

12  thesis itself was listed in the disclosure of the '311 patent

13  to the examiner.  So, it was fully aware at that time of the

14  Wu thesis and, nevertheless, issued the patent over that

15  thesis and now it is presumed, of course, to be his sole

16  invention.

17       So, we have on our chart here demonstrated the light

18  bulb goes on for Dr. Gall.  At that point he had completely

19  conceived in his mind of the operative invention.

20       I also have here an interesting visual aid, if you

21  will, because Dr. Gall had been keeping some notes in a

22  notebook of his over time has he had new ideas.  One of those

23  ideas included over time a trip that he made to the

24  Octoberfest in Munich, Germany, and he saw an amusement park

25  ride there of a big boat that swung around on the vertical

1   axis in 360 degrees and gave people the ride of their life,

2   but he noticed it had a structure of two strong arms on

3   bearings that rotated that around and that was another thought

4   of his that he had.  Okay, you can really hang heavy things

5   off of this type of gantry system.  He recorded those ideas in

6   his notebook and after he came back from the cyclotron

7   conference in 2001 --

8            COURT REPORTER:  Hold on.  Will you slow down for me,

9   please?

10           MR. BRUNO:  Certainly.

11           (Discussion off the record.)

12           MR. BRUNO:  He came back from the cyclotron

13   conference and he recorded in his notebook some fundamental

14   equations that he derived and calculated that allowed him to

15   input into a separate spreadsheet peak magnetic field of a

16   particular magnet and calculations would derive and give the

17   estimated weight and volume of a magnet that could be hung as

18   part of a synchrocyclotron on the gantry for delivery of

19   proton radiation therapy directly to patients.

20           And that the evidence will show -- and we can

21   certainly get into all of this and I think it's called out

22   very well in Dr. McWilliams' expert reports, but it's those

23   calculations that Dr. Gall was then able to input into a

24   spreadsheet, that when you change the peak magnetic field

25   strength, it gives you those calculations for weight and for

1    volume, and it's those ranges of values that Dr. Gall then

2    realized could be used to make a magnet that was small enough

3    to use with the synchrocyclotron in that system that he had

4    envisioned.  So, at that point he had fully conceived, if we

5    were to map it back to the claims, of every single element of

6    the claims as they are claimed in the '311 patent.

7         And just to briefly illustrate that as well.  This is

8    a visual that you'll see at a later time in the case.  What we

9    did is we went through the claims and we tried to categorize

10   the elements of the claims according to the different types of

11   things, and there are certain elements in the claims that

12   relate to system configuration.  That's what we talked about

13   before, being the gantry and the synchrocyclotron mounted on

14   the gantry and it rotated around the patient and delivering

15   the beam directly to the patient.  So, those are certainly

16   elements that are claimed.

17        And if you look in Dr. Gall's notebook and you look

18   in his spreadsheet, you will see that he had fully conceived

19   at that point in time in June 2001 of all of the system

20   configuration elements.

21        Furthermore, the other elements relate to

22   synchrocyclotron properties and those are things like the

23   weight, the volume, and then the energy level and the magnetic

24   field strength, and there are ranges of values that are

25   claimed in the claims of the '311 patent and if you, again,

1    look at the notebook and you look at the spreadsheet, all of

2    those ranges were calculateable based on the equations that

3    Dr. Gall derived and solved as of June 6, 2001.  That's what's

4    claimed in the '311 patent.

5            And, again, I would point the Court and all counsel

6    to Dr. McWilliams' excellent expert reports that map those out

7    page by page, piece by piece.

8            So, quickly hurrying up with the story of Dr. Gall's

9    invention, I think an interesting thing to note is that after

10   June 6, 2001, if you were to come down and page through this

11   book, there really isn't a whole lot of other calculations in

12   this inventor notebook.  As a matter of fact, there are dozens

13   and dozens of empty pages, and those empty pages are because

14   Dr. Gall himself realized at that time that he had completely

15   conceived of the invention and at that point he set the

16   inventor notebook aside and set about the task of trying to

17   find an engineering design team to help him reduce his

18   invention to practice.

19           So, after June 6, 2001, he then started looking for

20   his team.  In July of 2002 he met with Alan Sliski, who is

21   here today, at a conference and shared with him his conception

22   of his invention.  Mr. Sliski was excited about it.  The two

23   of them decided to team up and think about starting a company

24   to commercialize this invention and that is eventually what

25   led them to Dr. Antaya in January of 2003, at which point Dr.

1    Gall and Mr. Sliski met with Dr. Antaya for the first time at

2    MIT, shared with Dr. Antaya his conception, his idea.  Dr.

3    Antaya himself was excited about it and in that meeting Dr.

4    Gall shared his specifications for the system that he had

5    envisioned and conceived.

6          And an interesting thing to note is that after that

7    meeting, Dr. Gall emailed to confirm what they had discussed

8    and he shared his Exhibit 1 in this case in his email all of

9    the specifications that he had described to Dr. Antaya, what

10   type of system would need to be built, and Dr. Antaya wrote

11   back.  At that time, in Exhibit 1, he said, "Thank you, Dr.

12   Gall.  This looks like it will be a very straightforward

13   exercise."  And you see it there in quotes.  "Your spec

14   requirements for extracting beam are going to make this very

15   straightforward."  That was in January of 2003, what Dr.

16   Antaya thought about it.

17         Now, the Court will hear testimony from MIT's

18   witnesses that the equations that Dr. Gall solved were just

19   very simple equations in attempt to demean their importance

20   and to artificially overemphasize the importance of Dr.

21   Antaya's alleged contribution later on to the magnet design,

22   but it was understood in January of 2003, that what Dr. Gall

23   was requesting was engineering design work to help him build

24   an embodiment or reduction to practice of this invention that

25   he had conceived, and it's only in retrospect that,

1    unfortunately, that urge, that strong temptation to

2    reconstruct one's own contribution in order to become an

3    inventor and a conceiver.

4         Dr. Gall was the first one to ever combine the

5    elements claimed in the '311 patent in the manner that they're

6    claimed and that is the very heart of inventorship, combining

7    elements, even elements that in and of themselves are already

8    known in the prior art, in a new and useful way.  If Dr.

9    Gall's invention was so easy to realize, surely somebody else

10   would have done it first, but nobody did.

11        And if you look at the '311 patent, there is a

12   disclosure of prior art references that I think is probably

13   among the most robust in the history of the United States

14   Patent and Trademark Office, goes on for pages and pages.  Dr.

15   Gall wanted to disclose everything in the prior art that he

16   could, and it was over all of those prior art references that

17   these claims were still allowed.

18        So, the conclusion is that Dr. Gall completely

19   conceived of all the elements of all the claims prior to

20   meeting Dr. Antaya and, therefore, there is no room for any

21   conception by Dr. Antaya after that point.

22        Finally -- and I will certainly speed to the finish,

23   if I can.

24        SPECIAL MASTER PETERSON:  Yes.

25        MR. BRUNO:  There was a third important point and

1    that is that at most in this case Dr. Antaya assisted with

2    reduction to practice.  In fact, Dr. Antaya and MIT were hired

3    by Dr. Gall to help Dr. Gall build his fully-conceived

4    invention.

5            Dr. Antaya's work did not require anything but the

6    application of ordinary skill in the art, and I make that as a

7    statement saying that's what Mevion claims that the evidence

8    will show.  I understand that there's a dispute about that,

9    but we believe that Dr. McWilliams' expert reports demonstrate

10   that, indeed, there was a certain level of ordinary skill in

11   the art and, indeed, that based on his definition of the level

12   of ordinary skill, that a person at that level or a team at

13   that level, could have reduced the invention to practice, and

14   certainly MIT does not have clear and convincing evidence to

15   overcome the conclusions reached in Dr. McWilliams' expert

16   reports.

17           The law says that if an invention may be reduced to

18   practice by the application of ordinary skill, then there is

19   no room for a claim of co-inventorship by one who assists with

20   reduction to practice, and because MIT realizes it faces an

21   overwhelming burden of proof, it's attempting to cloud and

22   complicate the story and confuse the issues by redirecting the

23   focus of this case away from Dr. Gall's conception and his

24   revolutionary discovery to work that Dr. Antaya purportedly

25   did and participated in years after Dr. Gall had already

1    invented what is claimed in the '311 patent.

2         Now, one of the comments that was made by MIT's

3    counsel in the opening was that, Well, MIT delivered a bunch

4    of stuff.  Well, that's what they would like the Court to

5    focus on, was the kind of mass of a bunch of stuff and

6    research and reports and memos and charts and graphs that MIT

7    was doing, but it became an important point is that Dr. Gall

8    as of the time of his conception, based on his unique

9    experience and knowledge and expertise in synchrocyclotron,

10   knew that what he had conceived could be built and just

11   because Dr. Antaya needed to spend a lot of time going around

12   and solving equations to convince himself that Dr. Gall's

13   invention was feasible doesn't mean that Dr. Gall didn't

14   already know that it could be done.  He absolutely knew it

15   could be done.  That's why he set his inventor notebook aside

16   and became looking for a team to help him engineer it.

17        SPECIAL MASTER PETERSON:  All right.  Let me just --

18   I let Mr. Bauer run over as well, but I think you're about

19   five minutes over.  So, if you want to wrap up, that would be

20   great.

21        MR. BRUNO:  Thank you, your Honor.  I'll go fast.

22        COURT REPORTER:  Oh, no, don't do that.

23        SPECIAL MASTER PETERSON:  Actually, I think I

24   probably have a pretty good idea of your argument at this

25   stage.

1          MR. BRUNO:  All right.  If I may just have one

2     concluding thought, your Honor.

3          SPECIAL MASTER PETERSON:  All right.

4          MR. BRUNO:  MIT focuses a great deal on the

5     specification of the patent and saying that there are these

6     figures that Dr. Antaya had come up with, that MIT had come up

7     with, and that ended up being claimed -- or included in the

8     disclosure and the specifications of the patent, but that is

9     not a remarkable proposition because your Honor knows very

10    well the best mode requirement, and at the point in time that

11    Dr. Gall filed the patent application, he had paid MIT a lot

12    of money in order to try and come up with an engineering

13    design, and at the time that he filed the patent application,

14    that was the best engineering design that he knew.  He was

15    required to use it as the best mode in his application.  That

16    doesn't mean that it entitled MIT or Dr. Antaya to

17    inventorship.

18          And, in fact, again, skipping ahead, there are a lot

19    of facts that will come out about how their relationship broke

20    down between the parties.  Some of those reasons and important

21    reasons were that the designs that MIT provided were not

22    workable and that Dr. Antaya's behavior throughout the course

23    of the project was a destructive force to the project itself,

24    such that Mevion ended up having, again, to hire its own team

25    of engineers between 2008 and 2011 to complete the design in a

1   functional way.  And so, the claim by MIT that it contributed

2   and enabled this patent is just wrong.  The design that it

3   allegedly enabled didn't work.

4           SPECIAL MASTER PETERSON:  All right.  Thank you very

5   much.

6           MR. BRUNO:  Thank you, your Honor.

7           SPECIAL MASTER PETERSON:  All right.  Mr. Bauer, are

8   you ready to proceed with your first witness?

9           MR. BAUER:  We are.

10          SPECIAL MASTER PETERSON:  All right.  Call your first

11  witness.

12          MS. DEVARASETTY:  Your Honor, MIT calls Dr. Timothy

13  Alan Antaya to the stand.

14          SPECIAL MASTER PETERSON:  Okay.  Dr. Antaya.

15          DR. ANTAYA:  Good morning.

16          SPECIAL MASTER PETERSON:  Good morning.

17          Please raise your right hand, sir.

18          **TIMOTHY A. ANTAYA, Ph.D., SWORN.**

19          SPECIAL MASTER PETERSON:  Please be seated.

20          MS. DEVARASETTY:  Your Honor, just as a matter of

21  procedure --

22          SPECIAL MASTER PETERSON:  Let's get him on the

23  record, first.

24          Dr. Antaya, please give us your name, spelling your

25  name, please.

 1              DR. ANTAYA:  My name is Timothy Alan Antaya,

 2     A-n-t-a-y-a.

 3              SPECIAL MASTER PETERSON:  And your professional

 4     affiliation, please.

 5              DR. ANTAYA:  I am the founder, president and chief

 6     science officer of Ionetix Corporation.

 7              SPECIAL MASTER PETERSON:  I'm sorry.  Could you spell

 8     that?

 9              DR. ANTAYA:  I-o-n-e-t-i-x Corporation.

10              SPECIAL MASTER PETERSON:  And you're appearing here

11     on behalf of MIT; is that correct?

12              DR. ANTAYA:  Yes.

13              SPECIAL MASTER PETERSON:  All right.  Yes, proceed.

14              MS. DEVARASETTY:  So, as the declarations and the

15     direct testimony in the declarations, I'm going to ask just a

16     few questions to have that admitted into evidence.

17              SPECIAL MASTER PETERSON:  Let me ask you, counsel,

18     can you move that microphone or --

19              MS. DEVARASETTY:  Yes.

20              Just a few questions to enter the direct into

21     evidence and then -- your Honor, you asked a question of

22     counsel in the opening.  Just after I enter the direct into

23     evidence, I'll ask that question to Dr. Antaya.

24              SPECIAL MASTER PETERSON:  All right.

25              MS. DEVARASETTY:  And after that, what I'll do is

1    I'll move to admit all of the exhibits that were cited in Dr.

2    Antaya's declaration just for the record.

3              SPECIAL MASTER PETERSON:  All right.

4              MS. DEVARASETTY:  May I approach the witness, your

5    Honor?

6              SPECIAL MASTER PETERSON:  Yes, you may.

7                        **DIRECT EXAMINATION**

8      **BY MS. DEVARASETTY:**

9      Q.   Dr. Antaya, I've just handed you what's been marked as

10   Exhibit 113.  Can you take a look at that document, please.

11     A.   (Examining).

12     Q.   Do you recognize this document?

13     A.   Yes, I do.

14     Q.   What is it?

15     A.   It is a declaration.

16     Q.   Do you recognize this document as testimony that you're

17   giving in this case?

18     A.   Yes.

19     Q.   Can I have you flip to the last page, please.  And on

20   the last page there, that's your signature; is that right?

21     A.   Yes, it is.

22     Q.   And that's dated January 25th, 2012?

23     A.   Yes.

24              MS. DEVARASETTY:  I now move to offer this Exhibit

25   113 into evidence as Dr. Antaya's direct testimony.

1          SPECIAL MASTER PETERSON:  All right.  Mr. Bruno, any

2     objections?

3          MR. BRUNO:  No, your Honor.

4          SPECIAL MASTER PETERSON:  All right.  Exhibit 113

5     admitted without objection.

6          (Exhibit No. 113 received in Evidence.)

7     Q.   Dr. Antaya, I'll now have you take a look at Exhibit 114

8     now.  Do you recognize this document?

9     A.   Yes, I do.

10    Q.   Do you recognize this document as your testimony that

11    you're giving in this case?

12    A.   Yes.

13    Q.   Can you again flip to the last page.  Is that your

14    signature at the bottom?

15    A.   Yes, it is.

16    Q.   And that document is dated January 31st, 2012?

17    A.   Yes.

18         MS. DEVARASETTY:  Your Honor, I now would like to

19    offer into evidence Exhibit 114 as Dr. Antaya's rebuttal

20    testimony in this matter.

21         SPECIAL MASTER PETERSON:  All right.  Mr. Bruno?

22         MR. BRUNO:  No objection, your Honor.

23         SPECIAL MASTER PETERSON:  Admitted without objection.

24         (Exhibit No. 114 received in Evidence.)

25    Q.   Dr. Antaya, you were listening to Mevion's counsel's

1    opening statement, and Mr. Peterson asked a question of why

2    was this particular task that Dr. Gall presented to you in

3    January 2003 so hard.  And so, I'd like you to answer that

4    question for Mr. Peterson.  If you could explain why this

5    project to design and build this magnet was different than all

6    the other types of magnets that you worked on before.

7    A.   All right.  Yes.

8         Mr. Peterson, the underlying quantitative beam dynamics

9    of these particle accelerators has not been discussed.  All

10   you've heard are the superficial, generalized formula for the

11   overall characteristics of these accelerators.  The

12   quantitative beam dynamics -- first formulations were in the

13   late 1950s.  A complete theory of the circular particle

14   accelerators via the Hamiltonion LaGrange formulation of the

15   charged particle motion and --

16        SPECIAL MASTER PETERSON:  Can you spell that, please?

17        DR. ANTAYA:  Hamiltonion?  H-a-m-i-l-t-o-n-i-o-n.

18   LaGrange, L-a-G-r-a-n-g-e.

19   A.   (Continuing) And these equations are nonlinear, which

20   means that you can't make an exact solution.  So,

21   fundamentally, you're dealing with a kind of physics in which

22   there's no exact solvable solution.  So, that's the beginning.

23   So, it's hard stuff.

24        In addition, there weren't computational capabilities

25   then.  And so, the equations were simplified and linearized.

```
 1    That is, a solution of an easier version of the equation was
 2    found.
 3            SPECIAL MASTER PETERSON:  Or said, I guess, in
 4    English, the power of computers was not what it was today.
 5            DR. ANTAYA:  Right.
 6            SPECIAL MASTER PETERSON:  To input these nonlinear
 7    equations into a computer that was able to do iterative
 8    processing in those days.
 9            DR. ANTAYA:  Exactly.  Perfect.
10            SPECIAL MASTER PETERSON:  Okay.
11    A.   (Continuing) All right.  So, a theory developed in which
12    stable orbits of the simplified system were found and then
13    extensions to higher orders in the mathematics for selected
14    cases were found where there were resonances in the motion.
15            All right.  So, the evolution of the digital computer
16    evolved with our ability to do this quantitative computational
17    beam dynamics more precisely, and what also evolved was our
18    ability to calculate magnetic fields more precisely.  So,
19    these things, digital computers, the computational beam
20    dynamics, the ability to calculate the magnetic field.
21            In the '60s and '70s, the fields that could be produced
22    required -- or were made by resistive coils and the amount of
23    magnetization of the iron that could be achieved with
24    resistive coils as the energizing force for the magnet was not
25    sufficient to magnetize completely the iron.  And so, the iron
```

1    was also nonlinear.  So, if you changed the field a bit, what

2    you got in the magnet was significantly different.

3         And so, a cut-and-try approach was developed.  You did

4    the best you could with modeling.  You did the best you could

5    with the computations of the field, and then you built a

6    magnet that was a scale magnet of the device and you actually

7    measured the field and then you made adjustments to that

8    field.  Okay.

9         At Michigan State what we did in the late 1970s and

10   early 1980s was to extend cyclotrons above this magnetization

11   barrier.  So, we could put enough current in a superconducting

12   winding to fully magnetize the iron.  All right.  And so, when

13   that happens, the iron reduces to simple surfaces, which you

14   can now calculate a bit more precisely.

15        But to track particle orbits computationally requires

16   a field quality of a factor of about one part in 10,000.  So,

17   to make the orbits behave correctly in doing an iterative

18   tracking of particles as they separate, the field has to be a

19   good --

20        COURT REPORTER:  I'm sorry, the field has to be?

21   A.   The magnetic field has to be precise to one part in

22   10,000.  We're still not able to do that computationally.

23        So, what's happened is that we're able now to calculate

24   the magnetic fields in -- fully in three dimensions, but we

25   can get easily fields to a part in a hundred and with a lot of

1    work fields to a part in a thousand.

2          So, what happens is a mini version of the old days.  We

3    don't build model magnets anymore, but we do a lot of magnetic

4    field maps, all right?  And so -- and these can take years.

5    We just finished roughly a year ago the design of a high-field

6    isochronous superconducting cyclotron that's above the limits

7    that were claimed earlier and it took us a year to calculate

8    the magnetic field properly so that we could do all our

9    calculations.

10         All right.  So, now, in addition to that, cyclotrons

11   have -- all right.  So, we've got this problem that we can't

12   do the computations precisely.  We're getting better at it,

13   but it's a lot of work.

14         In addition, cyclotrons have a couple challenging

15   scalings that mix the beam physics with engineering.  So,

16   those challenging scalings are the following:

17         When you pick a certain energy in a cyclotron, say 250

18   MeV or 500, or whatever it is, it takes a certain amount of

19   magnetic flux.  That's the total amount of magnet that's going

20   through the pole to get to that final energy.  That's almost

21   independent of the field level.  So, you need -- so, the

22   interval of the field over the area sets the energy in a gross

23   way.  All right.

24         So, now when I try to make the magnet smaller at a high

25   energy, I have to keep the same amount of flux.  So, the flux

1   -- and it takes about the same amount of current in the

2   magnet.  It's around a million amp turns in a superconducting

3   coil, whatever its cross-section size is for a 250 MeV proton

4   beam.  I've got to put a million amps through the

5   cross-section of the coil.  All right.

6          But, now, as we're scaling this magnet down, the

7   coils are getting smaller.  They have to get smaller.  So, we

8   don't get a smaller cyclotron unless everything, the poles,

9   the coils, the return yoke gets smaller.

10          If I have to keep the same amount of flux and roughly

11   the same amount of current and I make the coil smaller, the

12   current density and the winding gets significantly higher.

13   All right.

14          Now, every wire -- so, now we couple beam physics

15   with magnets.  Every wire -- every wound wire has an outward

16   expanding force that wants to break it.  It's a tension in the

17   circumferential direction, but it wants to break it.  When the

18   -- and the measure of the strength of that force is a product

19   of the current density in the winding and the strength of the

20   magnetic field.

21          So, here's what we're doing to make a big cyclotron

22   small.  We're making the poles smaller.  The flux stays the

23   same.  The amount of current stays the same.  The cross-

24   sectional area of the coil gets smaller.  So, the current

25   density goes up, but the peak field of the winding also goes

1    up.  And so, the forces in the winding get significantly

2    larger.  All right.  So, that's our second problem.

3           The first one is computationally -- you know,

4    computationally the codes and the fields aren't precise enough

5    to get the orbit calculations precisely enough without a lot

6    of work.  The second is that the force density has to go up

7    enormously or the magnitude higher in the winding as I scale

8    it down.  All right.

9           But, in addition, we're doing something completely

10   new, and when we break this barrier of synchrocyclotrons above

11   one tesla or two tesla, what's happening is that we're going

12   from an iron-dominated magnetic field shape -- so, the shape

13   of the pole, all right -- to a coil-dominated magnetic field,

14   and while -- and regardless of what you say about what you can

15   build and sell commercially, that coil shape is never right

16   for accelerating particles in an accelerator.  All right.

17          And the reason for that is that the flux wraps around

18   the coil and it changes -- the coil field changes very sharply

19   at the edge.  All right.

20          So, now, when -- these are all things that we

21   developed and worked on at Michigan State, the first

22   superconducting cyclotron, the K500, which actually was the

23   first particle accelerator with the superconducting magnetic

24   field.  The cyclotron, the energy double saver, was not.  The

25   bigger K1200 cyclotron was the highest energy CW particle

1    accelerator until just recently.

2         A third machine, the Harper cyclotron, which is a

3    neutron beam radiotherapy accelerator of about 110-ton mass,

4    total mass, which was mounted on a gantry and rotated around

5    patients in a hospital for cancer therapy in 1991.  So, we had

6    already done this at five tesla, and it's a machine of more

7    than 100 tons total mass rotating on a gantry.

8         So, what you had to be able to do was get the beam

9    physics to be better.  The reason for that is that the

10   synchrocyclotron necessarily would have to run at a low

11   voltage, which would mean tens of thousands of orbits to go

12   from the center to the outside edge.

13        The codes that we had that could accurately reproduce

14   computationally what we saw in the machines could do about 500

15   to 1,000 orbits.  So, we're going to go up -- in order of

16   magnitude up in the number of orbits that we needed to track.

17   We are going to go an order of magnitude higher in the forces

18   that the coils could see and we're going to go into a

19   completely new regime in which the shape of the field -- we

20   would have to buck significantly the shape of the magnetic

21   field of the superconducting coils because they're going to

22   dominate.

23        All of these things were in my mind in January of

24   2003 when I met Dr. Gall to talk about his project.  These are

25   things that were already known to me.

1          What was different was that -- I had been ten years

2     away -- or seven years away from the cyclotron lab, designing

3     a huge superconducting --

4          SPECIAL MASTER PETERSON:  Let me interrupt you at

5     this stage.  I think that may be -- we're getting into matters

6     that are already covered in your declaration, I believe.

7          Did that answer the question, counsel?  Has he

8     answered your question at this stage?

9          MS. DEVARASETTY:  Yes, I believe so.

10          DR. ANTAYA:  Okay.

11          MS. DEVARASETTY:  At this point, your Honor, I would

12     like to move the exhibits that were cited in Dr. Antaya's

13     direct and rebuttal testimony into evidence.

14          SPECIAL MASTER PETERSON:  What are those exhibit

15     numbers?

16          MS. DEVARASETTY:  And I'll go slow.

17          Exhibit 1, 6, 7, 12, 14, 18, 26, 38, 44, 45, 46, 48,

18     51, 52, 55, 59, 60, 69, 71, 75, 88, 102, 104, 109, 112, 301,

19     302, 303, 304, 309, 310, 311, 316, 317, 318 through 324, 326

20     through 328, 330 through 340, 342 through 412, 415, 416,

21     417 -- 418, not 417, 434, 437, 438 and 439.

22          SPECIAL MASTER PETERSON:  All right.  Mr. Bruno?

23          MR. BRUNO:  Mevion has no objections, your Honor.

24          SPECIAL MASTER PETERSON:  All right.  The exhibits

25     counsel has so listed are admitted without objection.

```
1              (Exhibit Nos. 1, 6, 7, 12, 14, 18, 26, 38, 44, 45,
2    46, 48, 51, 52, 55, 59, 60, 69, 71, 75, 88, 102, 104, 109,
3    112, 301, 302, 303, 304, 309, 310, 311, 316, 317, 318 through
4    324, 326, 327, 328, 330 through 340, 342 through 412, 415,
5    416, 418, 434, 437, 438 and 439 received in Evidence.)
6              SPECIAL MASTER PETERSON:  All right.  Cross, Mr.
7    Bruno -- I'm sorry.
8              MR. HILL:  Mr. Hill.
9              SPECIAL MASTER PETERSON:  Okay.  Mr. Hill.
10                      CROSS-EXAMINATION
11    BY MR. HILL:
12    Q.  Good morning, Dr. Antaya.
13    A.  Good morning, Russ.  How are you?
14    Q.  Very well.
15        We met in November on the 3rd and 4th for your
16    deposition.  Do you recall that?
17    A.  Yes, I do.
18    Q.  I'd like to put in front of you Exhibit 96.  I'm sure
19    it's in a binder there and Ms. Christo will help you come to
20    that, which is a transcript of that deposition.
21    A.  All right.  I have it.
22    Q.  You've had a chance to review that before today,
23    correct?
24    A.  Yes, I did.  And edit and correction of the initial
25    transcript, yes.
```

1    Q.   You submitted an errata sheet showing some corrections

2    that needed to be made?

3    A.   Yes.

4    Q.   And you made those corrections?

5    A.   Yes.

6    Q.   And does Exhibit 96 appear to you to be a true copy of

7    your deposition transcript?

8    A.   I can't judge, but it looks -- let's just assume --

9    Q.   Okay.

10   A.   Let's assume that it is.

11   Q.   In MIT's counsel's opening statement I believe he said

12   that you had nothing to gain here but respect.  That isn't

13   quite true, is it?

14   A.   Yes, I think that's a -- I think that's a correct

15   statement.

16   Q.   But at your deposition you testified that you would

17   receive some sort of a financial benefit from being named as a

18   co-inventor on the '311 patent, correct?

19   A.   No.  You asked me at the deposition whether as a

20   licensee, as an inventor, I received some of the royalties

21   from the license.  And the answer is, yes.  The question of

22   whether the '311 patent changed that was not asked of me.

23   Q.   Could you turn to Page 200 of your deposition

24   transcript.

25   A.   Okay.  Yes, I'm there.

1    Q.   Give me a moment, please.

2         (Pause.)

3    Q.   Starting at Line 24 on Page 200 and continuing on, the

4    deposition reads:

5         Question:  "And I certainly don't mean to offend you in

6    any way.  I just have to make clear for the record that if you

7    are named as an inventor on the Gall patent and royalties are

8    received from that patent, you would receive some sort of

9    financial benefit, wouldn't you?

10        Answer:  "Yes.  Yes."

11        That was your testimony at that time, wasn't it?

12   A.   Yes, it was.  Yes.

13   Q.   Thank you.

14        And you're no longer employed by MIT, are you?

15   A.   I am not.

16   Q.   And you mentioned to Mr. Peterson that you are now

17   president and founder of a company?

18   A.   Yes, I am.

19   Q.   And if I have the name right, it's Iontix (phonetic)?

20   A.   Ionetix.

21   Q.   Ionetix, excuse me.

22        If you're named as a co-inventor on the '311 patent,

23   wouldn't that give MIT broader licensing rights to license

24   your company under that patent?

25        MS. DEVARASETTY:  Objection.  Speculation.

1          SPECIAL MASTER PETERSON:  I'm sorry, the objection is

2     what?

3          MS. DEVARASETTY:  Speculation.

4          SPECIAL MASTER PETERSON:  Overruled.

5          You may want to get that microphone back.

6     A.   I wouldn't know that.

7     Q.   You don't know the details of the patent licensing

8     agreement between the parties?

9     A.   I do not.

10    Q.   Have you designed any other superconducting cyclotron

11    since working with Dr. Gall?

12    A.   Yes.

13    Q.   Are those designs to be used by your new company?

14    A.   One of them is, yes.

15    Q.   Can you describe what kind of a cyclotron that is?

16    A.   Let's see.  So, there's sort of an issue of -- you know,

17    I'm happy to answer the question, but there's sort of an issue

18    of commercial confidentiality.

19         SPECIAL MASTER PETERSON:  Can you give counsel a

20    general answer?  Let's see if that's sufficient or not.

21         MS. DEVARASETTY:  Your Honor, I actually -- I don't

22    know that he can answer right now.  That would be, perhaps,

23    competitive information.  If we wanted to clear the room for

24    highly confidential information, we could do that, but --

25         MR. HILL:  I can move on from that, your Honor.  I'll

1    withdraw the question.

2             SPECIAL MASTER PETERSON:  All right.

3    Q.   Can you tell us how long it's taken thus far to design

4    that cyclotron?

5    A.   Yes.  The design is less than a year.  It's about three

6    weeks from operating and the magnet worked perfectly the first

7    time and it's quite advanced.

8    Q.   Thank you.

9         If you could go to Exhibit 114, which is your rebuttal

10   declarations that counsel handed to you.

11   A.   I have it.

12   Q.   You testified on Page 6 of that document that your

13   scaling law is what led directly to the '311 patent, correct?

14   A.   Yes.

15   Q.   Now, you wrote out the derivation of your scaling law on

16   December 11th, 2003; isn't that true?

17   A.   Yes.

18   Q.   And we have that in Exhibit 15.  If we could go there.

19   A.   All right.  Yes, I have it.

20   Q.   And Exhibit 15, can you tell us what that is?

21   A.   Exhibit 15 is an excerpt of notes of mine, including the

22   scaling law.

23   Q.   And are the notes concerning the scaling law on

24   particular pages within that Exhibit 15?

25   A.   Well, what someone has done is put together parts of

1    different notes, but the scaling law is a particular note from

2    12 -- December 12, 2003, and it's numbered Pages 1 through 8

3    with -- that are circled.

4    Q.   So, it's beginning -- is it the title at the top of

5    that, "Cyclotron K Factor Derivation"?

6    A.   No.

7    Q.   Could you point us to exactly where the scaling --

8    A.   The title is, "Geometric Orbit Scaling."

9    Q.   And can you see at the bottom a page number MIT?  And

10   point us to it.

11   A.   8729.

12   Q.   8729.  So, it's, "Geometric Orbit Scaling, TAA."  Those

13   are your initials, correct?

14   A.   Yes.

15   Q.   And dated December 11th, 2003; is that correct?

16   A.   Yes.

17   Q.   Are the pages that comprise your scaling law all of your

18   original work?

19   A.   Yes.

20   Q.   Now, it's true that you never published this scaling law

21   in a peer-reviewed journal, correct?

22   A.   I have not.

23   Q.   It's also true that you haven't been able to provide any

24   documentation showing that this scaling law has been broadly

25   agreed upon by experts in your field, have you?

1    A.   I wasn't asked to, but if I'm asked to, I would be happy

2    to do that.

3    Q.   You disclosed this scaling law in a different patent to

4    which you're the sole inventor, correct?

5    A.   Yes.

6    Q.   It's not something that's disclosed expressly in the

7    '311 patent, is it?

8    A.   It is not.

9    Q.   You knew the contents of Dr. Gall's patent while it was

10   pending as an application; isn't that true?

11   A.   No.  I believe it's the case that I saw a copy of it

12   after it was filed.

13   Q.   But it was before it was issued; it was still an

14   application, correct?

15   A.   I had some of the text.  I don't recall ever seeing a

16   complete patent.  In fact, I've never seen a complete

17   description patent -- of the full patent application.

18   Q.   Do you recall one of the claims in the '311 patent has a

19   magnetic field element that goes from 6 to 20 tesla?

20   A.   I don't recall that explicitly, but if you want to

21   stipulate to that, I'll -- I'm good with that.

22   Q.   Okay.  You told Dr. Gall it wasn't possible to get to 20

23   T with the superconducting synchrocyclotron, didn't you?

24   A.   I think what I said -- or what I likely said was that it

25   wasn't feasible.  The feasibility had not been established,

1    and that was important to me.

2       Q.   And, in fact, you told him in order to establish that

3    feasibility of being able to go to values above ten tesla,

4    that he would have to show that you could get both weak

5    focusing and phase stability, true?

6       A.   I mean, you'd have to -- you know, to point to some

7    particular instance.  The words you're using don't sound

8    exactly like me, but if you could make a reference to

9    something I said.

10      Q.   Sure.  Let's go to your deposition transcript at Page

11   178.

12      A.   Could you remind me of the number?

13      Q.   I'm sorry.  That was Exhibit 96.

14      A.   All right.  I have it.

15      Q.   Beginning at Line 6, I posed a question to you:

16      "Do you remember that this was the discussion regarding

17   the 6 to 20 T range that had been claimed in the provisional

18   application?

19      You answered:  "Yes."

20      A.   Could you --

21      Q.   I'm sorry.  You're not at the right page.

22      A.   Could you give me the page number?

23      Q.   Yes, 178.

24      A.   178.  Okay.  All right.  I'm sorry.  Go ahead.

25      Q.   All right.  Line 6, the question is:

1      "Do you remember that this was the discussion regarding

2  the 6 to 20 T range that had been claimed in the provisional

3  application?

4      You answered:  "Yes."

5      That was your testimony, right?

6  A.   Okay.  Right.  Yes.

7  Q.   And then I asked:

8      "And were you -- in your response were you telling Dr.

9  Gall that you could prove that that is invalid?

10     Answer:  "Yes, that I believe that I could, yes.

11     Next question:  "And it couldn't be scaled to 20 T, is

12  that what you were saying?

13     You answered:  "Yes."

14     That was your testimony, correct?

15  A.   All right.  Yes.  Good.

16  Q.   And then I asked you:  "Why not?

17     And your answer was:  "Because you have to show that you

18  can get both weak focusing and phase stability for it to be a

19  synchrocyclotron magnet and you have to do that in connection

20  with the fact that the total flux required is roughly a

21  constant, but the current density in the windings is going up

22  dramatically while the size is getting small.  So, it's a

23  couple set of issues that we had only established up to a

24  lower level.

25     Question:  "That being approximately 10 T level?

1        You answered:  "Yes."

2        That was your testimony, right?

3    A.   Yes.

4    Q.   Weak focusing was an important consideration in the

5    design, correct?

6    A.   There are -- for a synchrocyclotron there are two

7    fundamental characteristics that you need to establish and

8    that is that you have sort of -- because it's weak focusing,

9    you have to have a continuously from the center outward.  You

10   can't really tolerate any de-focusing and you have to

11   establish phase stability.  There are various ways of stating

12   phase stability, but the one I like the best is that you have

13   more voltage available than you need to accelerate the ions.

14   Q.   Thank you.

15        If I could get you to go to Exhibit 109.

16   A.   All right.  I'm there.

17   Q.   Does Exhibit 109 appear to be an email and an attachment

18   that you sent to Ken Gall on July 2nd, 2004?

19   A.   Yes.

20   Q.   Did you prepare the general requirements document that

21   was attached here?

22   A.   Yes.

23   Q.   What was the purpose of this document?

24   A.   The purpose is sort of severalfold.  First is that this

25   kind of engineering is really expensive and you really want to

1    do that, you know, in a careful way and you're going to have a

2    -- in the way this project was coming together, a distributed

3    team and you needed one overarching document.  That's what a

4    general requirements document is, that defines all of the

5    characteristics that you would need to validate the system

6    later once it was built.  And so, then you try to design to

7    that set of requirements, conduct reviews to that set of

8    requirements, do testing to them, and so forth.

9    Q.   Okay.  Can I get you to turn to Page 6 of the

10   attachment, which is Section 3.4, "Acceleration."

11   A.   Yes.

12   Q.   Does that show a starting and final frequency value?

13   A.   Let's see.  Yes, it does.

14   Q.   Were those values that you calculated?

15   A.   Yes.

16   Q.   Do you believe that these frequencies as calculated

17   would provide a stable beam output?

18   A.   Well, we're very early in the process.  We had just --

19   let's see the date of this.

20        Yes.  Sort of -- at that time what you're really doing

21   is you're trying to put down the best that you have to that

22   point, which is very, very early in the process, and what

23   you're really after is to see how many TBD's are left in the

24   document.  So, it's not -- and, anyway, a general requirements

25   document is not a statement that you think this will work.

1    This is a cut at what you think the properties are.

2    Q.   This --

3    A.   Other documents, the design system, design description,

4    and all the analysis do the validation.

5    Q.   So, is it fair to say that you don't know whether or not

6    those frequencies would have produced a stable beam output; is

7    that true?

8    A.   The range is roughly right both for -- both for the mass

9    swing and the relativistic -- you know, relativistic mass

10   swing and the weak focusing.  So, you know, they're roughly

11   right.

12   Q.   And this came about seven months after you had written

13   down your scaling law; is that true?

14   A.   Yes.

15   Q.   Thank you.

16        Go to Exhibit 1.

17        SPECIAL MASTER PETERSON:  Well, let me just ask, why

18   did it take seven months to come up with these values after

19   you had the scaling law?

20        DR. ANTAYA:  Oh, actually, that's a really important

21   question.

22        So, the first thing that you have to understand is

23   what I was trying to do.  So, we knew that we -- so, in the

24   ramp up in 2003 and 2004, I was really involved in most of the

25   discussions, including ways of funding the project.  To go

1    through the end, we really sort of needed late-stage funding,

2    but it appeared to inventors and others that such a large

3    step, that we wouldn't get that kind of funding.

4          So, what you wanted to -- what I was trying to do at

5    that time was find a way to cut to the chase.  That is, to not

6    say that one needed three million or four million to do the

7    beam dynamics, but to get an answer that, yeah, this cyclotron

8    would work quickly.  And so, through all of 2003, I'm thinking

9    about how to demonstrate, how to -- how to bypass all of the

10   orbit computations, and it was -- it was driven by two -- by

11   three things:

12         One, I didn't feel that anything we had done at MSU,

13   including the Harper machine that we mounted on a gantry for

14   -- and rotated 360 degrees around patients for radiotherapy,

15   and any of the work that we had done in the Wu thesis and the

16   other supporting papers had established the feasibility.

17         So, I had to answer the question, Could it really

18   work?  I was the only one that understood that question in

19   terms of the beam dynamics.

20         The second is that we weren't going to have a lot of

21   funds.  So, if we had some funds, Gall would have to split it

22   between getting his company started and spending some dollars

23   at MIT.

24         And, third, I knew that if we had some dollars at

25   MIT, we would -- we would want to try to quickly take

1   advantage of the resources of Joe Minervini's magnet team and

2   get a good answer.

3          So, the scaling law was settled for me.  So, the

4   question of how you get the same orbit shape -- that is, the

5   same --

6          COURT REPORTER:  I'm sorry, the same?

7          DR. ANTAYA:  The same nested set of equilibrium

8   orbits.  I'll slow down, I'm sorry.

9          COURT REPORTER:  No.  That was fine.

10         DR. ANTAYA:  -- was settled, but we had no funds to

11  work at MIT.

12         SPECIAL MASTER PETERSON:  All right.  Then let me

13  back up a little bit.

14         At this point was there a written agreement between

15  MIT and Mr. Gall or Mr. Gall's company?

16         DR. ANTAYA:  There was not.

17         SPECIAL MASTER PETERSON:  Was MIT being paid in any

18  form for the work that you were doing?

19         DR. ANTAYA:  It was not.

20         SPECIAL MASTER PETERSON:  And I guess I need to,

21  then, make clear for the record that the seven months from the

22  time of your -- you developing these equations until the

23  numbers that we saw on the previous exhibit, during those

24  seven months -- well, I'll just ask the question.

25         Were you working on this project full time on behalf

1    of Mr. Gall?

2            DR. ANTAYA:  No, I was not.  We were not officially

3    working on the project until around the beginning of June of

4    2004.  And so, I had been working on it, essentially, in my

5    spare time.

6            SPECIAL MASTER PETERSON:  Okay.

7            DR. ANTAYA:  I was paid to do other things at MIT and

8    I was doing those other things.

9            SPECIAL MASTER PETERSON:  Let me understand.

10           What I heard you say in response to the question a

11   couple of times -- a couple of questions ago when you were

12   looking at funding, et cetera, what I heard you say is this

13   was something you were not getting paid for.  And so, you

14   weren't working on this project until you knew there was money

15   to pay MIT and I guess -- and then you or funds dedicated to

16   your department.

17           DR. ANTAYA:  I couldn't use legally or ethically

18   sponsored research resources from other projects on this,

19   which meant that I couldn't, you know, involve engineers, ask

20   them to do work, or those kinds of things.  So, we couldn't

21   work on it officially and charge time to it, but I could work

22   on it, you know, separately.

23           SPECIAL MASTER PETERSON:  All right.  In your

24   position at MIT -- in fact, I don't even know what that was

25   and I don't need to know, but in your position at the MIT, was

1     this a salaried position or was this a position that you were

2     expecting to get research dollars and then support your salary

3     and anybody else in your department off those research

4     dollars?

5             DR. ANTAYA:  It was -- my position was a salaried

6     position, sponsored research, you know.  Engineer is what it

7     was.  And we were responsible for paying our own way.

8             SPECIAL MASTER PETERSON:  Getting research dollars to

9     offset your salary?

10            DR. ANTAYA:  Yes.  At that particular time I wasn't

11    officially.  Joe Minervini was responsible for getting those

12    research dollars, but, yes, essentially.

13            SPECIAL MASTER PETERSON:  All right.

14            Mr. Hill, I'm sorry.  You can certainly cross-examine

15    on any of those questions.

16            MR. HILL:  I'll move on, your Honor.

17    Q.   (By Mr. Hill)  We were returning to Exhibit 1.

18    A.   I think I have it.

19    Q.   You don't dispute that this was an email that Ken Gall

20    -- I'm sorry, let me rephrase that.

21            You don't dispute that this includes an email that Ken

22    Gall sent to you on January 23rd, 2003; is that right?

23    A.   I do not.

24    Q.   And you responded, in fact, a few hours later on the

25    same date and you wrote, in part, "Your spec requirements for

1    extracted beam are going to make this very straightforward,

2    which is good because it will be a step in other spaces."  Is

3    that true?

4    A.   Yes.

5    Q.   I need you to go to Exhibit 629.  Ms. Christo will help

6    you get to that one.  I'm sure it's a different binder.

7         (Pause.)

8    Q.   And, in particular, if I could get you to turn to the

9    page number at the bottom MIT8819.

10   A.   Yes.

11   Q.   From that page to 8824, are those notes that you made on

12   May 8th, 2004?

13   A.   No.  They appear to be made May 4th, not May 8th.

14   Q.   I'm sorry, I had the date mistranscribed here.

15        May 4th, 2004; is that right?

16   A.   Yes.

17   Q.   There's no record of you sharing these notes with Ken

18   Gall; isn't that true?

19   A.   I don't know whether there is or not.  I haven't looked

20   myself.

21   Q.   You don't recall having seen any emails or anything

22   where you sent this to Ken Gall; is that true?

23   A.   I haven't looked, but I -- I certainly don't recall -- I

24   can't say one way or the other.

25   Q.   But you did search for all documents related to the

1    subject matter of this case and produced those to counsel,

2    right?

3     A.   Yes.

4     Q.   The question posed at the top is, "Can I build this

5    magnet?"  Is that something you wrote?

6     A.   Yes.

7     Q.   And then on Page 8822, you have a notation there about,

8    "The present situation;" is that right?

9     A.   Yes.

10     Q.   And then you gave two points under, "The present

11    situation."  Could you please read those into the record.

12     A.   Could you -- I'm sorry, Russ.  Could you repeat the

13    question?

14     Q.   Sure.  You have points one and two underneath where it

15    says, "The present situation"?

16     A.   Okay.  Yes.

17     Q.   And I would like you to read both of those points into

18    the record, please.

19     A.   Sure.  Page 4, "Present situation:"  Bullet number one,

20    "Have known sound basis for the required magnet configuration

21    of appropriate tools to address the key issues that arise

22    extending the design to 9.5 tesla."

23          Number two, "Have a sound basis for 5.5 tesla

24    superconducting" -- "for 5.5 tesla superconducting magnet-

25    based synchrocyclotron design in a methodology worked out for

1   using modern cyclotron codes extend the basis to 9.5 tesla."

2   Q.   Could you go back two pages to 8820, please.

3   A.   Yes.

4   Q.   There's a sentence at the bottom.  It says, "Possible

5   two," and then there's a strike-out.  Could you read that

6   sentence into the record, please.

7   A.   Yes.  "Possible, have high confidence in tools that one

8   can build completed cyclotron design based on sound practice."

9   Q.   Then go to Page 8823, please.

10  A.   Yes.

11  Q.   You wrote there, "Orbit scaling is straightforward,"

12  correct?

13  A.   Yes.

14  Q.   Then you wrote, "Magnet scaling is straightforward,"

15  correct?

16  A.   Yes.

17  Q.   And then go to Page 8824, please.

18  A.   Okay.

19  Q.   And can you read what you wrote at the top there.

20  A.   "This is not a technical feasibility so much as

21  execution."

22  Q.   Thank you.

23       Before you met Dr. Gall, you had never designed a

24  synchrocyclotron before, correct?

25  A.   No.  No one had.

1    Q.   Did I hear you correctly, no one had designed a
2    synchrocyclotron?
3    A.   I thought you said -- oh, I'm sorry -- superconducting
4    synchrocyclotron.   Sorry.
5         I had not designed a synchrocyclotron.
6    Q.   In fact, when Dr. Gall first approached you and said he
7    wanted to have a synchrocyclotron mounted on a gantry, you
8    suggested that you perform a study whether an isochronous
9    cyclotron would work; isn't that true?
10   A.   That I can't recall.
11   Q.   Dr. Gall did mention to you that he had done a study
12   already and decided to use a synchrocyclotron rather than a
13   isochronous cyclotron, right?
14   A.   What I recall is that he had looked at the Wu thesis and
15   had decided to do a synchrocyclotron.   I don't recall anything
16   about an isochronous machine.
17   Q.   Do you remember that he sent to you an email with a
18   spreadsheet attached to it that he indicated was his
19   calculations?
20   A.   He did not.   I don't think there's ever any email with
21   his spreadsheet calculation.
22   Q.   Go to Exhibit 3, please.   Can you turn to Exhibit 3.   Do
23   you have that handy?
24   A.   Okay.   I'm at three.
25   Q.   I believe we went through this in your deposition.   This

1    was an email that you believed that you received from Dr.

2    Gall, correct?

3    A.   It looks to be the case, yes.

4    Q.   And he starts off, "Thanks for the update.  I wrote a

5    spreadsheet attached sometime ago."  And it goes on from

6    there.  Do you see that?

7    A.   Yes.

8    Q.   Now, at your deposition you didn't dispute having

9    received the spreadsheet, but you didn't tell me that you

10   never looked at the spreadsheets of others; isn't that right?

11   A.   So, a minute ago when you were asking me, I thought you

12   were -- you were referring to the earlier time in early 2003.

13   So, my answer was that I don't recall a spreadsheet from early

14   2003 because that's where we were, I believe, in time in the

15   discussion.

16        Yes, you're right, he sent me this email.  It probably

17   had a spreadsheet attached to it, and I wouldn't have looked

18   at it.

19   Q.   And this was before you wrote down in your notebook your

20   scaling law; is that correct?  The date of this email.

21   A.   The scaling law I worked on through all of 2003.  Yes, I

22   think it was codified in December of 2003, yes.

23   Q.   Thank you.

24        Go to Exhibit 10, please.

25   A.   All right.  I'm at ten.

1    Q.   Can you tell us what Exhibit 10 represents?

2    A.   Exhibit 10 is a roughly-to-scale engineering sketch of

3    what I would call a controlled central region that did phase

4    base selection, including a high-field ion source with dee

5    tips and a dummy dee, yes.

6    Q.   And you made some errors in mathematics on this,

7    correct?

8    A.   Yes.  There's a -- so, the purpose of this stretch was

9    to start to articulate central region design, you know.  So,

10   you're trying to get all the features in it.  In the margin on

11   the left there's a computation of the orbit radius.  It has an

12   arithmetic error in it, yes.

13   Q.   If I can get you to go to Exhibit 30, please.

14   A.   All right.  I'm at 30.

15   Q.   And is this an email that you sent to Ken Gall?

16   A.   Yes.

17   Q.   In the paragraph that starts, "Showing me the textbook

18   worked out criteria."  Do you see that paragraph?

19   A.   Yes.

20   Q.   The last sentence in that you wrote, "With all this, I

21   don't expect to create any new science, but I do not wish to

22   repeat old errors," exclamation point, correct?

23   A.   Yes.

24   Q.   Go to Exhibit 31, please.

25   A.   I am there.

1    Q.   There's a quote attributed to you near the bottom of the

2    first page.  It says, "Antaya recalled"?

3    A.   Yes.

4    Q.   And the quote states, "He had a good idea for a single-

5    room proton treatment facility, but hadn't found anyone who

6    thought it was possible to build"?

7    A.   Yes.

8    Q.   That's a quote that you gave, correct?

9    A.   I can't say whether it is or not because this is not my

10   -- not my writing.  So, someone may have -- yes.

11   Q.   Do you agree with what is stated there?

12   A.   It's a -- yeah, it's a generalized statement that is --

13   I don't know.  Don't have an opinion of it.

14   Q.   Okay.  Let's go to Exhibit 39, which I believe you

15   wrote.

16   A.   All right.  Yes.

17   Q.   You have a -- it looks like an email from you that is

18   included in this, dated June 5th, 2006, and it's to Ken, Earl

19   and Mark.  Do you see that?

20   A.   Yes.

21   Q.   In this email you wrote the following:  "A stranger came

22   into my office.  Made a very compelling case for a single-room

23   synchrocyclotron.  Our experience with other start-ups jive

24   very well with that and once we can see a technology path, we

25   said we thought that he" -- "he has finally gotten it all

```
 1    right and that we could help make that happen."  That's what
 2    you wrote there, correct?
 3     A.   Yes.
 4     Q.   Thank you.
 5          MR. HILL:  No further questions at this time.
 6          SPECIAL MASTER PETERSON:  All right.  Any redirect?
 7          MS. DEVARASETTY:  Yes, your Honor, but as I'm looking
 8    at -- it's 12:20.  Would you like to recess or should I
 9    continue?
10          SPECIAL MASTER PETERSON:  How much redirect do you
11    think you're going to have?
12          MS. DEVARASETTY:  More than ten minutes, less than a
13    half an hour.
14          SPECIAL MASTER PETERSON:  All right.  Let's take our
15    noon recess, then.  One hour I assume will be sufficient for
16    everyone.  We'll start up again at 1:20.
17          Before we break, let me just -- if over the break or
18    perhaps right now, if the parties could let the reporter know
19    about your wishes for a transcript, if you're ordering a
20    transcript, if you need any special treatment, so we can get
21    that under process.
22          All right.  Anything before we take our recess?
23          MR. HILL:  Not from our side.
24          SPECIAL MASTER PETERSON:  All right.  We stand in
25    recess until 1:20.
```

1          (First session adjourned, 12:22 p.m.)

2

3

4                    C E R T I F I C A T E

5          I, Catherine A. Handel, Official Court Reporter of

6    the United States District Court, do hereby certify that the

7    foregoing transcript, from Page 1 to Page 139, constitutes to

8    the best of my skill and ability a true and accurate

9    transcription of my stenotype notes taken in the matter of

10   Civil Action No. 10-12186-RWZ, Massachusetts Institute of

11   Technology vs. Mevion Medical Systems, Inc.

12

13   March 5, 2012          /s/ Catherine A. Handel
     Date                   Catherine A. Handel, RPR-CM, CRR
14

15

16

17

18

19

20

21

22

23

24

25